# EXHIBIT A

**Proposed Interim Approval and Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| 540 WEST 21ST STREET HOLDINGS LLC,[1] | ) | |
| | ) | Case No. 23-11053 (MFW) |
| Debtor. | ) | |
| | ) | Related Docket No. _____ |

**ORDER (I) CONDITIONALLY APPROVING SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN FOR SOLICITATION PURPOSES ONLY ON SHORTENED NOTICE, (II) ESTABLISHING PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT COMBINED DISCLOSURE STATEMENT AND PLAN, (III) APPROVING THE FORM OF BALLOT AND SOLICITATION MATERIALS, (IV) ESTABLISHING VOTING RECORD DATE, (V) FIXING THE DATE, TIME AND PLACE FOR THE CONFIRMATION HEARING AND THE DEADLINE FOR FILING OBJECTIONS THERETO, AND (VI) APPROVING RELATED SHORTENED NOTICE PROCEDURES**

Upon consideration of the *Debtor's Motion for Order (I) Approving Adequacy of Disclosures in Combined Disclosure Statement and Plan on Interim Basis, (II) Scheduling Confirmation Hearing and Objection Deadline, (III) Establishing Procedures for Solicitation and Tabulation of Votes, (IV) Approving Form of Ballot and Solicitation Package, and (V) Approving Notice* (the "**Motion**"); and upon consideration of the Motion and all pleadings related thereto, including the statements of counsel and evidence proffered at the hearing on the Motion, if a hearing is required; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing on the Motion establish just cause for the relief granted herein;

### THE COURT HEREBY FINDS AS FOLLOWS:

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S. C. § 157(b)(2).

---

[1]      The Debtor is the following entity (the last four digits of its taxpayer identification number follows in parentheses): 540 West 21st Street Holdings LLC (1133).  The Debtor's noticing address in this Chapter 11 case is c/o Bryan Cave Leighton Paisner LLP, Attn: Andrew E. Auerbach, 1290 Avenue of the Americas, New York, NY 10104-3300.

3.     Notice of the Motion and the hearing on the Motion was sufficient and proper under the circumstances and complied with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.[2]

4.     The relief requested in the Motion and granted herein is warranted under the circumstances and is in the best interests of the Debtor, its estate, and creditors.

5.     The forms of ballots attached hereto as Exhibit 1 (the "***Ballots***"): (i) are consistent with Official Form No. 314, (ii) adequately address the particular needs of the Chapter 11 Case, (iii) are appropriate for the Voting Classes, and (iv) comply with Bankruptcy Rule 3017(d).

6.     Ballots need not be provided to holders of Claims in the Non-Voting Classes (Classes 1, 6, 7, 8 and 9) because they are either Unimpaired and conclusively presumed to have accepted the Plan or Impaired and conclusively presumed to have rejected the Plan in accordance with Section 1126(f) and (g).

7.     The period during which the Debtor may solicit votes to accept or reject the Plan, as established by this Order, provides sufficient time for Claimholders to make informed decisions to accept or reject the Plan and submit their Ballots in a timely fashion.

8.     The Tabulation Procedures for the solicitation and tabulation of votes to accept or reject the Plan, as approved herein, provide a fair and equitable voting process and are consistent with Section 1126.

9.     The contents of the Solicitation Packages (*as defined below*) and the procedures for providing notice of the final hearing on approval of the Combined Disclosure Statement and Plan and the other matters set forth in the Confirmation Hearing Notice comply with Bankruptcy Rules

---

[2]     Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

2002 and 3017 and constitute sufficient notice to all interested parties in accordance with Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

**IT IS HEREBY FOUND AND DETERMINED THAT:**

10.     The Motion is GRANTED as set forth herein.

11.     The Combined Disclosure Statement and Plan is conditionally approved for solicitation purposes only on an interim basis and the following deadlines are approved:

| DESCRIPTION | DEADLINE |
|---|---|
| Voting Procedures Hearing Objection Deadline | October 13, 2023 at 4:00 p.m. (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | October 17, 2023 at 10:30 a.m. (ET) |
| Voting Record Date | The date of entry of the Interim Approval and Procedures Order |
| Solicitation Commencement Date | Within two (2) business days after entry of the Interim Approval and Procedures Order |
| Deadline for Creditors to File Rule 3018 Motions | October 27, 2023 at 4:00 p.m. (ET) |
| Deadline for Debtor to Respond to Rule 3018 Motions | November 3, 2023 at 4:00 p.m. (ET) |
| Hearing on Rule 3018 Motions | November 15, 2023 at 10:30 a.m. (ET) |
| Voting Deadline for the Combined Disclosure Statement and Plan | November 15, 2023 at 4:00 p.m. (ET) |
| Combined Disclosure Statement and Plan Objection Deadline | November 15, 2023 at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Disclosure Statement and Plan | November 17, 2023 at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | November 17, 2023 at 4:00 p.m. (ET) |

12.     The Ballots substantially in the form attached hereto as <u>Exhibit 1</u> are approved.  The Ballots shall be distributed to the Claimholders in the Voting Classes entitled to vote to accept or reject the Plan.

4894-3315-1109, v. 1

13.     In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered, by either mail, overnight delivery, or personal delivery so they are actually received no later than **4:00 p.m. (*prevailing* Eastern Time), on November 15, 2023** (the "***Voting Deadline***").  Ballots transmitted by facsimile or electronic mail will not be counted.

14.     For the purposes of voting on the Plan, each Claimholder must (i) have filed a proof of claim or (ii) be identified on the Schedules and not listed as disputed, contingent or unliquidated as to amount.  The foregoing is subject to further order of this Court to the extent a party moves for temporary allowance of its Claims in an amount which is different from the amount that otherwise would apply to such Claim under the foregoing.

15.     The following procedures shall be utilized in tabulating the Ballots (the "***Tabulation Procedures***"):

(a)     any Ballot received after the Voting Deadline, unless the Court grants an extension to the Voting Deadline with respect to such Ballot;

(b)     any Ballot that is illegible or contains insufficient information;

(c)     any Ballot cast by a Person or Entity that does not hold a Claim in the Class that is entitled to vote to accept or reject the Combined Disclosure Statement and Plan;

(d)     any Ballot cast for a Claim designated as unliquidated, contingent, or disputed or as zero (0) or unknown in amount and for which no Rule 3018(a) motion has been filed by the Rule 3018(a) motion deadline;

(e)     any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Combined Disclosure Statement and Plan or that indicates both acceptance and rejection of the Combined Disclosure Statement and Plan;

(f)     simultaneous duplicative Ballots voted inconsistently;

(g)     Ballots partially rejecting and partially accepting the Combined Disclosure Statement and Plan;

(h)   any Ballot received other than the official form sent by the Claims and Balloting Agent;

(i)   any unsigned ballot; or

(j)   any ballot that is submitted by facsimile.

16.   Upon completion of the balloting, the Balloting Agent will certify (i) the amount and number of allowed Claims of the Voting Classes accepting or rejecting the Combined Disclosure Statement and Plan, and (ii) details regarding Ballots received but not counted by the Balloting Agent because of defects or any other reason. The Debtor shall cause such certification to be served on the DIP Lender and the United States Trustee and filed with the Court no later than two (2) Business Days prior to the hearing on the final approval of the Combined Disclosure Statement and Plan.

17.   If any Claimholder seeks to challenge the allowance of its Claim for voting purposes in accordance with the Tabulation Procedures, such Claimholder must file a motion, pursuant to Bankruptcy Rule 3018(a) for an order temporarily allowing its Claim in a different amount or classification for purposes of voting to accept or reject the Combined Disclosure Statement and Plan (a "***Rule 3018 Motion***") and serve the Rule 3018 Motion on the Debtor so that it is received no later than **4:00 p.m. (*prevailing* Eastern Time), on October 27, 2023**. The Debtor shall then (a) have until **4:00 p.m. (*prevailing* Eastern Time), on November 3, 2023** to file and serve any response to such Rule 3018 Motions, and (b) coordinate with the Court to adjudicate and resolve all pending Rule 3018 Motions prior to the Confirmation Hearing. Any Ballot submitted by a Claimholder that files a Rule 3018 Motion shall be counted solely in accordance with the Tabulation Procedures and the other applicable provisions of this Order unless and until the underlying Claim or Equity Interest is temporarily allowed by the Court for voting purposes in a different amount, after notice and a hearing.

4894-3315-1109, v. 1

18.     The final hearing on the approval of the Combined Disclosure Statement and Plan is hereby scheduled for **November 20, 2023 at 11:00 a.m. (*prevailing* Eastern Time)**.  The hearing on the final approval of the Combined Disclosure Statement and Plan may be continued from time to time by the Court without further notice other than the announcement of the adjourned date(s) at the final hearing on the approval of the Combined Disclosure Statement and Plan or any continued hearing.

19.     Objections to confirmation of the Combined Disclosure Statement and Plan Hearing on any ground including adequacy of disclosure, if any, must: (i) be in writing; (ii) be filed with the Court and served on: (a) counsel for the Debtor; (b) the United States Trustee; and (c) counsel for the DIP Lender so that they are received no later than **4:00 p.m. (*prevailing* Eastern Time), on November 15, 2023** (the "***Confirmation Objection Deadline***").

20.     The Confirmation Hearing Notice in substantially the form attached hereto as Exhibit 2 is APPROVED.  The Debtor shall serve the Confirmation Hearing Notice on: (i) all parties filing a Notice of Appearance and Request for Service pursuant to Bankruptcy Rule 2002 in this Chapter 11 Case, (ii) state and local taxing authorities for jurisdictions in which the Debtor conducted business, (iii) the Internal Revenue Service, (iv) the United States Trustee, and (v) all creditors listed on the Debtor's Schedules and Statements or who have filed a proof of claim, no later than two (2) business days after the entry of the Interim Approval and Procedures Order.

21.     The Publication Notice in substantially the form attached hereto as Exhibit 3 is APPROVED.  The Debtor shall publish the Publication Notice in one or more national or regional newspapers, in its discretion, not less than seven days prior to the Confirmation Objection Deadline, and the adequacy and sufficiency of such publication notice is hereby approved.

4894-3315-1109, v. 1

22.     Pursuant to Bankruptcy Rule 3017(d), the date on which this Order is entered shall be the record date for purposes of determining which holders of Claims are entitled to receive Solicitation Packages and, where applicable, vote on the Combined Disclosure Statement and Plan (the "***Record Date***").

23.     The Balloting Agent shall mail or transmit Solicitation Packages no later than two (2) business days after the entry of the Interim Approval and Procedures Order to the Voting Classes containing copies of: (a) the Confirmation Hearing Notice; (b) a copy of this Order; (c) a copy of the Combined Disclosure Statement and Plan; and (d) a form of Ballot (collectively, the "***Solicitation Package***").  The Debtor shall also serve copies of the Solicitation Package (excluding the Ballot and a copy of the Combined Disclosure Statement and Plan) on (i) all parties who have filed requests for notice in the Chapter 11 Case on or before the Record Date; (ii) counsel for the DIP Lender; and (iii) the U.S. Trustee.

24.     The Debtor is authorized to make non-substantive and ministerial changes to any documents in the Solicitation Package without further approval of the Court prior to its dissemination, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Combined Disclosure Statement and Plan and any other materials included in the Solicitation Package prior to their distribution.

25.     Objections to (a) the Tabulation Procedures, (b) the form of Confirmation Hearing Notice to be provided to the Debtor's creditors and interest holders, and (c) the form of Ballot which will be provided to Voting Classes for voting on the Plan that are not made at the time of the hearing on the Motion shall not be considered at the time of the Combined Hearing.

26.     The Debtor is authorized to take or refrain from taking any action necessary or appropriate to implement the terms of, and the relief granted in, this Order without seeking further order of the Court.

27.     The Court shall retain jurisdiction as to all matters relating to the interpretation, implementation, and enforcement of this Order.

28.     This Order is effective immediately upon entry.

4894-3315-1109, v. 1

# EXHIBIT 1

## Ballots

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                    )

540 WEST 21ST STREET HOLDINGS LLC,[1]

Debtor.

)
)    Chapter 11
)
)    Case No. 23-11053 (MFW)
)
)
)

### Ballot for Accepting or Rejecting the Second Amended
### Combined Disclosure Statement and Plan

       This Ballot is submitted to you by the above-captioned debtor and debtor in possession (the "***Debtor***") to solicit your vote to accept or reject the Second Amended Combined Disclosure Statement and Plan [Docket No. ___], dated _____, 2023 (the "***Combined Disclosure Statement and Plan***"). Capitalized terms used in this Ballot and not otherwise defined have the meanings given to them in the Combined Disclosure Statement and Plan or the Bankruptcy Court's Order approving the Combined Disclosure Statement and Plan [Docket No. ___], entered on [DATE] (the "***Interim Approval and Procedures Order***").

       You should review the Combined Disclosure Statement and Plan before you vote. **Copies of the Combined Disclosure Statement and Plan and the Interim Approval and Procedures Order are available for review without charge at the website maintained by the Claims and Noticing Agent, https://cases.stretto.com/540West21st or by calling _____.** You may wish to seek legal advice concerning the Combined Disclosure Statement and Plan and your classification and treatment under the Combined Disclosure Statement and Plan.

       **If your Ballot is not received by the Balloting Agent on or before 4:00 p.m. (*prevailing Eastern Time*), on _____, 2023, and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Combined Disclosure Statement and Plan.**

       If the Combined Disclosure Statement and Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote. To have your vote counted, you must complete, sign and return this Ballot to the Claims and Noticing Agent so that is received by the deadline indicated above at the following address:

| If by Regular Mail: | If by Hand Delivery or Overnight Mail: |
|---|---|
| Attn: | Attn: |

---

[1]    The Debtor is the following entity (the last four digits of its taxpayer identification number follows in parentheses): 540 West 21st Street Holdings LLC (1133). The Debtor's noticing address in this Chapter 11 case is c/o Bryan Cave Leighton Paisner LLP, Attn: Andrew E. Auerbach, 1290 Avenue of the Americas, New York, NY 10104-3300.

YOU SHOULD CAREFULLY READ AND FOLLOW THE VOTING INSTRUCTIONS SET FORTH IN SECTION VI OF THE COMBINED DISCLOSURE STATEMENT AND PLAN BEFORE COMPLETING AND RETURNING THIS BALLOT.

Your claim has been placed in Class 2, 3, 4, or 5 under the Combined Disclosure Statement and Plan. You have a right to: (i) vote to accept or reject the Combined Disclosure Statement and Plan as provided in Item 2 below; and (ii) opt in to the Releases by Holders of Claims Against the Debtor under Article XI.IV of the Combined Disclosure Statement and Plan (the "Releases") in Item 3 below.

**Item 1. Amount of Claim.** The undersigned is a holder of a Class 2 (First Lien Claims), 3 (DZ Claims), 4 (General Unsecured Trade Claims), or 5 (Disputed Investor Claims) Claim in the unpaid principal amount of Dollars:

$ _____

**Item 2. Vote.** The owner of the Claim set forth in Item 1 votes (please check only one box):

[ ] To Accept the Combined Disclosure Statement and Plan
[ ] To Reject the Combined Disclosure Statement and Plan

**Item 3. Releases.**

[ ] The undersigned, elects to opt in to the Releases by Holders of Claims Against the Debtor under Article XI.IV of the Combined Disclosure Statement and Plan.

**Item 4. Certifications.** By signing this Ballot, the undersigned certifies: (a) no other Ballot has been cast with respect to the Claim identified in Item 1, and that to the extent any such Ballot has been cast, such earlier Ballots are hereby revoked; (b) the undersigned was aware a copy of the Disclosure Statement relating to the Combined Disclosure Statement and Plan was available for review and to the extent the undersigned wanted to do so and has reviewed the Combined Disclosure Statement and Plan; (c) as the Record Holder of the Claim set forth in Item 1, the undersigned has full power and authority to vote to accept or reject the Combined Disclosure Statement and Plan. The undersigned also acknowledges that this solicitation is subject to all the terms and conditions set forth in the Combined Disclosure Statement and Plan, and that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned hereunder shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

| | |
|---|---|
| Dated: | Street Address: |
| Signature: | |
| Name of Voter: | City, State, Zip Code: |

| | |
|---|---|
| Title: | |
| Social Security or Tax I.D. No.: | |
| | Telephone Number: |

# **EXHIBIT 2**

**Confirmation Hearing Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | )    Chapter 11 |
| 540 WEST 21ST STREET HOLDINGS LLC,[1] | ) |
| | )    Case No. 23-11053 (MFW) |
| Debtor. | ) |
| | ) |

## NOTICE OF (I) PLAN VOTING DEADLINE, (II) PLAN CONFIRMATION/ DISCLOSURE STATEMENT HEARING AND (III) CERTAIN RELATED MATTERS

### PLEASE TAKE NOTICE OF THE FOLLOWING:

On _____, 2023, the above-captioned debtor and debtor in possession (the "***Debtor***") filed the Second Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation (the "***Combined Disclosure Statement and Plan***"). Pursuant to an Order dated [_____ \_\_, 2023] (the "***Interim Approval and Procedures Order***"), the Bankruptcy Court conditionally approved the Combined Disclosure Statement and Plan for solicitation purposes only.

A combined hearing to consider the Combined Disclosure Statement and Plan (the "***Combined Hearing***") will be held before the Honorable Mary F. Walrath, United States Bankruptcy Judge, United States Bankruptcy Court, Fifth Floor, Courtroom No. 4, **on [_____, 2023 at 10:30 a.m. (*prevailing* Eastern Time)]**.

Objections to confirmation of the Combined Disclosure Statement and Plan, including any objection to the adequacy of the disclosures if any, must: (a) be in writing; (b) state the name and address of the objecting party and the nature of the Claim of such party; and (c) be filed with the

---

[1] The Debtor is the following entity (the last four digits of its taxpayer identification number follows in parentheses): 540 West 21st Street Holdings LLC (1133). The Debtor's noticing address in this Chapter 11 case is c/o Bryan Cave Leighton Paisner LLP, Attn: Andrew E. Auerbach, 1290 Avenue of the Americas, New York, NY 10104-3300.

Court and served so as to be actually received by the following parties by **4:00 p.m. (*prevailing Eastern Time) on _____, 2023**:

i.   co-counsel for the Debtor, *Chipman Brown Cicero & Cole, LLP*, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (Attn: William E. Chipman, Jr chipman@chipmanbrown.com);

ii.  co-counsel for the Debtor, *Bryan Cave Leighton Paisner LLP*, 161 N. Clark Street, Suite 4300, Chicago, Illinois 60602 (Attn: Jason J. DeJonker Jason.DeJonker@bclplaw.com and William S. Hackney William.Hackney@bclplaw.com);

iii. counsel to the DIP Lender, Ray New York LLC c/o of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Jennifer Rodburg and Andrew Minear, email: Jennifer.Rodburg@friedfrank.com and Andrew.Minear@friedfrank.com);

iv.  counsel to Purchaser 550W21 Owner LLC, c/o Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Christopher Robertson and Eli J. Vonnegut, email: Christopher.robertson@davispolk.com and eli.vonnegut@davispolk.com); and

v.   the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Timothy J. Fox Timothy.Fox@usdoj.gov).

The Debtor reserves the right to file a consolidated reply to any such objection no later than _____, 2023.

Pursuant to the Interim Approval and Procedures Order, the Bankruptcy Court approved the use of certain materials in the solicitation of votes to accept or reject the Combined Disclosure Statement and Plan and certain procedures for the tabulation of votes to accept or reject the Combined Disclosure Statement and Plan.  If you are a holder of a Claim against the Debtor as of [_____, 2023] (the "***Record Date***") and entitled to vote, you have received with this Notice a ballot form (a "***Ballot***") and instructions for completing the Ballot.

For a vote to accept or reject the Combined Disclosure Statement and Plan to be counted, the holder of a Ballot must complete all required information on the Ballot, execute the Ballot and

return the completed Ballot in accordance with the instructions so that it is received by **4:00 p.m., (***prevailing* Eastern Time), on [_____, 2023]** (the "***Voting Deadline***").  Any failure to follow the instructions included with the Ballot or to return a properly completed Ballot so that it is received by the Voting Deadline may disqualify such Ballot and vote on the Combined Disclosure Statement and Plan.  The rules and procedures for the tabulation of the votes are outlined in the Interim Approval and Procedures Order.

If a holder of a Claim wishes to challenge the allowance or disallowance of a Claim for voting purposes under the Tabulation Procedures (as defined in the Interim Approval and Procedures Order), such entity must file a motion, pursuant to Bankruptcy Rule 3018(a), for an order temporarily allowing such Claim in a different amount or classification for purposes of voting to accept or reject the Combined Disclosure Statement and Plan and serve such motion on the undersigned counsel to the Debtor so that it is received no later than **4:00 p.m. (***prevailing* Eastern Time), on [_____, 2023]**. The Debtor shall have until [_____, 2023] to file and serve any responses to such motions.  Unless the Court orders otherwise, such Claim will not be counted for voting purposes in excess of the amount determined in accordance with the Tabulation Procedures.

## Important Dates

| DESCRIPTION | DEADLINE |
|---|---|
| Voting Procedures Hearing Objection Deadline | _____, 2023 at ___:00 p.m. (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | _____, 2023 at ___: a.m. (ET) |
| Voting Record Date | The date of entry of the Interim Approval and Procedures Order |
| Solicitation Commencement Date | Within two (2) business days after entry of the Interim Approval and Procedures Order |
| Deadline for Creditors to File Rule 3018 Motions | _____, 2023 at 4:00 p.m. (ET) |

4894-3315-1109, v. 1

| DESCRIPTION | DEADLINE |
|---|---|
| Deadline for Debtor to Respond to Rule 3018 Motions | _____, 2023 at 4:00 p.m. (ET) |
| Hearing on Rule 3018 Motions | _____, 2023 at ___: a.m. (ET) |
| Voting Deadline for the Combined Disclosure Statement and Plan | _____, 2023 at 4:00 p.m. (ET) |
| Combined Disclosure Statement and Plan Objection Deadline | _____, 2023 at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Disclosure Statement and Plan | _____, 2023 at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | _____, 2023 at 4:00 p.m. (ET) |
| Combined Hearing | _____, 2023 at ___ a.m. (ET) |

## Summary of Estimated Recoveries

The table below summarizes the classification and treatment of all classified Claims under the Combined Disclosure Statement and Plan. The estimated amounts of Allowed Claims set forth in the following table are based on the Debtor's books and records. Additionally, the recoveries available to Holders of Claims set forth below are estimates, and actual recoveries may materially differ based on the amount of Claims actually Allowed, among other things. Depending on the amount of Allowed Claims, the actual recoveries available to Holders of Allowed Claims could be materially lower compared to the estimates provided below.

| Class | Estimated Allowed Claims[2] | Treatment | Estimated Recovery to Holders of Allowed Claims[3] |
|---|---|---|---|

---

[2] These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise. The Debtor has not completed its analysis of Claims in the Chapter 11 Case, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[3] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Case, as well as the applicability of the Class 3 and Class 4 Carveouts. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries

| | | | |
|---|---|---|---|
| Class 1 – Other Secured Claims | $1,058,780.35 | Unimpaired | 100% |
| Class 2 – First Lien Claims | $85,000,000.00 | Impaired, entitled to vote | 88% |
| Class 3 – DZ Claims | $28,175,050.00 | Impaired, entitled to vote | Not less than 57% |
| Class 4 – General Unsecured Trade Claims | $3,500,000.00 | Impaired | 100% |
| Class 5 – Disputed Investor Claims | $[---] | Impaired | [---]% |
| Class 6 – Casco Claims | $0.00 | Impaired, deemed to reject | 0% |
| Class 7 – Intercompany Claims | $0.00 | Impaired, deemed to reject | 0% |
| Class 8 – Subordinated Claims | $0.00 | Impaired, deemed to reject | 0% |
| Class 9 – Equity Interests | $0.00 | Impaired, deemed to reject | 0% |

Except to the extent a Holder of an Allowed Claim agrees to a less favorable treatment, such Holder shall receive, under the Combined Disclosure Statement and Plan, the treatment described in Article V in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim.

Copies of the Combined Disclosure Statement and Plan and the Interim Approval and Procedures Order are available for review without charge at the website maintained by the Claims and Noticing Agent, https://cases.stretto.com/540West21st or by calling (855) 693-5106 (Toll Free).

Dated: _____, 2023
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

---

may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

4894-3315-1109, v. 1

/s/ William E. Chipman, Jr.

William E. Chipman, Jr. (No. 3818)
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
Telephone:     (302) 295-0193
Facsimile:     (302) 295-0199
Email:          Chipman@ChipmanBrown.com

-and-

**BRYAN CAVE LEIGHTON PAISNER LLP**
Jason J. DeJonker (Admitted *pro hac vice*)
William S. Hackney (Admitted *pro hac vice*)
161 N. Clark Street, Suite 4300
Chicago, IL 60602
Telephone:     (312) 602-5000
Facsimile:     (312) 602-5050
Email:          jason.dejonker@bclplaw.com
                william.hackney@bclplaw.com

*Co-Counsel to the Debtor and Debtor-in-Possession*

4894-3315-1109, v. 1

# EXHIBIT 3

## Publication Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| 540 WEST 21ST STREET HOLDINGS LLC,[1] | ) |
| | ) Case No. 23-11053 (MFW) |
| Debtor. | ) |
| | ) |

**NOTICE OF (I) PLAN VOTING DEADLINE, (II) PLAN CONFIRMATION/
DISCLOSURE STATEMENT HEARING AND (III) CERTAIN RELATED MATTERS**

PLEASE TAKE NOTICE THAT on October ___, 2023, the above-captioned debtor and debtor in possession (the "***Debtor***") filed the Second Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation (the "***Combined Disclosure Statement and Plan***"). Pursuant to an Order dated [_____ __, 2023] (the "***Interim Approval and Procedures Order***"), the Bankruptcy Court conditionally approved the Combined Disclosure Statement and Plan for solicitation purposes only. A combined hearing to consider the Combined Disclosure Statement and Plan (the "***Combined Hearing***") will be held before the Honorable Mary F. Walrath, United States Bankruptcy Judge, United States Bankruptcy Court, Fifth Floor, Court Room No. 4, **on [_____, 2023 at 10:30 a.m. (*prevailing* Eastern Time)]**. Objections to confirmation of the Combined Disclosure Statement and Plan, including any objection to the adequacy of the disclosures if any, must: (a) be in writing; (b) state the name and address of the objecting party and the nature of the Claim of such party; and (c) be filed with the Court and served so as to be actually received by the following parties by **4:00 p.m. (*prevailing* Eastern Time) on _____, 2023**:

i. counsel for the Debtor, *Chipman Brown Cicero & Cole, LLP*, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (*Attn*: William E. Chipman, Jr. chipman@chipmanbrown.com);

ii. co-counsel for the Debtor, *Bryan Cave Leighton Paisner LLP*, 161 N. Clark Street, Suite 4300, Chicago, Illinois 60602 (*Attn*: Jason J. DeJonker (Jason.DeJonker@bclplaw.com) and William S. Hackney (William.Hackney@bclplaw.com));

iii. counsel to the DIP Lender, Ray New York LLC c/o of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Jennifer Rodburg and Andrew Minear, email: Jennifer.Rodburg@friedfrank.com and Andrew.Minear@friedfrank.com);

iv. counsel to Purchaser 550W21 Owner LLC, c/o Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Christopher Robertson and Eli

---

[1] The Debtor is the following entity (the last four digits of its taxpayer identification number follows in parentheses): 540 West 21st Street Holdings LLC (1133). The Debtor's noticing address in this Chapter 11 case is c/o Bryan Cave Leighton Paisner LLP, Attn: Andrew E. Auerbach, 1290 Avenue of the Americas, New York, NY 10104-3300.

J. Vonnegut, email: Christopher.robertson@davispolk.com and eli.vonnegut@davispolk.com); and

v. the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Timothy J. Fox Timothy.Fox@usdoj.gov).

Pursuant to the Interim Approval and Procedures Order, the Bankruptcy Court approved the use of certain materials in the solicitation of votes to accept or reject the Combined Disclosure Statement and Plan and procedures to tabulate votes on the Combined Disclosure Statement and Plan. If you are a holder of a Claim against the Debtor as of [_____, 2023] (the "***Record Date***") and entitled to vote, you have received a ballot form (a "***Ballot***") and instructions for completing the Ballot. Ballots must be completed and returned in accordance with the instructions by **4:00 p.m., (*prevailing* Eastern Time), on [_____, 2023]** (the "***Voting Deadline***"). Failure to follow the instructions may disqualify such Ballot and vote. The following are important dates to note.

## Important Dates

| DESCRIPTION | DEADLINE |
|---|---|
| Voting Procedures Hearing Objection Deadline | _____, 2023 at ___:00 p.m. (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | _____, 2023 at ___: a.m. (ET) |
| Voting Record Date | The date of entry of the Interim Approval and Procedures Order |
| Solicitation Commencement Date | Within two (2) business days after entry of the Interim Approval and Procedures Order |
| Deadline for Creditors to File Rule 3018 Motions | _____, 2023 at 4:00 p.m. (ET) |
| Deadline for Debtor to Respond to Rule 3018 Motions | _____, 2023 at 4:00 p.m. (ET) |
| Hearing on Rule 3018 Motions | _____, 2023 at ___: a.m. (ET) |
| Voting Deadline for the Combined Disclosure Statement and Plan | _____, 2023 at 4:00 p.m. (ET) |
| Combined Disclosure Statement and Plan Objection Deadline | _____, 2023 at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Disclosure Statement and Plan | _____, 2023 at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | _____, 2023 at 4:00 p.m. (ET) |
| Combined Hearing | _____, 2023 at ___ a.m. (ET) |

4894-3315-1109, v. 1

Copies of the Combined Disclosure Statement and Plan and the Interim Approval and Procedures Order are available for review without charge at the website maintained by the Claims and Noticing Agent, https://cases.stretto.com/540West21st or by calling (855) 693-5106 (Toll Free).

Dated: _____, 2023
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
Telephone:     (302) 295-0193
Facsimile:      (302) 295-0199
Email:            Chipman@ChipmanBrown.com

-and-

**BRYAN CAVE LEIGHTON PAISNER LLP**
Jason J. DeJonker (Admitted *pro hac vice*)
William S. Hackney (Admitted *pro hac vice*)
161 N. Clark Street, Suite 4300
Chicago, IL 60602
Telephone:     (312) 602-5000
Facsimile:      (312) 602-5050
Email:            jason.dejonker@bclplaw.com
                     william.hackney@bclplaw.com

*Co-Counsel to the Debtor and Debtor-in-Possession*

# EXHIBIT B

## Combined Disclosure Statement and Plan

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| 540 WEST 21ST STREET HOLDINGS LLC,[1] | Case No. 23-11053 (MFW) |
| Debtor. | |

## SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF 540 WEST 21ST STREET HOLDINGS LLC

CHIPMAN BROWN CICERO & COLE LLP
William E. Chipman, Jr.
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:  (302) 295-0193
Email:  Chipman@ChipmanBrown.com

BRYAN CAVE LEIGHTON PAISNER LLP
Jason J. DeJonker
William S. Hackney
161 North Clark Street, Suite 4300
Chicago, Illinois  60601
Telephone: (312) 602-5000
Fax: (312) 602-5050
Email:   jason.dejonker@bclplaw.com
             william.hackney@bclplaw.com

---

[1] The Debtor is the following entity (the last four digits of its taxpayer identification number follows in parentheses): 540 West 21st Street Holdings LLC (1133).  The Debtor's noticing address in this Chapter 11 case is c/o Bryan Cave Leighton Paisner LLP, Attn: Andrew E. Auerbach, 1290 Avenue of the Americas, New York, NY 10104-3300.

**PLAN EXHIBIT**

Exhibit A:  Purchase and Sale Contract dated June 13, 2023

Exhibit B:  Liquidation Analysis

Exhibit C: Fourth Amended and Restated Limited Liability Company Operating Agreement of 540 West 21st Street Holdings LLC dated September 15, 2017

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION AND
COMPUTATION OF TIME ................................................................. 3

Section 1.1    Defined Terms. ...................................................................... 3
Section 1.2    Rules of Interpretation and Computation of Time. .............. 14

ARTICLE II. BACKGROUND ............................................................................... 14

Section 2.1    General Background. ............................................................ 14
Section 2.2    The Chapter 11 Case. ........................................................... 20
Section 2.3    Summary of Treatment of Claims and Equity Interests Under the Plan .............. 21
Section 2.4    Potential Claims and Causes of Action. ............................... 23
Section 2.5    Certain Federal Income Tax Consequences. ........................ 23
Section 2.6    Certain Risk Factors to Be Considered. ............................... 25
Section 2.7    Feasibility. ........................................................................... 25
Section 2.8    Best Interests Test and Alternatives to this Combined Plan and
Disclosure Statement. .......................................................... 26
Section 2.9    Releases by the Debtor. ........................................................ 27
Section 2.10   Bankruptcy Rule 9019 Settlement. ...................................... 27

ARTICLE III. UNCLASSIFIED CLAIMS ............................................................. 30

Section 3.1    Administrative Claims. ......................................................... 30
Section 3.2    Priority Tax Claims. ............................................................. 31
Section 3.3    Professional Fee Claims. ...................................................... 31
Section 3.4    DIP Facility Claims. ............................................................. 32
Section 3.5    Statutory Fees. ..................................................................... 32

ARTICLE IV. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ......................................................................................... 32

Section 4.1    Classification of Claims. ...................................................... 32
Section 4.2    Class Identification. ............................................................. 33
Section 4.3    Treatment and Voting Rights of Claims and Equity Interests. ............. 33
Section 4.4    Special Provision Governing Unimpaired Claims. ............... 37
Section 4.5    Voting; Presumptions; Solicitation. ...................................... 37
Section 4.6    Nonconsensual Confirmation. .............................................. 38
Section 4.7    Subordinated Claims. ........................................................... 38
Section 4.8    No Waiver. ........................................................................... 39

ARTICLE V. IMPORTANT DATES AND PROCEDURES ........................................................ 39

ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN......................................... 42

Section 6.1    DIP Facility.............................................................................................. 42
Section 6.2    Sources of Consideration for Plan Distribution. ...................................... 42
Section 6.3    Bankruptcy Rule 9019 Settlement. .......................................................... 42
Section 6.4    Reserve Fund. ........................................................................................... 43
Section 6.5    Sale............................................................................................................ 43
Section 6.6    The Plan Administration Process and Wind Down. ................................. 44
Section 6.7    Corporate Action....................................................................................... 45
Section 6.8    Vesting of Assets. ..................................................................................... 46
Section 6.9    Exemption from Certain Transfer Taxes and Recording Fees................... 46
Section 6.10   Effectuating Documents; Further Transactions. ...................................... 46
Section 6.11   Nonconsensual Confirmation.................................................................... 47
Section 6.12   Closing of the Chapter 11 Case. .............................................................. 47

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
              LEASES ................................................................................................... 47

Section 7.1    Assumption and Rejection of Executory Contracts and Unexpired Leases. ........ 47
Section 7.2    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ....... 48
Section 7.3    Contracts and Leases Entered into After the Petition Date................................... 49
Section 7.4    Insurance Policies. .................................................................................... 49
Section 7.5    Reservation of Rights................................................................................ 50
Section 7.6    Nonoccurrence of the Effective Date........................................................ 50

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 50

Section 8.1    Distribution on Account of Claims and Equity Interests Allowed as of the
              Effective Date. ......................................................................................... 50
Section 8.2    Distribution on Account of Claims and Equity Interests Allowed After the
              Effective Date. ......................................................................................... 51
Section 8.3    Timing and Calculation of Amounts to Be Distributed. ......................... 51
Section 8.4    Delivery of Distributions. ........................................................................ 51
Section 8.5    Distributions by Distribution Agent......................................................... 52
Section 8.6    Minimum Distributions. ........................................................................... 52
Section 8.7    Undeliverable Distributions. .................................................................... 53
Section 8.8    Compliance with Tax Requirements/Allocations. ................................... 53
Section 8.9    Surrender of Cancelled Instruments or Securities. .................................. 54
Section 8.10   Claims Paid or Payable by Third Parties. ................................................ 54

ARTICLE IX. PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR EQUITY
             INTERESTS............................................................................................... 55

Section 9.1    Allowance of Claims and Equity Interests................................................ 55
Section 9.2    Claims Administration Responsibility....................................................... 55

Section 9.3     Estimation of Claims and Equity Interests..................................................... 55
Section 9.4     Adjustment to Claims and Equity Interests Without Objection.......................... 56
Section 9.5     Disallowance of Certain Claims. ................................................................. 56
Section 9.6     Offer of Judgment. ...................................................................................... 56
Section 9.7     Amendments to Claims.................................................................................. 57
Section 9.8     No Interest on Disputed Claims. .................................................................. 57

ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................. 57

Section 10.1    Conditions Precedent to Confirmation of the Plan. .................................... 57
Section 10.2    Conditions Precedent to the Effective Date. ............................................... 58
Section 10.3    Waiver of Conditions Precedent. ................................................................ 58
Section 10.4    Effect of Failure of Conditions Precedent. ................................................ 59
Section 10.5    Reservation of Rights..................................................................................... 59
Section 10.6    Substantial Consummation of the Plan. ....................................................... 59

ARTICLE XI. EFFECT OF CONFIRMATION ................................................................ 59

Section 11.1    Binding Effect................................................................................................ 59
Section 11.2    Release of Claims and Termination of Equity Interests; Compromise and
                Settlement of Claims, Equity Interests, and Controversies.................................. 60
Section 11.3    Releases by the Debtor................................................................................... 61
Section 11.4    Releases by Holders of Claims or Interests. ................................................ 62
Section 11.5    Exculpation and Limitation of Liability. ..................................................... 63
Section 11.6    Injunction. .................................................................................................... 64
Section 11.7    Setoffs and Recoupment. .............................................................................. 64
Section 11.8    Retention of Causes of Action; Reservation of Rights. .............................. 64
Section 11.9    Release of Liens. .......................................................................................... 65

ARTICLE XII. RETENTION OF JURISDICTION ........................................................... 65

ARTICLE XIII. MISCELLANEOUS PROVISIONS .......................................................... 67

Section 13.1    Immediate Binding Effect............................................................................. 67
Section 13.2    Amendments. ................................................................................................ 67
Section 13.3    Revocation or Withdrawal of the Plan.......................................................... 68
Section 13.4    Governing Law. ............................................................................................ 68
Section 13.5    Successors and Assigns.................................................................................. 69
Section 13.6    Consent Rights. ............................................................................................ 69
Section 13.7    Further Assurances. ...................................................................................... 69
Section 13.8    Severability. .................................................................................................. 69
Section 13.9    Controlling Document. .................................................................................. 70
Section 13.10   Filing of Additional Documents. .................................................................. 70
Section 13.11   Reservation of Rights..................................................................................... 70
Section 13.12   Service of Documents. .................................................................................. 71
Section 13.13   Section 1125(e). ............................................................................................ 72

Section 13.14  Tax Reporting and Compliance. ............................................................. 72

Section 13.15  Exhibits, Schedules, and Supplements................................................... 72

Section 13.16  Entire Agreement. ................................................................................... 73

Section 13.17  Allocation of Payments.......................................................................... 73

ARTICLE XIV................................................................................................................. 73

RECOMMENDATION ..................................................................................................... 73

## DISCLAIMER

THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS, NOR IS INTENDED TO BE, AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR TO BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

UNLESS OTHERWISE INDICATED HEREIN, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED PLAN AND DISCLOSURE STATEMENT OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR EQUITY INTEREST. THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b), AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. SEE SECTION 2.6 BELOW, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED", FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN'S DECISION TO VOTE TO ACCEPT THE PLAN.

## INTRODUCTION

540 West 21st Street Holdings LLC ("**540 Holdings**" or the "**Debtor**") proposes this Combined Plan and Disclosure Statement[2] pursuant to Bankruptcy Code Sections 105, 1125, and 1129[3] for the disposition of the Debtor's Assets and distribution of the proceeds of the Assets to the Holders of Allowed Claims against the Debtor, together with a settlement of claims and controversies pursuant to Bankruptcy Rule 9019, as set forth herein. The Debtor is the proponent of this Combined Plan and Disclosure Statement within the meaning of Section 1129.

This Combined Plan and Disclosure Statement is a liquidating chapter 11 plan that contemplates the sale of substantially all of the Debtor's assets. This Combined Plan and Disclosure Statement provides that the Effective Date shall occur on or shortly after, among other things, the closing of the Sale. After the Effective Date and the administration of this Combined Plan and Disclosure Statement, the Debtor will be dissolved.

This Combined Plan and Disclosure Statement contains, among other things, (i) a discussion of the Debtor's history and business, (ii) a summary of the events leading to the Chapter 11 Case, (iii) the goal of this Chapter 11 Case, (iv) risk factors associated with this Chapter 11 Case, (v) a summary and analysis of this Plan, including the settlement and compromise pursuant to Bankruptcy Rule 9019 that provides the basis for certain creditor recoveries under the Plan, and (vi) certain other related matters.

This Combined Plan and Disclosure Statement constitutes a Plan for the resolution of outstanding Claims against and Equity Interests in the Debtor pursuant to the Bankruptcy Code.

---

[2]     Capitalized terms used in this Combined Plan and Disclosure Statement and not otherwise defined herein have the meanings ascribed to such terms in Article I of this Combined Plan and Disclosure Statement.

[3]     References to sections herein shall refer to the Bankruptcy Code, unless otherwise set forth herein.

The Debtor is the proponent of this Combined Plan and Disclosure Statement within the meaning of Section 1129.

      **Copies of this Combined Plan and Disclosure Statement and all other documents related to this Chapter 11 Case are available for review without charge through Notice and Claims Agent, at Team540West21st@stretto.com and with charge at https://www.pacer.gov/.**

      ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ THIS COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS COMBINED PLAN AND DISCLOSURE STATEMENT, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

      Section 1.1    *Defined Terms.*

      The following terms shall have the respective meanings specified below when used in capitalized form in this Combined Plan and Disclosure Statement:

      1.     "***540 Holdings***" has the meaning set forth in the introductory section of this Combined Plan and Disclosure Statement.

      2.     "***9019 Settlement***" has the meaning ascribed to its in Section 2.10 of the Plan.

      3.     "***Administrative Claims***" means any and all requests for payment of costs or expenses of the kind specified in Section 503(b) and entitled to priority under Section 507, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; (b) Bankruptcy Fees; (c) Cure Costs; and (d) Allowed Professional Fee Claims.

      4.     "***Administrative Claims Bar Date***" means the first Business Day that is the 30th day after notice of entry of the Confirmation Order is filed with the Bankruptcy Court or such later date as may be established by an order of the Bankruptcy Court.

      5.     "***Affiliate***" means an affiliate as defined in Section 101(2).

      6.     "***Allowed***" means, with respect to any Claim or Equity Interest: (a) any Claim or Equity Interest arising on or before the Effective Date that is (i) (A) timely filed by the applicable Bar Date or (B) as to which there exists no requirement for the Holder of such Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order; and (ii) (A)

3

as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including pursuant to Section 502(d) or otherwise, has been instituted by the applicable objection deadline, or (B) as to which any objection has been determined in favor of the respective Holder by Final Order, but only to the extent allowed by Final Order; (b) any Claim or Equity Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtor; (c) any Claim or Equity Interest as to which the liability of the Debtor, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; or (d) any Claim or Equity Interest expressly allowed hereunder; *provided, however*, that notwithstanding the foregoing, unless expressly waived by the Plan, the Allowed amount of Claims or Equity Interests shall, to the extent applicable, be subject to the limitations under or maximum amounts permitted by the Bankruptcy Code, including Sections 502 or 503.

7.    "*Assets*" means all of the Debtor's right, title, and interest of any nature in property of any kind, wherever located, including, but not limited to, as specified in Section 541.

8.    "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable Section, including Sections 502, 510, 542, 544, 545, 547 through 550, 553, and 724(a), or under similar or related state, federal, or foreign Law, including fraudulent transfer or voidable transaction Laws.

9.    "*Ballot*" means a ballot upon which certain Holders of Impaired Claims that are entitled to vote may, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and, if applicable, make such other elections as may be made thereon.

10.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as may be amended, as in effect on the date hereof.

11.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Case or any proceeding within, or appeal of an order entered in, the Chapter 11 Case.

12.    "*Bankruptcy Fees*" means any and all fees or charges assessed against any Estate under section 1930 of title 28 of the United States Code.

13.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code and the Official Bankruptcy Forms, and the general, local, and chambers rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Case.

14.    "*Business Day*" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

4

15.     "*Casco*" means Casco Development Corp.

16.     "*Casco Claims*" means any and all Claims of Casco against the Debtor arising prior to the Petition Date.

17.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

18.     "*Causes of Action*" means any and all actions, causes of action, suits, claims, Claims, interests, damages, remedies, demands, rights, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, demands, obligations, liabilities, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, franchises, and trespasses of any kind or character whatsoever of or belonging to the Estate, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, reduced or not to judgment, liquidated or unliquidated, fixed, matured, unmatured, suspected, unsuspected, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or indirectly or derivatively, in Law, equity, or otherwise. For the avoidance of doubt, "Causes of Action" includes, but is not limited to: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) Claims pursuant to Section 362; (d) Avoidance Actions; and (e) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in Section 558.

19.     "*Chapter 11 Case*" means the case pending for the Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

20.     "*Claim*" means a claim as defined in Section 101(5) against the Debtor, whether or not asserted.

21.     "*Claims Bar Date*" means, as applicable, the Administrative Claims Bar Date and any other date or dates to be established by an Order of the Bankruptcy Court by which Proofs of Claim must be filed.

22.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

23.     "*Class*" means a group of Claims or Equity Interests classified together pursuant to Section 1122(a)(1).

24.     "**Class 3 Carve-Out**" means subject to and conditioned on Class 3 voting to accept the Plan, and pursuant to and as a direct byproduct of the settlement set forth in Section 6.4 of the Plan, an amount of cash to be funded by the First Lien Lender from its Class 2 sufficient to ensure that Class 3 receives no less than $15 million on the Effective Date, of which recovery DZ 21st Street shall contribute a maximum of $1,000,000 to fund the Reserve Fund.

5

25.     "**Class 4 Carve-Out**" means subject to and conditioned on Class 4 voting to accept the Plan, solely to the extent that such Holders would receive less than a 70% recovery on account of their Claims in such Class from the General Unsecured Recovery Pool, and pursuant to and as a direct byproduct of the settlement and compromise set forth in Section 6.4 of the Plan, an amount of cash to be funded by the First Lien Lender from its Class 2 distributions equal to an amount required to provide such Holders of Allowed Claims in class 4 a 70% recovery on account of the Allowed Claims in Class 5.

26.     "**COD**" means cancellation of indebtedness.

27.     "**COD Income**" means income from cancellation of indebtedness as defined by Internal Revenue Code §61(a)(11).

28.     "**Combined Plan and Disclosure Statement**" means this second amended combined disclosure statement and chapter 11 plan of liquidation, as may be amended, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules

29.     "**Confirmation**" means the Bankruptcy Court's entry of the Confirmation Order.

30.     "**Confirmation Date**" means the date upon which the Confirmation Order is entered on the Bankruptcy Court's docket.

31.     "**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under Section 1129.

32.     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129.

33.     "**Consummation**" means the occurrence of the Effective Date.

34.     "**Cure Cost**" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to an Executory Contract or Unexpired Lease) and all other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtor pursuant to Sections 365 and 1123.

35.     "**D&O Insurance**" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of the Debtor with respect to the Debtor's directors, managers, officers, and employees.

36.     "**Debtor**" has the meaning set forth in the introductory paragraph of this Combined Plan and Disclosure Statement.

37.     "***Disclosure Statement***" means the disclosure statement, as it may be amended, modified, or supplemented from time to time, that is embodied within this Combined Plan and Disclosure Statement, and that is prepared and distributed in accordance with Sections 1125, 1126(b), and 1145, Bankruptcy Rule 3018, and other applicable Laws.

38.     "***Disputed***" means, with respect to any Claim or Equity Interest, except as otherwise provided herein, a Claim or Equity Interest that is not yet Allowed. To the extent the Debtor disputes only a portion of a Claim or Equity Interest, such Claim or Equity Interest shall be deemed Allowed in the amount the Debtor does not dispute, if any, and Disputed as to the balance of such Claims or Equity Interests.

39.     "***Disputed Investor Claims***" means all claims that are subject to the Estimation Motion filed by the Debtor (which, for the avoidance of doubt, shall not include the DZ Claims).

40.     "***Distribution Agent***" means Plan Administrator, or any Person designated by Plan Administrator, in the capacity as distribution agent under the Plan.

41.     "***Distribution Date***" means the date on which Holders of Claims are eligible to receive distributions under the Plan.

42.     "***Distribution Record Date***" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which date shall be: (a) the Confirmation Date; or (b) such other date as designated by an order of the Bankruptcy Court.

43.     "***DZ 21ˢᵗ Street***" means DZ 21ˢᵗ Street, LLC.

44.     "***DZ Claims***" means any and all Claims of DZ 21ˢᵗ Street against the Debtor arising prior to the Petition Date.

45.     "***DZ RSA***" means that certain Restructuring Support Agreement, dated August 1, 2023, by and between the Debtor and DZ 21ˢᵗ Street in support of the Combined Plan and Disclosure Statement (as may amended and supplemented from time to time).

46.     "***Effective Date***" means the date that is the first Business Day upon which all conditions to the effectiveness of the Plan set forth in Article X hereof have been satisfied or waived in accordance with the terms of the Plan. Upon the occurrence of such date, the Debtor shall file a notice with the Bankruptcy Court indicating that the Effective Date has occurred.

47.     "***Entity***" means an "entity" as defined in Section 101(15).

48.     "***Equity Interest***" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership, limited liability company interests (whether certificated or uncertificated), or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, together with any warrants, equity-based awards, or contractual rights to purchase or acquire such interests at any time, and all rights arising with respect thereto that existed immediately before the Petition Date.

7

49.     "*Estate*" means the estate created for the Debtor pursuant to Section 541 upon the commencement of the Chapter 11 Case.

50.     "*Estimation Motion*" means the motion filed by the Debtor at Docket No. [X] on October [6], 2023, to estimate certain Claims of investors in the Debtor or its affiliates (which, for the avoidance of doubt, does not include the DZ Claims).

51.     "*Exculpated Parties*" means the Debtor and its directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants, and other professionals, advisors, and agents.

52.     "*Executory Contract*" means a contract or lease to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection under Sections 365 or 1123.

53.     "*Final Order*" means, as applicable, an order, ruling, or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated, or stayed and as to which the time to appeal, petition for certiorari, or move for new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing is pending, or as to which any right to appeal, petition for certiorari, move for a new trial, move for a stay, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtor or, in the event that an appeal, writ of certiorari, new trial, stay, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing has been denied and the time to take any further appeal, petition for certiorari, or move for new trial, stay, reargument, or rehearing has expired; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

54.     "*First Lien Claim*" means any and all Claims against the Debtor related to, arising out of, arising under, or arising in connection with the First Lien Loan Agreement Documents.

55.     "*First Lien Lender*" means Ray New York LLC, or any successor or assignee to and under the First Lien Loan Agreement.

56.     "*First Lien Loan*" means the secured loan evidenced by the First Lien Loan Agreement.

57.     "*First Lien Loan Agreement*" means that certain Promissory Note dated December 22, 2015 in the original principal amount of $20,000,000 governed by that certain Loan Agreement of the same date, by and among 540 Holdings, as borrower, and Original First Lien Lender, as lender, including all agreements, notes, instruments, and any other documents delivered pursuant

thereto or in connection therewith, as amended, supplemented, restated, or otherwise modified prior to the Petition Date.

58. "*First Lien Loan Agreement Documents*" means the First Lien Loan Agreement together with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date.

59. "*First Lien RSA*" means that certain Restructuring Support Agreement, dated June 26, 2023, by and between the Debtor and First Lien Lender in support of the Combined Plan and Disclosure Statement (as may be amended and supplemented from time to time).

60. "*General Unsecured Claim*" means any unsecured Claim, including Trade Claims (other than an Administrative Claim, an Intercompany Claim, a Priority Tax Claim or Other Priority Claim) against the Debtor, including (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which the Debtor is a party; and (b) Claims arising from any litigation or other court, administrative, or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by, the Debtor related thereto.

61. "*General Unsecured Trade Claim*" means any General Unsecured Claim (other than DZ Claims and Disputed Investor Claims).

62. "*Governmental Unit*" means a "governmental unit" as defined in Section 101(27).

63. "*Holder*" means the beneficial holder of any Claim or Equity Interest.

64. "*Impaired*" means, with respect to a Claim or Equity Interest, such Claim or Equity Interest that falls within a Class of Claims or Equity Interests that is impaired within the meaning of Section 1124.

65. "*Indemnification Obligation*" means the Debtor's obligation to indemnify, reimburse, or otherwise hold financially harmless its Indemnified Parties with respect to or based upon any act or omission taken or omitted in any of the relevant capacities, or for or on behalf of the Debtor, pursuant to and to the maximum extent provided by the Debtor's certificate of incorporation, certificate of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

66. "*Indemnified Parties*" means the Debtor's current and former directors, officers, managers, employees, attorneys, other professionals, and agents, and such current and former directors', officers', managers', and employees' respective Affiliates to the extent set forth herein, that were employed or served in such capacity as of or prior to the Effective Date and that are entitled to be indemnified by the Debtor pursuant to, among other things, the Debtor's bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

67.     "***Intercompany Claims***" means any and all Claims held by any of the Debtor's Affiliates against the Debtor.  For the avoidance of doubt, Intercompany Claims shall exclude any DZ Claims.

68.     "***Law***" means any federal, state, local, or foreign "law" (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction.

69.     "***Lien***" means a "lien" as defined in Section 101(37).

70.     "***Notice and Claims Agent***" means Stretto, Inc., in its capacity as noticing, claims, and solicitation agent for the Debtor.

71.     "***Operating Agreement***" means the Fourth Amended and Restated Limited Liability Company Operating Agreement of 540 West 21st Street Holdings LLC dated September 15, 2017.

72.     "***Original First Lien Lender***" means Bank Hapoalim B.M.

73.     "***Other Priority Claims***" means any and all Claims against the Debtor entitled to priority in right of payment under Section 507(a) that are not Administrative Claims, Priority Tax Claims, or Professional Fee Claims.

74.     "***Other Secured Claims***" means any Secured Claims against the Debtor that are not First Lien Claims.

75.     "***Person***" means a "person" as defined in Section 101(41).

76.     "***Petition Date***" means the date on which the Debtor filed a petition for relief, thereby commencing the Chapter 11 Case.

77.     "***Plan***" shall mean this joint plan of liquidation under chapter 11 of the Bankruptcy Code, as it may be amended, modified, or supplemented from time to time, that is embodied within this Combined Plan and Disclosure Statement, and that is prepared and distributed in accordance with Sections 1125, 1126(b), and 1145, Bankruptcy Rule 3018, and other applicable Laws.

78.     "***Plan Administration Assets***" means all of the Debtor's assets not sold to Purchaser, except for Sale Proceeds.

79.     "***Plan Administrator***" means 540 Holdings or a form of 540 Holdings that, in the discretion of the Debtor, with the consent of the First Lien Lender which consent shall not be unreasonably withheld, shall be established on or before the Effective Date for the benefit of holders of Claims against, and Equity Interests in, the Debtor in connection with the distribution of the Sale Proceeds and any other assets of the Debtor, and otherwise for the administration of the Plan for the Debtor and the Estate.

80.    "***Plan Documents***" means any and all documents, other than this Combined Plan and Disclosure Statement, to be executed, delivered, or performed in connection with the occurrence of the Effective Date, subject to any consent rights set forth in the Plan.

81.    "***Plan Objection Deadline***" means the deadline established pursuant to the Bankruptcy Code, Bankruptcy Rules, or Order of the Court for parties to object to Confirmation of the Plan.

82.    "***Plan Supplement***" means the compilation of documents, schedules, and exhibits to this Combined Plan and Disclosure Statement, and forms thereof, to the Combined Plan and Disclosure Statement to be filed by the Debtor no later than the Plan Supplement Filing Date, as the same may be amended, modified, or supplemented.

83.    "***Plan Supplement Filing Date***" means the date that is five calendar days prior to the Plan Objection Deadline, or such later date as is determined by the Debtor.

84.    "***Priority Tax Claims***" means any and all Claims against the Debtor of the kind specified in Section 507(a)(8).

85.    "***Professionals***" means (a) any and all professionals employed in the Chapter 11 Case pursuant to Sections 327, 328, 363, or 1103, or otherwise, and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b)(4).

86.    "***Professional Fee Claim***" means any Claim of a Professional seeking payment of compensation for services rendered or reimbursement of expenses incurred on or after the Petition Date and through and including the Confirmation Date, under Sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5).

87.    "***Proof of Claim***" means a "proof of claim," as defined in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs, or expenses made pursuant to Section 503 filed in the Chapter 11 Case.

88.    "***Property***" means the property to be sold to Purchaser pursuant to the Purchase and Sale Contract.

89.    "***Pro-Rata***" means as to a particular holder of an Allowed General Unsecured Claim at any date, the ratio that the amount of such claim bears to the total amount of all General Unsecured Claims (not otherwise electing a cash payment, if applicable) determined as if all disputed General Unsecured Claims were allowed claims so long as such claims remain disputed.

90.    "***Purchase and Sale Contract***" means that certain Purchase and Sale Contract, dated June 13, 2023, by and between Purchaser and 540 Holdings, as thereafter may be amended or modified, pertaining to the Sale.

91.    "***Purchaser***" means 550W21 Owner LLC.

92.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Equity Interests, the treatment provided for in Section 1124.

93.     "*Rejection Schedule*" means the schedule (as may be amended), if any, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that the Debtor will reject pursuant to the Plan and which will be included in the Plan Supplement.

94.     "*Related Parties*" means, with respect to any Entity, such Entity's predecessors, successors, assigns, affiliates (whether by operation of Law or otherwise) and subsidiaries, and each of their respective general partners, management companies, managed accounts, funds, or investment vehicles, and each of the foregoing's respective current and former equity holders, officers, directors, managers, management committee directors, principals, shareholders, members, partners, general partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case acting in such capacity, including in their capacity as directors of the Debtor, as applicable.

95.     "*Released Parties*" means, collectively: (a) the Debtor; (b) First Lien Lender; (c) Casco; (d) Purchaser; (e) DZ 21st Street, and (f) the Related Parties of each of the foregoing Entities in clauses (a) through (e) of this definition.

96.     "*Reserve Fund*" means a fund established in accordance with Sections 6.4 and 6.5 of the Plan consisting of Cash in amount equal to the lesser of (i) the amount of Allowed Disputed Investor Claims as determined by the Court after notice and a hearing on the Estimation Motion and (ii) $6,300,000.

97.     "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with Sections 327, 363, or 1103 and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) Sections 327, 328, 329, 330, or 331 or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which the Bankruptcy Court has allowed compensation and reimbursement pursuant to Section 503(b)(4).

98.     "*RSAs*" means the First Lien RSA and the DZ RSA, together.

99.     "*Sale*" means the sale of the Property as set forth herein and pursuant to the Purchase and Sale Contract.

100.     "*Sale Proceeds*" means the net proceeds actually received by the Debtor upon the closing of the Sale.

101.     "*Secured Claim*" means any and all Claims against the Debtor that (a) are secured by a Lien on, or security interest in, property of the Debtor, or that has the benefit of rights of setoff under Section 553, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or

applicable nonbankruptcy law, but only to the extent of the value of such Holder's interest in the Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in Section 506, or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

102.    "*Securities Act*" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

103.    "*Security*" has the meaning ascribed to such term in Section 101(49).

104.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege tax (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and any other similar tax imposed or assessed by any Governmental Unit.

105.    "*Subordinated Claim*" means any Claim that is subject to (a) subordination under Section 510(b), or (b) equitable subordination, as the Bankruptcy Court determines in a Final Order.

106.    "*Tax Code*" means the Internal Revenue Code, as amended.

107.    "*Trade Claim*" means any Claim of a vendor who extended trade debt to the Debtor on a Post-Petition basis.

108.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Debtor of an intent to accept a particular distribution; (c) responded to the Debtor's request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

109.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption, assumption and assignment, or rejection under Section 365.

110.    "*Unimpaired*" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest that is not Impaired.

111.    "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

112.    "*Wind Down*" means the process to wind down, dissolve, and liquidate the Debtor and the Estate and distribute any of the Sale Proceeds and remaining assets in accordance with the Plan through Plan Administrator.

Section 1.2    *Rules of Interpretation and Computation of Time.*

(a)    For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (ii) unless otherwise specified herein, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified herein, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified herein, all references herein to "Articles" and "Exhibits" are references to Articles and Exhibits, respectively, of this Combined Plan and Disclosure Statement; (v) the words "herein," "hereof," "hereunder," and "hereto" refer to this Combined Plan and Disclosure Statement in its entirety rather than to a particular portion or section of this Combined Plan and Disclosure Statement; (vi) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitations, and shall be deemed to be followed by the words "without limitation"; (vii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (viii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (ix) unless otherwise specified herein, the rules of construction set forth in Section 102 shall apply; (x) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xi) references to docket numbers are references to the docket numbers of documents filed in the Chapter 11 Case under the Bankruptcy Court's CM/ECF system; and (xii) except as otherwise provided herein, any references to the "Effective Date" shall mean the Effective Date or as soon as reasonably practicable thereafter.

(b)    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, unless otherwise provided for herein.

(c)    All references in this Combined Plan and Disclosure Statement to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

(d)    Any immaterial effectuating provision may be interpreted by the Debtor in a manner that is consistent with the overall purpose and intent of this Combined Plan and Disclosure Statement without further Final Order of the Bankruptcy Court.

## ARTICLE II.

## BACKGROUND

Section 2.1    *General Background.*

(a)    Overview of the Debtor's Business

14

The Debtor is headquartered in New York, New York and is a real estate holding company formed specifically to facilitate the financing for, and construction of a mixed-use development at the Property.

The Debtor purchased the Property with the intent to obtain financing to construct a 20 story, 275-foot tall ultra-luxury mixed use condominium building. The proposed development would include 34 residential units with a total area of 116,818 square feet, a 4,682 square foot retail component and a 48,737 square foot gallery.

     (b)     The Debtor's Organization and Capital Structure

Organization and Equity Structure

The Debtor's corporate structure is as follows:

The Debtor is owned by DZ 21st Street (8% interest) and West 21st Street Member LLC (92% interest). West 21st Street Member LLC is wholly owned by West 21st Street Investment Member LLC. West 21st Street Investment Member LLC is wholly owned by 540 West 21st Development LLC. 540 West 21st Development LLC is owned by 540 West 21st Street LLC (83.65% interest) and 540 West 21st Street Investments III LLC (16.35%). 540 West 21st Street LLC is owned by certain institutional and individual members, including Casco Development Corp. 540 West 21st Street Investments III LLC is owned by 540 West 21st Street Investments II LLC and 540 West 21st New General LLC. 540 West 21st New General LLC is wholly owned by 540 West 21st Street Investments II LLC. 540 West 21st Street Investments II LLC is owned by certain institutional and individual members and Casco Development Corp. Casco Development Corp. is wholly owned by NuCapital Management Inc.

Organizational Chart

Set forth below is an organizational chart for the Debtor and its direct and indirect equity



holders.

16

<u>Management and Control</u>

The Debtor is managed through several other limited liability companies owned by Casco Development Corp. ("Casco").  Mr. Uri Chaitchik, a minority owner (the "Minority Casco Owner") of less than 10% of the membership interests in Casco is the son-in-law of a member and owner of Ray New York.  Casco is the managing member of all of the limited liability companies that manage the Debtor and decision-making authority at all levels is vested in the two remaining owners of Casco, with the unanimous consent of both remaining owners required to take any corporate action.

<u>Capital Structure</u>

<u>Secured Financing</u>

To finance the proposed development at the Property, on December 22, 2015, the Debtor obtained the First Lien Loan, in the original principal amount of $20,000,000 from Original First Lien Lender secured by a mortgage on the Property. Pursuant to the First Lien Loan Agreement, interest accrues on the First Lien Loan at a rate of 5%.  After the First Lien Loan was entered into, the Original First Lien Lender provided additional amounts to the Debtor to fund the development of the Property. On June 28, 2017, the principal loan balance of the First Lien Loan was increased to $30,000,000 and on June 6, 2018, the principal loan balance of the First Lien Loan was increased to $50,000,000.

On or before April 28, 2021, the Debtor defaulted on its obligations under the First Lien Loan Agreement and as a result, the First Lien Loan began to accrue default interest at a rate of 18%.  On April 7, 2022, the defaulted First Lien Loan was sold by the Original First Lien Lender at a price of $52,000,000, which reflects a par price of $50,000,000 for the outstanding principal balance plus a discounted price of $2,000,000 for the accrued interest, to Ray New York, LLC (the First Lien Lender), an entity that is owned by the father-in-law of the Minority Casco Owner. Upon the sale, SL Green Realty Corp. was put in place to act as Servicer with respect to the loan. After the acquisition of the First Lien Loan, the First Lien Lender provided additional financing under the terms of the First Lien Loan Agreement, as amended, as follows: $2,100,000 in May 2022, $1,000,000 in July 2022 and $880,000 in August 2023. As of December 18, 2023, the anticipated effective date of the Plan, the outstanding balance of the First Lien Loan is expected to be not less than $85,000,000 (including principal, accrued interest and accrued default interest), inclusive of fees and costs owing to the First Lien Lender.

<u>Unsecured Trade Claims and Unsecured Financing of the Debtor's affiliates</u>

As of the Petition Date, the Debtor also carries approximately $3,500,000.00 in general unsecured debt obligations to its trade creditors.

West 21st Street Investment Member LLC obtained approximately $5 million in unsecured financing from Dr. Efraim Gutkind.

540 West 21st Development LLC obtained approximately $32 million in unsecured financing from various individuals and entities, many of which are also equity holders in 540 West 21st Development LLC's parent entities, 540 West 21st Street LLC and 540 West 21st Street Investments II, LLC.

540 West 21st Street LLC obtained approximately $178 million in unsecured financing from various individuals and entities, many of which are also equity holders in 540 West 21st Street LLC and 540 West 21st Street Investments II, LLC.

540 West 21st Street Investments II LLC obtained approximately $13 million in unsecured financing from various individuals and entities, many of which are also equity holders in 540 West 21st Street LLC and 540 West 21st Street Investments II, LLC.

(c)    Events Precipitating the Chapter 11 Filing and the Debtor's Remediation Efforts

The Debtor was originally created as a vehicle to own and develop the Property. To fund such development, Debtor's indirect parent entities obtained investments for third parties as described above. In addition, Debtor with assistance from its outside finance counsel, Bryan Cave Leighton Paisner LLP, put in place the First Lien Loan from Original First Lien Lender. Over time, Debtor's costs increased and it required additional financing, with the Original First Lien Lender periodically extending such financing. Still unable to complete the development, in 2021, the Debtor defaulted on its First Lien Loan Obligations.

In order to address its financing issues and remediate setbacks with the development, the Debtor's ultimate parent, Casco engaged Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") to assist in identifying and partnering with a new property developer. Fried Frank had previously represented Casco in certain real estate related litigation and in connection with the Debtor's Operating Agreement, as it relates to zoning matters and the negotiation over air rights and space in the developed Property.

Beginning in December 2021, frustrated with the Debtor's progress, the Original First Lien Lender indicated that it was unwilling to extend additional capital to the Debtor and that it intended to exercise remedies and collect on the First Lien Loan. Thereafter, the Original First Lien Lender approached the Minority Casco Owner's father-in-law, who was familiar with the Debtor's situation, and offered to sell the First Lien Loan in lieu of exercising other remedies. On or around April 7 2022, the First Lien Lender purchased the First Lien Loan from the Original First Lien Lender. Upon or shortly after the sale, the First Lien Lender provided incremental funding to the Debtor that was reflected in amendments to the First Lien Loan Agreements. Bryan Cave Leighton Paisner LLP again represented the Debtor in such financing matters and Fried Frank, ceasing efforts on behalf of Casco, became counsel to First Lien Lender.

After the purchase of the First Lien Loan, First Lien Lender worked with Debtor's management to explore potential options for the completion of the development of the Property and the repayment of the First Lien Loan prior to its maturity.

In connection with these discussions, the First Lien Lender proposed a potential restructuring transaction where the Debtor would transfer the Property to the First Lien Lender to

18

complete development and then provide certain returns to the Debtor and its stakeholders through a nonrecourse promissory note provided by the First Lien Lender in favor of the Debtor. This nonrecourse promissory note would then be paid either (a) through the completion of the development and sale of the Property or (b) to the extent the First Lien Lender decided to hold the Property for its own account, by making payment to the Debtor in an amount to be determined following an appraisal.

The Debtor's management engaged with certain of their stakeholders to discuss the restructuring transaction proposed by the First Lien Lender. Following these discussions, the Debtor determined that a significant number of stakeholders indicated a preference for selling the Property on an "as-is" basis as an alternative to pursuing the restructuring transaction proposed by the First Lien Lender.

As a result of these discussions, and in lieu of moving forward with the restructuring transaction proposed by the First Lien Lender, the Debtor decided it would be in the best interest of all parties to proceed with a sale of the Property.  First Lien Lender did not commence foreclosure or enforcement actions at this time to recover on its defaulted loan, but rather provided the Debtor with time and opportunity to explore its sale options.

In connection with its efforts to sell the Property, on November 9, 2022, the Debtor retained Jones Lang LaSalle Americas, Inc. ("JLL") as its agent to market and sell the Property.

JLL engaged in an extensive marketing effort by, among other things, reaching out to prospective bidders, soliciting interest from such parties, obtaining letters of intent, and analyzing bids. The Debtor identified Purchaser as the party who provided the highest and best offer for the Property among all others marketed.

After Purchaser was identified as the party with the highest and best offer for the Property, the Debtor, its professionals, and Purchaser proceeded with due diligence to finalize the terms upon which Purchaser would purchase the Property.

The Debtor and Purchaser then entered into the Purchase and Sale Contract (a copy of which is attached hereto as **Exhibit A**) which, among other things, contemplated that the Debtor would file the Chapter 11 Case, engage in a bankruptcy sale process, and obtain the confirmation of a chapter 11 plan. At Debtor's request, based on the requirements of the Buyer, First Lien Lender also agreed to support the implementation of the Sale through bankruptcy and provide the Debtor with sufficient financing to complete the transactions contemplated by the Purchase and Sale Contract, and sufficient to fund the Debtor's operations through the Chapter 11 Case, prior to the Petition Date.  The Debtor did not satisfy the condition to closing in the Purchase and Sale Contract that it obtain a final, non-appealable order of the Court approving the Sale on or before October 1, 2023.  As of the date of this filing the Purchaser is no longer bound by its previous commitment to purchase the Property and has not agreed to the terms set forth in this Combined Plan and Disclosure Statement.

       (d)     The RSAs

In connection with the foregoing, the Debtor and the First Lien Lender entered into the First Lien RSA on June 26, 2023; and the Debtor and DZ 21st Street entered into the DZ RSA on August 1, 2023. Pursuant to the RSAs, the First Lien Lender and DZ 21st Street agreed to consent to and support a plan filed by the Debtor if such plan conformed to the provisions set forth in a Restructuring Term Sheet, attached as an exhibit to the RSAs, and was otherwise reasonably acceptable to the First Lien Lender.  These included, among other things, incorporating the Sale as part of such plan and providing recoveries to other creditors that provides the basis for the treatment of Classes as set forth herein.

The negotiations among Debtor and the First Lien Lender were at arm's length and in good faith.  Further, Debtor and its counsel have analyzed the legal issues in connection with this familial relationship between the principals of the First Lien Lender and the member of the ultimate parent company of Debtor and based on that analysis, Debtor does not believe that the First Lien Lender is an "insider" of the Debtor as that term is defined by the Bankruptcy Code.  In particular, no principal of Debtor has sole control over Debtor.  Debtor was represented in all negotiations in connection with these Chapter 11 cases by Tomer Jacob, Debtor's chief restructuring officer and Bryan Cave Leighton Paisner LLP, Debtor's finance and bankruptcy counsel.

Section 2.2     *The Chapter 11 Case.*

On the Petition Date, the Debtor filed a voluntary chapter 11 bankruptcy petition. Substantially contemporaneously therewith, the Debtor filed a number of motions (the "**First Day Motions**") to transition into Chapter 11, stabilize operations, and preserve relationships with vendors, and clients. The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) reject certain executory contracts; (b) employ the Notice and Claims Agent; (c) approve interim compensation procedures; and (d) employ counsel and local counsel, among others. In support of the First Day Motions, the Debtor relied upon a first day declaration by Tomer Jacob, the Debtor's chief restructuring officer.

On September 8, 2023, the Debtor obtained approval from the Court of interim debtor-in-possession financing to be provided by the First Lien Lender.  On September 28, 2023 and October 4, 2023, the Court held hearings on the Debtor's request to obtain final approval of the debtor-in-possession financing, and continued such hearing to October 17, 2023.  On the continued hearing date, the Debtor intends to pursue final approval of the debtor-in-possession financing from the First Lien Lender in the approximate amount of $989,000.

On August 22, 2023, the Debtor filed a motion to approve the adequacy of disclosures in the Debtor's First Amended Combined Disclosure Statement and Plan.  On September 8, 2023, after an uncontested hearing, the Court entered an order approving the adequacies of the disclosures in the First Amended Combined Disclosure Statement and Plan and authorized the initiation of a solicitation process.  On September 8, 2023, Dr. Efraim Gutkind filed an adversary proceeding captioned *Dr. Efraim Gutkind v. 540 West 21st Street Holdings LLC et. al.* (Case No. 23-11053(MFW)) asserting alter ego claims against the Debtor and certain of its affiliates, breach of contract by the Debtor and its affiliates, and subordination and recharacterization of the claims of DZ 21st Street.  In addition to the adversary proceeding, Dr. Gutkind filed an objection to the Debtor's First Amended Combined Disclosure Statement and Plan.  The Office of the United

States Trustee also filed an objection to the Debtor's First Amended Combined Disclosure Statement and Plan. The Debtor, DZ 21st Street and the First Lien Lender each filed responses in support of the First Amended Combined Disclosure Statement and Plan. On September 28, 2023, the Bankruptcy Court held a hearing on the First Amended Combined Disclosure Statement and Plan. At the hearing, the Court indicated that the Court was not inclined to approve the Plan based on certain notice deficiencies and the Court continued the hearing to October 4, 2023. On October 4, 2023, the Debtor appeared before the Court and advised the Court that the Debtor did not intend to pursue the First Amended Combined Disclosure Statement and Plan that was originally filed on August 22, 2023.

Section 2.3    *Summary of Treatment of Claims and Equity Interests Under the Plan.*

The following chart summarizes the classification and treatment of the Classes:

| Class | Estimated Allowed Claims[4] | Treatment | Estimated Recovery to Holders of Allowed Claims[5] |
|---|---|---|---|
| Class 1 – Other Secured Claims | $1,058,780.35 | Unimpaired | 100% |
| Class 2 – First Lien Claims | $85,000,000.00 | Impaired, entitled to vote | 73%[6] |
| Class 3 – DZ Claims | $28,175,050.00 | Impaired, entitled to vote | Not less than 49.6% |
| Class 4 – General Unsecured Trade Claims | $3,500,000.00 | Impaired, entitled to vote | 70% |
| Class 5 – Disputed Investor Claims | $0.00 | Impaired, deemed to reject | 0% |
| Class 6 – Casco Claims | $1,358,000.00 | Impaired, deemed to reject | 0% |

---

[4]   These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise, other than Classes 3, 4 and 5, which reflect the approximate Allowed amounts of such Claims as determined by the Debtor. The Debtor has not completed its analysis of Claims in the Chapter 11 Case, and objections to such Claims have not been filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[5]   The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Case. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

[6] The recovery of the First Lien Claims is subject to the carve-outs described in this Combined Disclosure Statement and Plan.

| Class | Estimated Allowed Claims[4] | Treatment | Estimated Recovery to Holders of Allowed Claims[5] |
|---|---|---|---|
| Class 7 – Intercompany Claims | $0.00 | Impaired, deemed to reject | 0% |
| Class 8 – Subordinated Claims | $0.00 | Impaired, deemed to reject | 0% |
| Class 9 –Equity Interests | $0.00 | Impaired, deemed to reject | 0% |

Class 1 – Other Secured Claims.  The Other Secured Claims Class contains claimants with mechanics liens against the Property as well as a claim for unpaid but due and owing real estate taxes on the Property.

Class 2 – First Lien Claims.  The First Lien Claims Class contains only the secured claim of the First Lien Lender.

Class 3 – DZ Claims.  The DZ Claims Class contains only the claim of DZ 21st Street which claim arises from DZ 21st Street's exercise of that certain put right.

Class 4 – General Unsecured Trade Claims.  The General Unsecured Trade Claims Class contains all of the Debtor's usual and customary trade vendors.

Class 5 – Disputed Investor Claims.  The Disputed Investor Claims Class contains any and all claims asserted against the Debtor from investors, including Dr. Gutkind, which contributed funds to related, non-debtor affiliates of the Debtor and are the obligations of those related, non-debtor affiliates of the Debtor.

Class 6 – Casco Claims.  The Casco Claims Class contains any and all claims that could be asserted by the Debtor's managing member.

Class 7 – Intercompany Claims.  The Intercompany Claims Class contains any and all other claims that could be asserted against the Debtor by any other entity affiliated with the Debtor.

Class 8 – Subordinated Claims.  The Subordinated Claims Class contains any and all other claims that could be asserted against the Debtor from any other lending or investing entity but which are not obligations of the Debtor.

Class 9 – Equity Interests.  The Equity Interests Class contains any remaining equity interests of West 21st Street Member  LLC

Section 2.4    *Potential Claims and Causes of Action.*

The Bankruptcy Code preserves the Debtor's rights to prosecute claims and causes of action that exist outside of bankruptcy, and also empowers the Debtor to prosecute certain claims that are established by the Bankruptcy Code, including claims to, *inter alia*, avoid and recover certain preferential transfers and fraudulent conveyances. The Debtor has not yet investigated and analyzed all potential claims and causes of action.

Section 2.5    *Certain Federal Income Tax Consequences.*

The following discussion is a summary of certain U.S. federal income tax consequences of this Combined Plan and Disclosure Statement to the Debtor and to Holders of Claims and Equity Interests. This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of this the Combined Plan and Disclosure Statement, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of this the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local, or estate and gift taxation is addressed.

**EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THIS THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

(a)    Tax Consequences to the Debtor

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD Income to the extent that such taxpayer's indebtedness is cancelled for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (i) the adjusted issue price of the cancelled indebtedness, less (i) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such cancelled indebtedness.

The recognition of COD Income may be treated differently in the context of a confirmed chapter 11 plan. For example, under the bankruptcy exception defined in Section 108(a) of the Tax Code, instead of recognizing COD Income, the taxpayer is required, pursuant to Section 108(b) of the Tax Code, to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income. The tax attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets, and, finally, foreign tax credit carry forwards. If the amount of COD Income exceeds the amount of tax attributes available to be reduced, the excess still is excluded from income. Pursuant to Section 108(b)(4)(A) of the Tax Code, the reduction of tax attributes does not occur until the end of the taxable year after such tax attributes have been applied to determine the tax in the year of cancellation or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized. Section 108(e)(2) of the Tax Code provides a further exception to the recognition of COD Income upon the cancellation of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

(b)     Tax Consequences for Holders of Claims

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one (1) year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to this Combined Plan and Disclosure Statement, will be treated as having received

24

interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under this Combined Plan and Disclosure Statement on account of its Claim.

Section 2.6    *Certain Risk Factors to Be Considered.*

Effect of Failure to Confirm this Combined Plan and Disclosure Statement. If this Combined Plan and Disclosure Statement is not confirmed by the requisite majorities in number and amount as required by Section 1126, or if any of the other confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Case may not have sufficient funding to proceed, which may result in conversion to a case under chapter 7 of the Bankruptcy Code or dismissal.

"Cramdown." While the Debtor believes that the requirements of Section 1129 have been met, the Bankruptcy Court is afforded discretion to determine whether dissenting Holders of Claims would receive more if the Debtor was liquidated under chapter 7 of the Bankruptcy Code and, thus, whether or not cramdown of such dissenting Holders of Claims is permissible.

Claims Estimation. While the Debtor has undertaken its best efforts to estimate the amounts of Claims in each Class is correct, the actual amounts of allowed Claims may differ from the estimates.

Delays. Any delay in Confirmation of this Combined Plan and Disclosure Statement or delay to the Effective Date could result in additional Administrative Expense Claims. This may endanger ultimate approval of the effectiveness of this Combined Plan and Disclosure Statement or result in a decreased or zero recovery for Holders of Claims entitled to a Distribution. Additionally, in the event that consummation of the Sale does not occur by December 20, 2023, and the Debtor, the First Lien Lender, and Purchaser have not agreed, in writing, to extend such deadline, the Plan shall be deemed withdrawn, revoked, and deemed void *ab initio*, notwithstanding whether the Bankruptcy Court has entered the Confirmation Order.

Section 2.7    *Feasibility.*

The Bankruptcy Code requires that, in order for a plan to be confirmed, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the Debtor unless contemplated by the plan.

Here, this Combined Plan and Disclosure Statement provides for the liquidation and distribution of the Sale Proceeds, resulting from the Sale of the Debtor's Property. Accordingly, the Debtor believes all chapter 11 plan obligations will be satisfied without the need for further reorganization.

Section 2.8      *Best Interests Test and Alternatives to this Combined Plan and Disclosure Statement.*

The Bankruptcy Code requires that the Bankruptcy Court determine that a plan accepted by the requisite number of creditors in an impaired class provides each such member of each impaired class of claims and interests a recovery that has value, on the effective date, at least equal to the value of the recovery that each such creditor would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

The Bankruptcy Code further requires that the Bankruptcy Court determine that a plan is in the best interests of each holder of a claim or interest in any such impaired class which has not voted to accept the plan. Thus, if an impaired class does not vote unanimously to confirm the plan, the best interests test requires that the Bankruptcy Court find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, on the effective date, at least equal to the value of the recovery that each such class member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

Here, the Debtor believes this Combined Plan and Disclosure Statement satisfies the best interests test as the Liquidation Analysis, attached hereto as <u>Exhibit A</u>, demonstrates that the recoveries expected to be available to Holders of Allowed Claims under this Combined Plan and Disclosure Statement will be greater than the recoveries expected in a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses (including those incurred by a chapter 7 trustee) are next to receive payment. Unsecured creditors are paid from any remaining proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Here, all or substantially all of the Debtor's assets are being sold or transferred through the Sale. A liquidation under chapter 7 of the Bankruptcy Code would liquidate the Debtor's assets, but this Combined Plan and Disclosure Statement provides the best source of recovery for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely distribution, and likely no distribution at all to creditors junior to the First Lien Lender. Second, any Distributions would likely be smaller because of the fees and expenses incurred in a liquidation under chapter 7 of the Bankruptcy Code. Third, it is likely that a trustee would not realize values in a chapter 7 liquidation that approach the value arising from the negotiated Purchase and Sale Contract, the RSAs and the 9019 Settlement. The Sale arises from an extensive marketing process, and it is unlikely that the Purchaser would continue its pursuit of the Sale in a chapter 7 liquidation process, at least for the current sale price. Further, through the First Lien RSA and 9019 Settlement, the First Lien Lender has agreed to accept a recovery substantially less than what it is owed and is providing largess to other Classes that forms the basis of such Classes' recovery. However, this

discount is contingent on the timely closing of the Sale, approval of the 9019 Settlement and on the confirmation of a plan substantially similar to the Plan, neither of which are possible in a chapter 7 liquidation.

A chapter 7 trustee, by comparison, would not have the benefit of the Sale or the RSAs or the 9019 Settlement. A chapter 7 trustee's ability to monetize Debtor's assets would therefore be diminished and the values received reduced.

At this time, there are no alternative plans available to Debtor. Debtor believes that the Combined Plan and Disclosure Statement, which is built upon and incorporates the RSAs and the 9019 Settlement, provides the greatest possible value under the circumstances, and has the greatest chance to be confirmed and consummated.

Section 2.9    *Releases by the Debtor.*

Article XI of this Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language by the Debtor. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of this Combined Plan and Disclosure Statement will affect any claim, interest, right, or action with regard to Debtor.

**THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

Under the voting procedures described in Article V of this Combined Plan and Disclosure Statement, the Debtor believes that these releases, exculpations, and injunction language are considered consensual under applicable bankruptcy law.

This Combined Plan and Disclosure Statement provides Releases by the Debtor in favor of the Released Parties. The Debtor is not aware of any potential claims or causes of action against the Released Parties. Under the Releases by the Debtor set forth in this Combined Plan and Disclosure Statement, the Debtor is providing releases in favor of the Released Parties, which include (a) the Debtor; (b) the First Lien Lender; (c) Casco; and (d) their Related Parties. The Debtor is not aware of any potential claims or causes of action against any of the foregoing.

Section 2.10    *Bankruptcy Rule 9019 Settlement.*

The Plan represents a compromise between the divergent viewpoints held by Debtor's major creditor constituencies regarding the consideration to be distributed, and the allocation of the consideration to be distributed, in connection with the reorganization of Debtor.

The First Lien Loan was first extended to Debtor by Original First Lien Lender in the principal amount of $20,000,000. Since its origination, additional amounts were loaned to the Debtor under the First Lien Loan Documents by both the Original First Lien Lender and then by the First Lien Lender after it acquired the First Lien Loan. The First Lien Loan is secured by all

of the Debtor's assets including a mortgage on the Property. Since the occurrence of certain events of default, the First Lien Lender asserts that the First Lien Loan has been accruing interest and then additional default interest. Under the Plan, the First Lien Claims are Allowed in the aggregate amount of $85,000,000, including accrued but unpaid interest and plus accruing fees and expenses.

DZ 21st Street has raised certain potential issues regarding the validity of the security interests granted in connection with the First Lien Loan and the allowance of the First Lien Loan Claims, which Dr. Gutkind has echoed. The Debtor and the First Lien Lender do not believe that there is merit to such issues. In order to compromise and settle such issues, the First Lien Lender has agreed to gift certain of its proceeds that it would otherwise be entitled to fund the Class 3 Carve-Out, Class 4 Carve-Out and Reserve Fund. Absent the compromises and settlements described below and incorporated into the Plan, First Lien Lender would be entitled to receive the substantial majority of the proceeds from the Sale.

Under section 2.10 of the Operating Agreement, in the event that a construction loan had not closed by the 2 year anniversary of the operating agreement, DZ 21st Street had the right to require West 21st Street LLC to exercise its right under the Operating Agreement to cause the Debtor to redeem DZ 21st Street's equity (the "Put Right"). On November 4, 2023, DZ 21st Street exercised the Put Right.

Accordingly, DZ 21st Street has asserted an unsecured claim against the Debtor in the amount of not less than $28,175,050. DZ 21st Street contends that this claim is not subject to subordination pursuant to section 510(b) of the Bankruptcy Code because such equity interest was extinguished and converted to a claim upon exercise of his put right pursuant to section 2.10 of the Operating Agreement.

In the alternative, to the extent that DZ 21st Street's equity interest was not extinguished upon exercise of its put right, DZ 21st Street has alleged (i) claims against the Debtor's direct parent, 540 W 21st Street Member LLC, for breach of contract for failing to cause the redemption of DZ 21st Street's equity interest in the amount of not less than $28,175,050, which, according to DZ 21st Street, would be entitled to any surplus Sale proceeds that would be available for distribution to 540 W 21st Street Member LLC as 92% Equity holder in the Debtor and (ii) 8% of the Equity of the Debtor, which was not extinguished in this alternative scenario.

Accordingly, DZ 21st Street contends that regardless of whether its primary or alternative arguments are ultimately accepted and regardless of whether its claim is subject to subordination at the Debtor, DZ 21st Street would hold a structurally superior claim to sales proceeds as compared to Dr. Gutkind and any other investors at indirect parent companies of the Debtor.

DZ 21st Street LLC's asserted claims and interests are outlined in the following chart:



Dr. Efraim Gutkind, an alleged party in interest in the Debtor's case and an investor in West 21st Street Investment Member LLC, an indirect parent holding company with respect to the Debtor, has sought to challenge the Claims and Interests of DZ 21st Street and its entitlement to distributions of the proceeds from the Sale under the Plan and to assert a claim at the Debtor based upon an alter ego / reverse veil piercing theory.  DZ, the Debtor and the First Lien Lender do not believe Dr. Gutkind has a claim against the Debtor or West 21st Street Member LLC, the Debtor's direct equity holder, and is not entitled to any distributions from the proceeds of the Sale. Likewise, DZ, the Debtor and the First Lien Lender do not believe Dr. Gutkind has a claim against the Debtor or the Debtor's equity holder and is not entitled to any distributions from the proceeds of the Sale.

Litigation and resolution of these disputes, which involve complex questions of fact and law, could delay confirmation of the Plan and would jeopardize the closing of the Sale.  Further, the cost of litigating these disputes could diminish the value and resources of the Debtor's estate, which would be a necessary party in such disputes.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of this Section 2.10 and Section 6.4 of the Plan shall constitute a good faith compromise and settlement (the "*9019 Settlement*").  This compromise and settlement is in the best interests of Holders of Claims and Equity Interests and is fair, equitable, and reasonable.

# ARTICLE III.

## UNCLASSIFIED CLAIMS

In accordance with Section 1123(a)(1), Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article IV of this Combined Plan and Disclosure Statement.

Section 3.1    *Administrative Claims.*

(a)      Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and Debtor, each Holder of an Allowed Administrative Claim (except with respect to Priority Tax Claims, Professional Fee Claims, Statutory Fees, or Trade Claims) shall receive in full and final satisfaction, settlement, release, and cancellation of and in exchange for its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date that such order determining and allowing such Administrative Claim becomes a Final Order or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (iv) at such other time and upon such other terms as set forth in a Final Order of the Bankruptcy Court.

(b)      All requests for payment of an Administrative Claim (other than Professional Fee Claims or Administrative Claims that are not disputed and arose in the ordinary course of business) that accrued on or before the Effective Date must be filed with the Bankruptcy Court and served on the Debtor no later than the Administrative Claims Bar Date. Holders of Administrative Claims (other than Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor and the Estate, and such Administrative Claims shall be deemed cancelled, compromised, settled, and released as of the Effective Date.

(c)      The Debtor, in its sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtor may also object to any Administrative Claim no later than 45 days after the Administrative Claims Bar Date, subject to any extensions granted by the Bankruptcy Court, agreement in writing of the Debtor and the Holder of such Administrative Claim, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtor (or other party with standing) objects to a timely filed and properly served Administrative Claim, a timely filed and properly served Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtor objects to an Administrative Claim, the parties thereto may confer to try to settle such objection and, in the event

that such settlement attempt fails, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

Section 3.2    *Priority Tax Claims.*

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and cancellation of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C); *provided, however*, that the Debtor or Plan Administrator shall have the right to pay any Allowed Priority Tax Claim, or any unpaid balance thereof, in full at any time on or after the Effective Date, without incurring premium or penalty. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, when such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy Law, or in the ordinary course of business. In the event that an Allowed Priority Tax Claim is also a Secured Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

Section 3.3    *Professional Fee Claims.*

(a)    All final requests for payment of Professional Fee Claims must be filed no later than the Administrative Claims Bar Date. After notice and hearing, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)    Unless otherwise agreed to by the Holder of an Allowed Professional Fee Claim and the Debtor, as applicable, to the extent an Allowed Professional Fee Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Case, each Holder of an Allowed Professional Fee Claim shall receive in full and final satisfaction, settlement, release, and cancellation of and in exchange for of its Allowed Professional Fee Claim an amount of Cash equal to the unpaid portion of such Allowed Professional Fee Claim within five Business Days of entry of an Order approving such Professional Fee Claim, or as soon as reasonably practical thereafter.

(c)    Except as otherwise specifically provided herein, on and after the Confirmation Date, the Debtor shall pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to the implementation of the Plan and Consummation incurred by the Debtor after the Confirmation Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court. The Debtor shall pay, within ten Business Days, or as soon as reasonably practical thereafter, after submission of a detailed invoice to the Debtor, such reasonable Claims for compensation or reimbursement of expenses incurred by the Debtor's Retained Professionals. From and after the Confirmation Date, any requirement that Retained Professionals comply with Sections 327 through 331, 363, and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

31

Section 3.4     *DIP Facility Claims*

Except to the extent a Holder of a DIP Facility Claim agrees to less favorable treatment, each Holder of a DIP Facility Claim will be indefeasibly paid and satisfied in full in Cash on the Effective Date.  The DIP Facility Claims shall be Allowed in an aggregate principal amount $989,000 plus interest and fees as provided in the DIP Orders.  Upon the indefeasible payment in full in Cash of the DIP Facility Claims, all Liens and security interests granted to secured such DIP Facility Claims shall be terminated and of no further force and effect.  Notwithstanding the foregoing, the DIP Orders shall continue in effect solely for the purpose of preserve the First Lien Lender's rights to any contingent or indemnification obligations of the Debtor pursuant to and subject to the terms of the DIP Orders.

Section 3.5     *Statutory Fees.*

The Debtor shall pay all fees due and owing to the U.S. Trustee, including quarterly fees under 28 U.S.C § 1930(a), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtor's business at the time of Confirmation, pursuant to the applicable statutory payment schedule. On and after the Effective Date, to the extent that the Chapter 11 Case remains open, and for so long as Plan Administrator remains obligated to pay such quarterly fees, Plan Administrator shall pay such applicable fees as they become due in the ordinary course of business until the Bankruptcy Court enters a final decree in the Chapter 11 Case.

## ARTICLE IV.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 4.1     *Classification of Claims.*[7]

The Plan constitutes a chapter 11 plan for the Debtor, and the classification of Claims and Equity Interests set forth herein shall apply to the Debtor. In accordance with Section 1123(a)(1), the Debtor has not classified Administrative Claims, Priority Tax Claims, and Professional Fee Claims, as described in Article III above.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including for purposes of voting, Confirmation, and distribution pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1). A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that such Claim or Equity Interest qualifies within the description of such Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.

The classification and the manner of satisfying all Claims under the Plan take into consideration: (a) the existence of guarantees or alleged guarantees by the Debtor of obligations

---

[7]     The Debtor reserves the right to separately classify Claims to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable Law.

of other Affiliates or Entities, if any; and (b) that the Debtor may be a joint obligor with other Affiliates or Entities with respect to the same obligation.

Section 4.2    *Class Identification.*

The following chart represents the classification of Claims and Equity Interests for the Debtor pursuant to the Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|-------|-----------------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2 | First Lien Claims | Impaired | Yes |
| Class 3 | DZ Claims | Impaired | Yes |
| Class 4 | General Unsecured Trade Claims | Impaired | Yes |
| Class 5 | Disputed Investor Claims | Impaired | Yes |
| Class 6 | Casco Claims | Impaired | No (deemed to reject) |
| Class 7 | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 8 | Subordinated Claims | Impaired | No (deemed to reject) |
| Class 9 | Equity Interests | Impaired | No (deemed to reject) |

Section 4.3    *Treatment and Voting Rights of Claims and Equity Interests.*

Except to the extent that the Debtor and a Holder of an Allowed Claim or Allowed Equity Interest, as applicable, agree to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and cancellation of, and in exchange for, such Holder's Allowed Claim or Allowed Equity Interest. Unless otherwise indicated herein, the Holder of an Allowed Claim or Allowed Equity Interest, as applicable, shall receive such treatment on the Effective Date, except as otherwise provided in and subject to Section 8.2 below, or, if payment is not due, in accordance with its terms in the ordinary course.

(a)    Class 1— Other Secured Claims.

(i)    *Classification*: Class 1 consists of all Other Secured Claims.

(ii)    *Treatment:* Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and cancellation of and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive payment in full in Cash, equal to the unpaid portion of such Allowed Other Secured Claim, on the later of: (A) the Effective Date; (B) if such Other Secured Claim is Allowed after the Effective Date, on the date that such order determining and allowing such Other Secured Claim becomes a Final

Order or as soon as reasonably practicable thereafter; and (C) at such other time as the Debtor and such Holder agree or have agreed.

(iii)    *Impairment and Voting*: Class 1 is Unimpaired and Holders of Other Secured Claims are conclusively presumed to accept the Plan pursuant to Section 1126(f). Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims

(b)    Class 2—First Lien Claims.

(i)    *Classification*: Class 2 consists of First Lien Claims.

(ii)    *Treatment*:

A.    The Debtors acknowledge and agree that: (a) they have no defenses, rights of setoff, or other claims based upon subordination, disallowance, enforceability, or other similar applicable law related to First Lien Lender; and (b) as of the anticipated Effective Date, Debtors are indebted to First Lien Lender in the amount of not less than $85,000,000.00.

B.    The First Lien Claim is deemed Allowed pursuant to the 9019 Settlement in the amount of $85,000,000.00, and interest, legal fees, costs and expenses shall continue to accrue until the closing of the Sale and distribution of the Sale Proceeds.

C.    Except to the extent that First Lien Lender agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and cancellation of and in exchange for the Allowed First Lien Claim, First Lien Lender shall receive a payment in Cash of $85,000,000.00 on the closing of the Sale, which payment shall be made directly to First Lien Lender from the Sale Proceeds, subject to the Class 3 Carve-Out, Class 4 Carve-Out and the First Lien Lender's contribution to the Reserve Fund; provided that the First Lien Lender shall receive payment in Cash of at least $70,000,000 and no greater than $75,000,000 in satisfaction of its Allowed First Lien Claim after funding the Class 3 Carve-Out, Class 4 Carve-Out and Reserve Fund.

(iii)    *Impairment and Voting*: First Lien Claims are Impaired and are entitled to vote to accept or reject the Plan.

(c)    Class 3—DZ Claims

(i)    *Classification*: Class 3 consists of all DZ Claims.

(ii)    *Allowance*: Allowed pursuant to the 9019 Settlement in the amount of $28,175,050.00.

34

(iii) *Treatment*: Except to the extent that a Holder of an Allowed DZ Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and cancellation of and in exchange for each Allowed DZ Claim, each Holder thereof shall receive, on closing of a Sale, a payment, subject to a maximum reduction of $1,000,000 to account for the Holder of DZ Claim's contribution to the Reserve Fund, equal to $15 million plus any Cash remaining on the Debtor's balance sheet following distribution of its assets in accordance with the Plan.

(iv) *Impairment and Voting*: DZ Claims are Impaired and are entitled to vote to accept or reject the Plan.

(d)    Class 4—General Unsecured Trade Claims.

(i) *Classification*: Class 4 consists of all General Unsecured Trade Claims.

(ii) *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Trade Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and cancellation of and in exchange for each Allowed General Unsecured Trade Claim, each Holder thereof shall receive a payment in Cash equal to (a) its Pro-Rata share of the proceeds of the Sale that are remaining after satisfying the claims in Classes 1 and 2 (the "Remaining Proceeds"), which Remaining Proceeds shall be shared Pro-Rata with the holders of Allowed Claims in Class 5 (the "General Unsecured Claim Recovery Pool") *plus* (b) to the extent Class 4 votes in favor of the Plan, and subject to the conditions thereof, the Class 4 Carve-Out; provided that notwithstanding anything to the contained in this Plan, Holders of Allowed General Unsecured Trade Claims shall not receive greater than 70% of the amount of such Allowed General Unsecured Trade Claims.

(iii) *Impairment and Voting*: General Unsecured Trade Claims are Impaired and are entitled to vote to accept or reject the Plan.

(e)    Class 5 - Disputed Investor Claims.

(i) *Classification*: Class 5 consists of all Disputed Investor Claims.

(ii) *Treatment*: Except to the extent that a Holder of an Allowed Disputed Investor Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and cancellation of and in exchange for each Allowed Disputed Investor Claim, each Holder of an Allowed Disputed Investor Claim, shall receive a distribution in Cash from the Reserve Fund equal to its Pro Rata share of the General Unsecured Claim Recovery Pool; provided that notwithstanding anything to the contained in this Plan, the distribution to Holders of Allowed Disputed

35

Investor Claims shall be reduced (on a pro rata basis among such Holders) such that Holders of Allowed Disputed Investor Claims in this Class 5 do not receive a distribution, calculated in the aggregate taking into account distribution to all such Holders, in excess of $6,300,000.

(iii)    *Impairment and Voting*: Disputed Investor Claims are impaired and are entitled to vote to accept or reject the Plan.

(f)    Class 6—Casco Claims.

(i)    *Classification*: Class 6 consists of all Casco Claims.

(ii)    Treatment: On the Effective Date, each Casco Claim shall be cancelled and released without any distribution on account of such Claims.

(iii)    *Impairment and Voting*: Casco Claims are deemed to reject pursuant to Section 1126(g). Therefore, Holders of Allowed Casco Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Casco Claims.

(g)    Class 7—Intercompany Claims.

(i)    *Classification*: Class 7 consists of all Intercompany Claims.

(ii)    *Treatment*: On the Effective Date, each Intercompany Claim shall be cancelled and released without any distribution on account of such Claims.

(iii)    *Impairment and Voting*: Holders of Intercompany Claims are deemed to reject pursuant to Section 1126(g). Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Claims.

(h)    Class 8—Subordinated Claims.

(i)    *Classification*: Class 8 consists of all Subordinated Claims, if any.

(ii)    *Treatment*: On the Effective Date, all Subordinated Claims shall be cancelled and released as of the Effective Date, and shall be of no further force or effect. Therefore, Holders of Subordinated Claims shall not receive any distribution on account of such Subordinated Claims.

(iii)    *Impairment and Voting*: Subordinated Claims are Impaired and Holders of such Claims are deemed to have rejected the Plan pursuant to Section 1126(g). Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims.

(i)  Class 9—Equity Interests.

   (i)  *Classification*: Class 9 consists of all Equity Interests.

   (ii)  *Treatment*: On the Effective Date, all Equity Interests shall be cancelled without any distribution on account of such Equity Interests, except that the Plan Administrator, to the extent the equity interests therein shall constitute Equity Interests, shall continue in operation until the completion of its administration of the Plan as set forth herein.

   (iii)  *Impairment and Voting*: Equity Interests are Impaired and Holders of such Equity Interests are deemed to have rejected the Plan pursuant to Section 1126(g). Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Equity Interests.

   Section 4.4  *Special Provision Governing Unimpaired Claims.*

   Except as otherwise expressly provided herein, nothing in the Plan shall affect the Debtor's rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

   Section 4.5  *Voting; Presumptions; Solicitation.*

   (a)  *Acceptance by Certain Impaired Classes*. Only Holders of Allowed Claims in Class 3 and 4 are entitled to vote to accept or reject the applicable Plan. An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least 66.6% in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Only Holders of Claims in Classes 2, 3, 4 and 5 have received, or will receive, Ballots containing detailed voting instructions.

   (b)  *Conclusively Presumed Acceptance by Unimpaired Classes*. Holders of Claims in Classes 1, 2, and 3 are conclusively presumed to accept the Plan pursuant to Section 1126(f). Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

   (c)  *Deemed to Reject by Certain Impaired Classes*. Holders of Claims and Equity Interests in Classes 6, 7, 8, and 9 are deemed to reject the Plan pursuant to Section 1126(g). Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

   (d)  *Controversy Concerning Impairment*. If a controversy arises as to whether any Claims or Equity Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

(e)     *Elimination of Classes*. To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan, for purposes of determining whether such Class has accepted or rejected this Plan under Section 1129(a)(8).

Section 4.6     *Nonconsensual Confirmation.*

Because one or more Classes of Claims or Equity Interests entitled to vote on an applicable Plan are deemed not to vote to accept the Plan, the Debtor will seek Confirmation of the Plan under Section 1129(b). The Debtor reserves the right to amend or modify the Plan to the extent, if any, that such amendment or modification is necessary for Confirmation pursuant to Section 1129(b). This provision allows the Bankruptcy Court to confirm a plan accepted by at least one impaired class so long as it does not unfairly discriminate and is fair and equitable with respect to each class of claims and interest that is impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtor believes the treatment of Claims and Equity Interests described in this Combined Plan and Disclosure Statement is fair and equitable and does not discriminate unfairly. The proposed treatment of Claims and Equity Interests provides that each Holder of such Claim or Equity Interest will be treated identically within their respective class and that, except when agreed to by such Holder, no Holder of any Claim or Equity Interest junior will receive or retain any property on account of such junior Claim or Equity Interest.

Section 4.7     *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Equity Interests, and their respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Section 510(b), or otherwise. All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Equity Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, cancelled, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or any other such similar legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. Pursuant to Section 510, except where otherwise provided herein, the Debtor reserves the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

Section 4.8     *No Waiver.*

Nothing contained in this Combined Plan and Disclosure Statement shall be construed to waive the Debtor's or other Entity's right to object on any basis to any Claim or Lien, including after the Effective Date.

## ARTICLE V.

## IMPORTANT DATES AND PROCEDURES[8]

| DESCRIPTION | DEADLINE |
|---|---|
| Voting Procedures Hearing Objection Deadline | October 13, 2023 at 4:00 p.m. (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | October 17, 2023 at 10:30 a.m. (ET) |
| Voting Record Date | The date of entry of the Interim Approval and Procedures Order |
| Solicitation Commencement Date | Within two (2) business days after entry of the Interim Approval and Procedures Order |
| Deadline for Creditors to File Rule 3018 Motions | October 27, 2023 at 4:00 p.m. (ET) |
| Deadline for Debtors to Respond to Rule 3018 Motions | November 3, 2023 at 4:00 p.m. (ET) |
| Hearing on Rule 3018 Motions | November 15, 2023 at 10:30 a.m. (ET) |
| Voting Deadline for this Combined Plan and Disclosure Statement | November 15, 2023 at 4:00 p.m. (ET) |
| Combined Plan and Disclosure Statement Objection Deadline | November 15, 2023 at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief, Other Evidence Supporting this Combined Plan and Disclosure Statement, and Proposed Confirmation Order | November 17, 2023 at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | November 17, 2023 at 4:00 p.m. (ET) |

---

[8]     The proposed dates in the chart below are subject to the Court's availability and approval.

| DESCRIPTION | DEADLINE |
|---|---|
| Combined Hearing | November 20, 2023 at 11:00 a.m. (ET) |

The Confirmation Hearing has been scheduled for **November 20, 2023 at 10:30 a.m.** (prevailing eastern time) at the Bankruptcy Court, 824 North Market Street, [] Floor, Courtroom [], Wilmington, Delaware 198015, or via zoom, to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to Section 1125 and (b) Confirmation of the Plan pursuant to Section 1129. The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

Any objection to final approval of the Disclosure Statement as providing adequate information pursuant to Section 1125 and/or Confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on the following parties so as to be actually received on or before **November 15, 2023 at 4:00 p.m. (prevailing Eastern time)** upon (a) counsel to the Debtor: William Chipman, Jason J. DeJonker, and William S. Hackney at Chipman@chipmanbrown.com, jason.dejonker@bclplaw.com, and william.hackney@bclplaw.com; (b) counsel to the Office of the United States Trustee, Timothy J. Fox at Timothy.Fox@usdoj.gov, and (c) counsel to the First Lien Lender, Ray New York LLC c/o of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn: Jennifer Rodburg and Andrew Minear, email: Jennifer.Rodburg@friedfrank.com and Andrew.Minear@firedfrank.com) and (d) counsel to Purchaser 550W21 Owner LLC, c/o Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Christopher Robertson and Eli J. Vonnegut, email: Christopher.robertson@davispolk.com and eli.vonnegut@davispolk.com. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of Section 1129. Among other requirements, the Plan must: (a) be accepted by all Impaired Classes of Claims or Equity Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) be feasible. The Bankruptcy Court must also find that the Plan: (i) has classified Claims and Equity Interests in a permissible manner; (ii) complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) has been proposed in good faith.

Claims of the Debtor's Affiliates against the Debtor, including Intercompany Claims, shall be disregarded for both voting and distribution purposes.

Accompanying this Combined Plan and Disclosure Statement for the purposes of soliciting votes on this Combined Plan and Disclosure Statement are solicitation packages, which contain

copies of: (a) the Confirmation Hearing Notice; (b) a Ballot; and (c) such other documents the Bankruptcy Court may direct or approve or that Debtor deems appropriate.

Holders of Claims in non-voting classes will receive packages consisting of: (a) the Confirmation Hearing Notice; and (b) a notice of such Holder's non-voting status.

The date by which the Debtor must receive original ballots by mail, overnight delivery, hand delivery, or for electronic ballots, the deadline by which such electronic ballots must be submitted is **November 15, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

If you are entitled to vote to accept or reject this Combined Plan and Disclosure Statement, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of this Combined Plan and Disclosure Statement; (b) indicating whether you opt out of the Releases; and (c) signing and returning the Ballot to the Debtor. If you are a member of a Class entitled to vote and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Debtor's counsel.

The following Ballots will not be counted or considered:

(1)     any Ballot received after the deadline to vote, unless the Bankruptcy Court grants an extension with respect to such Ballot;

(2)     any Ballot that is illegible or contains insufficient information;

(3)     any Ballot cast by a Person or Entity that does not hold a Claim in a Class entitled to vote;

(4)     any Ballot cast for a Claim designated as unliquidated, contingent, or disputed or as zero (0) or unknown in amount and for which no Rule 3018 Motion has been timely filed;

(5)     any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of this Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of this Combined Plan and Disclosure Statement;

(6)     simultaneous duplicative Ballots voted inconsistently;

(7)     Ballots partially rejecting and partially accepting this Combined Plan and Disclosure Statement;

(8)     any Ballot received other than the official form sent by the Debtor's counsel;

(9)     any unsigned Ballot; or

(10)    any Ballot that is submitted by facsimile.

**YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE**

41

**BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 6.1    *DIP Facility.*

The First Lien Lender has agreed in principle to extend post-petition debtor-in-possession financing to the Debtor in the initial principal amount of $989,000.00, which may be advanced in one or more separate draws as authorized by the Bankruptcy Court (generally, the "**DIP Loan**"). The DIP Loan is expected to have a non-default interest rate of a 10% per annum interest rate on the outstanding amount and maturing on or at the closing of the Sale.  The DIP Loan may also include an additional $250,000.00 in incremental funding should the Debtor meet certain benchmarks and reporting requirements. The DIP Loan remains subject to final agreement and execution as to the governing terms and ultimately Bankruptcy Court approval, and is thus subject to possible change or modification.

Section 6.2    *Sources of Consideration for Plan Distribution.*

The Debtor shall fund distributions under the Plan with the Sale Proceeds, Cash on hand, the Class 3 Carve-Out, the Class 4 Carve-Out and the Reserve Fund. Cash payments to be made pursuant to the Plan will be made by the Debtor or Plan Administrator.

Section 6.3    *Bankruptcy Rule 9019 Settlement.*

(a)    In order to facilitate a consensual plan and expeditions implementation of the Plan, including the closing of the Sale, and to compromise and settle the same, the Debtors, the First Lien Lender and DZ 21st Street have agreed to a compromise and settlement of all such issues by providing for the treatment and distributions set forth in the Plan.  Specifically, as part of this settlement and compromise, DZ 21st Street shall have a stipulated Allowed Claim set forth in Class 3 and shall be entitled to the recovery set forth herein.  Pursuant to the settlement and compromise, First Lien Lender has agreed to "gift" its contribution to the Class 3 Carve-Out, Class 4 Carve-Out and Reserve Fund.  However, the First Lien Lender and DZ 21st Street, in order to facilitate a consensual plan and to settle and compromise any and all such issues and alleged Causes of Action, have each agreed to establish the Reserve Fund for the benefit of Dr. Efraim Gutkind and other holders of Claims in Class 5. The funding of the Reserve Fund, any distributions therefrom and the provisions of this Plan will constitute a good faith compromise and settlement of disputes described above.

(b)    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the settlements described in this Section 6.3 pursuant to Bankruptcy Rule 9019 and its finding that these are good faith settlements pursuant to any applicable state laws, given and made after due notice and opportunity for hearing and will bar any Causes of Action in connection with the

First Lien Claims, the DZ Claims, Claims by Dr. Efraim Gutkind, the Debtor, the First Lien Lender, DZ 21st Street and any other party in interest.

Section 6.4    *Reserve Fund.*

Pursuant to and in accordance with the settlement set forth in Section 6.4 of the Plan, the Reserve Fund, which shall not exceed $6.3 million[9], shall be funded by the proceeds of the Sale (allocated by reducing the First Lien Lender's recovery hereunder in an amount equal to 84.13% of the Reserve Fund, by reducing DZ 21st Street's recovery hereunder in an amount equal to 15.87% of the Reserve Fund and by a contribution from the Debtor'). To the extent there are any proceeds in the Reserve Fund after distributions to Holders of Allowed Disputed Investor Claims in Class 5, such excess proceeds shall be distributed to the First Lien Lender and DZ 21st Street based on the ratio of their original contribution reduction of their recovery hereunder (84.13%% of such excess proceeds shall be distributed to the First Lien Lender and 15.87% shall be distributed to DZ 21st Street).

Section 6.5    *Sale.*

(a)    After Confirmation, the Debtor shall consummate the Sale, and any other transactions contemplated by the Purchase and Sale Contract, pursuant to the terms and conditions of the Purchase and Sale Contract. Upon consummation of the Sale: (i) the Property shall be transferred to and vest in Purchaser; and (ii) the First Lien Lender shall assign its mortgage encumbering the Property and promissory note related thereto to Purchaser's lender, the identity of which Purchaser will disclose to the Debtor and the First Lien Lender prior to such consummation. The Sale shall not be subject to overbidding. Upon entry of the Confirmation Order by the Bankruptcy Court, the Sale and the Purchase and Sale Contract will be deemed approved, all matters provided for under the Purchase and Sale Contract and any related documentation will be deemed authorized and approved without any requirement of further act or action and the Debtor will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Purchase and Sale Contract and any related documentation, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

(b)    Notwithstanding the foregoing, the consummation of the Sale shall occur on or before December 20, 2023. In the event that consummation of the Sale does not occur by December 20, 2023, and the Debtor, the First Lien Lender, and Purchaser have not agreed, in writing, to extend such deadline, the Plan, any votes cast in favor of the Plan and any compromises or agreed discounts incorporated in the Plan shall be deemed withdrawn, revoked, and deemed void *ab initio*, notwithstanding whether the Bankruptcy Court has entered the Confirmation Order. In the event

[9] The deal was that DZ contributes $1 million and Ray contributes the remainder, subject to each party capping their downside at $14m/$70m respectively.

43

that such written agreement extending the deadline to consummate the Sale is reached on or before December 20, 2023, the Debtor shall file such agreement in the Chapter 11 Case.

(c)    Subject to Section 6.4(a) above, prior to, on, or as soon as reasonably practicable after the Effective Date, the Debtor may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Plan Supplement, including: (i) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (ii) all other actions that the Debtor reasonably determines are necessary or appropriate.

Section 6.6    *The Plan Administration Process and Wind Down.*

(a)    On the Effective Date, Plan Administrator shall accept authority over the Plan Administration Assets as a plan administration officer; provided, however, that Plan Administrator may abandon or otherwise not accept any assets that Plan Administrator believes, in good faith, have no value to the administration of the Plan or the Wind Down. As of the Effective Date, all assets vested as Plan Administration Assets and all assets dealt with in the Plan shall be free and clear of all Liens, Claims, and Equity Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

(b)    The powers, rights, and responsibilities of the Plan Administrator shall include the authority and responsibility to: (i) receive, manage, invest, supervise, and protect the Plan Administration Assets; (ii) pay taxes or other obligations incurred by the Estate after the Effective Date; (iii) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution, and distribution of Plan Administration Assets; (iv) calculate and implement distributions of Plan Administration Assets; (v) assert, settle, and abandon retained Causes of Action; (vi) resolve issues involving Claims and Equity Interests; and (vii) perform such other duties and functions that are consistent with the implementation of the Plan and undertake all administrative functions of the Chapter 11 Case, including the ultimate closing of the Chapter 11 Case. Plan Administrator is the successor to the Debtor, the Estate, and the Debtor's rights to their books and records. Plan Administrator shall be authorized pursuant to Section 554, in its sole discretion without any further notice to any party or action, order or approval of the Bankruptcy Court, to abandon, dispose of, or destroy in any commercially reasonable manner all originals or copies of any documents and books and records, including any electronic records, of the Debtor and which Plan Administrator reasonably concludes are burdensome or of inconsequential value and benefit.

On the Effective Date, Plan Administrator shall also have the power, right, and responsibility to conduct the Wind Down and to take possession of all books, records, and files of the Debtor and the Estate and provide for the retention and storage of such books, records, and files until such time as Plan Administrator determines that retention of same is no longer necessary or required. Plan Administrator is authorized and empowered to effect the dissolution of the Debtor as soon as practicable after the Effective Date without the need for any company action or approval, and neither the Debtor nor Plan Administrator shall be required to pay any taxes or fees to cause such dissolution. On the Effective Date, Plan Administrator shall Wind Down the affairs of the Debtor

and file final tax returns for the Debtor. Plan Administrator shall be authorized to file on behalf of the Debtor and any non-Debtor Affiliates certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtor.

(c)      The Debtor shall indemnify and hold harmless Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(d)      From and after the Effective Date, assertion, settlement, or abandonment of all retained Causes of Action shall be the sole responsibility of Plan Administrator pursuant to the Plan and the Confirmation Order. From and after the Effective Date, Plan Administrator shall have exclusive rights, powers, and interests of the Estate to assert, settle, or abandon such retained Causes of Action as the sole representative of the Estate pursuant to Section 1123(b)(3). All such retained Causes of Action are reserved and preserved.

(e)      All expenses incurred by Plan Administrator shall be the responsibility of the Estate and paid from the Sale Proceeds or other assets of the Estate.

Section 6.7      *Corporate Action.*

(a)      On the Effective Date, all actions contemplated by this Combined Plan and Disclosure Statement, the Plan Supplement, the Purchase and Sale Contract, and the RSAs shall be deemed authorized and approved in all respects, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtor and any corporate action required by the Debtor in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, or officers of the Debtor or otherwise.

(b)      On or before the Effective Date, as applicable, the appropriate officers of the Debtor, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated by this Combined Plan and Disclosure Statement, the Plan Supplement, the RSAs, and the Purchase and Sale Contract (or necessary or desirable to effect the transactions contemplated by the foregoing) in the name of and on behalf of the Debtor, and any and all agreements, documents, and instruments relating to the foregoing.

(c)      The authorizations and approvals contemplated by this Section 6.7 shall be effective notwithstanding any requirements under non-bankruptcy Law.

(d)      After the Effective Date, to the extent necessary, Plan Administrator shall have all authority to address any and all matters that would have required the approval of, and to act on behalf of, the stockholders, directors, members, or managers of the Debtor, including the Wind Down and dissolution of the Debtor.

Section 6.8     *Vesting of Assets.*

On the Effective Date, pursuant to Sections 1141(b) and (c), the Plan Administration Assets, if any, shall vest in the Debtor and the Estate for the purpose of liquidating the Plan Administration Assets and winding down the Estate, free and clear of all Liens, Claims, charges, and other encumbrances.

Section 6.9     *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by Section 1146(a), any transfer from the Debtor to any Entity pursuant to, in contemplation of, or in connection with this Combined Plan and Disclosure Statement or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Combined Plan and Disclosure Statement, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Combined Plan and Disclosure Statement, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Combined Plan and Disclosure Statement.

Section 6.10    *Effectuating Documents; Further Transactions.*

Prior to, on, and after the Effective Date, the Debtor and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Combined Plan and Disclosure Statement, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Combined Plan and Disclosure Statement.

The Confirmation Order shall, and shall be deemed to, pursuant to both Sections 363 and 1123, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

Section 6.11    *Nonconsensual Confirmation.*

The Debtor intends to undertake to have the Bankruptcy Court confirm the Plan under Section 1129(b) as to any Classes that reject or are deemed to reject the Plan.

Section 6.12    *Closing of the Chapter 11 Case.*

Plan Administrator shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.  Upon the filing of a motion to close the Chapter 11 Case, the Debtor shall file a final report with respect to the Chapter 11 Case pursuant to Local Rule 3022-1(c).

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 7.1    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

(a)    All Executory Contracts and Unexpired Leases of the Debtor that are not otherwise assumed or rejected will be deemed assumed by the Debtor in accordance with the provisions and requirements of Sections 365 and 1123, other than (i) those that are identified on the Rejection Schedule; (ii) those that have been previously assumed or rejected pursuant to a Final Order prior to the Effective Date; (iii) those that are the subject of a motion seeking assumption or rejection as of the Effective Date; or (iv) those that are to be rejected pursuant to the terms of this Combined Plan and Disclosure Statement. Each Executory Contract and Unexpired Lease assumed pursuant to this Article VII but not assigned to a third party shall be deemed to be assigned to the applicable contracting Debtor, and be fully enforceable by the Debtor in accordance with the terms thereof, except as otherwise modified by the provisions of this Combined Plan and Disclosure Statement, or by any order of the Bankruptcy Court.

(b)    The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts or Unexpired Leases, as described in this Combined Plan and Disclosure Statement and Plan Supplement, pursuant to Sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Debtor, the Estate, and all parties in interest in the Chapter 11 Case; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to this Combined Plan and Disclosure Statement are effective as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements herein; *provided, however*, that such Claims must be filed with the clerk of the Bankruptcy Court and served upon Plan Administrator and counsel for the Debtor within thirty (30) days of the Bankruptcy Court entering the Confirmation Order; *provided, further*,

that any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within the time required by this section will be forever barred from assertion against the Debtor, the Estate, the property of the Debtor, or Plan Administrator. Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim shall be classified as a 5 General Unsecured Claim.

(c)     Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Combined Plan and Disclosure Statement restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Combined Plan and Disclosure Statement shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

(d)     The Debtor shall create the Rejection Schedule in consultation with Purchaser, and Purchaser shall have approved any assumptions, rejections, or modifications of material Executory Contracts and Unexpired Leases as set forth therein, which approval shall not be unreasonably withheld, conditioned, or delayed. The Debtor shall include the Rejection Schedule with the Plan Supplement, filed on or before the hearing to approve this Combined Plan and Disclosure Statement. Notwithstanding anything to the contrary herein, the Debtor reserves the right to alter, amend, modify, or supplement the Rejection Schedule at any time before the Effective Date, in consultation with Purchaser.

Section 7.2     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

(a)     Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to this Combined Plan and Disclosure Statement shall be satisfied, pursuant to Section 365(b)(1), by payment of the Cure Cost in Cash on the Effective Date, subject to the limitation described in the following paragraph, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. No later than the Plan Supplement Filing Date, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, the Debtor shall file and serve upon applicable contract and lease counterparties notices of proposed assumption and proposed Cure Costs, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption, assumption and assignment, or related Cure Cost must be filed, served, and actually received by the Debtor within fourteen (14) days of such assumption or assumption and assignment.

(b)    Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption, assumption and assignment, or Cure Cost shall be deemed to have consented to such assumption, assumption and assignment, or Cure Cost. In the event of a dispute regarding: (i) the amount of any Cure Cost, (ii) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of Section 365(b), if applicable, under the Executory Contract or the Unexpired Lease to be assumed or assumed and assigned, and/or (iii) any other matter pertaining to assumption and/or assumption and assignment, then the Bankruptcy Court shall hear such dispute prior to the assumption and/or assumption and assignment becoming effective, and the applicable Cure Costs associated therewith (if any) shall be paid following entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment and shall not prevent or delay implementation of the Plan or Effective Date; *provided, however*, that the Debtor may settle any dispute regarding the amount of any Cure Cost without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided, further,* that notwithstanding anything to the contrary herein, the Debtor reserves the right to reject any Executory Contract or Unexpired Lease within 30 days after the entry of a Final Order resolving an objection to assumption or assumption and assignment, determining the Cure Cost for an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

(c)    Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Combined Plan and Disclosure Statement or otherwise, and the payment of the associated Cure Cost, if any, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to any Executory Contract or Unexpired Lease that has been assumed or assumed and assigned, and the associated Cure Cost paid, shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.3    *Contracts and Leases Entered into After the Petition Date.*

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, shall be performed by the Debtor in the ordinary course of its business. Accordingly, such contracts and leases that are not otherwise assumed or rejected will be deemed assumed by the Debtor in accordance with the provisions and requirements of Sections 365 and 1123.

Section 7.4    *Insurance Policies.*

Notwithstanding anything to the contrary in this Combined Plan and Disclosure Statement, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all insurance policies pursuant to which the Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as executory contracts pursuant to this Combined Plan and Disclosure Statement and shall be assumed by the Debtor or Plan

49

Administrator, as applicable, and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies not expressly assumed or assumed and assigned shall be deemed rejected.

Section 7.5    *Reservation of Rights.*

Nothing contained in this Combined Plan and Disclosure Statement shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

Section 7.6    *Nonoccurrence of the Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4), unless such deadline(s) have expired.

## ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

Section 8.1    *Distribution on Account of Claims and Equity Interests Allowed as of the Effective Date.*

Except as otherwise provided in this Combined Plan and Disclosure Statement or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Equity Interests Allowed on or before the Effective Date shall be made on the Distribution Date; *provided, however,* that: (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) in accordance with Article IV of this Combined Plan and Disclosure Statement, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C). To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

On the Closing Date, the Debtor shall deposit all remaining Cash after making any payment on the Closing contemplated by this Combined Plan and Disclosure Statement into an escrow account, pursuant to an escrow agreement that is reasonably acceptable to DZ 21st Street, for the benefit of DZ 21st Street. Amounts shall be released only from the escrow account (i) by Final

Order of the Court to pay any amounts arising after the Closing that are required to be paid pursuant to this Combined Plan and Disclosure Statement, or (ii) to DZ 21st Street.

Section 8.2    *Distribution on Account of Claims and Equity Interests Allowed After the Effective Date.*

(a)    *Payments and Distributions on Disputed Claims.* Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the first day that is thirty (30) Business Days after such Disputed Claim becomes an Allowed Claim; *provided, however,* that: (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice; and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with Article XI of this Combined Plan and Disclosure Statement and paid.

(b)    *Special Rules for Distributions to Holders of Disputed Claims.* Notwithstanding any provision otherwise in this Combined Plan and Disclosure Statement and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties or by Final Order.

Section 8.3    *Timing and Calculation of Amounts to Be Distributed.*

Except as otherwise provided herein, on the Distribution Date, each Holder of an Allowed Claim shall receive the full amount of the distributions that this Combined Plan and Disclosure Statement provides for Allowed Claims in the applicable Class. Except as otherwise provided in this Combined Plan and Disclosure Statement, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Combined Plan and Disclosure Statement, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Section 8.4    *Delivery of Distributions.*

(a)    *Record Date for Distributions.* On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim is transferred twenty (20) or fewer days before the Distribution Date, Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Debtor, the Plan Administrator and the Distribution Agent shall have no obligation to recognize any transfer of any applicable Claims occurring after the close of business

51

on the Distribution Record Date, and shall be entitled to recognize and deal for all purposes under this Combined Plan and Disclosure Statement with only those Holders of record as of the close of business on the Distribution Record Date.

(b)     *Cash Distributions*. Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Debtor or Plan Administrator, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(c)     *Delivery of Distributions in General*. Except as otherwise provided in this Combined Plan and Disclosure Statement, Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtor's records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder; *provided, however*, that the manner of such distributions shall be determined at the discretion of the Debtor or Plan Administrator, and no Distribution Agent shall incur any liability whatsoever on account of any distributions under the Plan.

(d)     *Delivery of Distributions on Account of First Lien Claims*. The First Lien Lender shall be deemed to be the Holder of all First Lien Claims for purposes of distributions to be made hereunder, and all distributions on account of the First Lien Claims shall be made to the First Lien Lender. As soon as practicable following compliance with the requirements set forth in Article VIII of the Plan (as applicable), the First Lien Lender shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed First Lien Claims in accordance with the terms of this Combined Plan and Disclosure Statement. Notwithstanding anything in this Combined Plan and Disclosure Statement to the contrary, and without limiting the exculpation and release provisions of this Combined Plan and Disclosure Statement, the First Lien Lender shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Lender.

Section 8.5     *Distributions by Distribution Agent.*

Plan Administrator shall serve as Distribution Agent (provided that Plan Administrator may hire professionals or consultants to assist with making disbursements or to act as Distribution Agent) and shall cause all distributions to be made to Holders of Claims after the Effective Date. Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

Section 8.6     *Minimum Distributions.*

Notwithstanding anything herein to the contrary, the Debtor, Plan Administrator, and Distribution Agent shall not be required to make distributions or payments of less than $100 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar or share of applicable equity interests (up or down), with half dollars and half shares of applicable equity interests or less being rounded down.

Section 8.7     *Undeliverable Distributions.*

(a)     *Holders of Certain Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Debtor or Plan Administrator (or its Distribution Agent) as undeliverable, no further distributions shall be made to such Holder. Undeliverable distributions shall remain in the possession of the Debtor or Plan Administrator, subject to Section 8.7(b) below, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

(b)     *Failure to Claim Undeliverable Distributions*. Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after such distribution shall be deemed unclaimed property under Section 347(b), and such Unclaimed Distribution shall revert to and vest in the Debtor or Plan Administrator free of any restrictions thereon. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary. Nothing contained herein shall require the Debtor or Plan Administrator to attempt to locate any Holder of an Allowed Claim.

(c)     *Failure to Present Checks*. Checks issued by Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 90 days after the issuance of such check. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 90 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check released and be forever barred, estopped, and enjoined from asserting any such Claim against the Debtor, Plan Administrator, or its property. Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Debtor or Plan Administrator. Nothing contained herein shall require the Debtor or Plan Administrator to attempt to locate any Holder of an Allowed Claim.

Section 8.8     *Compliance with Tax Requirements/Allocations.*

In connection with this Combined Plan and Disclosure Statement, to the extent applicable, the Debtor and Plan Administrator shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Combined Plan and Disclosure Statement to the contrary, the Debtor, Plan Administrator, and Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Debtor and Plan Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

53

Section 8.9     *Surrender of Cancelled Instruments or Securities.*

Except as otherwise provided in this Combined Plan and Disclosure Statement, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Equity Interest that is released or cancelled by the Plan shall be deemed to have surrendered such certificate or instrument to Plan Administrator. Except as otherwise expressly provided in the Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtor, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Equity Interests, which shall continue in effect. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

Section 8.10    *Claims Paid or Payable by Third Parties.*

(a)      *Claims Paid by Third Parties*. The Notice and Claims Agent, as applicable, shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or Plan Administrator without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or Plan Administrator on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Debtor or Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)      *Claims Payable by Insurance*. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtor's insurance policies, if any, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies. To the extent that one or more of the Debtor's insurers satisfies or agrees to satisfy in full or in part a Claim, if any, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      *Applicability of Insurance Policies*. Except as otherwise provided in this Combined Plan and Disclosure Statement, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Combined Plan and Disclosure Statement shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE IX.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR EQUITY INTERESTS

Section 9.1      *Allowance of Claims and Equity Interests.*

(a)      Except as provided in Article XI of this Combined Plan and Disclosure Statement, Plan Administrator shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under the Plan.

(b)      Except as expressly provided in this Combined Plan and Disclosure Statement or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Case allowing such Claim. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties.

Section 9.2      *Claims Administration Responsibility.*

Except as otherwise specifically provided in this Combined Plan and Disclosure Statement or by order of the Bankruptcy Court, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, Plan Administrator shall have the sole authority for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Equity Interests in, the Debtor, including the authority: (a) to file, withdraw, or litigate to judgment objections to Claims or Equity Interests; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. In the event that any objection to a Claim filed by the Debtor remains pending as of the Effective Date, Plan Administrator shall be deemed substituted for the Debtor as the objecting party.

Section 9.3      *Estimation of Claims and Equity Interests.*

Before or after the Effective Date, the Debtor or Plan Administrator, as applicable, may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim or Equity Interest pursuant to Section 502(c) or Bankruptcy Rule 3012 for any reason, regardless of whether any party previously objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Equity Interest, including during the litigation of any objection to any Claim or Equity Interest or during the appeal relating to such objection. Simultaneously with the filing of this Combined Plan and Disclosure Statement, the Debtor has filed a motion to estimate in regards to the Disputed Investor Claims.  That motion is expected to be heard and ruled upon prior to the hearing on confirmation. Notwithstanding any provision otherwise in this Combined Plan and Disclosure Statement, a Claim or Equity Interest that has been expunged from the Claims Register,

55

but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim or Equity Interest, such estimated amount shall constitute a limitation on the maximum amount of such Claim or Equity Interest for all purposes under the Plan, and Plan Administrator may elect to pursue any supplemental proceedings to object to any distribution on such Claim or Equity Interest. Notwithstanding Section 502(j), in no event shall any Holder of a Claim that has been estimated be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. Each of the foregoing procedures are cumulative and not exclusive of one another. Claims may be estimated and compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

Section 9.4    *Adjustment to Claims and Equity Interests Without Objection.*

Any Claim or Equity Interest that has been paid or satisfied, or any Claim or Equity Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by Plan Administrator without filing an objection to such Claim or Equity Interest or further notice to or action, order, or approval of the Bankruptcy Court.

Section 9.5    *Disallowance of Certain Claims.*

Any Claims held by Entities from which property is recoverable under Sections 542, 543, 550, or 553 or by a transferee of a transfer avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) shall be deemed disallowed pursuant to Section 502(d), and Holders of such Claims may not receive any distributions on account of such Claims and Equity Interests until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due have been turned over or paid to Plan Administrator. All Proofs of Claim filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further action, order or approval of the Bankruptcy Court.  However, the Plan Administrator shall notify the Clerk of the Court and the Claims Agent of any such claim disallowed pursuant to this provision.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims.  Again, the Plan Administrator shall notify the Clerk of the Court and the Claims Agent of any such Claim disallowed pursuant to this provision.**

Section 9.6    *Offer of Judgment.*

Plan Administrator is authorized to serve upon any Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and Federal Rule of Civil Procedure 68 shall apply

to such offer of judgment. To the extent the Holder of a Claim or Equity Interest must pay the costs incurred by Plan Administrator after making such offer, Plan Administrator is entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 9.7    *Amendments to Claims.*

On or after the Effective Date, except as provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or Plan Administrator, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further action.

Section 9.8    *No Interest on Disputed Claims.*

Unless otherwise specifically provided for in this Combined Plan and Disclosure Statement or as otherwise required by Section 506(b), postpetition interest shall not accrue or be paid on Claims or Equity Interests, and no Holder of a Claim or Equity Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Equity Interest. Without limiting the foregoing, unless otherwise specifically provided for in this Combined Plan and Disclosure Statement or otherwise required by Section 506(b), interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, if any.

## ARTICLE X.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 10.1    *Conditions Precedent to Confirmation of the Plan.*

The following are conditions precedent to entry of the Confirmation Order:

(a)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(b)    the Confirmation Order shall be consistent in all material respects with this Combined Plan and Disclosure Statement, and shall otherwise be in a form reasonably acceptable to the Debtor and the First Lien Lender, which consent as to the form of the Confirmation Order shall not be unreasonably withheld, conditioned, or delayed;

(c)    this Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified except as set forth herein; and

(d)    the RSAs shall not have been terminated and shall be in full force and effect.

Section 10.2    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless and until each of the following conditions have occurred or been waived in accordance with the terms herein:

(a)    the Confirmation Order shall have become a Final Order (unless otherwise waived by the First Lien Lender) and shall not have been stayed;

(b)    all documents, certificates, and agreements necessary to implement the Plan shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable Laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

(c)    this Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made as set forth herein;

(d)    all actions necessary to implement this Combined Plan and Disclosure Statement shall have been effected;

(e)    all governmental and material third party approvals and consents necessary in connection with the Sale shall have been obtained, all conditions precedent shall have been fulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Sale;

(f)    the RSAs shall not have been terminated and shall be in full force and effect;

(g)    the 9019 Settlement shall have been approved by the Bankruptcy Court (unless otherwise waived by the First Lien Lender and DZ 21st Street);

(h)    there shall be no ruling, judgment, or order issued by any Governmental Unit making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Sale

(i)    the First Lien Lender shall receive a distribution from the Sale proceeds on account of its Class 2 Caims of not less than $70,000,000; and

(j)    the Sale shall have closed and been consummated.

Section 10.3    *Waiver of Conditions Precedent.*

The Debtor, with the consent of the First Lien Lender, which consent, other than with respect to Section 10.2(g) and Section 10.2(i), shall not be unreasonably withheld, conditioned, or delayed, may waive any of the conditions to the Effective Date set forth above at any time, without

any notice to any parties in interest and without any further notice to, or action, order, or approval of, the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan; *provided, that,* with respect to the condition in Section 10.2(f) and Section 10.2(g) hereof, DZ 21st Street's consent shall also be required.

Section 10.4    *Effect of Failure of Conditions Precedent.*

If the Effective Date does not occur, then, upon notice by the Debtor to the Bankruptcy Court: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in this Combined Plan and Disclosure Statement or the Confirmation Order shall: (i) constitute a waiver or release of any Claims, Equity Interests, or Causes of Action, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

Section 10.5    *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the filing of this Combined Plan and Disclosure Statement, any statement or provision contained in this Combined Plan and Disclosure Statement, or action taken by the Debtor, the First Lien Lender or DZ 21st Street with respect to this Combined Plan and Disclosure Statement shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

Section 10.6    *Substantial Consummation of the Plan.*

Substantial consummation of the Plan under Section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XI.

## EFFECT OF CONFIRMATION

Section 11.1    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind and inure to the benefit of the Debtor, Plan Administrator, the First Lien Lender, and each Holder of a Claim against or Equity Interest in the Debtor and inure to the benefit of and be binding on the Debtor's, Plan Administrator's, the First Lien Lender's, and Holder's respective successors and assigns, regardless of whether the Claim or Equity Interest of such Holder is Impaired under the Plan and whether such Holder has accepted or rejected the Plan or is deemed to have accepted or rejected the Plan.

Section 11.2   *Release of Claims and Termination of Equity Interests; Compromise and Settlement of Claims, Equity Interests, and Controversies.*

(a)      To the fullest extent permitted by Section 1141(d), and except as otherwise specifically provided in the Plan: (i) the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and cancellation, effective as of the Effective Date, of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, liabilities of, Liens on, obligations of, and rights against the Debtor, Plan Administrator, or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and causes of action that arose prior to the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i), in each case whether or not: (A) a Proof of Claim or Equity Interest is filed or deemed filed pursuant to Section 501; (B) a Claim or Equity Interest is Allowed; or (C) the Holder of such Claim or Equity Interest has accepted or rejected, or been deemed to accept or reject, the Plan; (ii) all Claims and Equity Interests shall be satisfied, cancelled, and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Section 502(g); and (iii) all Entities shall be precluded from asserting against the Debtor, the Estate, Plan Administrator, their successors and assigns, and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. Except as otherwise provided herein, any default by the Debtor or its Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the release of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

(b)      Pursuant to Section 1123 and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest, and shall be deemed a motion to approve such good-faith compromise between the Debtor and any other party that has settled or compromised with the Debtor. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement among the parties that have agreed to them (among any other party who has expressly entered into a written settlement agreement) pursuant to the Plan, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor and its Estate and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, Plan Administrator may compromise and settle Claims against the Debtor and its Estate.

Notwithstanding any other provision in the Plan, the settlements are approved among the parties that have agreed to them (among any other party who has expressly entered into a written settlement agreement), and the treatment of Claims and Equity Interests is being afforded pursuant to Confirmation by satisfying the requirements of Section 1129.

Section 11.3    *Releases by the Debtor.*

**Without limiting any other applicable provisions of, or releases contained in, the plan, pursuant to section 1123(b), and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the efforts of Released Parties to facilitate the expeditious liquidation of the Debtor and the implementation of the restructuring contemplated by the Plan, pursuant to the Confirmation Order, the adequacy of which is hereby confirmed, and on and after the effective date, each Released Party shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtor, Plan Administrator, the Estate, and any other person seeking to exercise the rights of the estate from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, Plan Administrator, or the Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, matured or unmatured, existing or hereafter arising, in law, at equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, including, without limitation, those that the Debtor, Plan Administrator, the Estate, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, the Debtor or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the business operations of the Debtor, actions taken by the Debtor's board of directors, any avoidance actions (but excluding avoidance action brought as counterclaims or defenses to claims asserted against the Debtor), the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or Plan Administrator, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, including those occurring prior to the Petition Date, intercompany transactions (other than any Intercompany Claims that have been reinstated as provided herein), the Sale, the Chapter 11 Case, the formulation, preparation, dissemination, or negotiation of this Combined Plan and Disclosure Statement, the Plan Supplement, the RSAs, or other documents, solicitation, implementation or administration of the Plan, including the issuance or distribution of any Property pursuant to the Plan or any other related agreement, pursuit of Confirmation, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the effective date, other than claims or liabilities arising from any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence; *provided, however*, that the foregoing release shall not apply to any express contractual or financial obligations or any right or obligation arising under or that is part of the Plan or any agreements (including those set forth in the Plan Supplement or the Purchase and Sale Contract) entered into pursuant to, in connection with, or contemplated by the Plan, and any right to enforce the Plan and Confirmation Order**

is not so released. For the avoidance of doubt, nothing in this Section 11.3 shall in any way affect the operation of Section 11.2 of this Combined Plan and Disclosure Statement, pursuant to Section 1141(d).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor's release, which includes by reference each of the related provisions and definitions contained in this Combined Plan and Disclosure Statement, and further, shall constitute the Bankruptcy Court's finding that the Debtor's release is (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of such claims; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to the Debtor or Plan Administrator or the Estate asserting any Claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

To the extent permitted by applicable law, the Debtor shall be authorized, but not obligated, to seek releases for the Released Parties comparable to those in this Section 11.3 from any and all other parties receiving distributions under the Plan.

Section 11.4    *Releases by Holders of Claims or Interests.*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service and contribution of the Released Parties to facilitate the implementation of the Plan, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, by the holders of all Claims and Interests who vote to accept the Plan and opt-in on the ballot to grant the releases set forth herein, (b) the holders of Unimpaired Claims or Equity Interests who do not object to the releases by filing an objection to the Plan and opt-in on the notice to grant the releases set forth herein (provided that holders of Unimpaired Claims or Equity Interests shall not be deemed to have released the Debtor pursuant to this Section 11.4); and (c) with respect to any Entity in the foregoing clauses (a) and (b), (x) such Entity's predecessors, successors, and assigns, and (y) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing Entities are providing releases, in each case, from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, Plan Administrator, or the Estate, as applicable, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, matured or unmatured, existing or hereafter arising, in law, at equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that such Holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, Plan Administrator, or the Estate, the Chapter 11 Case, the pre- and post-petition marketing and sale process, the Sale, the subject matter of, or the transactions or events giving rise to, any Claim or Equity

Interest that is treated in this Combined Plan and Disclosure Statement, the business or contractual arrangements or interactions between the Debtor and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Case, the RSAs, and related agreements, instruments, and other documents and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, or any other relief obtained by Debtors in the Chapter 11 Case, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the effective date, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct as determined by a Final Order.

Section 11.5    *Exculpation and Limitation of Liability.*

(a)    **Upon and effective as of the Effective Date, the Debtor and its directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants, and other professionals, advisors, and agents shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including Section 1125(e).**

(b)    **Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement, or any related documents, from and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken from the period beginning on the Petition Date and extending to and including the Effective Date in connection with or in contemplation of the restructuring of the Debtor, including without limitation, the distribution of Property under the Plan or any other agreement; *provided, however*, that the foregoing shall have no effect on any Entity's liability resulting from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; *provided, further,* that, to the extent permitted by applicable law, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning their duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.**

(c)    **Exculpated Parties have, and shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and, therefore, are not and shall not be liable at any time for the violations of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

Section 11.6    *Injunction.*

**The satisfaction, releases, cancellation, and exculpation pursuant to this Article XI shall also act as a permanent injunction against any Entity bound by such provision to commence or continue any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, cancelled, or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by Sections 524 and 1141.**

Section 11.7    *Setoffs and Recoupment.*

(a)    Except as otherwise provided herein, Plan Administrator, pursuant to the Bankruptcy Code, applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtor or Plan Administrator may hold against such Holder, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order, or otherwise); *provided, however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by Plan Administrator with respect to such Claims, rights, and Causes of Action.

(b)    In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of the Debtor or Plan Administrator, as applicable, unless such Holder has timely and properly filed a Proof of Claim preserving such setoff or recoupment in such Proof of Claim.

Section 11.8    *Retention of Causes of Action; Reservation of Rights.*

Except as otherwise provided in Sections 11.3, 11.4, 11.5, and 11.6 above, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of the Estate or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor including actions arising under chapter 5 of the Bankruptcy Code. Except as provided in any order entered by the Bankruptcy Court, Plan Administrator shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced. Notwithstanding the foregoing, the Debtor and Plan Administrator shall not retain any Claims or Causes of Action released under the terms of the Plan against Released Parties.

Section 11.9    *Release of Liens.*

(a)    Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and cancelled, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to Plan Administrator and its successors and assigns.

(b)    To the extent that the First Lien Lender that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such First Lien Claim, then as soon as practicable on or after the Effective Date, such Holder (or the First Lien Lender, as applicable) shall take any and all steps requested by the Debtor or Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and Plan Administrator shall be entitled to make any such filings or recordings on such Holder's behalf.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Sections 105(a) and 1142, including jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, nature, validity, amount, or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment and any and all objections to the allowance, classification, priority or amount of Claims or Equity Interests;

(b)    Decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom; (ii) any potential obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Debtor's or Plan Administrator's amendment, modification, or supplement after the Effective Date, pursuant to Article VII of this Combined Plan and Disclosure Statement, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(d)      Ensure that distributions to Holders of Allowed Claims are carried out pursuant to the provisions of the Plan;

(e)      Adjudicate, decide, or resolve any motions, adversary proceedings, any other matters, and any applications involving the Debtor that may be pending on the Effective Date;

(f)      Adjudicate, decide or resolve any and all matters related to Causes of Action;

(g)      Adjudicate, decide or resolve any and all matters related to Section 1141;

(h)      Resolve any and all avoidance or recovery actions under Sections 105, 502(d), 542 through 551 and 553;

(i)      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or Confirmation Order or any Entity's obligations incurred in connection with the Plan or Confirmation Order, including disputes arising under or in connection with any agreements, documents, or instruments executed in connection with the Plan, Plan Supplement, or Confirmation Order;

(j)      Enter and implement such orders as may be necessary or appropriate to execute, implement, or Consummate the provisions of the Plan or Confirmation Order and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Combined Plan and Disclosure Statement or the Confirmation Order;

(k)      Enter and enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a);

(l)      Adjudicate, decide, or resolve matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146;

(m)      Grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4);

(n)      Enforce the injunction, release, cancellation, and exculpation provisions of the Plan, and issue injunctions, enter and implement orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

(o)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(p)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid;

(q)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(r)     Determine any other matters that may arise in connection with or relate to this Combined Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection therewith;

(s)     Enter an order or final decree concluding or closing the Chapter 11 Case;

(t)     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

(u)     Consider any modifications of this Combined Plan and Disclosure Statement, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(v)     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(w)     Hear and determine all disputes involving the existence, nature, or scope of the Debtor's releases, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(x)     Enforce all orders previously entered by the Bankruptcy Court; and

(y)     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

Section 13.1    *Immediate Binding Effect.*

Notwithstanding the Bankruptcy Rules, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, Plan Administrator, and any and all Holders of Claims and Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, cancellations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

Section 13.2    *Amendments.*

(a)     *Plan Modifications*. Subject to the limitations contained in this Combined Plan and Disclosure Statement and the RSAs, and in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) the Debtor reserves the right, to amend or modify this Combined Plan and

Disclosure Statement, subject to the consent of the First Lien Lender and, with respect to any amendment materially adverse to DZ 21st Street (which shall include any amendment that would affect DZ 21st Street's recovery), DZ 21st Street, prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Section 1129(b); and (b) after the entry of the Confirmation Order, the Debtor or Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, and subject to the consent of the First Lien Lender and, with respect to any amendment materially adverse to DZ 21st Street (which shall include any amendment that would affect DZ 21st Street's recovery), DZ 21st Street, amend or modify this Combined Plan and Disclosure Statement, in accordance with Section 1127(b), or remedy any defect or omission or reconcile any inconsistency in this Combined Plan and Disclosure Statement in such manner as may be necessary to carry out the purpose and intent of this Combined Plan and Disclosure Statement.

(b)    *Effect of Confirmation on Modifications*. Upon entry of the Confirmation Order, all modifications or amendments to this Combined Plan and Disclosure Statement occurring on or after the solicitation thereof shall be deemed approved pursuant to Section 1127(a) and shall not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c)    *Technical Amendments*. Prior to the Effective Date, the Debtor may make technical adjustments and modifications to this Combined Plan and Disclosure Statement, subject to the consent of the First Lien Lender and, with respect to any amendment materially adverse to DZ 21st Street (which shall include any amendment that would affect DZ 21st Street's recovery), DZ 21st Street, that do not adversely affect the treatment of Holders of Claims or Equity Interests thereunder, without further order or approval of the Bankruptcy Court.

Section 13.3    *Revocation or Withdrawal of the Plan.*

Subject to the RSAs, Section 13.3 hereunder, and the conditions to the Effective Date, the Debtor reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans. If the Debtor revokes or withdraws the Plan subject to the terms hereof or the RSAs, or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor or any other Entity.

Section 13.4    *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal Law, rule, or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to this Combined Plan and Disclosure Statement provides otherwise, this Combined Plan and Disclosure Statement shall be governed by and construed in accordance with the Laws of the State of Delaware, without giving effect to the principles of conflict of Laws thereof. Corporate

governance matters shall be governed by the laws of the applicable state of incorporation, formation, or functional equivalent thereof, as applicable.

Section 13.5    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, Affiliate, assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

Section 13.6    *Consent Rights.*

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the First Lien Lender set forth in the First Lien RSA (irrespective of whether the Debtor has assumed the First Lien RSA and any and all consent rights of DZ 21st Street under the DZ RSA (irrespective of whether the Debtor has assumed the DZ RSA) with respect to the form and substance of the Plan, the Plan Supplement, and any other documents contemplated under the Plan, shall apply to the Plan as if stated in full herein until such time as the First Lien RSA or the DZ RSA, as applicable, is terminated in accordance with its terms.

Section 13.7    *Further Assurances.*

For the avoidance of doubt, the Debtor and the First Lien Lender shall not violate, and shall otherwise comply with, the RSAs in all respects, including with respect to the implementation of the Plan and the Effective Date. The Debtor, all Holders of Claims receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Combined Plan and Disclosure Statement or the Confirmation Order.

Section 13.8    *Severability.*

If, prior to the entry of the Confirmation Order, the Bankruptcy Court determines that any term or provision of this Combined Plan and Disclosure Statement is invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, which term shall thereafter apply as so altered or interpreted. Notwithstanding the forgoing, the remaining terms and provisions of this Combined Plan and Disclosure Statement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Combined Plan and Disclosure Statement, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to this Combined Plan and Disclosure Statement and may not be deleted or modified without the Debtor's, the First Lien Lender's, and DZ 21st Street's consent, and (c) nonseverable and mutually dependent.

Section 13.9    *Controlling Document.*

In the event of a conflict between this Combined Plan and Disclosure Statement and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order); *provided, however*, that in the event any such conflict is a material conflict with the treatment of the First Lien Claims, the DZ Claims or the General Unsecured Claims that would require the Debtor to re-solicit the votes of Holders of Claims in Class 3 or Class 4, as applicable, under Section 1127, this Combined Plan and Disclosure Statement shall control solely with respect to such provision giving rise to such material conflict. The provisions of this Combined Plan and Disclosure Statement and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, however*, that in the event of any inconsistency or conflict between this Combined Plan and Disclosure Statement and the Confirmation Order that cannot be so construed, then, solely to the extent necessary, the applicable provisions of the Confirmation Order shall control and any such provision of the Confirmation Order shall be deemed a modification of this Combined Plan and Disclosure Statement.

Section 13.10    *Filing of Additional Documents.*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or Plan Administrator, as applicable, and all Holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

Section 13.11    *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of this Combined Plan and Disclosure Statement or the Plan Supplement, anything contained therein, or any action the Debtor takes with respect thereto, shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

Section 13.12  *Service of Documents.*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to Plan Administrator shall also be served on:

540 W. 21st Street Holdings, LLC
1290 6th Ave.
New York, New York 10104

with copies to:

Chipman Brown Cicero & Cole LLP
William E. Chipman, Jr.
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Attention: William E. Chipman, Jr.
Email: chipman@chipmanbrown.com,
*Proposed Counsel to Debtor*

and

Ray New York, LLC


with copies to:

Fried, Frank, Harris, Shriver & Jacobson LLP
Jennifer Rodburg
Andrew Minear
One New York Plaza
New York, New York 10004
*Counsel to the First Lien Lender*

and

550W21 Owner LLC

with copies to:

Davis Polk & Wardwell LLP
Christopher Robertson
Eli J. Vonnegut
450 Lexington Avenue
New York, New York 10017
*Counsel to Purchaser*

71

and

Office of the United States Trustee
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Attention: Timothy J. Fox
E-mail: Timothy.Fox@usdoj.gov

After the Effective Date, Plan Administrator has authority to notify Entities informing them that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, Plan Administrator is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such requests.

Section 13.13  *Section 1125(e).*

As of the Confirmation Date: (a) the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy Law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Debtor, the First Lien Lender, DZ 21st Street and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys shall be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under the Plan, and, therefore, are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

Section 13.14  *Tax Reporting and Compliance.*

The Debtor shall be authorized to request an expedited determination under Section 505(b) for all tax returns filed for, or on behalf of, the Debtor for any and all taxable periods ending after the Petition Date through, and including, the dissolution of the Debtor.

Section 13.15  *Exhibits, Schedules, and Supplements.*

All exhibits, schedules, and supplements to this Combined Plan and Disclosure Statement are incorporated into and made a part of this Combined Plan and Disclosure Statement as if fully set forth herein. To the extent any exhibit, schedule, or supplement is inconsistent with the terms of this Combined Plan and Disclosure Statement and unless otherwise provided for in the Confirmation Order, the terms of such exhibit, schedule, or supplement shall control as to the transactions contemplated thereby and the terms of this Combined Plan and Disclosure Statement shall control as to any Plan provision as may be required under such exhibit, schedule, or supplement.

Section 13.16  *Entire Agreement.*

Except as otherwise set forth herein and except for the terms and conditions of the RSAs, on the Effective Date, the Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Section 13.17  *Allocation of Payments.*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## ARTICLE XIV.

## RECOMMENDATION

In the opinion of the Debtor, this Combined Plan and Disclosure Statement is superior and preferable to the alternatives described in this Combined Plan and Disclosure Statement. Accordingly, the Debtor recommends that Holders of Claims entitled to vote on this Combined Plan and Disclosure Statement vote to accept this Combined Plan and Disclosure Statement and support Confirmation.

*[Remainder of Page Intentionally Left Blank]*

# EXHIBIT A

**PURCHASE AND SALE CONTRACT**

*BETWEEN*

**540 WEST 21ST STREET HOLDINGS LLC,**
a Delaware limited liability company,
*AS SELLER*

*AND*

**550W21 OWNER LLC,**
a Delaware limited liability company,
*AS PURCHASER*

The Property is that certain real property known as
540 West 21st Street, New York, New York 10011

# TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS ................................................................................. 1

ARTICLE II PURCHASE AND SALE, PURCHASE PRICE & DEPOSIT .............................. 6

2.1     Purchase and Sale ................................................................. 6
2.2     Purchase Price and Deposit................................................... 6
2.3     Escrow Provisions Regarding Deposit.................................... 6

ARTICLE III INSPECTIONS .................................................................................... 6

3.1     Property Investigations ........................................................ 6
3.2     Access to Property ................................................................ 6
3.3     Contact with Governmental Authority .................................. 7
3.4     Indemnity .............................................................................. 7
3.5     Survival ................................................................................. 8

ARTICLE IV TITLE ............................................................................................... 8

4.1     Title Documents.................................................................... 8
4.2     Survey ................................................................................... 8
4.3     Permitted Exceptions ........................................................... 8
4.4     Subsequently Disclosed Exceptions ...................................... 9
4.5     Must-Cure Matters.  ............................................................ 10

ARTICLE V CLOSING ........................................................................................... 10

5.1     Closing Date.......................................................................... 10
5.2     Seller Closing Deliveries ....................................................... 11
5.3     Purchaser Closing Deliveries ................................................ 11
5.4     Closing Prorations and Adjustments..................................... 12

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER 13

6.1     Seller's Representations......................................................... 13
6.2     Breach of a Seller Representation.......................................... 14
6.3     Damages Floor ...................................................................... 15
6.4     Definition of Seller's Knowledge .......................................... 15
6.5     AS-IS..................................................................................... 15
6.6     Representations and Warranties of Purchaser........................ 16

ARTICLE VII OPERATION OF THE PROPERTY ......................................................... 17

7.1     General Operation of Property............................................... 17

i

7.2    Tax Appeals ............................................................................... 18
7.3    Closure Report. . ....................................................................... 18

ARTICLE VIII CONDITIONS PRECEDENT TO CLOSING................................ 18

8.1    Purchaser's Conditions to Closing............................................ 18
8.2    Seller's Conditions to Closing ................................................. 19
8.3    Financial Restructuring; Sale Through Bankruptcy Court. ................... 20

ARTICLE IX BROKERAGE ...................................................................... 21

9.1    Brokerage Commission.............................................................. 21

ARTICLE X DEFAULTS AND REMEDIES..................................................... 21

10.1    Purchaser Default.................................................................... 21
10.2    Seller Default ........................................................................ 22

ARTICLE XI EMINENT DOMAIN AND CASUALTY ........................................ 23

11.1    Eminent Domain ..................................................................... 23
11.2    Casualty................................................................................ 23

ARTICLE XII 24

SELLER CREDITOR ACKNOWLEDGMENT ................................................. 24

12.1    Seller Creditor Acknowledgment .............................................. 24
12.2    Creditor Acknowledgment Deadline; Termination Right..................... 24

ARTICLE XIII MISCELLANEOUS ............................................................. 25

13.1    Binding Effect of Contract........................................................ 25
13.2    Exhibits and Schedules ............................................................ 25
13.3    Assignability ......................................................................... 25
13.4    Captions ............................................................................... 26
13.5    Number and Gender of Words ................................................... 26
13.6    Notices ................................................................................ 26
13.7    Governing Law and Venue ........................................................ 27
13.8    Entire Agreement ................................................................... 27
13.9    Amendments ......................................................................... 28
13.10   Severability .......................................................................... 28
13.11   Multiple Counterparts/Electronic Signatures................................. 28
13.12   Construction ......................................................................... 28
13.13   Confidentiality ...................................................................... 28
13.14   Time of the Essence ............................................................... 29
13.15   Waiver ................................................................................ 29
13.16   Attorneys' Fees ..................................................................... 29

#96885590v8

13.17  Time Zone/Time Periods ........................................................................ 29
13.18  1031 Exchange ..................................................................................... 29
13.19  No Personal Liability of Officers, Trustees or Directors .................................... 29
13.20  No Recording ....................................................................................... 30
13.21  Relationship of Parties ............................................................................ 30
13.22  Survival ............................................................................................. 30
13.23  Multiple Purchasers ............................................................................... 30
13.24  WAIVER OF JURY TRIAL...................................................................... 30

**EXHIBITS AND SCHEDULES**

**EXHIBITS**

Exhibit A          Legal Description of the Property
Exhibit B          Form of Bargain and Sale Deed
Exhibit C          Restructuring Term Sheet
Exhibit D          Form of General Assignment
Exhibit E          Form of Title Affidavit
Exhibit F          Form of Restructuring Support Agreement


Schedule 1         Certain Permitted Exceptions
Schedule 2         Escrow Terms
Schedule 3         Development and Air Rights Certificates
Schedule 4         Seller's Plans and Specifications

#96885590v8

## PURCHASE AND SALE CONTRACT

**THIS PURCHASE AND SALE CONTRACT** (this "**Contract**") is entered into as of the 13th day of June, 2023 (the "**Effective Date**"), by and between **540 WEST 21ST STREET HOLDINGS LLC**, a Delaware limited liability company ("**Seller**") and **550W21 OWNER LLC**, a Delaware limited liability company ("**Purchaser**").

NOW, THEREFORE, in consideration of mutual covenants set forth herein, Seller and Purchaser hereby agree as follows:

### RECITALS

A.      Seller owns the land located at 540 West 21st Street, New York, New York 10011, as described in Exhibit A attached hereto and made a part hereof (the "**Land**").  Seller and Purchaser each acknowledge and agree that the only improvements on the Land is the building foundation that exists in the condition it is in as of the Effective Date (the "**Improvements**").

B.      Seller desires to sell and convey to Purchaser and Purchaser desires to purchase, the Property (as hereinafter defined), upon the terms and conditions of this Contract.

C.      As a result of certain obligations related to the Property, Seller has further determined that it is in the best interests of each such entity and its respective constituents to provide for the purchase and sale of the Property to be closed in conjunction with a financial restructuring of Seller and certain related entities, with such transaction to be consummated, upon the occurrence of certain events, which shall include, among other things, Chapter 11 bankruptcy filing, bankruptcy sale process, and the confirmation of a Chapter 11 plan submitted by Seller and certain related entities, with such financial restructuring to be structured and subject to the milestones and deadlines as outlined in Exhibit C attached hereto (the "**Restructuring Term Sheet**"), which is incorporated herein and made a part hereof for all purposes (the "**Financial Restructuring**").

### ARTICLE I
### DEFINED TERMS

Unless otherwise defined herein, any term with its initial letter capitalized in this Contract shall have the following meaning:

1.1      "**Action**" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

1.2      "**Affiliate**" means, with respect to any Person, any corporation, limited liability company, partnership, trust or other entity controlling, controlled by or under common control with the Person in question.

1.3      "**Bankruptcy Case**" shall mean the case relating to the Financial Restructuring to be instituted by Seller in the Bankruptcy Court.

#96885590v8

1.4    "**Bankruptcy Court**" shall have the meaning set forth in the Restructuring Term Sheet (or any District Court as to which the reference may have been withdrawn).

1.5    "**Broker**" shall have the meaning set forth in Section 9.1.

1.6    "**Business Day**" means any day other than a Saturday or Sunday or Federal holiday or legal holiday in the State of New York.

1.7    "**Closing**" means the consummation of the purchase and sale and related transactions contemplated by this Contract in accordance with the terms and conditions of this Contract.

1.8    "**Closing Date**" shall have the meaning set forth in Section 5.1.

1.9    "**Closing Payment**" shall have the meaning set forth in Section 2.2.2.

1.10    "**Code**" shall have the meaning set forth in Schedule 2.

1.11    "**Conforming Plan**" shall have the meaning set forth in the Restructuring Term Sheet.

1.12    "**Conforming Plan Deadline**" means 5:00 p.m. on July 20, 2023, provided that Purchaser shall have the right, in its sole discretion to extend such date upon notice to Seller one or more times but no later than September 20, 2023.

1.13    "**Conforming Plan Termination Period**" means the period commencing upon the Conforming Plan Deadline and ending on 5:00 p.m. on the date that is three (3) Business Days thereafter.

1.14    "**Creditor**" shall mean Ray New York LLC.

1.15    "**Creditor Acknowledgment**" shall have the meaning set forth in Section 12.1.

1.16    "**Creditor Acknowledgment Deadline**" means 5:00 p.m. on the date that is ten (10) days after the Effective Date.

1.17    "**Creditor Acknowledgment Termination Period**" means the period commencing upon the Creditor Acknowledgment Deadline and ending on 5:00 p.m. on the date that is three (3) Business Days thereafter.

1.18    "**Cut-off Time**" shall have the meaning set forth in Section 5.4.1.

1.19    "**Deed**" shall have the meaning set forth in Section 5.2.1.

1.20    "**Deposit**" shall have the meaning set forth in Section 2.2.1.

1.21    "**Effective Date**" shall have the meaning set forth in the Preamble.

1.22    "**Environmental Laws**" shall have the meaning set forth in Section 6.1.9.

2

1.23    "**Escrow Agent**" means Title Insurer.

1.24    "**Existing Survey**" means, collectively, (i) that certain Architectural Survey, prepared by True North Surveyors, P.C. and last certified on November 2, 2018 and (ii) that certain draft survey dated August 31, 2018, prepared by Land Metrics Engineering & Land Surveying, PC.

1.25    "**Financial Restructuring**" shall have the meaning set forth in the Recitals hereto.

1.26    "**Final Order**" means an order of the Bankruptcy Court as to which no stay is in effect and the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

1.27    "**General Assignment**" means a bill of sale and general assignment substantially in the form attached hereto as Exhibit D with respect to the transfer of Seller's right, title and interest in and to the Miscellaneous Property, and Purchaser's assumption thereof.

1.28    "**Governmental Authority**" means any federal, state, county, municipal or other government or any governmental or quasi-governmental agency, department, commission, board, bureau, officer or instrumentality, foreign or domestic, or any of them including, without limitation, the Bankruptcy Court.

1.29    "**Improvements**" shall have the meaning set forth in the Recitals.

1.30    "**Inspections**" shall have the meaning set forth in Section 3.1.

1.31    "**Land**" shall have the meaning set forth in the Recitals.

1.32    "**Lease(s)**" means all leases, subleases and other occupancy contracts, whether or not of record, which provide for the use or occupancy of space or facilities on or relating to the Property.

1.33    "**Losses**" means any and all damages, mechanics' liens, materialmen's liens, liabilities, penalties, interest, losses, demands, actions, causes of action, claims, costs and expenses (including reasonable attorneys' fees).

1.34    "**Materials**" means all documents and information concerning the Property that are in Seller's possession or reasonable control, other than such documents and information that Seller deems to be confidential or proprietary.

1.35    "**Miscellaneous Property**" means Seller's right, title and interest in and to (a) all development and air rights appurtenant or related to the Land, including, without limitation any certificates relating to any inclusionary air rights or other development rights owned or heretofore issued or transferred to by Seller, including those described on Schedule 3, Schedule 5, and Items 6 through 16 of Schedule 1 attached hereto, (b) any easements, interests, privileges, tenements, hereditaments, rights of way, appurtenances, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land or the Improvements or any portion thereof and in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof, (c) to

3

the extent assignable and transferable, any and all entitlements, permits, licenses, consents, authorizations and approvals, registrations and certificates issued by any Governmental Authority relating to the Land and Improvements, (d) to the extent assignable and transferable, any and all guaranties, warranties and indemnities relating to the Land and Improvements, (e) any plans and specifications relating to the Land and Improvements, to the extent in Seller's possession or control, including those described on Schedule 4 attached hereto and (f) to the extent assignable and transferable, any and all intangibles relating to the Land and Improvements, including without limitation, any websites and domain names (including the domain name "https:// 540w21.com), relating to the Land or the Improvements,.

1.36    "**Must-Cure Matter**" shall have the meaning set forth in Section 4.5.

1.37    "**New Exception**" shall have the meaning set forth in Section 4.4.

1.38    "**New Exception Review Period**" shall have the meaning set forth in Section 4.4.

1.39    "**Outside Order Date**" shall have the meaning set forth in Section 5.1.

1.40    "**Permitted Exceptions**" shall have the meaning set forth in Section 4.3.

1.41    "**Person**" means an individual, partnership, limited partnership, corporation, limited liability company or other entity of any kind.

1.42    "**Petition of Relief**" shall have the meaning set forth in the Restructuring Term Sheet.

1.43    "**Prohibited Person**" means any of the following:  (a) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "**Executive Order**"); (b) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") at its official website, http://www.treas.gov/offices/enforcement/ofac; (d) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (e) a person or entity that is affiliated with any person or entity identified in clause (a), (b), (c) and/or (d) above.

1.44    "**Property**" means, collectively, the Land, the Improvements and the Miscellaneous Property.

1.45    "**Property Investigation**" shall have the meaning set forth in Section 3.2.

1.46    "**Proration Schedule**" shall have the meaning set forth in Section 5.4.1.

1.47    "**Purchase Price**" shall have the meaning set forth in Section 2.2.

#96885590v8

1.48    "**Purchaser Parties**" means Purchaser, Purchaser's Affiliates, parent and subsidiary entities, successors, assigns, partners, managers, members, employees, officers, directors, trustees, shareholders, counsel, representatives and agents.

1.49    "**Purchaser's Representatives**" means, collectively, (i) Purchaser's (and Purchaser's Affiliates') attorneys, consultants, accountants, architects, engineers, contractors, agents, representatives and other qualified professionals, (ii) any lender of or investor in Purchaser or its direct or indirect owners and (iii) any consultant, accountant, architect, engineer, agent, representative and other qualified professional of any lender of or investor in Purchaser.

1.50    "**RAWP**" shall have the meaning set forth in Section 6.1.9.

1.51    "**Report of Title**" shall have the meaning set forth in Section 4.1.

1.52    "**Restructuring Term Sheet**" shall have the meaning set forth in the Recitals hereto.

1.53    "**Sale Order**" shall mean an order of the Bankruptcy Court authorizing the sale of the Property to Purchaser on the terms contemplated by this Contract, which may be included in the order of the Bankruptcy Court confirming Seller's plan of reorganization, which order shall be in form and substance acceptable to Seller and Purchaser (such acceptance shall not be unreasonably, withheld, conditioned or delayed) and shall, among other things, (a) approve, pursuant to Sections 363, 365, 1123 and 1129 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Contract in all respects, (ii) the sale of the Property to Purchaser on the terms set forth herein, and (iii) the performance by Seller of its obligations under this Contract; (b) provide that Purchaser shall take the Property free and clear of any and all pre-existing liens, claims, and other encumbrances of any kind other than those expressly agreed by Purchaser to be assumed under this Contract (including, without limitation, all Permitted Exceptions); and (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to the Sellers and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code.

1.54    "**Seller**" shall have the meaning set forth in the Preamble hereto.

1.55    "**Seller's Indemnified Parties**" means, collectively, Seller and Seller's Affiliates, parent and subsidiary entities, successors, assigns, partners, managers, members, employees, officers, directors, trustees, shareholders, counsel, representatives, agents and property manager.

1.56    "**Seller's Representations**" shall have the meaning set forth in Section 6.1.

1.57    "**Surveys**" shall have the meaning ascribed thereto in Section 4.2.

1.58    "**Third-Party Reports**" means any reports, studies or other information prepared or compiled for Purchaser by any consultant or other third-party in connection with Purchaser's investigation of the Property.

1.59    "**Title Commitment**" shall have the meaning set forth in Section 4.1.

1.60   "**Title Documents**" shall have the meaning set forth in <u>Section 4.1</u>.

1.61   "**Title Insurer**" means Langdon Title Agency, LLC.

1.62   "**Title Policy**" shall have the meaning set forth in <u>Section 4.1</u>.

1.63   "**Transfer Tax Forms**" shall have the meaning set forth in <u>Section 5.2.7</u>.

1.64   "**Violations**" shall have the meaning set forth in <u>Section 4.3.14</u>.

<div align="center">

**ARTICLE II**
**PURCHASE AND SALE, PURCHASE PRICE & DEPOSIT**

</div>

2.1   **Purchase and Sale**.  Seller agrees to sell and convey the Property to Purchaser and Purchaser agrees to purchase the Property from Seller, all in accordance with the terms and conditions set forth in this Contract.

2.2   **Purchase Price and Deposit**.  The total purchase price ("**Purchase Price**") for the Property shall be an amount equal to **NINETY-FIVE MILLION EIGHT-HUNDRED THOUSAND AND 00/100 DOLLARS ($95,800,000.00)**, payable by Purchaser, as follows:

2.2.1   Within one (1) Business Day following the Effective Date, Purchaser shall deliver to Escrow Agent a deposit (together with all accrued interest thereon, the "**Deposit**") of Four Million Dollars ($4,000,000.00) by wire transfer of immediately available funds. The Deposit shall be non-refundable to Purchaser for any reason, except as otherwise expressly provided herein.

2.2.2   The balance of the Purchase Price, subject to adjustment as herein expressly provided in <u>Section 5.4</u> (the "**Closing Payment**") shall be paid to and received by Escrow Agent by wire transfer of immediately available funds no later than 6:00 p.m. on the Closing Date.

2.3   **Escrow Provisions Regarding Deposit**.  The Deposit shall be held by Escrow Agent in accordance with the escrow terms set forth on <u>Schedule 2</u>.

<div align="center">

**ARTICLE III**
**INSPECTIONS**

</div>

3.1   **Property Investigations**.   Purchaser hereby acknowledges that it has conducted all of Purchaser's inspections, investigations and diligence related to the Property prior to the Effective Date and, except as otherwise expressly set forth in this Contract, Purchaser (a) shall no right to terminate this Contract as a result of Purchaser's inspections, investigations and diligence related to the Property and (b) is purchasing the Property in its "as-is," "where is," condition as of the Effective Date in accordance with the terms of <u>Section 6.5</u> hereof.

3.2   **Access to Property.**  Purchaser and Purchaser's Representatives, at Purchaser's sole cost and expense, shall have the right, in accordance with the conditions set forth in this <u>Section 3.2</u>, during the period from the Effective Date through the earlier to occur of the Closing Date or the termination  of this Contract, to further access the Property for any further property inspections ("**Property Investigation**") that may be required by Purchaser or Purchaser's lender

<div align="center">6</div>

(it being agreed and understood that Purchaser shall not have any right to terminate this Contract as a result of any such Property Investigation or as a result of any testing or determinations relating thereto or as a result thereof). If not already made available to the Purchaser prior to the Effective Date, Seller shall make available promptly after the Effective Date to Purchaser and Purchaser's Representatives in an electronic data room or at Seller's office or another location selected by Seller in New York City, the Materials that are in Seller's possession (but specifically excluding any confidential, proprietary or privileged information or materials, and any information or materials prepared by or for Seller for its internal analysis or review or by or for prospective Purchasers or lenders). In connection with the Property Investigation, Purchaser, at Purchaser's sole cost and expense, shall also have the right to make such non-invasive inspections, investigations and tests as Purchaser may elect to make or obtain upon reasonable notice to Seller and subject to Seller's right to have a representative present at all such tests, investigations and inspections; provided, that, notwithstanding anything to the contrary contained in this Contract, Purchaser acknowledges and agrees that (i) any on-site inspections and examinations of the Property shall be performed during normal business hours in a manner to minimize interference with the Property; (ii) Purchaser shall promptly repair (or cause to be repaired) in a good workmanlike manner any damage to the Property or any adjacent property(ies) caused by any actions of Purchaser or Purchaser's Representatives and shall promptly restore the Property to the condition which existed immediately prior to such damage; (iii) Purchaser shall furnish Seller on or prior to the Effective Date with a certificate of general liability and property damage insurance maintained by Purchaser, evidencing single occurrence coverage of at least $1,000,000 (and aggregate coverage of at least $2,000,000) and naming Seller and such other Persons as Seller shall reasonably require as additional insureds; (iv) neither Purchaser nor any of Purchaser's Representatives shall conduct any environmental investigations or testing, other than a standard "Phase I" environmental assessment, of the Property without the prior written consent of Seller, which may be given or withheld in Seller's sole discretion; (v) Purchaser shall not permit any portion of the Property to have any dangerous conditions established or permitted as a result of any test or investigations conducted by or on behalf of Purchaser; and (vi) Purchaser shall keep the Property free of any liens, and repair any damage to the Property arising from the inspection of the Property by Purchaser or Purchaser's Representatives and any acts or omissions of Purchaser or Purchaser's Representatives. Without limiting the foregoing, Purchaser shall cause all adequate safeguards and protections to be provided so as to protect occupants and the general public from harm or exposure from such tests and inspections. All information learned by Purchaser in connection with the Property Investigation shall be kept confidential in accordance with Section 13.13 hereof. All Purchaser's Representatives shall be promptly paid by Purchaser.

3.3 **Contact with Governmental Authority**. Notwithstanding anything to the contrary contained herein, in no event shall Purchaser or any of Purchaser's Representative be permitted to meet, correspond or otherwise discuss with any Governmental Authority any matter relating to or arising out of the Property without the prior written consent of Seller, other than customary title and lien searches, and in the event that Seller provides such consent, then Seller shall have the right, but not the obligation, to be present for any such discussions or meetings.

3.4 **Indemnity**. Purchaser shall indemnify the Seller's Indemnified Parties against and hold the Seller's Indemnified Parties harmless from (i) any and all Losses arising out of in any way or resulting from the tests performed on and the inspection of the Property by Purchaser or Purchaser's Representatives and any negligence, acts or omissions of Purchaser or Purchaser's

#96885590v8

Representatives at the Property or otherwise in connection with the Property Investigation and (ii) any other breach by Purchaser or Purchaser's Representatives of any of its obligations set forth in this Article III; provided, however, that the foregoing indemnity shall not extend to protect Seller from any pre-existing liabilities for matters merely discovered by Purchaser unless exacerbated or aggravated by Purchaser or Purchaser's Representatives' actions (in which case Purchaser shall be responsible solely to the extent of such exacerbation or aggravation).

3.5     **Survival**.  Purchaser's obligations under Sections 3.2 and 3.3 hereof shall survive the Closing or any termination of this Contract.

<div align="center">

**ARTICLE IV**
**TITLE**

</div>

4.1     **Title Documents**.  Prior to the Effective Date, (a) Seller has delivered a Report of Title for the Property prepared by Title Insurer, dated April 11, 2023 (the "**Report of Title**") and (b) Purchaser has ordered from Title Insurer a commitment for owner's title insurance with regard to the Property (the "**Title Commitment**") to provide a standard American Land Title Association owner's title insurance policy for the Property, using the ALTA Form 2006 customarily provided by the Title Insurer, along with a development rights endorsement, in an amount equal to the Purchase Price (the "**Title Policy**"), together with copies of all instruments identified as exceptions therein (together with the Title Commitment, referred to herein as the "**Title Documents**"). Purchaser has provided a copy of the Title Documents to Seller's attorney.  Purchaser shall be responsible for all costs relating to procurement of the Title Commitment, the Title Policy and any requested endorsements.

4.2     **Survey**.  Prior to the Effective Date, Seller has provided Purchaser with copies of the Existing Survey.  Purchaser may, at its sole cost and expense, update the Existing Survey or order a new survey(s) of the Property after the Effective Date (the Existing Survey, together with any update thereto or such new survey(s) are, collectively, referred to herein as the "**Surveys**").

4.3     **Permitted Exceptions**.  The Deed for the Property delivered pursuant to this Contract shall be subject to the following, all of which shall be deemed "**Permitted Exceptions**":

4.3.1     all matters set forth on Schedule 1;

4.3.2     all present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all Governmental Authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any;

4.3.3     all presently existing and future liens for real estate taxes and water and sewer charges not due and payable as of the date of the Closing, subject to adjustment as hereinafter provided;

4.3.4     state of facts shown by the Surveys, and any additional facts which would be shown on or by an accurate current survey of the Property, provided such additional facts do not render title to the Property unmarketable or materially impair Purchaser's contemplated

<div align="center">8</div>

redevelopment of the Property in accordance with the Seller's plans and specifications relating to the Land and Improvements as of the Effective Date and being assigned to Purchaser as part of the Miscellaneous Property;

4.3.5    minor variations between tax lot lines and lines of record title;

4.3.6    standard exclusions from coverage contained in the form of title policy or "marked-up" title commitment employed by the Title Insurer;

4.3.7    any lien or encumbrance arising out of the acts or omissions (where there is a duty to act) of Purchaser;

4.3.8    any other matter (other than liens being paid or cleared by the Sale Order) which the Title Insurer may raise as an exception to title, provided the Title Insurer will, on Purchaser's title policy, omit same at no additional cost or expense to Purchaser;

4.3.9    any and all violations of law, rules, regulations, ordinances, orders or requirements noted in or issued by any Federal, state, county, municipal or other department or Governmental Authority having jurisdiction against or affecting the Property whenever noted or issued (collectively, "**Violations**") and any conditions which could give rise to any Violations; it being agreed and understood that Seller shall have no obligation to cure or remove any Violations; <u>provided</u>, however, that, if an to the extent that there are any monetary fines or penalties due to Violations outstanding as of the Closing Date, Seller shall be responsible therefor and Purchaser will be credited for the amount of such fines at Closing; and

4.3.10   any encumbrance that will be extinguished upon conveyance of the Property to Purchaser.

For the avoidance of doubt, and notwithstanding anything to the contrary in this Contract, in no event shall any Must-Cure Matters be Permitted Exceptions hereunder.

4.4    **Subsequently Disclosed Exceptions**.

4.4.1    Subject to <u>Section 4.4.2</u> hereof, if any update to the Title Commitment received after the Effective Date discloses any additional item that materially adversely affects title to the Property which was not disclosed on the Report of Title or any version of or update to such Title Commitment delivered to Purchaser prior to the end of the Effective Date and is not otherwise a Permitted Exception (the "**New Exception**"), Purchaser shall have a period of fifteen (15) Business Days from the date of its receipt of such update (but in no event later than the then scheduled Closing Date) (the "**New Exception Review Period**") to notify Seller in writing of Purchaser's objection to the New Exception.  If Purchaser objects to the New Exception, Seller may, in its sole discretion, notify Purchaser as to whether it is willing to cure the New Exception. If Seller elects to cure the New Exception, Seller shall be entitled to reasonable adjournments of the Closing Date to cure the New Exception, not to exceed thirty (30) days in the aggregate.  If Seller fails to deliver a notice to Purchaser within five (5) Business Days after the expiration of the New Exception Review Period, Seller shall be deemed to have elected not to cure the New Exception.  If Purchaser is dissatisfied with Seller's response, or lack thereof, Purchaser may, as its exclusive remedy elect either:  (i) to terminate this Contract, in which event the Deposit shall

9

be promptly returned to Purchaser and thereafter neither Purchaser or Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives the termination of this Contract or (ii) to waive the New Exception and proceed with the transactions contemplated by this Contract, in which event Purchaser shall be deemed to have approved the New Exception.  If Purchaser fails to notify Seller of its election to terminate this Contract in accordance with the foregoing sentence within fifteen (15) Business Days after the expiration of the New Exception Review Period (but in no event later than the then scheduled Closing Date), Purchaser shall be deemed to have elected to approve and irrevocably waive any objections to the New Exception (except to the extent governed by Section 4.4.1).

       4.4.2   Notwithstanding the foregoing provisions of this Section 4.4, in the event that Title Insurer shall raise an exception to title which is not a Permitted Exception, Seller shall have no obligation to eliminate such exception and Purchaser shall have no right to terminate this Contract by reason of such exception (and such exception shall be deemed a Permitted Exception) if (a) Title Insurer or another nationally recognized title company selected by Seller, as applicable, shall be prepared to insure title to the Property in accordance with the requirements of this Contract at regular rates without such exception or (b) such exception is actually removed or cured and omitted from the Title Policy at Closing pursuant to the Sale Order and will not be an exception to the Title Policy.

       4.5   **Must-Cure Matters**.  Notwithstanding anything in this Contract to the contrary, the Sale Order shall provide that the following shall be released or discharged at Closing  (each, a "**Must-Cure Matter**" and collectively, the "**Must-Cure Matters**"): (a)  all mortgages, deeds of trust or other financing or security interests against Seller's interest in the Property or any portion thereof (including, without limitation, Seller's existing financing), and any documents recorded in connection therewith, including, without limitation, any UCC financing statement, (b) any monetary lien against the Property or any portion thereof, including judgment liens, notices of commencement, mechanic's liens or contractor's liens and (c) any title exception affecting the Property that is voluntarily granted or created by or through Seller on or after the Effective Date without Purchaser's prior written consent.

## ARTICLE V
## CLOSING

       5.1   **Closing Date**.  The Closing shall occur on the date that is thirty (30) days following the Sale Order becoming a Final Order; provided, however, (i) in no event shall the Closing occur on a date prior to September 29, 2023 and (ii) Purchaser shall have the one-time right to adjourn the scheduled closing date by up to five (5) Business Days upon written notice to Seller, but in no event shall the Closing Date be later than the thirty (30) days following the Outside Order Date. The Closing shall occur no later than 6:00 p.m. on the Closing Date and through an escrow with Escrow Agent, whereby Seller, Purchaser and their attorneys need not be physically present at the Closing and may deliver documents by overnight air courier or other means.  The actual date that the Closing occurs shall hereinafter be referred to as the "**Closing Date**". In the event that the Sale Order is not entered or does not become a Final Order prior to the Outside Order Date, then either Seller or Purchaser shall have the right to terminate this Contract upon written notice to the other party and the provisions of Sections 8.1 and 8.2 shall apply accordingly.  As used herein, the "**Outside Order Date**" shall mean December 28, 2023. **TIME SHALL BE OF THE ESSENCE**

**AS TO PURCHASER'S AND SELLER'S OBLIGATION TO CLOSE ON THE SCHEDULED CLOSING DATE**.

5.2    **Seller Closing Deliveries**.  Seller shall deliver to Escrow Agent each of the following items, as applicable, on or prior to the then scheduled Closing Date:

5.2.1    A Bargain and Sale Deed without Covenants Against Grantor's Acts (the "**Deed**") substantially in the form attached as Exhibit B from Seller to Purchaser, subject to the Permitted Exceptions.

5.2.2    A countersigned counterpart of the General Assignment.

5.2.3    A customary title affidavit substantially in the form attached hereto as Exhibit E, with such changes thereto to reflect any changes in fact or circumstance and reasonable requests by Title Insurer;

5.2.4    Seller's counterpart signature to the closing statement prepared by Title Insurer and incorporating the Proration Schedule.

5.2.5    A certification of Seller's non-foreign status pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended.

5.2.6    Resolutions, certificates of good standing, and such other organizational documents or documents relating to the Financial Restructuring as Title Insurer shall reasonably require evidencing Seller's authority to consummate this transaction.

5.2.7    A New York State Real Estate Transfer Tax Return Credit Line Mortgage Certificate (TP-584) and any successor form(s) then required to be filed with respect to the payment of the New York State Real Estate Transfer Tax, together with a RP-5217 form and a New York City Department of Finance Real Property Transfer Tax Return (NYC-RPT) (collectively, the "**Transfer Tax Forms**").

5.2.8    Any customary documents or acknowledgments reasonably requested by Purchaser that are necessary for the relevant Governmental Authorities to transfer the inclusionary air rights included in the Miscellaneous Property to Purchaser, including re-issued certificates of the air and development rights listed on Schedule 3 naming Purchaser as the "benefit transferee" (and, at Seller's request, Purchaser agrees to reasonably cooperate in connection with obtaining such re-issued certificates, including delivering any information or document required by Housing Preservation and Development or such other agency having jurisdiction over the re-issuance of any such certificates in order to cause such certificates to be re-issued and for Purchaser to be named as the "benefit transferee").

5.2.9    A validly executed IRS Form W-9 from Seller.

5.2.10    If obtained, a certified copy of the Sale Order.

5.3    **Purchaser Closing Deliveries**.  Purchaser shall deliver to Escrow Agent each of the following items with respect to the Property on or prior to then scheduled Closing Date:

5.3.1    The Closing Payment.

5.3.2    A countersigned counterpart of the General Assignment.

5.3.3    Purchaser's counterpart signature to the closing statement prepared by Title Insurer and incorporating the Proration Schedule.

5.3.4    A countersigned counterpart of the Transfer Tax Forms.

5.3.5    Resolutions, certificates of good standing, and such other organizational documents as Title Insurer shall reasonably require evidencing Purchaser's authority to consummate this transaction shall be delivered to the Title Insurer.

5.4    **Closing Prorations and Adjustments**.

5.4.1    **General**.  Each of the items set forth in this Section 5.4.1 shall be prorated as of 11:59 p.m. on the day immediately preceding the Closing Date (the "**Cut-off Time**"), Seller being charged or credited, as appropriate, for all of same attributable to the period up to the Cut-off Time and Purchaser being responsible for, and credited or charged, as the case may be, for all of the same attributable to the period after the Cut-off Time.  Seller shall prepare a proration schedule (the "**Proration Schedule**") of the adjustments described in this Section 5.4.1 prior to Closing and shall use good faith efforts to deliver such Proration Schedule at least two (2) Business Days prior to the Closing, which such Proration Schedule shall be subject to the review and approval of Purchaser, which approval shall not be unreasonably withheld, conditioned or delayed.

a.    **Real Estate Taxes**.  Any real estate taxes and assessments, so-called BID taxes, water rates and charges, sewer taxes (if any) for the Property (or installments thereof), based upon actual days involved.  If the actual figures for such taxes, assessments, rates, rents or charges are not yet fixed at the Closing Date, the proration shall be made using figures from the preceding period (assuming payment at the earliest time to allow for the maximum possible discount) and shall be recalculated after the Closing once such figures are finally determinable.

b.    **Intentionally Omitted**.

5.4.2    **Closing Costs**.  Purchaser shall pay at Closing (i) the premiums, title search fees and all other costs relating to the Title Commitments, Title Policy and any requested endorsements, (ii) the cost of any new or updated Surveys, (iii) all recording charges incident to the recording of the Deed and any financing documents in connection with the Purchaser's acquisition of the Property, and (iv) all costs and expenses incurred in connection with Purchaser's inspections of the Property. The costs and fees of Escrow Agent shall be divided equally between Seller and Purchaser.  Each party shall pay the cost of its own counsel except as otherwise provided in this Contract.  Seller and Purchaser acknowledge and agree that the sale of the Property to Purchaser pursuant to a plan of reorganization approved by the Bankruptcy Court as provided in the Restructuring Term Sheet should be exempt from New York City and New York State transfer taxes and, accordingly, no such payments shall be made at Closing; provided, that, if the sale of the Property to Purchaser is not so exempted, then Seller shall be solely responsible for any transfer taxes payable in connection with the sale of the Property to Purchaser, if any. All closing costs and

12

fees, other than those allocated in this Contract, shall be paid by Purchaser and/or Seller in accordance with the custom of the city and state of New York.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER

6.1    **Seller's Representations**.    Seller represents and warrants to Purchaser the following (collectively, the "**Seller's Representations**") as of the Effective Date and as of the Closing Date, except where stated to be as of the Effective Date and except as a result of any changes of facts that are not caused by a material default by Seller under this Contract:

6.1.1    Seller is a Delaware limited liability company, validly existing and in good standing under the laws of Delaware and duly qualified to transact business in the State of New York; and, subject to the Bankruptcy Court approving the sale of the Property to Purchaser and the issuance of the Sale Order, has or at the Closing shall have the entity power and authority to sell and convey the Property and to execute the documents to be executed by Seller and prior to the Closing will have taken as applicable, all limited liability company actions required for the execution and delivery of this Contract, and the consummation of the transactions contemplated by this Contract.  The compliance with or fulfillment of the terms and conditions hereof will not conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any contract to which Seller is a party or by which Seller is otherwise bound, which conflict, breach or default would have a material adverse effect on Seller's ability to consummate the transaction contemplated by this Contract or on the Property.  This Contract is a valid and binding agreement against Seller in accordance with its terms;

6.1.2    Seller is not a "foreign person," as that term is used and defined in the Internal Revenue Code, Section 1445, as amended;

6.1.3    There are no leases relating to the Land and Improvements (or any portion thereof);

6.1.4    Except for Permitted Exceptions, this Contract and agreements to be delivered pursuant to this Contract, there are no contracts relating to the Property that shall be binding on Purchaser or the Property following the Closing;

6.1.5    Other than with respect to Seller's obligations to Purchaser under this Contract, Seller has not entered into any presently effective agreement to sell the Property or any portion thereof, or entered into any right of first refusal or other option agreement for the sale of the Property.  Except as otherwise set forth in the Title Commitment, Seller has not conveyed or transferred any development or air rights;

6.1.6    The Seller does not have and has never had any employees that will remain employed at the Property following the Closing. Seller is not a party to, or otherwise bound by, any collective bargaining agreement or other contract or agreement with any labor organization with respect to the Property.

#96885590v8

6.1.7    As of the Effective Date, (a) to Seller's knowledge, there are no pending or threatened condemnation or eminent domain proceedings that would affect the Property and (b) Seller has not received any written notice from any Governmental Authority with respect thereto;

6.1.8    Seller is not a Prohibited Person.  To Seller's knowledge, none of its investors, Affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Contract is a Prohibited Person.  The assets Seller will transfer to Purchaser under this Contract are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person; and

6.1.9    As of the Effective Date, Seller has not received any written notice from any Governmental Authority of any violation of any Environmental Law that has not been previously disclosed to Purchaser in any of the Materials delivered to Purchaser prior to the Effective Date or which has not been corrected.  Seller has provided Purchaser with true, correct and complete copies of all final environmental reports relating to the Property that are in Seller's possession and a true, correct and complete copy of the Remedial Action Work Plan dated May, 2018 ("**RAWP**") as approved by the New York City Office of Environmental Remediation, together with any amendments, modifications and supplements thereto. For purposes of this Section, "**Environmental Laws**" shall mean any and all federal, state, county and local statutes, laws, regulations and rules in effect on the date of this Contract relating to the protection of the environment or to the use, transportation and disposal of hazardous materials.

6.2    **Breach of a Seller Representation**. Subject to Section 6.3 hereof, if Purchaser actually determines, in good faith, prior to the Closing that any of Seller's Representations were not true in any material respect when given, then Purchaser shall notify Seller of same within three (3) Business Days after Purchaser obtains actual knowledge of information that renders such Seller's Representation(s) untrue or incorrect (but in no event later than the then scheduled Closing Date), which notice shall include a detailed description of the basis by which Purchaser believes such Seller's Representation(s) to be untrue or incorrect and Purchaser's good faith reasonable estimate of the damages caused by such breach(es).  Subject to Section 6.3 hereof, if it is actually determined that such Seller's Representation was in fact untrue or incorrect when made and such breach(es) result in (or are reasonably likely to result in) a loss or cost that exceeds $1,000,000 individually or in the aggregate, then Purchaser's sole right and exclusive remedy (subject, however, to Purchaser's rights under Section 10.2 hereof) shall be to terminate this Contract, in which event the Deposit shall be returned to Purchaser and neither Purchaser or Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives the termination of this Contract and, if Seller willfully, knowingly or intentionally breaches such Seller Representation, the reimbursement obligations set forth in Section 10.2 hereof.  If it is actually determined that such Seller Representation was in fact untrue or incorrect when made and such breach(es) result in (or are reasonably likely to result in) a loss or cost that is $1,000,000 or less (but subject to Section 6.3 hereof), then the following shall apply:  (i) Seller shall have the right, but not the obligation, upon written notice to Purchaser, to cure such breach(es), or provide Purchaser with a credit at Closing in an amount equal to such estimated amount as reasonably agreed to by Purchaser and Seller; provided, however, that if Seller elects to attempt to cure such breach(es), then Seller shall have until the then scheduled Closing Date to do so, and for this purpose Seller shall be entitled to a reasonable adjournment of the Closing, but in no event shall the adjournment exceed thirty (30) days in the aggregate with all

14

other adjournment rights of Seller hereunder; (ii) if Seller cures such breach(es) or provides Purchaser with such a credit, then Purchaser shall be obligated to perform its obligations under this Contract (including its obligations with respect to the Closing) in accordance with this Contract notwithstanding such breach(es); and (iii) if Seller does not provide such credit to Purchaser at Closing or does not cure such breach(es) on or prior to the then scheduled Closing Date (including any adjournment), then Seller shall notify Purchaser in writing of Seller's inability to cure such breach(es) or election not to provide Purchaser with such credit, and Purchaser's sole right and exclusive remedy (subject, however, to Purchaser's rights under Section 10.2 hereof) shall be to terminate this Contract by sending written notice thereof to Seller within ten (10) Business Days after Purchaser's receipt of the notice referred to in this clause (iii) (but in no event later than the then scheduled Closing Date), in which event (A) this Contract shall terminate upon the giving of such termination notice, (B) thereafter neither Purchaser or Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives the termination of this Contract and (C) the Deposit shall be returned to Purchaser.  If Purchaser fails to give such written termination notice to Seller within the time period described in clause (iii) above, Purchaser shall be deemed to have waived any right or remedy (including any right to terminate this Contract) by reason of such breach. Notwithstanding anything to the contrary contained in this Contract, in no event shall Seller be liable to Purchaser for, nor shall Purchaser have a right to terminate this Contract or otherwise be relieved of its Closing obligations hereunder by reason of any fact that contradicts a representation or warranty that is known to Purchaser as of the Effective Date.

6.3    **Damages Floor**.  Notwithstanding any provision of this Contract to the contrary, Seller shall not have any liability (and Purchaser waives its right to bring any action or its rights under Section 6.2 hereof) with respect to any of Seller's Representations contained herein, if the aggregate amount of damages are less than $50,000.

6.4    **Definition of Seller's Knowledge**.  Any representations and warranties made "to the knowledge of Seller" shall not be deemed to imply any duty of inquiry.  For purposes of this Contract, the term Seller's "**knowledge**" shall mean and refer only to actual knowledge of Jacob Tomer and Mimi Ho, and shall not be construed to refer to the knowledge of any other partner, officer, director, agent, employee or representative of Seller, or any Affiliate of Seller, or to impose upon such person any duty to investigate the matter to which such actual knowledge or the absence thereof pertains other than reasonable consultation with individuals at Seller familiar with the Property, or to impose upon such person any individual personal liability.

6.5    **AS-IS**.  Except as otherwise expressly set forth in Seller's Representations:

6.5.1    The Property is expressly purchased and sold "AS IS," "WHERE IS," and "WITH ALL FAULTS."

6.5.2    The Purchase Price and the terms and conditions set forth herein are the result of arm's-length bargaining between entities familiar with transactions of this kind, and said price, terms and conditions reflect the fact that Purchaser shall have the benefit of, but is not relying upon, any information provided by Seller or Broker or statements, representations or warranties, express or implied, made by or enforceable directly against Seller or Broker, including, without limitation, any relating to the value of the Property, the physical or environmental condition of the

15

Property, any state, federal, county or local law, ordinance, order or permit; or the suitability, compliance or lack of compliance of the Property with any regulation, or any other attribute or matter of or relating to the Property (other than any covenants of title contained in the Deed conveying the Property and Seller's Representations with respect to the Property).  Purchaser agrees that Seller shall not be responsible or liable to Purchaser for any defects, errors or omissions in the Materials, or on account of any conditions affecting the Property.

6.5.3    Purchaser, its successors and assigns, and anyone claiming by, through or under Purchaser, hereby fully releases each of Seller's Indemnified Parties from, and irrevocably waives its right to maintain, any and all claims and causes of action that it or they may now have or hereafter acquire against any Seller's Indemnified Parties with respect to any and all Losses arising from or related to any defects, errors, omissions in the Materials or other conditions affecting the Property.

6.5.4    Purchaser represents and warrants that, as of the date hereof and as of the Closing Date, it has and shall have reviewed and conducted such independent analyses, studies (including, without limitation, environmental studies and analyses concerning the presence of lead, asbestos, water intrusion and/or fungal growth and any resulting damage, PCBs and radon in and about the Property), reports, investigations and inspections as it deems appropriate in connection with the Property.  If Seller provides or has provided any documents, summaries, opinions or work product of consultants, surveyors, architects, engineers, title companies, Governmental Authorities or any other person or entity with respect to the Property, including, without limitation, the offering prepared by Broker, Purchaser and Seller agree that Seller have done so or shall do so only for the convenience of the parties, Purchaser shall not rely thereon and the reliance by Purchaser upon any such documents, summaries, opinions or work product shall not create or give rise to any liability of or against any of Seller's Indemnified Parties.  Purchaser acknowledges and agrees that, except for the Seller's Representations, no representation has been made and no responsibility is assumed by Seller with respect to current and future applicable zoning or building code requirements or the compliance of the Property with any other laws, rules, ordinances or regulations, or the financial earning capacity or expense history of the Property.

6.5.5    Purchaser hereby releases Seller from any and all claims and liabilities relating to the matters set forth in this <u>Section</u>, other than with respect to intentional common law fraud.

6.5.6    This <u>Section 6.5</u> shall survive the termination of this Contract and the Closing.

6.6    **<u>Representations and Warranties of Purchaser</u>**.  Purchaser represents and warrants to Seller the following as of the Effective Date and as of the Closing Date:

6.6.1    Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

6.6.2    Purchaser, acting through any of its or their duly empowered and authorized officers or members, has all necessary entity power and authority to own and use its properties and to transact the business in which it is engaged, and has full power and authority to enter into this

16

Contract, to execute and deliver the documents and instruments required of Purchaser herein, and to perform its obligations hereunder; and no consent of any of Purchaser's partners, directors, officers or members are required to so empower or authorize Purchaser. The compliance with or fulfillment of the terms and conditions hereof will not conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any contract to which Purchaser is a party or by which Purchaser is otherwise bound, which conflict, breach or default would have a material adverse effect on Purchaser's ability to consummate the transaction contemplated by this Contract. This Contract is a valid, binding and enforceable agreement against Purchaser in accordance with its terms.

6.6.3   No pending or, to the knowledge of Purchaser, threatened litigation exists which if determined adversely would restrain the consummation of the transactions contemplated by this Contract or would declare illegal, invalid or non-binding any of Purchaser's obligations or covenants to Seller.

6.6.4   Other than Seller's Representations, Purchaser has not relied on any representation or warranty made by Seller or any representative of Seller (including, without limitation, Broker) in connection with this Contract and the acquisition of the Property.

6.6.5   Purchaser is not a Prohibited Person. To Purchaser's knowledge, none of its investors, Affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Contract is a Prohibited Person. The funds or other assets Purchaser will transfer to Seller under this Contract are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person. The funds or other assets Purchaser will transfer to Seller under this Contract are not the proceeds of specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7).

6.6.6   To the knowledge of the Purchaser, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Purchaser and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

## ARTICLE VII
## OPERATION OF THE PROPERTY

7.1   **General Operation of Property**. Purchaser hereby acknowledges and agrees that (i) Seller shall be under no obligation to make any alteration or repairs to the Property (and, other than in connection with any emergency or life safety issue) shall not make any alterations or repairs without Purchaser's consent) and (ii) Seller's sole obligation under this Contract between the Effective Date and the Closing with respect to the Property is to deliver the Property at Closing, subject to and in accordance with this Contract; provided, however, between the Effective Date and the Closing Date or earlier termination of this Contract, Seller shall not (i) enter into any Lease with respect to the Property, (ii) enter into any service contract with respect to the Property (or any portion thereof), other than service contracts that are terminable on thirty (30) days or less notice and without any cost or expense to Purchaser and which are actually terminated at or prior to Closing and (iii) create any new lien or other encumbrance affecting any portion of the Property that is not paid or cleared by the Sale Order or otherwise removed on or before the Closing. Further, between the Effective Date and the Closing Date or earlier termination of this Contract, Seller shall (a)

17

provide Purchaser with copies of any material notices given or received from any Governmental Authority promptly upon Seller's receipt thereof, (b) continue to maintain the property insurance maintained by Seller with respect to the Property that is currently in effect as of the date hereof (or the substantial equivalent of such insurance) and (c) keep Purchaser generally appraised of all matters relating to the Financial Restructuring and provide updates upon reasonable request of Purchaser.

7.2     **Tax Appeals**.  If any tax reduction proceedings, tax protest proceedings or tax assessment appeals for the Property, relating to any fiscal year through and including the fiscal year in which the Closing occurs, are pending at the time of Closing, Purchaser shall have the right to take over the prosecution and/or settlement of same without the consent of Seller. Purchaser shall have the exclusive right to institute a tax reduction proceeding, tax protest proceeding or tax assessment appeal for the Property with respect to real estate taxes attributable to the fiscal years prior to and including the fiscal year in which the Closing occurs and Purchaser shall have the right to prosecute and/or settle the same without the consent of Seller. Seller shall cooperate with Purchaser in connection with the prosecution and/or settlement of any such tax reduction proceedings, tax protest proceedings or tax assessment appeals, including executing such documents as Purchaser may reasonably request in order for Purchaser to prosecute and/or settle any such proceedings.  Any refunds or savings in the payment of taxes resulting from any tax reduction proceedings, tax protest proceedings or tax assessment appeals applicable to the period up to the Cut-off Time shall belong to Seller and any refunds or savings in the payment of taxes applicable to the period after the Cut-off Time shall belong to Purchaser.  All attorneys' fees and other expenses incurred in obtaining such refunds or savings shall be apportioned between Seller and Purchaser in proportion to the gross amount of such refunds or savings payable to Seller and Purchaser, respectively.  The terms of this Section 7.2 shall survive the Closing.

7.3     **Closure Report**.  Seller shall use commercially reasonable efforts to obtain a closure report from Langan Engineering, Environmental, Surveying and Landscape Architecture, D.P.C. providing that all remediation work has been completed in accordance with the RAWP; provided, however, Purchaser hereby acknowledges and agrees that Seller obtaining such closure report is not a condition to Purchaser's obligations to close and that Seller shall not be in default hereunder if Seller fails to obtain such closure report.

7.4     **DCP Notice**.  Seller shall use commercially reasonable efforts, and work in good faith with Purchaser, to obtain a notice by the Department of City Planning of receipt of certified copies of the declarations listed on Schedule 5 in accordance with Section 98-33(e) of the Zoning Resolution; provided, however, Purchaser hereby acknowledges and agrees that Seller obtaining such notice is not a condition to Purchaser's obligations to close and that Seller shall not be in default hereunder if Seller fails to obtain such closure report.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO CLOSING

8.1     **Purchaser's Conditions to Closing**.  Purchaser's obligation to close under this Contract shall be subject to and conditioned upon the fulfillment of the following conditions precedent:

8.1.1    Subject to <u>Section 6.2</u> hereof, each of Seller's Representations shall be true and correct in all material respects as of the Closing Date except where stated to be as of the Effective Date (it being agreed and understood that, for purposes of this <u>Section 8.1.1</u>, the term "material" shall mean one or more breach(es) of Seller's Representation that will result in a loss or cost to Purchaser that exceeds $50,000, individually or in the aggregate);

8.1.2    Seller shall have complied with, fulfilled and performed in all material respects each of the covenants, terms and conditions to be complied with, fulfilled or performed by Seller hereunder;

8.1.3    The Title Insurer shall be irrevocably and unconditionally committed to issue the Title Policy (subject to the Permitted Exceptions) to Purchaser in accordance with this Contract, subject only to (a) the payment of any premiums therefor by Purchaser and (b) Purchaser and Seller's consummation of the transactions pursuant to this Contract; and

8.1.4    Prior to the Outside Order Date, (a) the Bankruptcy Court shall have approved the sale of the Property to Purchaser in accordance with the terms of this Contract pursuant to the Sale Order and (b) the Sale Order shall have become a Final Order.

Notwithstanding anything to the contrary, there are no other conditions to Purchaser's obligation to Close except as expressly set forth in this <u>Section 8.1</u> or as expressly set forth elsewhere in this Contract.  If any condition set forth in this <u>Section 8.1</u> is not met, Purchaser may (a) other than with respect to the condition set forth in <u>Section 8.1.3</u> above, waive any of the foregoing conditions and proceed to Closing on the then scheduled Closing Date with no offset or deduction from the Purchase Price, (b) terminate this Contract and receive a return of the Deposit from the Escrow Agent, <u>provided</u>, <u>however</u>, Purchaser may not terminate this Contract under this <u>Section 8.1</u> if the condition set forth in <u>Section 8.1.3</u> above is not satisfied as a result of a default by Purchaser of its obligations under this Contract or (c) if such failure constitutes a default by Seller of its covenants hereunder, exercise any of its remedies pursuant to <u>Section 10.2</u>.

8.2    **<u>Seller's Conditions to Closing</u>**.  Seller's obligation to close with respect to conveyance of the Property under this Contract shall be subject to and conditioned upon the fulfillment of the following conditions precedent:

8.2.1    Each of the representations and warranties of Purchaser contained herein shall be true and correct in all material respects as of the Closing Date;

8.2.2    Purchaser shall have complied with, fulfilled and performed in all material respects each of the covenants, terms and conditions to be complied with, fulfilled or performed by Purchaser hereunder; and

8.2.3    Prior to the Outside Order Date, (a) the Bankruptcy Court shall have approved the sale of the Property to Purchaser in accordance with the terms of this Contract pursuant to the Sale Order and (b) the Sale Order shall have become a Final Order.

If any of the foregoing conditions to Seller's obligations to close with respect to the conveyance of the Property under this Contract are not met, Seller may (a) other than with respect to the condition set forth in <u>Section 8.2.3</u> above, waive any of the foregoing conditions and proceed to

Closing on the then scheduled Closing Date, (b) terminate this Contract; provided, however, Seller may not terminate this Contract under this Section 8.2 if the condition set forth in Section 8.2.3 above is not satisfied as a result of a default by Seller of its obligations under this Contract  or (c) if such failure constitutes a default by Purchaser, exercise any of their remedies pursuant to Section 10.1.

>       8.3       **Financial Restructuring; Sale Through Bankruptcy Court.**

        8.3.1    This Contract is subject to approval by the Bankruptcy Court.  Following the date of the entry of the Final Order approving this Contract and until such time as this Contract has been terminated in accordance with its express terms or all transactions contemplated by this Contract have been fully consummated, Seller shall not, nor shall they authorize or permit any of their representatives to, (i) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any alternative bid or any other transaction that could reasonably be expected to interfere with the consummation of the sale of the Property to Purchaser, or (ii) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to an alternative bid or otherwise interfere with the sale of the Property to Purchaser.

        8.3.2    Seller and Purchaser acknowledge that this Contract and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval.

        8.3.3    Purchaser agrees that it will not object to Seller and its Affiliates making a motion for substantive consolidation (in their sole and absolute discretion) provided that such motion does not impact Purchaser's rights to purchase the Property pursuant to the terms of this Contract.

        8.3.4    Through the Closing Date, Seller shall use (and shall cause its controlled Affiliates to use) commercially reasonable efforts:  (a) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Contract, applicable law or otherwise to consummate and make effective the transactions set forth in this Contract; (b) to obtain promptly from any Governmental Authority any orders or permits required to be obtained by Seller or any of its Affiliates in connection with the authorization, execution, delivery and performance of this Contract and the consummation of the transactions set forth herein; (c) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Contract and prompt consummation of the transactions set forth herein required under any applicable law; (d) to defend any and all lawsuits and other proceedings by or before any Governmental Authority challenging this Contract or the consummation of the transactions set forth herein; (e) to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Governmental Authority adversely affecting the ability of any of the parties hereto to consummate the transactions set forth herein; and (f) to provide prompt notification to Purchaser of any actions pursuant to clauses (a)-(e) of this Section 8.3.4; provided, however, that Seller shall not be obligated to pay any consideration or incur any costs to obtain any approvals or consents from third parties, whether or not they may be necessary, proper or advisable to consummate the transactions under this Contract.  In addition, through the Closing Date or earlier termination of this Contract, Purchaser shall, at Seller's request

20

and at Seller's sole cost and expense, use good faith efforts to support the Financial Restructuring and not object to or intentionally hinder or delay the Financial Restructuring, provided that (i) such cooperating shall not increase Purchaser's obligations under this Contract or decrease Purchaser's rights hereunder and in no event shall Purchaser be required to agree to any modification of the terms of this Contract and (ii) Seller acknowledges that any breach of this provision by Purchaser shall not be a default under this Contract (further provided that Purchaser shall not be entitled to any cost reimbursement set forth in Section 10.2 hereof if the failure to obtain a Final Order from the Bankruptcy Court is as a result of Purchaser's breach of this provision).  At Purchaser's request, Seller shall provide Purchaser reasonably updates as to the status of the Conforming Plan, a copy of the final Conforming Plan and material developments in the Bankruptcy Case.

8.3.5   Purchaser acknowledges that it is not seeking the assumption by Seller and assignment to Purchaser of any contracts of Seller, including those that would qualify as "executory contracts" under the Bankruptcy Code and applicable law.  As such, Seller and Purchaser acknowledge and agree that Purchaser need not provide any evidence of "adequate assurance," as that term is used in Section 365 of the Bankruptcy Code, with respect to any contracts to be assumed, assigned, or purchased by Purchaser in conjunction with Purchaser's acquisition of the Property.

## ARTICLE IX
## BROKERAGE

9.1   **Brokerage Commission**.  Seller and Purchaser each represents and warrants to the other that, other than Jones Lang LaSalle Americas, Inc. (the "**Broker**"), such party has not dealt with or utilized the services of any other real estate broker, sales person or finder in connection with this Contract, and each party agrees to indemnify, hold harmless, and, if requested in the sole and absolute discretion of the indemnitee, defend (with counsel approved by the indemnitee) the other parties from and against all Losses relating to brokerage commissions and finder's fees arising from or attributable to the acts or omissions of the indemnifying party contrary to representations contained in this Contract.  If the Closing occurs, Seller agrees to pay Broker at the Closing a commission according to the terms of a separate agreement between Broker and Seller and in accordance with the Sale Order.  Broker shall not be deemed a party or third party beneficiary of this Contract.  This Section 9.1 shall survive the termination of this Contract and the Closing.

## ARTICLE X
## DEFAULTS AND REMEDIES

10.1   **Purchaser Default**.  If Purchaser defaults in any material respect on any of its obligations under this Contract to be performed at the Closing, or if any one or more of Purchaser's representations or warranties are breached in any material respect, and as a result of such default or breach the Closing does not occur in accordance with the terms of this Contract, then Seller shall be entitled to terminate this Contract and recover the Deposit as liquidated damages and, upon the Deposit being delivered to Seller, neither party shall have any further rights or obligations hereunder except that which expressly survive the termination of this Contract.  The Deposit is liquidated damages and recourse to the Deposit is, except for Purchaser's indemnity and confidentiality obligations hereunder and Seller's right to recover attorneys' fees pursuant to

21

Section 13.16 hereof, Seller's sole and exclusive remedy for the Closing not occurring in accordance with the terms of this Contract as a result of Purchaser's default or failure to perform its obligation hereunder or breach of a representation or warranty. SELLER AND PURCHASER ACKNOWLEDGE THAT SELLER'S DAMAGES WOULD BE DIFFICULT TO DETERMINE, AND THAT THE DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES RESULTING FROM A DEFAULT BY PURCHASER IN ITS OBLIGATION TO PURCHASE THE PROPERTY. SELLER AND PURCHASER FURTHER AGREE THAT THIS SECTION 10.1 IS INTENDED TO AND DOES LIQUIDATE THE AMOUNT OF DAMAGES DUE TO SELLER, AND SHALL BE SELLER'S EXCLUSIVE REMEDY AGAINST PURCHASER, BOTH AT LAW AND IN EQUITY, ARISING FROM OR RELATED TO THE CLOSING NOT OCCURRING IN ACCORDANCE WITH THE TERMS OF THIS CONTRACT AS A RESULT OF A DEFAULT OR OTHER FAILURE BY PURCHASER OF ITS OBLIGATIONS UNDER THIS CONTRACT OR BREACH OF A REPRESENTATION OR WARRANTY, OTHER THAN WITH RESPECT TO PURCHASER'S INDEMNITY AND CONFIDENTIALITY OBLIGATIONS HEREUNDER AND SELLER'S RIGHT TO RECOVER ATTORNEYS' FEES PURSUANT TO SECTION 13.16 HEREOF. Notwithstanding anything to the contrary contained in this Section 10.1, nothing contained herein shall limit or effect any and all rights and remedies that Seller may have against Purchaser under law or equity as a result of, or in connection with, a breach or default by Purchaser of Purchaser's obligations under this Contract prior to the Closing, including, without limitation, any claims against Purchaser with respect to any of Purchaser's indemnity and confidentiality obligations hereunder and Seller's right to recover attorneys' fees pursuant to Section 13.16 hereof.

10.2   **Seller Default**. If Seller defaults on its obligations hereunder to consummate the transactions contemplated by this Contract, and such default (other than Seller's default of its obligations under this Contract to be performed on the Closing Date, for which there shall be no cure period) shall not be cured by Seller within ten (10) Business Days following Seller's receipt of written notice thereof from Purchaser, then, at Purchaser's election and as Purchaser's exclusive remedy (subject to the last sentence of this Section 10.2), Purchaser may either (i) terminate this Contract and to receive the return of the Deposit, in which event no party hereto shall have any further rights, duties, obligations or liabilities under this Contract except for those rights, duties, obligations and liabilities that are expressly stated to survive the termination of this Contract, (ii) enforce specific performance of Seller's obligations under this Contract or (iii) waive the failure and proceed to Closing without abatement of the Purchase Price. Purchaser may seek specific performance of Seller's obligation to close on the sale of the Property pursuant to this Contract only if, as a condition precedent to initiating such litigation for specific performance, Purchaser shall file suit therefor with the court on or before the ninety (90th) day after the scheduled Closing Date. If Purchaser fails to file an action for specific performance within such ninety (90) day period, then Purchaser shall be deemed to have elected to terminate the Contract in accordance with clause (i) above. SELLER AND PURCHASER FURTHER AGREE THAT THIS SECTION 10.2 SHALL BE PURCHASER'S EXCLUSIVE REMEDY AGAINST SELLER, BOTH AT LAW AND IN EQUITY ARISING FROM OR RELATED TO A BREACH BY SELLER OF ITS OBLIGATION TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED BY THIS CONTRACT. UNDER NO CIRCUMSTANCES MAY PURCHASER SEEK OR BE ENTITLED TO RECOVER ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INDIRECT DAMAGES, ALL OF WHICH PURCHASER SPECIFICALLY WAIVES. PURCHASER SPECIFICALLY WAIVES THE RIGHT TO FILE ANY LIS PENDENS OR ANY

LIEN AGAINST THE PROPERTY.  Notwithstanding anything to the contrary contained herein, if (a) Purchaser elects to terminate this Contract pursuant to clause (i) above as a result of a willful default by Seller or (b) Purchaser elects to terminate this Contract pursuant to Sections 6.2 or 8.1.1 hereof as a result of a willful, knowing or intentional breach of a Seller Representation, then, in either case, in addition to Purchaser receiving the return of the Deposit, Seller shall be required to reimburse Purchaser for Purchaser's out-of-pocket costs and expenses in connection with this transaction contemplated under this Contract (as evidenced by invoices or other evidence that reasonably sets forth such cost or expense), in an amount not to exceed Five Hundred Thousand Dollars ($500,000) in the aggregate.  Further, if Seller obtains the Creditor Acknowledgment and finalizes the Conforming Plan and files or causes to be filed the Petition of Relief with the Bankruptcy Court, but thereafter this Contract terminates as a result of the failure to obtain a Final Order from the Bankruptcy Court (other than as a result of Purchaser's failure to comply with the terms of this Contract), then, in addition to Purchaser receiving the return of the Deposit, Seller shall be required to reimburse Purchaser for Purchaser's out-of-pocket costs and expenses in connection with this transaction contemplated under this Contract (as evidenced by invoices or other evidence that reasonably sets forth such cost or expense), in an amount not to exceed Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate; provided, however, in no event shall Purchaser be entitled to such reimbursement of costs if this Contract terminates pursuant to Section 12.2.4 and Purchaser still acquires the Property through some other form of sale process.

## ARTICLE XI
## EMINENT DOMAIN AND CASUALTY

11.1  **Eminent Domain**.  If, at the time of Closing, a material portion of the Property is acquired, or is about to be acquired, by any governmental agency by the powers of eminent domain or transfer in lieu thereof, Purchaser shall have the right, at Purchaser's option, to terminate this Contract by giving written notice within thirty (30) days after Purchaser's receipt from Seller of notice of the occurrence of such event (but in no event later than the then scheduled Closing Date), and if Purchaser so terminates this Contract, Purchaser shall recover the Deposit hereunder.  If Purchaser does not have the right to terminate this Contract pursuant to this Section 11.1 or if Purchaser fails to terminate this Contract within such thirty (30) day period, then this transaction shall be closed in accordance with the terms of this Contract for the full Purchase Price and Purchaser shall receive the full benefit of any condemnation award.  For the purposes of this Section 11.1, a "material portion of the Property" shall mean a condemnation or taking (i) of five percent (5%) or more of the square footage of the Property, (ii) of a portion of the Property that is valued at five (5%) or more of the Purchase Price or (iii) that would materially impair the development of the Property in accordance with the Seller's plans and specifications in effect as of the Effective Date.

11.2  **Casualty**.  If prior to the Closing there shall occur damage to a material portion of the Property caused by fire or other casualty, as reasonably determined by an engineer or contractor engaged by Purchaser which is reasonably satisfactory to Seller, then Purchaser shall have the right, at Purchaser's option in its sole and absolute discretion, to terminate this Contract by giving written notice to Seller within thirty (30) days after the date that such determination is communicated to Purchaser and Seller (but in no event later than the Closing Date), and if Purchaser so terminates this Contract, Purchaser shall recover the Deposit hereunder.  If Purchaser does not have the right to terminate this Contract pursuant to this Section 11.2 or if Purchaser fails

to terminate this Contract within such thirty (30) day period, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the Closing, by written instrument in form reasonably satisfactory to Purchaser and Seller, all of Seller's interest in and to any insurance proceeds which may be payable to Seller on account of any such fire or other casualty and shall deliver to Purchaser any such proceeds actually theretofore paid to Seller, in each case, less any reasonable, out-of-pocket costs (including reasonable, out-of-pocket attorney's fees) actually incurred by Seller to collect such proceeds and any such proceeds that Seller uses to make necessary temporary or emergency repairs to the Property and Seller shall give Purchaser a credit against the Purchase Price in an amount equal to any unused portion of the deductible, if any, under Seller's property insurance policy(ies). For the purposes of this Section 11.2, a "material portion of the Property" shall mean a fire or other casualty which would cost an amount equal to five (5%) of the Purchase Price to restore the Improvements, as reasonably determined by an engineer or contractor engaged by Purchaser which is reasonably satisfactory to Seller. The foregoing provisions of this Section 11.2 are and shall be deemed to be an express agreement to the contrary under the provisions of Section 5-1311 of the General Obligations Law of the State of New York. The provisions of this Section 11.2 shall survive Closing.

## ARTICLE XII
## SELLER CREDITOR ACKNOWLEDGMENT AND CONFORMING PLAN

12.1   **Seller Creditor Acknowledgment and Conforming Plan.**   Seller shall use commercially reasonable efforts to secure the commitment of Creditor to support the Financial Restructuring, as evidenced by a Restructuring Support Agreement substantially in the form of Exhibit F (the "**Creditor Acknowledgment**") and to finalize the Conforming  Plan. Seller shall deliver to Purchaser the Creditor Acknowledgment and final Conforming Plan promptly following receipt thereof.

12.2   **Creditor   Acknowledgment   Deadline;   Conforming   Plan   Deadline; Termination Rights.**

12.2.1  Purchaser hereby acknowledges and agrees that Seller shall have until the Creditor Acknowledgment Deadline to obtain the Creditor Acknowledgment and that Purchaser shall have no right to terminate this Contract pursuant to this Section 12.2 prior to the Creditor Acknowledgment Deadline. If Seller has obtained the Creditor Acknowledgment prior to the Creditor Acknowledgment Deadline, then Purchaser shall have no right to terminate this Contract pursuant to this Section 12.2.1.   If Seller has not delivered to Purchaser the Creditor Acknowledgment on or before the Creditor Acknowledgment Deadline, Purchaser may elect to terminate this Contract by delivering written notice to Seller during the Creditor Acknowledgment Termination Period.  If Purchaser either delivers such written termination notice to Seller pursuant to the foregoing sentence, or if Purchaser fails to deliver any such written termination notice during the Creditor Acknowledgment Termination Period, then, unless Purchaser and Seller otherwise agree in writing, this Contract shall terminate, in which case Escrow Agent shall return the Deposit to Purchaser and neither party shall have any further rights or obligations under this Contract (except for provisions hereof that are expressly stated to survive a termination of this Contract).

24

12.2.2 Further, if Seller obtains the Creditor Acknowledgement pursuant to Section 12.2.1, Purchaser hereby acknowledges and agrees that Seller shall have until the Conforming Plan Deadline to finalize the Conforming Plan and file or caused to be filed the Petition of Relief with the Bankruptcy Court and that Purchaser shall have no right to terminate this Contract pursuant to this Section 12.2.2 prior to the Conforming Plan Deadline. If Seller finalizes the Conforming Plan and files or causes to be filed the Petition of Relief with the Bankruptcy Court prior to the Conforming Plan Deadline, then Purchaser shall have no right to terminate this Contract pursuant to this Section 12.2.2.  If Seller does not finalize the Conforming Plan and filed or cause to be filed the Petition of Relief with the Bankruptcy Court on or before the Conforming Plan Deadline, Purchaser may elect to terminate this Contract by delivering written notice to Seller during the Conforming Plan Termination Period.  If Purchaser delivers such written termination notice to Seller pursuant to the foregoing sentence, then this Contract shall terminate, in which case Escrow Agent shall return the Deposit to Purchaser and neither party shall have any further rights or obligations under this Contract (except for provisions hereof that are expressly stated to survive a termination of this Contract). If Purchaser does not deliver such notice during the Conforming Plan Termination Period, then Purchaser shall have waived its right to terminate this Contract pursuant to Section 12.2.2.

12.2.3 If, after delivery of the Creditor Acknowledgment as required by the foregoing Section 12.2.1, the Creditor Acknowledgment is terminated or otherwise ceases to be binding on Creditor, Seller shall promptly notify Purchaser of such termination in writing and Purchaser may elect to terminate this Contract by delivering written notice to Seller within three (3) Business Days following receipt of such notice.

12.2.4 This Contract and the obligations of all parties hereunder shall automatically terminate without any further action or notice of any party upon the occurrence of one of the following events: (i) the Bankruptcy Court enters an order converting the Chapter 11 cases of Seller and its related entities to cases under Chapter 7 of the Bankruptcy Code or appointing a trustee or custodian or examiner with expanded powers for Seller; or (ii) the Bankruptcy Court enters an order dismissing the Chapter 11 cases of Seller and its related entities.

## ARTICLE XIII
## MISCELLANEOUS

13.1    **Binding Effect of Contract**.  This Contract shall not be binding on any party until executed by Purchaser and Seller.  Escrow Agent's execution of this Contract shall not be a prerequisite to its effectiveness.  Subject to Section 13.3, this Contract shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and permitted assigns. This Section 13.1 shall survive the termination of this Contract or the Closing.

13.2    **Exhibits and Schedules**.  All Exhibits and Schedules, whether or not annexed hereto, are a part of this Contract for all purposes.

13.3    **Assignability**.  This Contract is not assignable by Purchaser without first obtaining the prior written approval of Seller.

25

13.4    **Captions**.  The captions, headings, and arrangements used in this Contract are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

13.5    **Number and Gender of Words**.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.

13.6    **Notices**.  All notices, demands, requests and other communications required or permitted hereunder shall be in writing, and shall be (a) personally delivered with a written receipt of delivery; (b) sent by a nationally-recognized overnight delivery service requiring a written acknowledgement of receipt or providing a certification of delivery or attempted delivery; or (c) sent by electronic delivery with an original copy thereof transmitted to the recipient by one of the means described in subsections (a) or (b) no later than one (1) Business Day thereafter.  All notices shall be deemed effective when actually delivered as documented in a delivery receipt (which with respect to an electronic delivery shall mean the date and time of such electronic transmission); provided, however, that if the notice was sent by overnight delivery as aforesaid and is affirmatively refused or cannot be delivered during customary business hours by reason of the absence of a signatory to acknowledge receipt, or by reason of a change of address with respect to which the addressor did not have either knowledge or written notice delivered in accordance with this paragraph, then the first attempted delivery shall be deemed to constitute delivery.  Any party shall be entitled to change its address for notices from time to time by delivering to the other parties notice thereof in the manner herein provided for the delivery of notices.  A notice may be given by either party or such party's attorney on behalf thereof.  All notices shall be sent to the addressee at its address set forth following its name below:

To Purchaser:

550W21 Owner LLC
c/o Legion Investment Group LLC
1270 Avenue of the Americas, Suite 910
New York, New York 10020
Attention: Victor Sigoura
Email: vsigoura@legionig.com

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: Michael J. Rishty, Esq.
Email: michael.rishty@davispolk.com

To Seller:

West 21st Street Member LLC
c/o Casco Development Corp.

548 W 21st Street
New York, New York 10011
Attention: Uri Chaitchik and Noam Teltch
Email: uri@casco-re.com and noam@casco-re.com

with a copy to:

Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas
New York, New York 10104
Attention:  Andrew E. Auerbach, Esq. and Jason J. DeJonker, Esq.
Email:  aeauerbach@bclplaw.com and jason.dejonker@bclplaw.com


Any notice required hereunder to be delivered to the Escrow Agent shall be delivered in accordance with above provisions as follows:

Langdon Title Agency, LLC
463 Seventh Avenue, Suite 701
New York, New York 10018
Attn: Jonathan Tomberg/Brigette Farino
Email: jtomberg@langdontitle.com/Bfarino@langdontitle.com

Unless specifically required to be delivered to the Escrow Agent pursuant to the terms of this Contract, no notice hereunder must be delivered to the Escrow Agent in order to be effective so long as it is delivered to the other party in accordance with the above provisions.  This Section 13.6 shall survive the termination of this Contract or the Closing.

13.7    **Governing Law and Venue**.  The laws of the State of New York shall govern the validity, construction, enforcement, and interpretation of this Contract.  All claims, disputes and other matters in question arising out of or relating to this Contract, or the breach thereof, shall be decided by proceedings instituted and litigated in a court of competent jurisdiction in the State of New York are situated, and the parties hereto expressly consent to the venue and jurisdiction of such court.   This Section 13.7 shall survive the termination of this Contract or the Closing.  Notwithstanding the foregoing, upon the filing of the Bankruptcy Case by Seller and its related entities: (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Contract and to decide any claims or disputes among the Parties which may arise or result from, or be connected with, this Contract, any breach or default thereunder, or the sale of the Property; and (b) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as provided herein.

13.8    **Entire Agreement**.  This Contract embodies the entire agreement between the parties hereto concerning the subject matter hereof and supersedes all prior conversations, proposals, negotiations, understandings and contracts, whether written or oral.  This Section 13.8 shall survive the termination of this Contract or the Closing.

27

#96885590v8

13.9    **Amendments**.  This Contract shall not be amended, altered, changed, modified, supplemented or rescinded in any manner except by a written contract executed by all of the parties; provided, however, that, the signature of the Escrow Agent shall not be required as to any amendment of this Contract other than an amendment of Schedule 2. This Section 13.9 shall survive the termination of this Contract or the Closing.

13.10    **Severability**.  In the event that any part of this Contract shall be held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be reformed, and enforced to the maximum extent permitted by law.  If such provision cannot be reformed, it shall be severed from this Contract and the remaining portions of this Contract shall be valid and enforceable.  This Section 13.10 shall survive the termination of this Contract or the Closing.

13.11    **Multiple Counterparts/Electronic Signatures**.  This Contract may be executed in a number of identical counterparts.  This Contract may be executed by electronic delivery of signatures (including .pdf signatures) which shall be binding on the parties hereto, with original signatures to be delivered as soon as reasonably practical thereafter if requested by a party hereto. This Section 13.11 shall survive the termination of this Contract or the Closing.

13.12    **Construction**.  No provision of this Contract shall be construed in favor of, or against, any particular party by reason of any presumption with respect to the drafting of this Contract; both parties, being represented by counsel, having fully participated in the negotiation of this instrument.  This Section 13.12 shall survive the termination of this Contract or the Closing.

13.13    **Confidentiality**.  Seller and Purchaser shall not disclose the terms and conditions contained in this Contract and shall keep the same confidential, provided that each may disclose the terms and conditions of this Contract (a) as required by law, (b) to consummate the terms of this Contract, or any financing relating thereto, (c) to its lenders and potential lenders, investors and potential investors, partners, direct and indirect members, attorneys and accountants and other Purchaser's Representatives, and (d) in the case of Seller and its Affiliates and Representatives, as may be necessary in connection with the Financial Restructuring and/or the administration of Seller's and/or its Affiliates' chapter 11 estates.  Any information obtained by Purchaser in the course of its inspection of the Property, and any Materials provided by Seller to Purchaser hereunder, shall be confidential and Purchaser shall be prohibited from making such information public to any other person or entity other than its consultants, without Seller's prior written authorization, which may be granted or denied in Seller's sole discretion. Notwithstanding the foregoing or anything else in this Contract to the contrary, (i) any information which was previously or is hereafter publicly disclosed (other than in violation of this Contract or other confidentiality agreements) and (ii) any information known by Purchaser or Seller, respectively, or their respective Affiliates, from a source other than Purchaser, Seller or Broker or another Person owing a duty of confidentiality to Seller or Purchaser, respectively, shall not be considered confidential.  In addition, each party shall use its reasonable efforts to prevent its consultants from divulging any such confidential information to any unrelated third parties except for the limited purpose of analyzing and investigating such information for the purpose of consummating the transaction contemplated by this Contract.  This Section 13.13 shall survive the termination of this Contract or the Closing.

#96885590v8

13.14 **Time of the Essence**. **IT IS EXPRESSLY AGREED BY THE PARTIES HERETO THAT TIME IS OF THE ESSENCE WITH RESPECT TO PURCHASER'S AND SELLER'S OBLIGATIONS UNDER THIS CONTRACT AND ANY ASPECT THEREOF.** This <u>Section 13.14</u> shall survive the termination of this Contract or the Closing.

13.15 **Waiver**. No delay or omission to exercise any right or power accruing upon any default, omission, or failure of performance hereunder shall impair any right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. No waiver, amendment, release, or modification of this Contract shall be established by conduct, custom, or course of dealing and all waivers must be in writing and signed by the waiving party. This <u>Section 13.15</u> shall survive the termination of this Contract or the Closing.

13.16 **Attorneys' Fees**. In the event any party hereto commences litigation against another party hereto to enforce its rights hereunder, the prevailing party in such litigation shall be entitled to recover from the other party its reasonable attorneys' fees and expenses incidental to such litigation. This <u>Section 13.16</u> shall survive the termination of this Contract or the Closing.

13.17 **Time Zone/Time Periods**. Any reference in this Contract to a specific time shall refer to the time in the time zone where the Property is located. If the last day of a time period falls on a weekend or legal holiday, then the next Business Day shall be considered the end of the time period. This <u>Section 13.17</u> shall survive the termination of this Contract or the Closing.

13.18 **1031 Exchange**. Seller and Purchaser acknowledge and agree that the purchase and sale of the Property may be part of a tax-free exchange for either Purchaser or Seller pursuant to Section 1031 of the Code, the regulations promulgated thereunder, revenue procedures, pronouncements and other guidance issued by the Internal Revenue Service. Each party hereby agrees to reasonably cooperate with the other parties and take all reasonable steps on or before the then scheduled Closing Date to facilitate such exchange if requested by another party, provided that (a) no party making such accommodation shall be required to acquire any substitute property, (b) such exchange shall not affect the representations, warranties, liabilities and obligations of the parties to each other under this Contract, (c) no party making such accommodation shall incur any additional cost, expense or liability in connection with such exchange (other than expenses of reviewing and executing documents required in connection with such exchange), (d) no dates in this Contract will be extended or adjourned as a result thereof and (e) the consummation or accomplishment of any exchange shall not be a condition precedent to the requesting party's obligations under this Contract. This <u>Section 13.18</u> shall survive the termination of this Contract or the Closing.

13.19 **No Personal Liability of Officers, Trustees or Directors**. Purchaser and Seller each acknowledges that this Contract is entered into by Seller and Purchaser and Purchaser and Seller each agrees that none of Seller's Indemnified Parties or Purchaser Parties (other than Purchaser) shall have any personal liability under this Contract or any document executed in connection with the transactions contemplated by this Contract. This <u>Section 13.19</u> shall survive the termination of this Contract or the Closing.

13.20    **No Recording**.  Purchaser shall not cause or allow this Contract or any contract or other document related hereto, nor any memorandum or other evidence hereof, to be recorded or become a public record without the prior written consent of Seller, which consent may be withheld at Seller's sole discretion.  If Purchaser records this Contract or any other memorandum or evidence thereof, Purchaser shall be in default of its obligations under this Contract.  Purchaser hereby appoints Seller as Purchaser's attorney-in-fact to prepare and record any documents necessary to effect the nullification and release of this Contract or other memorandum or evidence thereof from the public records.  This appointment shall be coupled with an interest and irrevocable.  This Section 13.20 shall survive the termination of this Contract.

13.21    **Relationship of Parties**.  Purchaser and Seller acknowledge and agree that the relationship established between the parties pursuant to this Contract is only that of a seller and a purchaser of property.  Neither Purchaser nor Seller is, nor shall either hold itself out to be, the agent, employee, joint venturer or partner of any other party.  This Section 13.21 shall survive the termination of this Contract or the Closing.

13.22    **Survival**.  Except for any provisions in this Contract that by their express terms survive the termination of this Contract and/or the Closing, none of the terms and provisions of this Contract shall survive the termination of this Contract, and if the Contract is not so terminated, all of the terms and provisions of this Contract shall be merged into the Closing documents and shall not survive Closing.  This Section 13.22 shall survive the termination of this Contract or the Closing.

13.23    **Multiple Purchasers**.  As used in this Contract, the term "**Purchaser**" includes all entities acquiring any interest in the Property at the Closing.  In the event that "**Purchaser**" has any obligations or makes any covenants, representations or warranties under this Contract, the same shall be made jointly and severally by all entities being a Purchaser hereunder.  This Section 13.23 shall survive the termination of this Contract or the Closing.

13.24    **WAIVER OF JURY TRIAL**.  THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS CONTRACT.  This Section 13.24 shall survive the termination of this Contract or the Closing.

13.25    **Mortgage Recording Tax**.  As an accommodation to Purchaser, to the extent permitted by applicable law and the Bankruptcy Court, Seller shall require as part of the Conforming Plan that the holder of the existing mortgage and note to assign its mortgage and note to Purchaser's lender at Closing for the purpose of saving mortgage recording tax.  Purchaser shall pay the reasonable, out-of-pocket, costs and expenses of Seller's mortgage holder's counsel in connection with the preparation of the assignment of the existing mortgage and note (but not any other costs of the Financial Restructuring).

[Remainder of Page Intentionally Left Blank]

#96885590v8

NOW, THEREFORE, the parties hereto have executed this Contract as of the date first set forth above.

**SELLER:**

**540 WEST 21ST STREET HOLDINGS LLC,**
a Delaware limited liability company

By: _____

Name:  Noam Teltch
Title:    Authorized Signatory

[Signatures Continued on Following Page]

**PURCHASER:**

**550W21 OWNER LLC,**
a Delaware limited liability company

By: _____
Name:
Title:   Victor Sigoura
         Authorized Signatory

[Signatures Continued on Following Page]

## ESCROW AGENT SIGNATURE PAGE

ESCROW AGENT HAS EXECUTED THIS CONTRACT TO ACKNOWLEDGE ITS AGREEMENT TO HOLD THE DEPOSIT IN ACCORDANCE WITH <u>SCHEDULE 2</u> HEREOF.

**LANGDON TITLE AGENCY, LLC**

By: _Jonathan Tomberg_

Name:  Jonathan Tomberg
Title:  Senior Underwriting Counsel

# EXHIBIT A

## LEGAL DESCRIPTION OF THE PROPERTY

PARCEL A

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF WEST 21ST STREET DISTANT 500 FEET 4 INCHES WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE WESTERLY SIDE OF 10TH AVENUE AND THE SOUTHERLY SIDE OF WEST 21ST STREET;

RUNNING THENCE SOUTHERLY PARALLEL WITH THE WESTERLY SIDE OF 10TH AVENUE, 92 FEET TO THE CENTER LINE OF THE BLOCK;

THENCE WESTERLY ALONG SAID CENTER LINE OF THE BLOCK 49 FEET 8 INCHES; THENCE NORTHERLY PARALLEL WITH THE WESTERLY SIDE OF TENTH AVENUE 92 FEET TO THE SOUTHERLY SIDE OF WEST 21ST STREET;

THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF WEST 21ST STREET 49 FEET 8 INCHES TO THE POINT OR PLACE OF BEGINNING.

PARCEL B

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH, COUNTY, CITY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTH SIDE OF 21ST STREET, DISTANT 550 FEET WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTH SIDE OF 21ST STREET AND THE WESTERLY SIDE OF 10TH AVENUE;

RUNNING THENCE SOUTHERLY PARALLEL WITH 10TH AVENUE 92 FEET TO THE CENTER OF THE BLOCK;

THENCE WESTERLY ALONG SAID CENTER OF THE BLOCK 100 FEET;

THENCE NORTHERLY PARALLEL WITH 10TH AVENUE 92 FEET TO THE SOUTHERLY SIDE OF 21ST STREET;

THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF 21ST STREET 100 FEET TO THE POINT OR PLACE OF BEGINNING.

PARCEL C

#96885590v8

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, CITY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF TWENTY-FIRST STREET DISTANT 33 FEET, 9 ¼ INCHES EASTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF TWENTY-FIRST STREET WITH THE EASTERLY SIDE OF ELEVENTH AVENUE, AS NOW WIDENED;

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF TWENTY-FIRST STREET 50 FEET;

THENCE SOUTHERLY AT RIGHT ANGLES WITH TWENTY-FIRST STREET 110 FEET, 8 ¼ INCHES;

THENCE WESTERLY PARALLEL WITH TWENTY-FIRST STREET 41 FEET MORE OR LESS TO ELEVENTH AVENUE;

THENCE NORTHWESTERLY ALONG THE EASTERLY SIDE OF ELEVENTH AVENUE 31 FEET, 6 ¼ INCHES TO THE SOUTHERLY FACE OF THE SOUTHERLY WALL OF BUILDING ON PREMISES ADJOINING ON THE NORTH WHICH POINT IS DISTANT 87 FEET AND 1 ¾ INCHES FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF WEST TWENTY-FIRST STREET WITH THE SAID EASTERLY SIDE OF ELEVENTH AVENUE, MEASURED ALONG 11TH AVENUE;

THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF THE SAID SOUTHERLY WALL OF SAID BUILDING 2 FEET, 6 INCHES MORE OR LESS TO LAND OF THE SEAMEN'S CHRISTIAN ASSOCIATION OF THE CITY OF NEW YORK;

THENCE NORTHERLY AT RIGHT ANGLES WITH TWENTY-FIRST STREET 80 FEET, 4 5/8 INCHES MORE OR LESS TO THE POINT AND POINT OR PLACE OF BEGINNING.

PARCEL D

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY AND STATE OF NEW YORK, BEING BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF 21ST STREET WITH THE EASTERLY SIDE OF MARGINAL STREET (ELEVENTH AVENUE AS WIDENED);

THENCE EASTERLY, ALONG THE SOUTHERLY SIDE OF 21ST STREET, 33 FEET 9-¼ INCHES;

THENCE SOUTHERLY AT RIGHT ANGLES WITH 21ST STREET, 87 FEET 4-7/8 INCHES TO A POINT ON THE EASTERLY SIDE OF ELEVENTH AVENUE; AND

THENCE NORTHERLY, ALONG THE EASTERLY SIDE OF ELEVENTH AVENUE, 93 FEET 8-3/8 INCHES TO THE POINT OR PLACE OF BEGINNING.

EXCEPTING FROM THE ABOVE DESCRIBED PREMISES SO MUCH THEREOF AS WAS CONVEYED BY JOHN J. HALPIN AND MARGUERITE D. HALPIN HIS WIFE TO THE SEAMEN'S CHRISTIAN ASSOCIATION OF THE CITY OF NEW YORK BY DEED DATED MAY 3, 1923 AND RECORDED ON MAY 5, 1923 IN LIBER 3345 CP. 3. SAID EXCEPTED PARCEL IS BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY SIDE OF 11TH AVENUE WHERE THE SAME IS INTERSECTED BY THE SOUTHERLY LINE OF THE SOUTHERLY WALL OF THE BUILDING NOW STANDING ON THE SOUTHEAST CORNER OF 11TH AVENUE AND 21ST STREET, BEING A POINT DISTANT SOUTHEASTERLY 87 FEET 1-¾ INCHES FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF WEST 21ST STREET WITH SAID EASTERLY SIDE OF 11TH AVENUE;

THENCE RUNNING EASTERLY AND ALONG SAID SOUTHERLY LINE OF SAID SOUTHERLY WALL, 2 FEET 6 INCHES MORE OR LESS TO LAND OF THE SEAMEN'S CHRISTIAN ASSOCIATION OF THE CITY OF NEW YORK;

THENCE SOUTHERLY, ALONG SAID LAND OF SAID SEAMEN'S CHRISTIAN ASSOCIATION, 6 FEET 10-¾ INCHES MORE OR LESS TO 11TH AVENUE; AND THENCE RUNNING NORTHERLY OR NORTHWESTERLY, 6 FEET 6-¾ INCHES MORE OR LESS TO THE POINT OR PLACE OF BEGINNING.

#96885590v8

<u>**EXHIBIT B**</u>

**FORM OF BARGAIN AND SALE DEED**

SECTION:
BLOCK:
LOT:
ADDRESS:
CITY:
COUNTY:

BARGAIN AND SALE DEED WITHOUT
COVENANT AGAINST GRANTOR'S ACTS

from

[_____]

to

[_____]

Dated as of _____ __, 202_

RECORD AND RETURN TO:

_____
_____
_____
_____

Exh. B-1

## BARGAIN AND SALE DEED WITHOUT
## COVENANTS AGAINST GRANTOR'S ACTS

**THIS INDENTURE**, made as of _____ __, 202_, between _____, a _____, having an address at _____, party of the first part, and _____, a _____, having a principal address at _____, party of the second part:

### W I T N E S E T H:

That the party of the first part, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, lawful money of the United States, paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns forever,

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of New York, County of New York, State of New York, as more particularly described in <u>Schedule A</u> attached hereto.

**TO HAVE AND TO HOLD** the premises herein granted unto the party of the second part, the heirs or successors and assigns forever.

[AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.]

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

[    ], a [        ]

By: _____
Name:
Title:

STATE OF _____ )

_____ ) ss.:

COUNTY OF _____ )

On this __ day of _____, 202_, before me, the undersigned, a Notary Public in and for said State, personally appeared, _____, personally known to me, or proved to me on the basis of satisfactory evidence, to be the person whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in his(er) authorized capacity, and that by his(er) signature on the instrument, executed the instrument.

GIVEN under my hand and seal this __ day of _____, 202_.

_____
Notary Public

**EXHIBIT C**

**RESTRUCTURING TERM SHEET**

Set forth below are the specific terms of a Financial Restructuring of 540 WEST 21ST STREET HOLDINGS LLC, a Delaware limited liability company, ("540W21st" and collectively with any affiliates of 540W21st that initiate a chapter 11 case, "Debtors"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Purchase Agreement. In the event of a bankruptcy filing, the terms set forth herein reflect an integrated transaction, and nothing contained herein shall constitute a legally binding obligation of 540W21st, any Debtors, or any other party in interest until the Conforming Plan has been confirmed by a final order of the Bankruptcy Court that is not subject to a stay.

## I.   GENERAL TERMS OF THE FINANCIAL RESTRUCTURING.

Debtors shall:

1.   (a) as promptly as practicable and in no event later than June 23, 2023, finalize a restructuring support agreement among Debtors and Senior Lender (as defined below), substantially in the form attached to that certain Purchase and Sale Contract, dated June 13, 2023, by and between 540W21st and 550W21 Owner LLC, a Delaware limited liability company; and (b) as promptly as practicable and in no event later than July 14, 2023, a Chapter 11 Plan (a "Conforming Plan") which embodies and implements the Financial Restructuring and the Sale of the Property as described herein;

2.   within two (2) business days after finalizing the Conforming Plan, solicit and obtain pre-petition ballots or votes with respect to the Conforming Plan;

3.   within two (2) business days after obtaining pre-petition ballots or votes with respect to the Conforming Plan and in no event later than July 20, 2023, file or cause to be filed a petition for relief under chapter 11 of Title 11 of the United States Code on behalf of each Debtor (the "Petition for Relief," and the date on which such Petition for Relief is filed being referred to as the "Petition Date") with the United States Bankruptcy Court for the either the District of Delaware or the Southern District of New York (the "Bankruptcy Court");

4.   contemporaneously with the filing of the Petition for Relief, file: (a) the Conforming Plan; (b) a disclosure statement (pursuant to Section 1125 of the Bankruptcy Code and all local rules of the Bankruptcy Court); and (c) any other such pleadings as are necessary to have the Bankruptcy Court approve the pre-petition solicitation of votes and acceptances of the Conforming Plan. Each of the foregoing shall be (x) in form and substance reasonably acceptable to all Parties and (y) not be amended, modified or supplemented without prior written consent of all Parties;

5.      from and after the Petition Date and at all times prior to the date that the Conforming Plan is confirmed by the Bankruptcy Court and such plan becomes effective as provided for therein or in the order confirming such plan (the "Plan Effective Date"), support the Conforming Plan and the confirmation thereof and take any reasonable actions, including the filing of pleadings to effectuate the Financial Restructuring and the confirmation of the Conforming Plan;

6.      from and after the Petition Date to the extent any additional post-petition solicitation of votes or ballots is required to confirm the Conforming Plan, take all reasonable actions necessary to solicit such additional votes or ballots in favor of the Conforming Plan from any creditors necessary to vote to confirm the Conforming Plan, and as may be required by law;

7.      at all times prior to the Plan Effective Date, in no way agree to or otherwise provide any support to any other proposed financial restructuring, any sale of the Property other than the Sale, or any plan of reorganization other than the Conforming Plan, any other transaction that is an alternative to the Sale or the Conforming Plan, or take any other action that could reasonably be expected to preclude, delay, or interfere with consummation of the Conforming Plan or the Sale;

8.      at all times prior to the Plan Effective Date, not object to and not otherwise take any action or file any pleading to oppose or alter any of the terms of the Financial Restructuring, the Conforming Plan or any other document filed to effect the consummation of the Financial Restructuring or take any other action that is inconsistent with, or that would materially delay, consummation of the Financial Restructuring or confirmation of the Conforming Plan;

9.      at all times prior to the Plan Effective Date, take such steps to as may be reasonably necessary to coordinate with the Parties and their designated representatives and advisors and to prepare all necessary documents to consummate the Financial Restructuring and the Conforming Plan, which documents will be materially consistent with this Restructuring Agreement and its attachments; and

10.      at all times prior to the Plan Effective Date, take all reasonable steps that are necessary to obtain any necessary approval under applicable law, rule, or regulation, including, but not limited to, any and all requisite regulatory or third party approvals, for the sale of the Property and the confirmation of the Conforming Plan as expeditiously as possible.

## II.    TREATMENT OF CLAIMS AND INTERESTS UNDER THE FINANCIAL RESTRUCTURING AND PURSUANT TO THE CONFORMING PLAN

The Financial Restructuring will classify and provide treatment for claims against and interests in the Debtor as described below.  In the event of a bankruptcy filing, such terms will be incorporated into the Conforming Plan.  Claims in each such class will be

#96885590v8

satisfied in full by the delivery of the consideration described below on the effective date (the "Plan Effective Date") of the Conforming Plan or such other distribution date agreed to by the Parties.

| | |
|---|---|
| **General Administrative Claims** | Each holder of an allowed administrative claim shall receive, in full satisfaction of its claim, a cash payment equal to the unpaid portion of such allowed general administrative claim on the later of: (a) the Plan Effective Date or as soon as practicable thereafter; or (b) as soon as reasonably practicable following the date on which an order determining and allowing such claim as an administrative claim becomes final and nonappealable. |
| **Statutory Fees** | Administrative expense claims for fees payable pursuant to 28 U.S.C. § 1930, shall be paid in cash and in accordance with the statutory schedule.  All fees payable pursuant to 28 U.S.C. § 1930 subsequent to the Plan Effective Date shall be paid by reorganized Debtors on a timely basis until entry of a final decree. |
| **Priority Tax Claims** | Each holder of an allowed priority tax claim, if any, shall receive in full satisfaction of its claim, treatment consistent with the requirements of 11 U.S.C. § 1129(a)(9)(C), provided, however, that reorganized Debtors shall have the right to pay any allowed priority tax claim, or the remaining balance of any allowed priority tax claim, in full at any time on or after the Plan Effective Date, without premium or penalty. |
| **Administrative Trade Claims** | Each holder of an administrative trade claim shall be paid in the ordinary course of business of the claimant and the applicable Debtor, and in accordance with the terms and conditions of the particular transaction giving rise to the administrative trade claim. |
| **Senior Secured Debt Claims and Any Other Claims arising under the Senior Secured Credit Agreement**: | The currently outstanding senior secured credit facility ("Senior Secured Debt") owed by 540W21st provides for a loan facility up to $80.45 million (including accrued interest, legal fees, costs and expenses), arising pursuant to the terms of that certain Amended and Restated Loan Agreement, dated June 28, 2017, as amended by, *inter alia*, that certain Omnibus Amendment to Loan Documents dated May 9, 2022 between 540W21st and Ray New York LLC, as successor in interest to Bank Hapoalim B.M. ("Senior Lender"). Senior Lender shall be paid approximately [$-- million] in cash from the proceeds of the Sale.  The Senior Secured Debt will remain in place and accrue interest until the consummation of the Sale and will receive the distributions outlined above following consummation of the Sale. |

Exh. C-3

| | |
|---|---|
| **Mechanic's Lien and Other Secured Claims** | From the proceeds of the Sale, each holder of an allowed mechanic's lien claim shall receive, in full satisfaction of its claim, a cash payment equal to the unpaid portion of such allowed mechanic's lien claim on the later of: (a) the Plan Effective Date or as soon as practicable thereafter; (b) as soon as reasonably practicable following the date on which an order determining and allowing such claim as an administrative claim becomes final and nonappealable; or (c) as otherwise required under any prepetition settlement agreement between the holder of an allowed mechanic's lien claim and 540W21st. |
| | . |
| **Treatment of General Unsecured Claims Against 540W21st** | The claims of holders of allowed General Unsecured Claims (including certain allowed professional fee claims against 540W21st (including brokerage claims of JLL) and any other allowed unsecured claims) against 540W21st will be paid in cash equal to their Pro Rata Share (as defined below) of certain funds resulting from the sale of the Property segregated to pay unsecured claims against 540W21st (the "Unsecured Creditor Funds"). Debtors and Senior Lender shall determine the aggregate amount of the Unsecured Creditor Funds. |
| **Treatment of Casco Development Corp. General Unsecured Claim** | Any prepetition claims of Casco Development Corp. against Debtors shall be deemed waived and released in accordance with the terms of the Conforming Plan. |
| **Treatment of Gutkind General Unsecured Claim** | Reference is hereby made to that certain Promissory Note, dated February 20, 2020, between West 21st Street Investment Member LLC (an affiliate of 540W21st) and Efraim Gutkind ("Gutkind") on the other. In full satisfaction of all claims of Gutkind against Debtors, Gutkind shall be paid a certain amount in cash from the proceeds of the Sale as agreed between 540W21st and Senior Lender. |
| **Treatment of Unsecured Claims Against Any Other Debtors** | 540W21st is not aware of any other claims against any affiliated Debtors other than the Subordinated Notes. |
| **Treatment of Existing Equity Interests**: | Any prepetition interests in Debtors arising from (1) any subordinated promissory notes in any affiliate of 540W21st, including 540 West 21st Street LLC and 540 W 21st Development LLC (collectively, the "Subordinated Notes") or (2) any capital stock or other equity securities, as defined in 11 U.S.C. § 101(16), including, without limitation, any prepetition common and preferred stock issued and outstanding and all options, warrants and other rights relating thereto |

Exh. C-4

(collectively, the "Existing Equity Interests"), shall be retired, cancelled, extinguished and/or discharged on the Plan Effective Date in accordance with the terms of the Conforming Plan.

**Sale of Real Estate:**  On the date which is thirty (30) days following the Plan Effective Date, 540W21st shall close the sale of the Property to Purchaser as provided in the Purchase Agreement (the "Sale"). All distributions will be made pursuant to the Conforming Plan. In connection with the Sale, to the extent permitted by applicable law and the Bankruptcy Court, the Senior Lender shall assign its mortgage and note to Purchaser's lender at Closing for the purpose of saving mortgage recording tax.

**Contracts and Agreements**:  On or prior to the hearing on the approval of the Disclosure Statement for the Conforming Plan, 540W21st shall identify, after consultation with 541W21st, any executory contracts or unexpired leases to be rejected as of the Plan Effective Date and the Conforming Plan will so provide.  All other executory contracts and unexpired leases shall be assumed as of the Plan Effective Date.  Claims for rejection damages will be treated as General Unsecured Claims.

**Releases**:  The Conforming Plan shall include, to the fullest extent available and provided by law, a full discharge and release of liability by 540W21st and its related Debtors (in their capacities as debtor in possession and reorganized Debtors) in favor of Senior Lender,  Casco Development, and each of their respective affiliates, principals, employees, agents, officers, directors, and professionals from: (a) any and all claims and causes of action arising prior to the Plan Effective Date; and (b) any and all claims arising from the actions taken or not taken in connection with the Financial Restructuring, the Conforming Plan and Debtors' bankruptcy filing.  In addition and to the extent permitted by law, Debtors shall be entitled to seek similar releases from all Parties receiving distributions under the Conforming Plan.

**Acknowledgement of Validity of Lenders' Pre-Petition Claims**:  As reconfirmed on the Petition Date, Debtors will acknowledge that: (a) they have no defenses, rights of setoff or other claims based upon subordination, disallowance, enforceability or applicable law related to Senior Lender; and (b) as of the Petition Date, 540W21st is indebted to Senior Lender in the principal amount of [$-- million], plus accrued and unpaid interest (including interest on unpaid interest), attorneys' fees, costs and expenses.

#96885590v8

| | |
|---|---|
| **Timing** | The Conforming Plan shall be confirmed by an order of the Bankruptcy Court that is not subject to a stay and is reasonably acceptable in all respects to all Parties. |
| **Other Agreements of the Debtor**: | (a)     Debtors shall take such steps as may be reasonably necessary to coordinate with 541W21st and its designated representatives and advisors and to prepare all necessary documents to consummate the Financial Restructuring, including without limitation, the drafting of the Conforming Plan and related Disclosure Statement and plan solicitation materials which documents will be materially consistent with the Purchase Agreement and its attachments; |
| | (b)     Debtors shall take all commercially reasonable steps to obtain any necessary approval for the Financial Restructuring, including any necessary government or regulatory approval, as expeditiously as possible under applicable law; |
| | (c)     To the extent required to do so, the Debtors shall file their schedules and statements of financial affairs within 15 days of the Petition Date or within such other time as permitted by the Bankruptcy Court.  Debtors may seek one additional 15 day extension from the Court, and thereafter, may seek additional extensions with the consent of 541W21st. |
| **Definitions:** | "Pro Rata Share" means as to a particular holder of an allowed General Unsecured Claim at any date, the ratio that the amount of such claim bears to the total amount of all General Unsecured Claims (not otherwise electing a cash payment, if applicable) determined as if all disputed General Unsecured Claims were allowed claims. |

## EXHIBIT D

**FORM OF BILL OF SALE AND GENERAL ASSIGNMENT**

**BILL OF SALE AND GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT**

This **BILL OF SALE AND GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment"), made and entered into as of this _____ day of _, 20__, by and between [_____], a [_____] ("Assignor") and [_____], a [_____] ("Assignee").

W I T N E S E T H :

**WHEREAS**, pursuant to that certain Purchase and Sale Contract, dated as of [_____ _____], 2023 (as same may have been or may hereafter be assigned, amended, modified or otherwise supplemented, the "Contract"; all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Contract), between Assignor and Assignee, Assignor has agreed to sell and Assignee has agreed to purchase, among other things, the Property; and

**WHEREAS,** pursuant to the Contract, the Closing for the Property is occurring on the date hereof, and Assignor is required to assign, and Assignee is required to accept, the Assigned Interests (as hereinafter defined) at Closing.

**NOW THEREFORE,** in consideration of the premises and of the mutual conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Assignor hereby conveys, grants, bargains, sells, transfers, sets over, assigns, releases, delivers and confirms to Assignee, and Assignee hereby accepts, all of Assignor's right, title and interest in and to all Miscellaneous Property (the "Assigned Interests").

2.      Assignee hereby expressly assumes the obligation for the performance of any and all of the obligations of Assignor with respect to the Assigned Interests relating to the period on and after the date hereof.

3.      This Assignment shall survive the Closing and shall inure to the benefit of all parties hereto and their respective heirs, successors and assigns.

4.      This Assignment may be executed in counterparts, each of which shall constitute an original, but all of which shall collectively constitute one instrument.

5.      This Assignment, and all questions of interpretation hereof and all controversies hereunder shall be construed in accordance with and governed by the laws of the State of New York (without reference to principles of conflict of laws).

[NO FURTHER TEXT ON THIS PAGE]

Exh. D-1

**IN WITNESS WHEREOF,** the parties have executed this Assignment as of the day and year first above written.

**ASSIGNOR:**

[_____], a Delaware limited liability company


By:
    Name:_____
    Title:_____


**ASSIGNEE:**

[_____,
_____]


By:
    Name:_____
    Title:_____

Ex. D - 2

<u>EXHIBIT E</u>

**FORM OF TITLE AFFIDAVIT**[1]

TITLE #: LTA-                                                          DATE:

State of          New York        )
County of _____) ss:


_____, being duly sworn, deposes and
says:

1. That (I am/we are) (the/a) (owner) (shareholder/member/partner/authorized signatory) of
_____ (the "Company") the grantor(s) executing the deed of the
property     known     as     _____     to
_____.

2. There are presently no tenants in said premises.

3. That the Company is the same company which acquired title to the premises herein by deed
dated _____and recorded _____ in Liber/Page_____ or CRFN
_____ in the New York City Register's Office of_____.

4. The Company has not been known by any other name for the past ten (10) years, except as ____
_____.

5. The Company agrees to indemnify the above Title Company for any loss and/or cost of damage,
for any unpaid vault charge(s) which may have been or may be levied by the City of New York.

6. No work has been done upon the above premises by the City of New York nor has any demand
been made by the City of New York for any such work that may result in charges by the New York
City Department of Rent and Housing Maintenance Emergency Services or charges by the New
York City Department for Environmental Protection for water tap closings or any related work.

7. That there has been no work performed by any agency of The City of New York to cure problems
under the New York City Hazardous Substances Emergency Response Law.  Nor can any claim
be incurred pursuant to the aforementioned statute.  The Company agrees to indemnify the above
Title Co. for any loss, cost or damage, for any lien incurred up to the date of this affidavit, whether
filed or unfiled.

That    I    make    this    affidavit    to    induce    <u>Langdon   Title   Agency,   LLC</u>    and
_____ (underwriter) to insure title free and clear of the aforesaid,
knowing that it will rely on the truth of the statements herein made.

_____
[1] Title affidavit is subject to Title Company's review of final sale order.

Ex. E - 1

_____
Seller:
By:
Its:


Sworn to before me this _____
day of _____, 20____


_____
Notary Public

Exh. E-2

<u>**EXHIBIT F**</u>

**FORM OF RESTRUCTURING SUPPORT AGREEMENT**

**RESTRUCTURING SUPPORT AGREEMENT**

This RESTRUCTURING SUPPORT AGREEMENT (this "<u>Agreement</u>"), dated as of \_\_\_\_ _____, 2023, is entered into by and among 540 West 21st Street Holdings, LLC, a Delaware limited liability company ("<u>540W21st</u>"), its direct and indirect subsidiaries and affiliates (540W21st and such subsidiaries and affiliates, and their respective successors and assigns, collectively, the "<u>Companies</u>"), and the Companies' Senior Lender (as defined below) (the "<u>Consenting Creditor</u>").  The Companies and the Consenting Creditor and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "<u>Parties</u>" and individually as a "<u>Party</u>".

**PRELIMINARY STATEMENTS**

**WHEREAS,** as of the date hereof, the currently outstanding senior secured credit facility (the "<u>Senior Secured Debt</u>") owed by 540W21st provides for a loan facility up to $80.45 million (including accrued interest, legal fees, costs and expenses), arising pursuant to the terms of that certain Amended and Restated Loan Agreement, dated June 28, 2017, as amended by, *inter alia*, that certain Omnibus Amendment to Loan Documents dated May 9, 2022 between 540W21st and Ray New York LLC, as successor in interest to Bank Hapoalim B.M. (the "Senior Lender");

**WHEREAS,** the Companies and the Consenting Creditor have agreed to implement a restructuring of the Companies pursuant to the terms and conditions set forth in: (a) the Restructuring Term Sheet attached hereto as <u>Exhibit A</u> (the "<u>RTS</u>") and (b) the Plan of Reorganization (the "<u>Plan</u>"), which RTS and Plan are the product of arm's length, good faith discussions between the Companies and the Consenting Creditor;

**WHEREAS,** it is anticipated that, subject to the terms of this Agreement, the restructuring transactions contemplated by the RTS and Plan (the "<u>Financial Restructuring</u>") will be implemented through a solicitation of votes for the Plan pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "<u>Bankruptcy Code</u>") and one or more exemptions from the registration requirements under the Securities Act of 1933, as amended (the "<u>Solicitation</u>"); and

**WHEREAS,** the Companies have agreed to commence voluntary reorganization cases under chapter 11 of the Bankruptcy Code for 540W21st and each of its direct and indirect subsidiaries and affiliates (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the _____ (the "<u>Bankruptcy Court</u>") to effect the Financial Restructuring through the Plan.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements set forth herein, and for such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**Section 1. <u>Plan</u>**.  The Plan sets forth the material terms and conditions of the Financial Restructuring; however, the Plan is supplemented by the terms and conditions of the RTS and this Agreement. In the event of any inconsistency between the Plan, the RTS and this Agreement, the RTS shall control.

**Section 2. <u>Certain Definitions</u>**. As used in this Agreement, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the RTS and the Plan.

**Section 3. <u>Agreement of the Consenting Creditor</u>**.

(a) <u>Voting and Support</u>. Subject to the conditions contained in Section 3(b) hereof, the Consenting Creditor agrees that until such time as the Companies obtain an order confirming the Plan (the "Lock-Up Period"), such Consenting Creditor shall, subject to the receipt by such Consenting Creditor of a disclosure statement and other solicitation materials in respect of the Plan (the "<u>Disclosure Statement</u>"):

(i) timely vote or cause to be voted its claims against the Companies arising under the Senior Secured Debt to accept the Plan; <u>provided</u>, <u>however</u>, that such vote may, upon written notice to the Companies, be revoked (and, upon such revocation, deemed void *ab initio)* at any time after the Lock-Up Period;

(ii) timely vote or cause to be voted against and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation of, any restructuring or reorganization of the Companies (or any plan or proposal in respect of the same) other than the Plan, or any other transaction, restructuring or other action that would interfere with or preclude consummation of the Plan;

(iii) support the Plan and the sale of substantially all of the Companies' assets contemplated by the Purchase and Sale Contract, date as of _____, between 540W21st and 550W21 Owner LLC, a Delaware limited liability company (the "<u>Sale</u>"), including taking reasonable actions including the filing of pleadings to effectuate the confirmation of the Plan and the consummation of the Sale and the Plan

(iv) not (A) directly or indirectly seek, solicit, support or encourage the termination or modification of the exclusive period for the filing of any plan, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Companies, or take any other action, including but not limited to initiating any legal proceedings or enforcing rights as a holder of the Senior Secured Debt, that could prevent, interfere with, delay or impede the approval of the Disclosure Statement, the Solicitation or the implementation or consummation of the Financial Restructuring as contemplated by the Plan, (B) directly or indirectly seek, solicit, support or encourage any plan other than the Plan or any sale of the Companies' assets other than the Sale or (C) take any other action that is inconsistent with, or that could delay, interfere with, or preclude confirmation or consummation of, the Sale, the Plan or the Financial Restructuring.

(b) <u>Rights of Consenting Creditor Unaffected</u>. Nothing contained herein shall limit the rights of the Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated, to appear and be heard, concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is not inconsistent with the Consenting Creditor's obligations hereunder or under the terms of the Plan and are not for the purpose of hindering, delaying or preventing the consummation of the Financial Restructuring.

(c) <u>Transfers</u>. The Consenting Creditor agrees that, for the duration of the Lock-Up Period, such Consenting Creditor shall not sell, transfer, loan, hypothecate, pledge, encumber, assign or otherwise dispose of (including by participation), in whole or in part, any of the Senior Secured Debt.

**Section 4. <u>Termination of Agreement</u>.**

(a) <u>Consenting Creditor's Termination Events</u>. This Agreement may be terminated by delivery of written notice of termination by the Consenting Creditor at any time after the occurrence of, and during the continuation of, any of the following events (each, a "<u>Consenting Creditor's Termination Event</u>"):

(i) the failure by the Companies to comply with the provisions of this Agreement.

(b) <u>Companies' Termination Events</u>. The Companies may terminate this Agreement as to all Parties upon two (2) business days written notice, delivered in accordance with Section 16 hereof, upon the occurrence of any of the following events:

(i) the breach by the Consenting Creditor of any of the representations, warranties or covenants of such Consenting Creditor set forth in this Agreement, if such breach would have a material adverse impact on the Companies or the consummation of the Financial Restructuring, which breach remains uncured for a period of three (3) business days after the receipt by the Consenting Creditor from the Companies of written notice of such breach; or

(ii) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Financial Restructuring.

(c) <u>Automatic Termination</u>. This Agreement and the obligations of all Parties hereunder shall automatically terminate without any further action or notice of any party upon the occurrence of one of the following events:

(i) the Bankruptcy Court enters an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or appointing a trustee or custodian for the Companies; or

(ii) the Bankruptcy Court enters an order dismissing the Chapter 11 Cases.

(d) <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Companies and the Consenting Creditor.

Sch. 2 - 3

**Section 5. <u>Good Faith Cooperation; Further Assurances; Acknowledgment</u>**.

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to their rights in respect of the Companies or otherwise in connection with their relationship with the Companies, (b) all matters concerning the implementation of the Plan and (c) the pursuit and support of the Financial Restructuring. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any equity securities of the Companies in favor of the Financial Restructuring (provided that no Consenting Holder shall be required to incur any expense (other than nominal expenses associated with the performance of its obligations hereunder), liability or other obligation), and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement, including proposing a plan that is not the Plan. This Agreement is not, and shall not be deemed, a solicitation for consents to the Plan or a solicitation to tender or exchange any Senior Notes.

**Section 6. <u>Amendments and Waivers</u>**. This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented except in a writing signed by the Companies and the Consenting Creditor.

**Section 7. <u>Effectiveness</u>**. This Agreement shall not become effective and binding on the Parties unless and until counterpart signature pages to this Agreement shall have been executed and delivered by 540W21st and each of its direct and indirect subsidiaries and affiliates, and Consenting Creditor (the "<u>Lock-Up Effective Date</u>").

**Section 8. <u>GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL</u>**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE

EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

**Section 9. <u>Counterparts</u>**. This Agreement may be executed in one or more counterparts (including by facsimile signature or otherwise), each of which shall be deemed an original and all of which shall constitute one and the same agreement.

**Section 10. <u>Notices</u>**. All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

(1) If to the Companies, to:

With a copy to:

Bryan Cave Leighton Paisner LLP
161 North Clark Street, Suite 4400
Chicago, Illinois  60601
Attention: Jason J. DeJonker, Esq.

(2) If to the Consenting Creditor, to:

With a copy to:

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

**Section 11. <u>Reservation of Rights</u>**. Except as expressly provided otherwise in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of the Consenting Creditor to protect and preserve its rights, remedies and interests, including its claims against the Companies. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated herein are not consummated, or this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**Section 12. <u>Prevailing Party</u>**. If any Party brings an action or proceeding against any other Party based upon a breach by such Party of its obligations hereunder, the prevailing Party shall be

#96885590v8

entitled to all reasonable expenses incurred, including reasonable attorneys', accountants' and financial advisors fees in connection with such action or proceeding.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed as of the date first written above.

**[Signature Pages Follow]**

RAY NEW YORK, LLC

By:_____
Name:_____
Its:_____

540 WEST 21ST STREET HOLDINGS, LLC

By:_____
Name:_____
Its:_____

#96885590v8

## SCHEDULE 1

## CERTAIN PERMITTED EXCEPTIONS

1. Party Wall Agreement recorded in Reel 857 Page 583.
2. Lot Line Declaration recorded in Reel 2901 Page 253.
3. Notice of Appropriation and Acquisition Map recorded in Reel 2836 Page 628 and Page 631.
4. Zoning Lot Description and Ownership Statement made by Atlantic Foundation, dated
5. 6/8/1999 and recorded 6/24/1999 in Reel 2901 Page 270.
6. Transfer and Distribution of Development Rights Pursuant to Section 98-33(a) of the Zoning Resolution of The City of New York recorded in CRFN 2014000387478.
7. Notice of Zoning Lot Restrictions recorded in CRFN 2014000387479.
8. Notice of Zoning Lot Restrictions recorded in CRFN 2015000360816.
9. Restrictive Declaration Highline Transfer of Development Rights recorded in CRFN 2015000360817.
10. Transfer and Distribution of Development Rights Pursuant to Section 98-33(a) of the Zoning Resolution of The City of New York recorded in CRFN 2015000360818.
11. Notice of Zoning Lot Restrictions recorded in CRFN 2016000190129.
12. Transfer and Distribution of Development Rights Pursuant to Section 98-33(a) of the Zoning Resolution of The City of New York recorded in CRFN 2016000190130.
13. Notice of Zoning Lot Restrictions recorded in CRFN 2016000190131.
14. Transfer and Distribution of Development Rights Pursuant to Section 98-33(a) of the Zoning Resolution of The City of New York recorded in CRFN 2016000190132.
15. Notice of Zoning Lot Restrictions recorded in CRFN 2017000197163.
16. Transfer and Distribution of Development Rights Pursuant to Section 98-33(a) of the Zoning Resolution of The City of New York recorded in CRFN 2017000197164.
17. Lotline Window Restrictive Declaration recorded in CRFN 2019000075178.
18. Zoning Lot Certification recorded in CRFN 2017000389780.
19. Declaration of Zoning Lot Restrictions recorded in CRFN 2017000389783.  WITH REGARD THERETO:
    a. Waiver of Declaration of Zoning Lot Restrictions and Consent and Subordination to Zoning Lot Development Agreement recorded in CRFN 2017000389781.
    b. Waiver of Declaration of Zoning Lot Restrictions and Consent and Subordination to Zoning Lot Development Agreement recorded in CRFN 2017000389782.
20. Zoning Lot Development and Easement Agreement recorded in CRFN 2017000389784.
21. Light and Air Easement Agreement recorded in CRFN 2017000389785
22. Zoning Lot Description recorded in CRFN 2017000389786.

#96885590v8

## SCHEDULE 2

## ESCROW TERMS

Escrow Agent agrees to hold in escrow the Deposit delivered to Escrow Agent pursuant to this Contract upon the following terms and conditions:

a.       Escrow Agent shall hold the Deposit and make delivery of the Deposit to the party entitled thereto under the terms of this Contract.  Escrow Agent shall invest the Deposit in an FDIC-insured, interest-bearing bank account or FDIC-insured money market fund at Bank United, and all interest and income thereon shall become part of the Deposit and shall be remitted to the party entitled to the Deposit pursuant to this Contract; provided, however, notwithstanding anything to the contrary contained herein, if the Closing shall occur, then any and all interest and income earned on the Deposit shall accrue to the benefit of Purchaser and shall be applied as a credit against the Purchase Price.  Purchaser shall provide Escrow Agent with a completed and signed Form W-9.

b.       Escrow Agent shall hold and apply the Deposit in strict accordance with the terms of this Contract.  The tax identification numbers of the parties shall be furnished to Escrow Agent upon request.

c.       If prior to the then scheduled Closing Date any party hereto makes a written demand upon Escrow Agent for payment of the Deposit, Escrow Agent shall give written notice to the other parties hereto of such demand.  If Escrow Agent does not receive a written objection from another party hereto to the proposed payment within five (5) Business Days after the giving of such notice, Escrow Agent is hereby authorized to make such payment.  If Escrow Agent does receive such written objection within such five (5) Business Day period, Escrow Agent shall continue to hold such amount until otherwise directed by joint written instructions from the parties to this Contract or a final judgment or arbitrator's decision.  However, Escrow Agent shall have the right at any time thereafter to deliver the Deposit and interest thereon, if any, with a court of competent jurisdiction in the State of New York.  Escrow Agent shall give written notice of such deposit to Seller and Purchaser.  Upon such deposit, Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

d.       The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, and that Escrow Agent shall not be deemed to be the agent of any of the parties and shall not be liable for any act or omission on its part unless taken or suffered in bad faith in willful disregard of this Contract or involving gross negligence.  Seller and Purchaser jointly and severally shall indemnify and hold Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorney's fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith, in willful disregard of this Contract or involving gross negligence on the part of the Escrow Agent.

e.       The parties shall deliver to Escrow Agent an executed copy of this Contract. Escrow Agent shall execute the signature page for Escrow Agent attached to the Contract which shall confirm Escrow Agent's agreement to comply with the provisions of this Schedule 2.

Sch. 2 - 1

   f.  Escrow Agent, as the person responsible for closing the transaction within the meaning of Section 6045(e) (2) (A) of the Internal Revenue Code of 1986, as amended (the "**Code**"), shall file the 1099 form regarding the transaction required by the Code.

   g.  The provisions of this <u>Schedule 2</u> shall survive the Closing or earlier termination of this Contract.

# SCHEDULE 3

## DEVELOPMENT AND AIR RIGHTS CERTIFICATES

- Certificate with a date of issuance of February 28, 2017 for Affordable Housing Floor Area of 1460.00 Square Feet.

- Certificate with a date of issuance of July 2, 2014  for Affordable Housing Floor Area of 5,800  Square Feet.

- Certificate with a date of issuance of December 19, 2016 for Affordable Housing [Low Income] Floor Area of 6000.00 Square Feet.

#96885590v8

**SCHEDULE 4**

**SELLER'S PLANS AND SPECIFICATIONS**


[SEE ATTACHED]



Suffolk Construction Company, Inc.

Printed on Fri May 26, 2023 at 10:34 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

# Current Specifications

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| **00 - Procurement and Contracting Requirements** | | | | | |
| 000000 | Cover | 4 | 05/08/20 | | Bulletin 4.3 |
| 000110 | Table of Contents | 6 | 05/08/20 | | Bulletin 4.3 |
| **01 - General Requirements** | | | | | |
| 01 10 00 | Summary | 0 | 07/20/18 | | Volume 1 |
| 01 23 00 | Alternates | 0 | 08/17/18 | | Volume 1 |
| 01 25 00 | Substitution Procedures | 0 | 07/20/18 | | Volume 1 |
| 01 31 00 | Project Management and Coordination | 0 | 07/20/18 | | Volume 1 |
| 01 31 26 | Electronic Communication Protocols | 0 | 07/20/18 | | Volume 1 |
| 01 32 33 | Photographic Documentation | 0 | 07/20/18 | | Volume 1 |
| 01 33 00 | Submittal Procedures | 0 | 07/20/18 | | Volume 1 |
| 01 33 01.1 | Submittal Stamp (Primary) | 0 | 07/20/18 | | Volume 1 |
| 01 33 01.2 | Submittal Stamp (Secondary) | 0 | 07/20/18 | | Volume 1 |
| 01 40 00 | Quality Requirements | 0 | 07/20/18 | | Volume 1 |
| 01 42 00 | References | 0 | 07/20/18 | | Volume 1 |
| 01 50 00 | Temporary Facilities and Controls | 0 | 07/20/18 | | Volume 1 |
| 01 60 00 | Product Requirements | 0 | 07/20/18 | | Volume 1 |
| 01 73 00 | Execution | 0 | 07/20/18 | | Volume 1 |
| 01 74 19 | Construction Waste Management and Disposal | 0 | 07/20/18 | | Volume 1 |
| 01 77 00 | Closeout Procedures | 0 | 07/20/18 | | Volume 1 |
| 01 78 23 | Operation and Maintenance Data | 0 | 07/20/18 | | Volume 1 |
| 01 78 39 | Project Record Documents | 0 | 07/20/18 | | Volume 1 |
| 01 79 00 | Demonstration and Training | 0 | 07/20/18 | | Volume 1 |
| 01 81 13 | Sustainable Design Requirements | 0 | 07/20/18 | | Volume 1 |
| 01 84 23 | Slip Resistance Performance Requirements | 0 | 07/20/18 | | Volume 1 |
| 01 91 13 | General Commissioning Requirements | 0 | 07/20/18 | | Volume 1 |
| **02 - Existing Conditions** | | | | | |
| 02 20 50 | Protection of Existing Utility | 0 | 07/20/18 | | Volume 1 |
| 02 61 13 | Excavation and Handling of Contaminated Material | 0 | 07/20/18 | | Volume 1 |
| **03 - Concrete** | | | | | |
| 03 15 11 | Concrete Insulated Connections | 0 | 07/20/18 | | Volume 1 |
| 03 30 00 | Cast-in-Place Concrete | 0 | 07/20/18 | | Volume 1 |
| 03 30 60 | Cast in Place Concrete Topping Slabs | 0 | 07/20/18 | | Volume 1 |

Printed on Fri May 26, 2023 at 10:34 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 03 35 43 | Polished Concrete Finishing | 0 | 07/20/18 | | Volume 1 |
| 03 45 00 | Precast Architectural Concrete | 0 | 11/15/19 | | Bulletin 4 |
| 03 49 00 | Glass-Fiber-Reinforced Concrete | 1 | 02/20/20 | | Bulletin 4.2 |
| 03 54 16 | Hydraulic Cement Underlayment | 0 | 07/20/18 | | Volume 1 |
| **04 - Masonry** | | | | | |
| 04 20 00 | Unit Masonry | 0 | 07/20/18 | | Volume 1 |
| **05 - Metals** | | | | | |
| 05 10 00 | Structural Steel | 0 | 07/20/18 | | Volume 1 |
| 05 30 00 | Metal Decking | 0 | 07/20/18 | | Volume 1 |
| 05 40 00 | Cold-Formed Metal Framing | 0 | 07/20/18 | | Volume 1 |
| 05 50 00 | Metal Fabrications | 1 | 01/24/20 | | Bulletin 4.1 |
| 05 51 00 | Metal Stairs | 0 | 07/20/18 | | Volume 1 |
| 05 53 13 | Bar Gratings | 0 | 07/20/18 | | Volume 1 |
| 05 70 00 | Architectural Metal | 0 | 10/19/18 | | Volume 1 |
| 05 70 50 | Architectural Metal Canopies | 0 | 07/20/18 | | Volume 1 |
| 05 71 13 | Architectural Feature Stairs | 0 | 10/19/18 | | Volume 1 |
| 05 73 00 | Decorative Metal Railings | 0 | 07/20/18 | | Volume 1 |
| **06 - Wood, Plastics, and Composites** | | | | | |
| 06 06 00 | Schedules for Wood Types | 0 | 07/20/18 | | Volume 1 |
| 06 10 00 | Rough Carpentry | 0 | 08/17/18 | | Volume 1 |
| 06 40 23 | Architectural Woodwork | 0 | 10/19/18 | | Volume 1 |
| 06 41 00 | Architectural Cabinets | 0 | 10/19/18 | | Volume 1 |
| **07 - Thermal and Moisture Protection** | | | | | |
| 07 10 00 | Foundation Waterproofing | 0 | 07/20/18 | | Volume 1 |
| 07 13 26 | Self-Adhering Sheet Waterproofing | 0 | 07/20/18 | | Volume 1 |
| 07 14 16 | Cold Fluid-Applied Waterproofing | 0 | 07/20/18 | | Volume 1 |
| 07 16 16 | Crystalline Waterproofing | 0 | 07/20/18 | | Volume 1 |
| 07 21 00 | Thermal Insulation | 0 | 07/20/18 | | Volume 1 |
| 07 27 26 | Fluid-Applied Membrane Air Barriers | 0 | 07/20/18 | | Volume 1 |
| 07 42 13 | Metal Wall Panels | 0 | 10/19/18 | | Volume 1 |
| 07 55 56 | Fluid-Applied Protected Membrane Roofing | 0 | 07/20/18 | | Volume 1 |
| 07 62 00 | Sheet Metal Flashing and Trim | 0 | 07/20/18 | | Volume 1 |
| 07 72 00 | Roof Accessories | 0 | 07/20/18 | | Volume 1 |
| 07 81 00 | Applied Fireproofing | 0 | 07/20/18 | | Volume 1 |
| 07 81 23 | Intumescent Fireproofing | 1 | 11/15/19 | | Bulletin 4 |
| 07 84 13 | Penetration Firestopping | 0 | 07/20/18 | | Volume 1 |
| 07 84 43 | Joint Firestopping | 0 | 07/20/18 | | Volume 1 |

Printed on Fri May 26, 2023 at 10:34 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 07 92 13 | Architectural Joint Sealants | 0 | 07/20/18 | | Volume 1 |
| 07 95 00 | Expansion Control | 1 | 11/15/19 | | Bulletin 4 |
| **08 - Openings** | | | | | |
| 08 06 71 | Door Hardware Schedule | 0 | 10/19/18 | | Volume 1 |
| 08 11 13 | Hollow Metal Doors and Frames | 0 | 07/20/18 | | Volume 1 |
| 08 14 16 | Flush Wood Doors | 0 | 07/20/18 | | Volume 1 |
| 08 31 13 | Access Doors and Frames | 0 | 07/20/18 | | Volume 1 |
| 08 36 13 | Special Function Doors | 0 | 07/20/18 | | Volume 1 |
| 08 39 19 | Watertight Doors | 0 | 07/20/18 | | Volume 1 |
| 08 40 00 | Exterior Walls General | 0 | 02/20/20 | | Bulletin 4.2 |
| 08 41 14 | Glazed Office Fronts - Gallery | 1 | 02/01/19 | | Bulletin 3 |
| 08 41 23 | Custom Flood Resistant Glazing and Framing System | 1 | 11/15/19 | | Bulletin 4 |
| 08 42 26 | All-Glass Entrances | 1 | 11/15/19 | | Bulletin 4 |
| 08 44 13 | Curtain Wall | 1 | 02/20/20 | | Bulletin 4.2 |
| 08 44 18 | Glazed Steel Curtain Walls | 0 | 07/20/18 | | Volume 1 |
| 08 63 00 | Skylights | 1 | 11/15/19 | | Bulletin 4 |
| 08 71 00 | Door Hardware | 0 | 10/19/18 | | Volume 1 |
| 08 71 13 | Automatic Door Operators | 0 | 07/20/18 | | Volume 1 |
| 08 80 00 | Glazing | 0 | 02/20/20 | | Bulletin 4.2 |
| 08 81 13 | Interior Glazing | 0 | 07/20/18 | | Volume 1 |
| **09 - Finishes** | | | | | |
| 09 06 40 | Schedule for Stone Types | 2 | 05/08/20 | | Bulletin 4.3 |
| 09 21 00 | Plaster and Gypsum Board Assemblies | 1 | 11/15/19 | | Bulletin 4 |
| 09 23 00 | Gypsum Plastering | 0 | 07/20/18 | | Volume 1 |
| 09 23 13 | Acoustical Gypsum Plastering | 0 | 07/20/18 | | Volume 1 |
| 09 30 00 | Tiling | 2 | 05/08/20 | | Bulletin 4.3 |
| 09 51 13 | Acoustical Panel Ceilings | 0 | 08/17/18 | | Volume 1 |
| 09 54 43 | Stretched-Fabric Ceiling Systems | 1 | 11/15/19 | | Bulletin 4 |
| 09 63 40 | Stone Flooring | 0 | 07/20/18 | | Volume 1 |
| 09 64 00 | Wood Flooring | 0 | 08/17/18 | | Volume 1 |
| 09 64 66 | Sports Wood Floor | 0 | 07/20/18 | | Volume 1 |
| 09 65 13 | Resilient Base and Accessories | 0 | 07/20/18 | | Volume 1 |
| 09 65 19 | Resilient Tile Flooring | 0 | 07/20/18 | | Volume 1 |
| 09 67 23 | Resinous Flooring | 0 | 07/20/18 | | Volume 1 |
| 09 68 16 | Sheet Carpeting - Gallery | 0 | 07/20/18 | | Volume 1 |
| 09 75 00 | Interior Stone Facing | 1 | 11/15/19 | | Bulletin 4 |
| 09 91 00 | Painting | 0 | 07/20/18 | | Volume 1 |



Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 09 96 00 | High-Performance Coatings | 0 | 07/20/18 | | Volume 1 |
| 09 97 13 | Steel Coatings | 0 | 07/20/18 | | Volume 1 |
| **10 - Specialties** | | | | | |
| 10 14 13 | Photoluminescent Markings | 0 | 07/20/18 | | Volume 1 |
| 10 21 13 | Toilet Compartments | 0 | 07/20/18 | | Volume 1 |
| 10 22 50 | Custom Interior Specialties | 0 | 07/20/18 | | Volume 1 |
| 10 28 00 | Washroom Accessories | 0 | 07/20/18 | | Volume 1 |
| 10 44 13 | Fire Protection Cabinets | 0 | 07/20/18 | | Volume 1 |
| 10 44 16 | Fire Extinguishers | 0 | 07/20/18 | | Volume 1 |
| 10 51 13 | Metal Lockers | 0 | 07/20/18 | | Volume 1 |
| 10 51 43 | Wire Mesh Storage Lockers | 0 | 07/20/18 | | Volume 1 |
| 10 55 00 | Postal Specialties | 0 | 07/20/18 | | Volume 1 |
| **11 - Equipment** | | | | | |
| 11 24 23 | Facade Maintenance | 1 | 11/15/19 | | Bulletin 4 |
| 11 31 00 | Miscellaneous Appliances | 0 | 07/20/18 | | Volume 1 |
| 11 82 26 | Facility Waste Compactors | 0 | 07/20/18 | | Volume 1 |
| **12 - Furnishings** | | | | | |
| 12 22 00 | Curtains and Drapes | 0 | 10/19/18 | | Volume 1 |
| 12 24 13 | Roller Window Shades | 0 | 10/19/18 | | Volume 1 |
| 12 48 16 | Entrance Floor Grilles | 1 | 02/01/19 | | Bulletin 3 |
| 12 93 13 | Bicycle Racks | 0 | 07/20/18 | | Volume 1 |
| **13 - Special Construction** | | | | | |
| 13 24 20 | Sauna | 0 | 07/20/18 | | Volume 1 |
| 13 24 26 | Steam Room | 0 | 07/20/18 | | Volume 1 |
| **14 - Conveying Equipment** | | | | | |
| 14 21 00 | Electric Traction Elevators | 0 | 07/20/18 | | Volume 1 |
| 14 24 00 | Hydraulic Elevators | 1 | 10/19/18 | | Volume 1 |
| 14 27 13 | Custom Elevator Cab Finishes | 1 | 02/01/19 | | Bulletin 3 |
| 14 91 82 | Trash Chutes | 0 | 07/20/18 | | Volume 1 |
| **21 - Fire Suppression** | | | | | |
| 21 05 00 | Common Work Results for Fire Protection | 0 | 07/20/18 | | Volume 1 |
| 21 05 05 | General Materials and Methods | 0 | 07/20/18 | | Volume 1 |
| 21 05 17 | Sleeves and Sleeve Seals for Fire Suppression Piping | 0 | 07/20/18 | | Volume 1 |
| 21 05 18 | Escutcheons for Fire Suppression Piping | 0 | 07/20/18 | | Volume 1 |
| 21 05 19 | Meters and Gauges | 0 | 07/20/18 | | Volume 1 |
| 21 05 29 | Hangers and Supports | 0 | 07/20/18 | | Volume 1 |
| 21 05 33 | Heat Tracing for Fire-Suppression Piping | 0 | 07/20/18 | | Volume 1 |

Printed on Fri May 26, 2023 at 10:34 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 21 05 46 | Vibration and Seismic Controls for Fire Protection Systems | 0 | 07/20/18 | | Volume 1 |
| 21 05 53 | Identification for Fire-Suppression Piping and Equipment | 0 | 07/20/18 | | Volume 1 |
| 21 07 00 | Fire Suppression Systems Insulation | 0 | 07/20/18 | | Volume 1 |
| 21 08 00 | Fire Protection Testing | 0 | 07/20/18 | | Volume 1 |
| 21 12 00 | Fire-Suppression Standpipes | 0 | 07/20/18 | | Volume 1 |
| 21 12 26 | Cabinets | 0 | 07/20/18 | | Volume 1 |
| 21 13 13 | Wet-Pipe Sprinkler Systems | 0 | 07/20/18 | | Volume 1 |
| 21 13 16 | Dry-Pipe Sprinkler Systems | 0 | 07/20/18 | | Volume 1 |
| 21 31 13 | Electric-Drive, Centrifugal Fire Pumps | 0 | 07/20/18 | | Volume 1 |
| 21 41 00 | Water Storage Tanks | 0 | 07/20/18 | | Volume 1 |
| **22 - Plumbing** | | | | | |
| 22 05 00 | Common Work Results for Plumbing | 0 | 07/20/18 | | Volume 1 |
| 22 05 08 | Testing, Adjusting and Balancing | 0 | 07/20/18 | | Volume 1 |
| 22 05 16 | Expansion Fittings and Loops for Plumbing Piping | 0 | 07/20/18 | | Volume 1 |
| 22 05 17 | Sleeves and Sleeve Seals for Plumbing Piping | 0 | 07/20/18 | | Volume 1 |
| 22 05 18 | Escutcheons for Plumbing Piping | 0 | 07/20/18 | | Volume 1 |
| 22 05 19 | Meters and Gages for Plumbing Piping | 0 | 07/20/18 | | Volume 1 |
| 22 05 23 | Valves for Plumbing Piping | 0 | 07/20/18 | | Volume 1 |
| 22 05 29 | Hangers and Supports for Plumbing Piping and Equipment | 0 | 07/20/18 | | Volume 1 |
| 22 05 33 | Heat Tracing for Plumbing Piping | 0 | 07/20/18 | | Volume 1 |
| 22 05 46 | Vibration and Seismic Controls for Plumbing Systems | 0 | 07/20/18 | | Volume 1 |
| 22 05 53 | Identification for Plumbing Piping and Equipment | 0 | 07/20/18 | | Volume 1 |
| 22 07 19 | Plumbing Piping Insulation | 0 | 07/20/18 | | Volume 1 |
| 22 08 00 | Commissioning of Plumbing | 0 | 07/20/18 | | Volume 1 |
| 22 11 16 | Domestic Water Piping | 0 | 07/20/18 | | Volume 1 |
| 22 11 19 | Domestic Water Piping Specialties | 0 | 07/20/18 | | Volume 1 |
| 22 11 23 | Domestic Water Pumps | 0 | 07/20/18 | | Volume 1 |
| 22 13 16 | Storm and Sanitary Waste and Vent Piping | 0 | 07/20/18 | | Volume 1 |
| 22 13 19 | Sanitary Waste and Storm Drainage Piping Specialties | 0 | 07/20/18 | | Volume 1 |
| 22 13 29 | Sanitary Sewage and Sump Pumps | 0 | 07/20/18 | | Volume 1 |
| 22 16 00 | Natural - Gas Piping and Equipment | 0 | 07/20/18 | | Volume 1 |
| 22 33 00 | Electric Domestic Water Heaters | 0 | 07/20/18 | | Volume 1 |
| 22 41 00 | Fixtures and Appliances | 0 | 07/20/18 | | Volume 1 |
| 22 91 00 | Common Work Results for Underground Plumbing | 0 | 07/20/18 | | Volume 1 |
| 22 93 16 | Underground Sanitary Waste and Vent Piping | 0 | 07/20/18 | | Volume 1 |
| 22 93 19 | Underground Sanitary Waste Drainage Piping Specialties | 0 | 07/20/18 | | Volume 1 |
| 22 95 17 | Sleeves and Sleeve Seals for Underground Plumbing Piping | 0 | 07/20/18 | | Volume 1 |



Printed on Fri May 26, 2023 at 10:34 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| **23 - Heating, Ventilating, and Air Conditioning (HVAC)** | | | | | |
| 23 01 30.51 | HVAC Air Distribution System Cleaning | 0 | 07/20/18 | | Volume 2 |
| 23 05 00 | Common Work Results for HVAC | 0 | 07/20/18 | | Volume 2 |
| 23 05 11 | Special Mechanical Systems | 0 | 08/17/18 | | Volume 2 |
| 23 05 12 | Variable-Frequency Motor Controllers | 0 | 07/20/18 | | Volume 2 |
| 23 05 13 | Common Motor Requirements for HVAC Equipment | 0 | 07/20/18 | | Volume 2 |
| 23 05 14 | Enclosed Controllers | 0 | 07/20/18 | | Volume 2 |
| 23 05 16 | Expansion Fittings and Loops for HVAC Piping | 0 | 07/20/18 | | Volume 2 |
| 23 05 17 | Sleeves and Sleeve Seals for HVAC Piping | 0 | 07/20/18 | | Volume 2 |
| 23 05 18 | Escutcheons for HVAC Piping | 0 | 07/20/18 | | Volume 2 |
| 23 05 19 | Meters and Gages for HVAC Piping | 0 | 07/20/18 | | Volume 2 |
| 23 05 23 | General-Duty Valves for HVAC Piping | 0 | 07/20/18 | | Volume 2 |
| 23 05 29 | Hangers and Supports for HVAC Piping and Equipment | 0 | 07/20/18 | | Volume 2 |
| 23 05 46 | Vibration and Seismic Controls for Mechanical Systems | 0 | 07/20/18 | | Volume 2 |
| 23 05 53 | Identification for HVAC Piping, Ductwork and Equipment | 0 | 07/20/18 | | Volume 2 |
| 23 05 93 | Testing, Adjusting, and Balancing for HVAC | 0 | 07/20/18 | | Volume 2 |
| 23 07 10 | Fire Resistive Duct Enclosures | 0 | 07/20/18 | | Volume 2 |
| 23 07 13 | Duct Insulation | 0 | 07/20/18 | | Volume 2 |
| 23 07 16 | HVAC Equipment Insulation | 0 | 07/20/18 | | Volume 2 |
| 23 07 19 | HVAC Piping Insulation | 0 | 07/20/18 | | Volume 2 |
| 23 07 20 | Acoustical Duct Lining and Duct Wrap | 1 | 11/15/19 | | Bulletin 4 |
| 23 08 00 | Commissioning of HVAC | 0 | 07/20/18 | | Volume 2 |
| 23 09 00 | Instrumentation and Control for HVAC | 0 | 08/17/18 | | Volume 2 |
| 23 09 93 | Sequence of Operations for HVAC Controls | 2 | 11/15/19 | | Bulletin 4 |
| 23 21 13 | Hydronic Piping | 0 | 07/20/18 | | Volume 2 |
| 23 21 16 | Hydronic Piping Specialties | 0 | 07/20/18 | | Volume 2 |
| 23 21 23 | Hydronic Pumps | 0 | 07/20/18 | | Volume 2 |
| 23 23 00 | Refrigerant Piping | 0 | 07/20/18 | | Volume 2 |
| 23 25 13 | Water Treatment for Closed-Loop Hydronic Systems | 0 | 07/20/18 | | Volume 2 |
| 23 25 16 | Water Treatment for Open Hydronic Systems | 0 | 07/20/18 | | Volume 2 |
| 23 25 23 | Water Treatment for Humidification Steam System | 0 | 07/20/18 | | Volume 2 |
| 23 31 13 | Metal Ducts | 1 | 11/15/19 | | Bulletin 4 |
| 23 31 16 | Nonmetal Ducts | 0 | 07/20/18 | | Volume 2 |
| 23 31 19 | HVAC Casings | 0 | 07/20/18 | | Volume 2 |
| 23 33 00 | Air Duct Accessories | 0 | 07/20/18 | | Volume 2 |
| 23 34 13 | Axial HVAC Fans | 0 | 07/20/18 | | Volume 2 |
| 23 34 16 | Centrifugal HVAC Fans | 0 | 07/20/18 | | Volume 2 |



Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 23 34 23 | HVAC Power Ventilators | 0 | 07/20/18 | | Volume 2 |
| 23 34 33 | Air Curtains | 0 | 07/20/18 | | Volume 2 |
| 23 36 00 | Air Terminal Units | 0 | 07/20/18 | | Volume 2 |
| 23 37 13 | Diffusers, Registers, and Grilles | 0 | 07/20/18 | | Volume 2 |
| 23 37 23 | HVAC Gravity Ventilators | 0 | 07/20/18 | | Volume 2 |
| 23 41 00 | Particulate Air Filtration | 0 | 07/20/18 | | Volume 2 |
| 23 51 00 | Breechings, Chimneys, Stacks and Emergency Generator Exhaust | 0 | 07/20/18 | | Volume 2 |
| 23 52 16 | Condensing Boilers | 0 | 07/20/18 | | Volume 2 |
| 23 57 00 | Heat Exchangers for HVAC | 0 | 07/20/18 | | Volume 2 |
| 23 65 00 | Cooling Towers | 0 | 07/20/18 | | Volume 2 |
| 23 65 50 | Condenser Water Filtration System | 0 | 07/20/18 | | Volume 2 |
| 23 82 16 | Air Coils | 0 | 07/20/18 | | Volume 2 |
| 23 82 33 | Convectors | 0 | 07/20/18 | | Volume 2 |
| 23 82 39 | Cabinet Heaters | 0 | 07/20/18 | | Volume 2 |
| 23 82 39.16 | Unit Heaters | 0 | 07/20/18 | | Volume 2 |
| 23 82 39.19 | Wall and Ceiling Heaters (Electric) | 0 | 07/20/18 | | Volume 2 |
| 23 83 13 | Radiant-Heating Electric Cables | 0 | 07/20/18 | | Volume 2 |
| **26 - Electrical** | | | | | |
| 26 05 00 | Common Work Results for Electrical | 1 | 11/15/19 | | Bulletin 4 |
| 26 05 01 | Underground Common Work Results for Electrical | 0 | 07/20/18 | | Volume 2 |
| 26 05 19 | Low-Voltage Electrical Power Conductors and Cables | 1 | 11/15/19 | | Bulletin 4 |
| 26 05 23 | Control-Voltage Electrical Power Cables | 0 | | | Volume 2 |
| 26 05 26 | Grounding and Bonding for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 27 | Underground Grounding and Bonding for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 29 | Hangers and Supports for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 31 | Heat Tracing for Piping | 0 | 07/20/18 | | Volume 2 |
| 26 05 32 | Underground Raceways and Boxes for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 33 | Raceway and Boxes for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 34 | Telecommunications Distribution Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 43 | Underground Ducts and Utility Structures | 0 | 07/20/18 | | Volume 2 |
| 26 05 44 | Sleeves and Sleeve Seals for Electrical Raceways and Cabling | 0 | 07/20/18 | | Volume 2 |
| 26 05 45 | Underground Sleeves and Sleeve Seals for Electrical Raceways and Cabling | 0 | 07/20/18 | | Volume 2 |
| 26 05 46 | Vibration and Seismic Controls for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 53 | Identification for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 54 | Underground Identification for Electrical Systems | 0 | 07/20/18 | | Volume 2 |
| 26 05 73 | Overcurrent Protective Device Coordination Study | 1 | 11/15/19 | | Bulletin 4 |
| 26 08 00 | Commissioning of Lighting | 0 | 07/20/18 | | Volume 2 |



Printed on Fri May 26, 2023 at 10:34 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 26 09 23 | Lighting Control Devices | 0 | 07/20/18 | | Volume 2 |
| 26 09 43.01 | Architectural Lighting Control Specifications | 0 | 07/20/18 | | Volume 2 |
| 26 09 43.02 | Architectural Lighting Control Specifications Appendix A | 1 | 11/15/19 | | Bulletin 4 |
| 26 09 93 | Gallery Lighting Control Sequence of Operations | 0 | 07/20/18 | | Volume 2 |
| 26 20 01 | Feeders and Branch Circuitry | 0 | 07/20/18 | | Volume 2 |
| 26 22 00 | Low-Voltage Transformers | 0 | 07/20/18 | | Volume 2 |
| 26 24 13 | Switchboards | 0 | 07/20/18 | | Volume 2 |
| 26 24 16 | Panelboards | 0 | 07/20/18 | | Volume 2 |
| 26 27 01 | Provisions for Elevators | 0 | 07/20/18 | | Volume 2 |
| 26 27 13 | Electricity Metering (Utility) | 0 | 07/20/18 | | Volume 2 |
| 26 27 14 | Electricity Metering (Electronic Submetering System) | 1 | 11/15/19 | | Bulletin 4 |
| 26 27 26 | Wiring Devices | 1 | 11/15/19 | | Bulletin 4 |
| 26 28 01 | Fused Power Circuit Devices | 0 | 07/20/18 | | Volume 2 |
| 26 28 02 | Selection of Overcurrent Devices | 0 | 07/20/18 | | Volume 2 |
| 26 28 13 | Fuses | 0 | 07/20/18 | | Volume 2 |
| 26 28 16 | Enclosed Switches and Circuit Breakers | 0 | 07/20/18 | | Volume 2 |
| 26 29 13 | Enclosed Controllers | 0 | 07/20/18 | | Volume 2 |
| 26 29 23 | Variable-Frequency Motor Controllers | 0 | 07/20/18 | | Volume 2 |
| 26 32 13 | Engine Generators | 1 | 11/15/19 | | Bulletin 4 |
| 26 36 00 | Transfer Switches | 0 | 07/20/18 | | Volume 2 |
| 26 43 13 | Surge Protective Devices for Low-Voltage Electrical Power Circuits | 0 | 07/20/18 | | Volume 2 |
| 26 50 00.01 | Architectural Lighting Specifications | 0 | 07/20/18 | | Volume 2 |
| 26 50 00.02 | Appendix A - Architectural Lighting Fixture Schedule | 1 | 11/15/19 | | Bulletin 4 |
| 26 50 00.03 | Appendix B - Architecture Lighting Fixture Cutsheets | 1 | 11/15/19 | | Bulletin 4 |
| 26 51 00.10 | Lighting | 0 | 08/17/18 | | Volume 2 |
| 26 51 00 .20 | Gallery Luminaires | 0 | 07/20/18 | | Volume 2 |
| 26 60 03 | Fire Protective Alarm System - Gallery | 0 | 07/20/18 | | Volume 2 |
| 26 60 06 | Fire Protective Alarm System (NYC R-2) | 0 | 08/17/18 | | Volume 2 |
| 26 60 08 | Fire Fighter's Auxiliary Radio Communication System (ARCS) | 1 | 11/15/19 | | Bulletin 4 |
| 26 60 09 | Carbon Monoxide Alarm Devices | 0 | 07/20/18 | | Volume 2 |
| **27 - Communications** | | | | | |
| 27 00 01 | Telecommunications Cabling Systems | 0 | 07/20/18 | | Volume 2 |
| 27 41 01 | Audio Video Communications | 0 | 07/20/18 | | Volume 2 |
| **28 - Electronic Safety and Security** | | | | | |
| 28 00 01 | Security Systems | 0 | 07/20/18 | | Volume 2 |
| 28 15 00 | Access Control Hardware Devices | 0 | 07/20/18 | | Volume 2 |
| **31 - Earthwork** | | | | | |

Printed on Fri May 26, 2023 at 10:34 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 31 00 00 | Earthwork | 0 | 07/20/18 | | Volume 2 |
| 31 09 13 | Geotechnical Instrumentation and Monitoring | 0 | 07/20/18 | | Volume 2 |
| 31 25 00 | Erosion and Sedimentation Controls | 0 | 07/20/18 | | Volume 2 |
| 31 50 00 | Excavation Support and Protection | 0 | 07/20/18 | | Volume 2 |
| 31 63 18 | Drilled Caisson Piles | 0 | 07/20/18 | | Volume 2 |
| 31 68 00 | Permanent Rock Anchors | 0 | 07/20/18 | | Volume 2 |
| **32 - Exterior Improvements** | | | | | |
| 32 14 13 | Unit Pavers | 1 | 03/16/20 | | RFI 706 |
| 32 20 01 | Pavement Restoration NYC R.O.W | 0 | 07/20/18 | | Volume 2 |
| 32 20 02 | Pavement RestorationNYS R.O.W | 0 | 07/20/18 | | Volume 2 |
| **99 - Appendix** | | | | | |
| 99 99 99 Appendix A | Cladding Wind Load Study | 0 | 09/19/17 | | Appendices |
| 99 99 99 Appendix B | Pedestrian Wind Study | 0 | 07/21/17 | | Appendices |
| 99 99 99 Appendix C | Falling Ice and Snow Consultation Report | 0 | 07/14/17 | | Appendices |
| 99 99 99 Appendix E | Acoustic Report | 0 | 06/06/17 | | Appendices |
| 99 99 99 Appendix F | Preliminary LEED Score Card | 0 | 03/16/18 | | Appendices |
| 99 99 99 Appendix Ga | Con Edison Vault | 0 | 09/06/07 | | Appendices |
| 99 99 99 Appendix Gb | Con Edison Vault | 0 | 09/06/07 | | Appendices |
| 99 99 99 Appendix J | Architectural Lighting Control Layouts | 1 | 11/15/19 | | Appendices |
| 99 99 99 Appendix K | Skylight Visual Mockup Drawing | 1 | 11/15/19 | | Appendices |
| 99 99 99 Appendix L | Wast Characterization and Lead Delineation Report | 0 | 08/01/18 | | Appendices |
| 99 99 99 Appendix M | Environmental Bid Support Docs | 0 | 08/18/17 | | Appendices |
| 99 99 99 Appendix N | Remedial Investigation Report | 0 | 01/25/18 | | Appendices |
| 99 99 99 Appendix O | Remedial Action Work Plan | 0 | 05/01/18 | | Appendices |
| 99 99 99 Appendix P | Stipulation List | 0 | 05/24/18 | | Appendices |
| 99 99 99 Appendix Q | Remediation Bid Checklist | 0 | 10/02/17 | | Appendices |
| 99 99 99 Appendix R | Geotechnical Engineering Report | 0 | 09/19/17 | | Appendices |
| 99 99 99 Appendix S | Preconstruction Conditions Documentation | 0 | 11/15/17 | | Appendices |
| 99 99 99 Appendix T | Preconstruction Conditions Documentation | 0 | 11/15/17 | | Appendices |
| 99 99 99 Appendix U | Preconstruction Conditions Documentation | 0 | 03/19/18 | | Appendices |



Suffolk Construction Company, Inc.

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

## Current Drawings

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| **General** | | | | | |
| G-000 | COVER PAGE | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| G-001 | DRAWING INDEX (1 OF 3) | 6 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| G-002 | DRAWING INDEX (2 OF 3) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| G-003 | DRAWING INDEX (3 OF 3) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| **Structural** | | | | | |
| S-001 | GENERAL NOTES | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-002 | LOAD MAPS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-003 | LOAD MAPS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-004 | LOAD MAPS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-005 | LOAD MAPS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-006 | LOAD MAPS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-101 | GROUND FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-102 | 2ND FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-103 | 3RD FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-104 | 4TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-105 | 5TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-106 | 6TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-107 | 7TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-108 | TYPICAL 8TH THRU 12TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-113 | 13TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-114 | TYPICAL 14TH THRU 16TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-117 | 17TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-118 | 18TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-119 | 19TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-120 | 20TH FLOOR COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-121 | 21ST FLOOR (ROOF) COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-122 | 22ND FLOOR (BULKHEAD 2) COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-123 | 23RD FLOOR (BULKHEAD 3) COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-124 | 24TH FLOOR (BULKHEAD ROOF) COORDINATE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-201 | GROUND FLOOR FRAMING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-202 | 2ND FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-203 | 3RD FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-204 | 4TH FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |



Suffolk Construction Company, Inc.

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| S-205 | 5TH FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-206 | 6TH FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-207 | 7TH FLOOR REINFORCING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-208 | TYPICAL 8TH THRU 12TH FLOOR REINFORCING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-213 | 13TH FLOOR REINFORCING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-214 | TYPICAL 14TH THRU 16TH FLOOR REINFORCING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-217 | 17TH FLOOR REINFORCING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-218 | 18TH FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-219 | 19TH FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-220 | 20TH FLOOR REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-221 | 21ST FLOOR (ROOF) REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-222 | 22ND FLOOR (BULKHEAD 2) REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-223 | 23RD FLOOR (BULKHEAD 3) REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-224 | 24TH FLOOR (BULKHEAD ROOF) REINFORCING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-301 | COLUMN SCHEDULE AND DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-302 | COLUMN SCHEDULE AND DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-311 | SHEAR WALL REINFORCEMENT 1 | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-312 | SHEAR WALL REINFORCEMENT 2 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-313 | SHEAR WALL REINFORCEMENT 3 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-314 | SHEAR WALL REINFORCEMENT 4 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-315 | SHEAR WALL REINFORCEMENT 5 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-316 | SHEAR WALL REINFORCEMENT 6 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-331 | SHEAR WALL ELEVATION 1 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-332 | SHEAR WALL ELEVATION 2 | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-333 | SHEAR WALL ELEVATION 3 | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-334 | SHEAR WALL ELEVATION 4 | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-340 | MID SLAB LANDING PLANS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-341 | MID SLAB LANDING PLANS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-342 | MID SLAB LANDING PLANS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-343 | MID SLAB LANDING PLANS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-344 | MID SLAB LANDING PLANS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-401 | TYPICAL CONCRETE SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-402 | TYPICAL CONCRETE SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-403 | TYPICAL CONCRETE SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-404 | CONCRETE SECTIONS AND DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-405 | CONCRETE SECTIONS AND DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-406 | TYPICAL CONCRETE SECTIONS AND DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-407 | TYPICAL CONCRETE SECTIONS AND DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |



Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| S-408 | TYPICAL CONCRETE SECTION AND DETAILS | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-409 | TYPICAL CONCRETE SECTION AND DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-410 | TYPICAL CONCRETE SECTIONS AND DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-420 | CONCRETE SECTIONS AND DETAILS | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-430 | CONCRETE SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-501 | TYPICAL STEEL SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-502 | TYPICAL STEEL SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-503 | TYPICAL STEEL SECTIONS AND DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-504 | TYPICAL STEEL SECTIONS AND DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-505 | SECTIONS AND DETAILS STRUCTURAL STEEL | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-506 | TYPICAL STEEL SECTIONS AND DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| S-507 | TYPICAL STEEL SECTIONS AND DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-508 | TYPICAL CONCRETE SECTIONS AND DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-551 | SECTIONS & DETAIL STRUCTURAL STEEL | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-552 | TYPICAL STEEL SECTIONS AND DETAILS | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| S-553 | SECTIONS & DETAILS STRUCTURAL STEEL | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| S-554 | SECTIONS & DETAILS STRUCTURAL STEEL | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| S-601 | TYPICAL MASONRY SECTIONS AND DETAILS | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| S-701 | CAMBER PART PLANS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| **Architectural** | | | | | |
| A-001 | ARCHITECTURAL SITE PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-002 | ABBREVIATIONS, SYMBOLS AND LEGENDS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-003 | BUILDING CODE NOTES | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-004 | BUILDING CODE NOTES | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-005 | ACCESSIBILITY PROVISIONS AND NOTES | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-006 | ACCESSIBILITY PROVISIONS AND NOTES | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-010 | FEMA 2013 FIRM FLOOD MAP | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-011 | FEMA 2007 FIRM FLOOD MAP | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-012 | FLOOD MITIGATION SYSTEMS PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-013 | RESIDENTIAL UNIT MATRIX | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-090 | SETTING OUT PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-100 | CELLAR FLOOR PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-101 | GROUND FLOOR PLAN | 2 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-102 | 2ND FLOOR PLAN | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-103 | 3RD FLOOR PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-104 | 4TH FLOOR PLAN | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-105 | 5TH FLOOR PLAN | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-106 | 6TH FLOOR PLAN | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-107 | 7TH & 8TH THROUGH 12TH FLOOR PLAN | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-113 | 13TH THROUGH 16TH & 17TH FLOOR PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-118 | 18TH & 19TH FLOOR PLAN | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-120 | 20TH & ROOF INTERSTITIAL PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-121 | BULKHEAD LEVEL 1, 2, 3, AND ROOF PLAN | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-150 | CELLAR REFLECTED CEILING PLAN | 5 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-151 | GROUND FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-152 | 2ND FLOOR REFLECTED CEILING PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-153 | 3RD FLOOR REFLECTED CEILING PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-154 | 4TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-155 | 5TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-156 | 6TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-157 | 7TH & 8TH THROUGH 12TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-158 | 13TH & 14TH THROUGH 16TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-159 | 17TH & 18TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-160 | 19TH & 20TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-161 | BULKHEAD LEVEL 1 REFLECTED CEILING PLAN | 1 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-200A | ENLARGED CELLAR PLAN - POOL, SPA & FITNESS | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-200B | ENLARGED CELLAR PLAN AMENITY LOBBY & TENANT | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-200C | ENLARGED CELLAR PLAN - BOH | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-201A | ENLARGED GROUND FLOOR PLAN - RESIDENTIAL LOBBY | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-201B | ENLARGED GROUND FLOOR PLAN - GALLERY LOADING DOCK | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-201C | ENLARGED GROUND FLOOR PLAN - GALLERY | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-202A | ENLARGED 2ND FLOOR PLAN - PART PLAN A | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-202B | ENLARGED 2ND FLOOR PLAN - PART PLAN B | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-202C | ENLARGED 2ND FLOOR PLAN - PART PLAN C | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-202D | ENLARGED 2ND FLOOR PLAN - PART PLAN D | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-203A | ENLARGED 3RD FLOOR PLAN - PART PLAN A | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-203B | ENLARGED 3RD FLOOR PLAN - PART PLAN B | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-203C | ENLARGED 3RD FLOOR PLAN - PART PLAN C | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-203D | ENLARGED 3RD FLOOR PLAN - PART PLAN D | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-204A | ENLARGED 4TH FLOOR PLANS DUPLEX UNITS A & B (1 OF 2) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-204B | ENLARGED 4TH FLOOR PLANS DUPLEX UNIT C (1 OF 2) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-204C | ENLARGED 4TH FLOOR PLAN - BOH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-204D | ENLARGED 4TH FLOOR PLAN DUPLEX UNIT D (1 OF 2) | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-205A | ENLARGED 5TH FLOOR PLAN DUPLEX UNIT C (2 OF 2) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-205B | ENLARGED 5TH FLOOR PLAN DUPLEX UNIT A (2 OF 2) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-205C | ENLARGED 5TH FLOOR PLAN DUPLEX UNITS B & D (2 OF 2) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-206A | ENLARGED 6TH FLOOR PLAN (UNIT A) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-206B | ENLARGED 6TH FLOOR PLAN (UNIT B) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-207A | ENLARGED 7TH FLOOR PLAN (UNIT A) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-207B | ENLARGED 7TH FLOOR PLAN (UNIT B) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-208A | ENLARGED 8TH-17TH FLOOR PLAN (UNIT A) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-208B | ENLARGED 8TH-12TH FLOOR PLAN (UNIT B) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-213B | ENLARGED 13TH-16TH FLOOR PLAN (UNIT B) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-217B | ENLARGED 17TH FLOOR PLAN (UNIT B) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-218A | ENLARGED 18TH FLOOR PLAN (PENTHOUSE UNIT C) - 1 OF 2 | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-218B | ENLARGED 18TH FLOOR PLAN (PENTHOUSE UNIT C) - 2 OF 2 | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-219A | ENLARGED 19TH FLOOR PLAN (PENTHOUSE UNIT B) - 1 OF 2 | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-219B | ENLARGED 19TH FLOOR PLAN (PENTHOUSE UNIT B) - 2 OF 2 | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-220A | ENLARGED 20TH FLOOR PLAN (PENTHOUSE UNIT A) - 1 OF 2 | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-220B | ENLARGED 20TH FLOOR PLAN (PENTHOUSE UNIT A) - 2 OF 2 | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-221A | ENLARGED ROOF INTERSTITIAL PLAN A | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-221B | ENLARGED ROOF INTERSTITIAL PLAN B | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-222A | ENLARGED BULKHEAD LEVEL 1 PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-222B | ENLARGED BULKHEAD LEVEL 1 PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-223 | ENLARGED BULKHEAD LEVEL 2 AND 3 PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-224 | ENLARGED BULKHEAD ROOF PLAN | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-250A | ENLARGED CELLAR REFLECTED CEILING PLAN - POOL AND | 5 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-250B | ENLARGED CELLAR REFLECTED CEILING PLAN - AMENITY | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-251A | RESIDENTIAL LOBBY | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-251B | ENLARGED GROUND FLOOR REFLECTED CEILING PLAN GALLERY LOADING DOCK | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-251C | ENLARGED GROUND FLOOR REFLECTED CEILING PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-252A | ENLARGED 2ND FLOOR REFLECTED CEILING PLAN - AREA | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-252B | ENLARGED 2ND FLOOR REFLECTED CEILING PLAN - AREA | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-252C | ENLARGED 2ND FLOOR REFLECTED CEILING PLAN - AREA C - GALLERY | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-253A | ENLARGED 3RD FLOOR REFLECTED CEILING PLAN - AREA | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-253B | ENLARGED 3RD FLOOR REFLECTED CEILING PLAN - AREA | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-254A | ENLARGED 4TH FLOOR | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-254B | ENLARGED 4TH FLOOR REFLECTED CEILING PLAN (DUPLEX UNIT C) - 1 OF 2 | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-254C | ENLARGED 4TH FLOOR REFLECTED CEILING PLAN (DUPLEX UNIT D) 1 OF 2 | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-254D | ENLARGED 4TH FLOOR REFLECTED CEILING PLAN - AREA D - GALLERY | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-255A | ENLARGED 5TH FLOOR | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-255B | ENLARGED 5TH FLOOR REFLECTED CEILING PLAN (DUPLEX UNIT C) - 2 OF 2 | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-255C | ENLARGED 5TH FLOOR REFLECTED CEILING PLAN (DUPLEX UNIT D) 2 OF 2 | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-256A | ENLARGED 6TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-256B | ENLARGED 6TH FLOOR REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-257A | ENLARGED 7TH FLOOR REFLECTED CEILING PLAN (UNIT A) | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-257B | ENLARGED 7TH FLOOR REFLECTED CEILING PLAN (UNIT B) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-258A | ENLARGED 8TH - 12TH FLOORS REFLECTED CEILING PLAN (UNIT A) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-258B | ENLARGED 8TH - 12TH FLOORS REFLECTED CEILING PLAN (UNIT | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-259A | ENLARGED 13TH FLOOR REFLECTED CEILING PLAN (UNIT A) | 1 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-259B | ENLARGED 13TH FLOOR REFLECTED CEILING PLAN (UNIT B) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-260A | ENLARGED 14TH - 16TH REFLECTED CEILING PLAN (UNIT A) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-260B | ENLARGED 14TH - 16TH REFLECTED CEILING PLAN (UNIT B) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-261A | ENLARGED 17TH REFLECTED CEILING PLAN (UNIT A) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-261B | ENLARGED 17TH REFLECTED CEILING PLAN (UNIT B) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-262A | ENLARGED 18TH REFLECTED CEILING PLAN (PENTHOUSE UNIT | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-262B | ENLARGED 18TH REFLECTED CEILING PLAN (PENTHOUSE UNIT | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-263A | ENLARGED 19TH REFLECTED CEILING PLAN (PENTHOUSE UNIT B) - 1 OF 2 | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-263B | ENLARGED 19TH REFLECTED CEILING PLAN (PENTHOUSE UNIT | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-264A | ENLARGED 20TH REFLECTED CEILING PLAN (PENTHOUSE UNIT A) - 10F 2 | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-264B | ENLARGED 20TH REFLECTED CEILING PLAN (PENTHOUSE UNIT | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-265 | ENLARGED BULKHEAD 1 REFLECTED CEILING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-301 | ENLARGED PLANS - RESIDENTIAL CORE (STAIRS A & B) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-302 | ENLARGED PLANS - RESIDENTIAL CORE (STAIRS A & B) | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-304 | ENLARGED PLANS & SECTIONS - REFUSE CHUTE & COMPACTOR ROOM | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-305 | STAIR/ELEVATOR SECTIONS - RESIDENTIAL CORE & ELEVATOR STACKING DIAGRAMS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-306 | ENLARGED SECTIONS (STAIRS A & B) | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-307 | ENLARGED SECTIONS (STAIRS A & B) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-308 | ENLARGED PLANS (STAIRS C, D & E) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-309 | ENLARGED SECTIONS (STAIRS C, D & E) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-310 | EGRESS STAIR DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-311 | ENLARGED PLANS & SECTIONS (PE4, PE5, FR1) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-312 | FLOOD STAIR SECTIONS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-320 | DUPLEX STAIR - UNIT 4/5 E | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-321 | DUPLEX STAIR - UNIT 4/5 N | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-322 | DUPLEX STAIR - UNIT 4/5 W | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-323 | DUPLEX STAIR - UNIT 4/5 S | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-323A | DUPLEX STAIR DETAILS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-324 | ENLARGED PLANS (FEATURE STAIR UNIT PHA) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-325 | ENLARGED SECTIONS (FEATURE STAIR UNIT PHA) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-326 | STAIR DETAILS (FEATURE STAIR UNIT PHA) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-327 | STAIR DETAILS (FEATURE STAIR UNIT PHA) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |



Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-330 | ENLARGED PLANS & SECTIONS (GALLERY MONUMENTAL STAIR) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-331 | STAIR DETAILS (GALLERY MONUMENTAL STAIR) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-332 | STAIR DETAILS (GALLERY MONUMENTAL STAIR) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-333 | STAIR DETAILS (GALLERY MONUMENTAL STAIR) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-334 | STAIR DETAILS (GALLERY MONUMENTAL STAIR) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-335 | ENLARGED PLANS AND SECTIONS (GALLERY OFFICE STAIR) | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-336 | STAIR DETAILS (GALLERY OFFICE STAIR) | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-337 | STAIR DETAILS (GALLERY OFFICE STAIR) | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-340 | ENLARGED PLANS, SECTIONS & DETAILS (GALLERY CORRIDOR STAIR) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-341 | ENLARGED PLANS & SECTIONS (GALLERY CORRIDOR RAMP) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-350 | ENLARGED PLANS AND ELEVATIONS (RESIDENTIAL | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-351 | ELEVATOR CAB DETAILS (PE1 & PE2) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-352 | ENLARGED PLANS AND ELEVATIONS (RESIDENTIAL | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-353 | ELEVATOR CAB DETAILS (SE3) | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-354 | ELEVATOR DOOR DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-360 | ENLARGED PLANS AND ELEVATIONS (GALLERY ELEVATORS PE4 & PE5) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-361 | ELEVATOR CAB DETAILS (GALLERY ELEVATORS PE4 & PE5) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-362 | ENLARGED PLANS AND ELEVATIONS (GALLERY | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-363 | ELEVATOR CAB DETAILS (GALLERY ELEVATOR FR1) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-380 | MISC. STAIRS AND LADDERS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-382 | MISC. STAIRS AND LADDERS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-401 | PARTITION SCHEDULE | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-402 | PARTITION SCHEDULE | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-403 | PARTITION SCHEDULE | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-404 | PARTITION SCHEDULE | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-410 | DOOR SCHEDULE | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-411 | DOOR SCHEDULE | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-413 | DOOR TYPES & DETAILS | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-414 | DOOR DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-415 | DOOR DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-416 | DOOR DETAILS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-417 | DOOR DETAILS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-418 | DOOR DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-420 | FINISH SCHEDULE AND LEGEND | 5 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-421 | FINISH SCHEDULES | 5 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-422 | APPLIANCE & CASEWORK SCHEDULES | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-423 | PLUMBING FIXTURE AND ACCESSORY SCHEDULES | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-424 | PLUMBING FIXTURE AND ACCESSORY SCHEDULES | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |

SUFFOLK

Suffolk Construction Company, Inc.

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-425 | SHADE SCHEDULE | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-430 | FLOOR FINISH ASSEMBLIES, TRANSITION AND BASE DETAILS | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-440 | EXTERIOR WALL TYPE DESIGNATION - NORTH ELEVATION | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-441 | EXTERIOR WALL TYPE DESIGNATION - SOUTH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-442 | EXTERIOR WALL TYPE DESIGNATION - EAST ELEVATION | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-443 | EXTERIOR WALL TYPE DESIGNATION - WEST ELEVATION | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-444 | OPERABLE WINDOW & DOOR SCHEDULE AND ELEVATIONS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-445 | OPERABLE WINDOW & DOOR SCHEDULE AND ELEVATIONS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-446 | EXTERIOR WALL TYPES & MATERIALS DESIGNATION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-447 | EXTERIOR WALL TYPES & MATERIALS DESIGNATION | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-450 | ROOF TYPES | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-480 | PARTITION SCHEDULE (GALLERY) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-483 | DOOR SCHEDULE (GALLERY) | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-484 | DOOR DETAILS (GALLERY) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-488 | FINISH SCHEDULE (GALLERY) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-489 | FLOOR FINISH ASSEMBLIES, TRANSITION AND BASE DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-490 | PLUMBING FIXTURE, ACCESSORY, APPLIANCE & SHADE SCHEDULES GALLERY | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-501 | NORTH ELEVATION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-502 | WEST AND EAST ELEVATIONS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-503 | SOUTH ELEVATION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-504 | BUILDING AXONOMETRICS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-510 | BUILDING SECTIONS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-511 | BUILIDNG SECTIONS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-530 | ENLARGED ELEVATION NORTH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-531 | ENLARGED ELEVATION NORTH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-532 | ENLARGED ELEVATION EAST | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-533 | ENLARGED ELEVATION WEST | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-534 | ENLARGED ELEVATION EAST AND WEST | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-535 | ENLARGED ELEVATION SOUTH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-536 | ENLARGED ELEVATION SOUTH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-580 | ENLARGED SECTION - GALLERY | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-601 | ENLARGED NORTH ELEVATION, PLANS & SECTIONS | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-602 | ENLARGED NORTH ELEVATION, PLANS, & SECTIONS | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-603 | ENLARGED NORTH ELEVATION, PLANS & SECTIONS | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-604 | ENLARGED NORTH ELEVATION, PLANS & SECTIONS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-605 | ENLARGED WEST ELEVATION, PLANS & SECTIONS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-606 | ENLARGED WEST ELEVATION, PLANS & SECTIONS | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-607 | ENLARGED SOUTH ELEVATION, PLANS & SECTIONS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-608 | ENLARGED NORTH ELEVATION, PLANS & SECTIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-609 | ENLARGED NORTH ELEVATION, PLANS & SECTIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-611 | ENLARGED ELEVATIONS - WEST NOTCH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-612 | ENLARGED ELEVATIONS - WEST NOTCH | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-613 | ENLARGED ELEVATIONS - EAST NOTCH | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-620 | ENLARGED ELEVATIONS (BULKHEAD) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-621 | ENLARGED SECTIONS (BULKHEAD) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-622 | ENLARGED SECTIONS (BULKHEAD) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-623 | WALL SECTIONS (BULKHEAD WEST) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-624 | WALL SECTIONS (BULKHEAD NORTH) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-625 | WALL SECTIONS (BULKHEAD EAST) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-626 | WALL SECTIONS (BULKHEAD SOUTH) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-627 | UNDER WATER TANKS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-630 | ENLARGED PLANS AND ELEVATIONS (WATER TANKS) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-631 | ENLARGED PLANS AND ELEVATIONS (WATER TANKS) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-632 | DETAILS (WATER TANKS) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-633 | DETAILS (WATER TANKS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-640 | WT-13 & STACKED FLOOD DOOR (NORTH) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-641 | WT-13 & STACKED FLOOD DOOR (WEST) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-642 | WT-10 (BI-FOLDING ART DOOR) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-643 | WT-10 (BI-FOLDING ART DOOR) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-644 | WT-9 (ART DOOR) | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-645 | WT-11 (GALLERY PATIO GATE) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-646 | WT-11 (GALLERY PATIO GATE) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-647 | WT-12 (OVERHEAD SECTIONAL DOOR) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-648 | WT-12 (OVERHEAD SECTIONAL DOOR) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-649 | WT-5 (GALLERY VESTIBULE) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-650 | WT-5 (RESIDENTIAL VESTIBULE) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-651 | WT-5 (COMMERCIAL VESTIBULE) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-652 | WT-5 (STOREFRONT & VESTIBULE DETAILS) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-653 | WT-5 (STOREFRONT& VESTIBULE DETAILS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-654 | WT-5 (STOREFRONT ENTRANCE DOORS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-655 | WT-5 (DETAILS) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-656 | CANOPY DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-657 | WT-6 (GALLERY GLAZING) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-660 | PERIMETER BASE DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-661 | PERIMETER BASE DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-662 | ENLARGED RCPS (EXTERIOR SOFFITS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-663 | DETAILS (EXTERIOR SOFFITS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-670 | WALL SECTIONS AT ADJACENT BUILDING (LOT 52) | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-671 | WALL SECTIONS AT ADJACENT BUILDING (LOT 11) | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-672 | WALL SECTIONS AT ADJACENT BUILDING (LOT 7501) | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-675 | DETAILS AT ADJACENT BUILDINGS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-676 | DETAILS AT ADJACENT BUILDINGS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-677 | DETAILS AT ADJACENT BUILDINGS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-678 | DETAILS AT ADJACENT BUILDINGS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-701 | WALL SECTIONS (PODIUM) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-702 | WALL SECTIONS (PODIUM) | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-703 | WALL SECTIONS (PODIUM) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-704 | WALL SECTIONS (PODIUM) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-705 | WALL SECTIONS (TOWER) | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-706 | WALL SECTIONS (TOWER) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-707 | WALL SECTIONS (TOWER) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-708 | WALL SECTIONS (TOWER) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-710 | WT-3 - GLASS BOX PLANS | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-711 | WT-3 - GLASS BOX PLANS | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-712 | WT-3 - GLASS BOX PLANS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-713 | WT-3 - GLASS BOX PLANS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-714 | WT-3 - GLASS BOX PLANS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-715 | WT-3 - GLASS BOX DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-716 | WT-3 - GLASS BOX DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-718 | WT-3 - GLASS BOX DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-719 | WT-3 - GLASS BOX DETAILS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-720 | WT-3 - GLASS BOX DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-730 | WT-1 - DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-732 | WT-4 DETAILS (FIRE RATED FACADE) | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-740 | WT-8 (GALLERY UNIT SKYLIGHTS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-742 | WT-7 (GALLERY SKYLIGHT) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-743 | WT-7 (GALLERY SKYLIGHT) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-744 | WT-7 (GALLERY SKYLIGHT) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-745 | WT-7 (GALLERY SKYLIGHT) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-746 | WT-7 (GALLERY SKYLIGHT) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-750 | ENLARGED PLANS AND SECTIONS (PLANTERS& TERRACE DIVIDERS) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-752 | DETAILS (PLANTERS& TERRACE DIVIDERS) | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-755 | DETAILS (PARAPETS AND GUARDS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-756 | DETAILS (PARAPETS AND GUARDS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-760 | ENLARGED PLANS AND SECTIONS (UNITS 5/6A & B POOLS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-761 | ENLARGED PLAN AND SECTIONS (UNIT 5/6C SPA POOL) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-762 | ENLARGED PLAN AND SECTIONS (UNIT PHA POOL) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-763 | ENLARGED PLANS AND SECTIONS (UNIT PHA SPA POOL) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-764 | SECTION DETAILS (POOLS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-770 | ENLARGED PLANS (BALCONIES) | 2 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-771 | ENLARGED PLANS (BALCONIES& LOGGIAS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-772 | ENLARGED PLANS (BALCONIES & LOGGIAS) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-773 | SECTIONS (BALCONIES & LOGGIAS) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-774 | SECTIONS (BALCONIES& LOGGIAS) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-775 | SECTION (LOGGIAS) | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-776 | DETAILS (BALCONIES& LOGGIAS) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-780 | DETAILS (BULKHEAD) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-781 | DETAILS (BULKHEAD) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-782 | DETAILS - BOILER ROOM ENCLOSURE | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-801 | ELEVATIONS (CELLAR POOL) | 5 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-802 | ELEVATIONS (CELLAR POOL) | 4 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-803 | ELEVATIONS (AMENITY SPA) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-804 | ELEVATIONS (AMENITY SPA) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-805 | ELEVATIONS (AMENITY SPA) | 2 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-806 | ELEVATIONS (FITNESS& YOGA) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-807 | SECTIONS & DETAILS (CELLAR SPA POOLS) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-808 | SECTIONS & DETAILS (CELLAR POOLS) | 3 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-809 | LINEN SUPPLY RECEPTION COUNTER DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-810 | ELEVATIONS (RESIDENTIAL LOBBY) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-811 | ELEVATIONS (RESIDENTIAL LOBBY) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-812 | ENLARGED PLANS, ELEVATIONS & DETAILS (MAILROOM) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-813 | ELEVATIONS (ELEVATOR LOBBY) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-814 | SECTIONS & DETAILS - CELLAR POOL AND HOT STONE ROOM | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-815 | PLANS & DETAILS - TENANAT EXERCISE ROOM GYM STORAGE | 0 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-820 | KITCHEN TYPE A | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-820A | KITCHEN TYPE A-1 | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-821 | KITCHEN TYPE B | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-822 | KITCHEN TYPE B (17TH FLOOR) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-823 | KITCHEN TYPES C & C1 | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-824 | KITCHEN TYPE D | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-825 | KITCHEN TYPE E | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-826 | KITCHEN TYPE F | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |



Suffolk Construction Company, Inc.

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-827 | KITCHEN TYPE G | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-828 | KITCHEN TYPE J | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-829 | DETAILS (KITCHEN TYPE A) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-830 | DETAILS (KITCHEN COUNTER) | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-831 | DETAILS (KITCHEN STORAGE) | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-832 | KITCHEN ISLAND TYPE A | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-833 | KITCHEN ISLAND TYPE B | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-834 | KITCHEN ISLAND TYPE C | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-835 | KITCHEN ISLAND TYPE D | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-836 | MIDNIGHT KITCHEN TYPES A, B & C | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-837 | MIDNIGHT KITCHEN TYPES A, B & C | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-838 | LAUNDRY ROOM PLANS & ELEVATIONS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-839 | LAUNDRY ROOM DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-850 | MASTER BATHROOM TYPE A1 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-851 | MASTER BATHROOM TYPE A6 | 5 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-851A | MASTER BATHROOM A4 | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-851B | MASTER BATHROOM TYPE A5 | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-851C | MASTER BATHROOM TYPE A6 | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-851D | MASTER BATHROOM TYPE A7 | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-852 | MASTER BATHROOM TYPE A3 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-853 | MASTER BATHROOM TYPE B | 4 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-853A | MASTER BATHROOM TYPE B1 | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-854 | MASTER BATHROOM TYPE C1 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-855 | MASTER BATHROOM TYPE C2 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-856 | BATHROOM TYPE D1 & D1A | 2 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-856A | BATHROOM TYPE D1B & D1C | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-856B | BATHROOM TYPE D2A & D2B | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-856C | BATHROOM TYPE D2C & D2D | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-856D | BATHROOM TYPE D3A, D3B & D3C | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-856E | BATHROOM TYPE D4 | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-856F | BATHROOM TYPE D5 & D6 | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-857 | BATHROOM TYPES F1 & F2 | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-858 | BATHROOM TYPE G | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-859 | POWDER ROOM TYPE A1 | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-860 | POWDER ROOM TYPE A2 & A2C | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-860A | POWDER ROOM TYPE A2A & A2B | 0 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-860B | POWDER ROOM TYPE A3 & A4 | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-860C | POWDER ROOM A5 | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-861 | DETAILS (MASTER BATH VANITY) | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-862 | DETAILS (MASTER & SECONDARY BATH VANITY) | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-863 | DETAILS (MASTER & SECONDARY BATH VANITY) | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-864 | DETAILS (PH MASTER BATH VANITY) | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-865 | DETAILS (PH MASTER BATH VANITY) | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-866 | DETAILS (PH MASTER BATH STORAGE) | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-867 | DETAILS (BATHROOM STONE) | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-868 | DETAILS (MASTER BATH SHOWER) | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-870 | CLOSET TYPE A | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-871 | CLOSET TYPES B & C | 1 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-872 | CLOSET TYPES D & E | 2 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-873 | CLOSET TYPES F, G, H & I | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-875 | CELLAR MILLWORK DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-876 | SPA SHOWER/CHANGING & WC | 2 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-877 | SPA FAMILY ROOM RESTROOM AND STORAGE | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-878 | CELLAR RESTROOM - BOH | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-879 | RESIDENTIAL LOBBY RESTROOM | 3 | 07/31/2020 | | Bulletin 4.5 (07/31/20) |
| A-880 | INTERIOR ELEVATIONS - GALLERY LOADING DOCK | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-881 | INTERIOR ELEVATIONS - GALLERY GROUND FLOOR LOBBY | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-882 | INTERIOR ELEVATIONS - GALLERY LEVEL 1 EXHIBITION ELEVATIONS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-883 | INTERIOR ELEVATIONS - GALLERY LEVEL 1 & 2 EXHIBITION ELEVATIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-884 | INTERIOR ELEVATIONS - GALLERY LEVEL 2 EXHIBITION ELEVATIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-885 | INTERIOR ELEVATIONS - GALLERY OPEN OFFICE LEVEL 2 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-886 | INTERIOR ELEVATIONS - GALLERY 2ND & 3RD FL ELEVATOR LOBBY | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-887 | INTERIOR ELEVATIONS - GALLERY LEVEL 3 EXHIBITION ELEVATIONS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-888 | INTERIOR ELEVATIONS - GALLERY OPEN OFFICE LEVEL 3 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-889 | ENLARGED PLANS - GALLERY STAFF PANTRY | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-890 | ENLARGED ELEVATIONS - GALLERY STAFF PANTRY | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-891 | ENLARGED PLANS AND ELEVATIONS - GALLERY PUBLIC WC AT CORE, LEVELS 2 AND 3 | 2 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-892 | ENLARGED PLANS AND ELEVATIONS - GALLERY STAFF WC | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-900 | DETAILS (SPA) | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-901 | DETAILS (RESIDENTIAL LOBBY) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-902 | DETAILS (RESIDENTIAL LOBBY) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-903 | DETAILS (RESIDENTIAL LOBBY) | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-906 | RESIDENTIAL LOBBY RECEPTION DESK | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-907 | RESIDENTIAL LOBBY RECEPTION DESK | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-910 | STONE AND WOOD SLAT DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-911 | INTERIOR DOOR DETAILS AT CELLAR | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |



Suffolk Construction Company, Inc.

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-920 | PARTITION DETAILS | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-921 | PARTITION DETAILS | 1 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-922 | PARTITION DETAILS | 3 | 05/08/2020 | | Bulletin 4.3 (05/08/20) |
| A-923 | PARTITION DETAILS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-925 | PARTITION DETAILS (GALLERY) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-926 | PARTITION DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-930 | CEILING DETAILS (RESIDENTIAL PERIMETER) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-931 | CEILING DETAILS (RESIDENTIAL PERIMETER) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-932 | CEILING DETAILS (RESIDENTIAL INTERIOR) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-933 | CEILING DETAILS (RESIDENTIAL PERIMETER) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-934 | CEILING DETAILS (RESIDENTIAL & SPA) | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-935 | CEILING DETAILS (GALLERY PERIMETER) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-936 | CEILING DETAILS (GALLERY INTERIOR) | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-937 | CEILING DETAILS (GALLERY INTERIOR) | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| A-938 | CEILING DETAILS (GALLERY INTERIOR) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-939 | CEILING DETAILS (RESIDENTIAL INTERIOR) | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| A-950 | TYPICAL PENETRATION FIRESTOP DETAILS | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| A-951 | MISC. BOH DETAILS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-952 | MISC. BOH DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-955 | ENLARGED WCU CLOSET PLANS | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-956 | ACCESS DOOR DETAILS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-980 | GALLERY MILLWORK - GROUND FLOOR RECEPTION DESK | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-981 | GALLERY MILLWORK - GROUND FLOOR RECEPTION DESK | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-982 | GALLERY MILLWORK - 2ND & 3RD FLOOR RECEPTION DESK | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| A-983 | GALLERY MILLWORK - GROUND FLOOR BOOK WALL | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-984 | GALLERY MILLWORK - COFFEE STATION | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-985 | GALLERY MILLWORK - OFFICE BOOKSHELVES | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-986 | GALLERY MILWORK - COFFEE STATION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-990 | GALLERY MILLWORK - STAFF PANTRY BOOK SHELF | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| A-991 | GALLERY MILLWORK - STAFF PANTRY KITCHEN | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-992 | GALLERY MILLWORK - HALLWAY BOOKSELF | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-993 | GALLERY MILLWORK - STAFF PANTRY STORAGE | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| A-994 | GALLERY MILLWORK - HALLWAY BOOKSHELF | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-995 | GALLERY MILLWORK - HALLWAY BOOKSHELF | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| A-996 | GALLERY MILLWORK - EQUIPMENT ROOM SHELF | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| **Pool & Spa** | | | | | |
| PL-001 | CELLAR POOL, SPA, COLD PLUNGE, STEAM & SAUNA FACILITY PLAN, NOTES, DATA & DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-002 | CELLAR POOL SECTIONS, NOTES, DATA & DETAILS | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| PL-003 | CELLAR POOL & SPA NOTES & DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-004 | CELLAR SPA PLAN, SECTIONS, NOTES | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| PL-005 | CELLAR COLD PLUNGE PLAN, SECTIONS, NOTES & DETAILS | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| PL-006 | MISCELLANEOUS DETAILS & NOTES | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-007 | CELLAR POOL, SPA & COLD PLUNGE PIPING & EQUIPMENT PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-008 | CELLAR PIPING PLANS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| PL-009 | ISOMETRIC DIAGRAMS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-010 | CELLAR STEAM ROOM PLAN, ELEVATIONS, DETAILS, NOTES & DATA | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-011 | CELLAR SAUNA PLAN, ELEVATIONS, DETAILS, NOTES & DATA | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-012 | APT 5A, 5B & 5C FACILITY PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| PL-013 | APT 5A & 5B POOL PLANS & SECTIONS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| PL-014 | APT 5A & 5B POOL DETAILS & BONDING DIAGRAMS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| PL-015 | APT 5A & 5B POOL PIPING & EQUIPMENT PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| PL-016 | APT 5C WHIRLPOOL SPA PLAN AND SECTIONS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| PL-017 | APT 5C WHIRLPOOL SPA PIPING & EQUIPMENT PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| PL-018 | PENTHOUSE POOL & SPA FACILITY PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-019 | PENTHOUSE POOL CONSTRUCTION PLAN & SECTIONS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| PL-020 | PENTHOUSE POOL DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-021 | SPA CONSTRUCTION PLAN & SECTIONS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| PL-022 | PENTHOUSE POOL & SPA PIPING & EQUIPMENT PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-023 | PENTHOUSE POOL & SPA PIPING DIAGRAMS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| PL-024 | PENTHOUSE POOL & SPA PIPING DIAGRAMS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| **Civil** | | | | | |
| C-100 | SOIL EROSION & SEDIMENT CONTROL PLAN AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| C-200 | SITE UTILITY PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| C-300 | WEST 21ST STREET GRADING PLAN & PROFILE | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| C-301 | 11TH AVENUE STREET GRADING PLAN & PROFILE | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| C-500 | NYC DOT DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| C-501 | NYS DOT DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Mechanical** | | | | | |
| M-001 | MECHANICAL COVER SHEET #1 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-002 | Mechanical Cover Sheet #2 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| M-100 | Mechanical Cellar Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-101 | Mechanical Ground Floor Plan | 4 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-102 | Mechanical 2nd Floor Plan | 4 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-103 | Mechanical 3rd Floor Plan | 4 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-104 | Mechanical 4th Floor Plan | 4 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-105 | Mechanical 5th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| M-106 | Mechanical 6th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-107 | Mechanical 7th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-108 | Mechanical 8th -12th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-113 | Mechanical 13th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-114 | Mechanical 14-16th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-117 | Mechanical 17th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-118 | Mechanical 18th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-119 | Mechanical 19th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-120 | Mechanical 20th Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-121 | Mechanical 20th level interstitial Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-122 | Mechanical Bulkhead Level 1 Plan and Roof level | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-123 | Mechanical Bulkhead Level 2 Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-124 | Mechanical Bulkhead Level 3 Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-125 | Mechanical Bulkhead Roof level | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-201 | Mechanical Part Plans Sheet #1 | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| M-300 | Mechanical Air Riser Diagram Sheet #1 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-301 | Mechanical Air Riser Diagram Sheet #2 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-302 | Mechanical Water Riser Diagram | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-303 | Mechanical Water Riser Diagram | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-400 | Mechanical Schedules Sheet #1 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-401 | Mechanical Schedules Sheet # 2 | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-402 | Mechanical Schedules Sheet # 3 | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-403 | MECHANICAL SCHEDULE SHEET #4 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-500 | Mechanical Details Sheet # 1 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-501 | Mechanical Details Sheet # 2 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| M-502 | Mechanical Details Sheet # 3 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| M-503 | Mechanical Details Sheet # 4 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-504 | Mechanical Details Sheet # 5 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-505 | Mechanical Details Sheet # 6 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-506 | Mechanical Details Sheet # 7 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-507 | Mechanical Details Sheet # 8 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-508 | Mechanical Details Sheet # 9 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| M-509 | Mechanical Details Sheet #10 | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| M-510 | Mechanical Details Sheet # 11 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| **Plumbing** | | | | | |
| P-001 | PLUMBING SYMBOLS, ABBREVIATIONS, NOTES AND DRAWING LIST | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| P-002A | PLUMBING & SITE UTILITY PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| P-002B | PLUMBING STORM TANK DRAINAGE DETAIL | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| P-099 | Plumbing Cellar Underground Floor Plan | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-100 | Plumbing Cellar Floor Plan- Construction Floor (LL- Marketing Floor) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-100A | Plumbing Cellar Ceiling Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-101 | Plumbing Ground Floor Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-102 | Plumbing 2nd Floor Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-103 | Plumbing 3rd Floor Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-104 | Plumbing 4th Floor Plan | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-105 | Plumbing 5th Floor Plan | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-106 | Plumbing 6th Floor Plan | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-107 | Plumbing 7th Floor Plan | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-108 | Plumbing 8th Floor Plan | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-109 | Plumbing 9th- 12th Floor Plan | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-113 | Plumbing 13th Floor Plan- Construction Floor (14th Floor Plan- Marketing Floor) | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-114 | Plumbing 14th-16th Floor Plan- Construction Floor (15th-17th Floor Plan- Marketing Floor) | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-117 | Plumbing 17th Floor Plan | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-118 | Plumbing 18th Floor Plan | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-119 | Plumbing 19th Floor Plan | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-120 | Plumbing 20th Floor Plan | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-121 | Plumbing 20th Level Interstitial Space | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-122 | Plumbing Bulkhead Level 1 Plan and Roof | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-123 | Plumbing Bulkhead Level 2 Plan | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| P-124 | Plumbing Bulkhead Level 3 Plan and Roof | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| P-301 | PLUMBING DOMESTIC WATER RISER DIAGRAM | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-302 | PLUMBING STORM WATER RISER DIAGRAM | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-303 | PLUMBING GAS RISER DIAGRAM | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| P-304 | PLUMBING SANITARY RISER DIAGRAM | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| P-401 | PLUMBING DETAILS | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| P-402 | PLUMBING DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| P-403 | DOMESTIC WATER HEATING EQUIPMENT-SHEET #1 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| P-404 | DOMESTIC WATER HEATING EQUIPMENT-SHEET #2 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| P-405 | DOMESTIC WATER PRESSURE REDUCING VALVES | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| P-406 | DOMESTIC WATER FILTRATION EQUIPMENT SPECIFICATIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| P-500 | PLUMBING SCHEDULES | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Fire Protection** | | | | | |
| FP-001 | FIRE PROTECTION SYMBOLS, ABBREVIATIONS, DRAWING LIST AND NOTES | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FP-100 | Fire Protection Cellar Floor Plan | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-101 | Fire Protection Ground Floor Plan | 2 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| FP-102 | Fire Protection 2nd Floor Plan | 2 | 02/01/2019 | | Bulletin 3 (02/01/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| FP-103 | Fire Protection 3rd Floor Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-104 | Fire Protection 4th Floor Plan | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-105 | Fire Protection 5th Floor Plan | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-106 | Fire Protection 6th Floor Plan | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-107 | Fire Protection 7th - 13th and 15th, 16th Floor Plan - Construction Floor (7th-14th and 16th, 17th Floor Plan - Marketing Floor) | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-114 | Fire Protection 14th Floor Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-117 | Fire Protection 17th Floor Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-118 | Fire Protection 18th Floor Plan - Construction Floor | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-119 | Fire Protection 19th Floor Plan | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-120 | Fire Protection 20th Floor Plan - Construction Floor | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FP-121 | Fire Protection Bulkhead Level 1 - Construction Floor | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FP-122 | Fire Protection Bulkhead Level 2 Plan | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FP-123 | Fire Protection Bulkhead Level 3 Plan | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FP-301 | FIRE PROTECTION RISER DIAGRAM | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FP-401 | FIRE PROTECTION DETAILS #1 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FP-402 | FIRE PROTECTION DETAILS 2 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FP-501 | FIRE PROTECTION SCHEDULES | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| **Electrical** | | | | | |
| E-001 | ELECTRICAL SYMBOL AND DRAWING LIST | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-002 | ELECTRICAL GENERAL NOTES AND ABBREVIATIONS LIST | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| E-099 | ELECTRICAL UNDERGROUND PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| E-100 | ELECTRICAL CELLAR POWER PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-101 | ELECTRICAL GROUND FLOOR POWER PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-102 | ELECTRICAL 2ND FLOOR POWER PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-103 | ELECTRICAL 3RD FLOOR POWER PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-104 | ELECTRICAL 4TH FLOOR POWER PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-105 | ELECTRICAL 5TH FLOOR POWER PLAN | 1 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-106 | ELECTRICAL 6TH FLOOR POWER PLAN | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-107 | ELECTRICAL 7TH FLOOR POWER PLAN | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-113 | CONSTRUCTION (8TH-12TH, 14TH-17TH FLOOR MARKETING) POWER PLAN | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-117 | ELECTRICAL 17TH FLOOR CONSTRUCTION (18TH FLOOR MARKETING) POWER PLAN | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-118 | ELECTRICAL 18TH FLOOR POWER PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-119 | ELECTRICAL 19TH FLOOR POWER PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-120 | ELECTRICAL 20TH FLOOR POWER PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-121 | ELECTRICAL BULKHEAD LEVEL 1 CONSTRUCTION (R LEVEL MARKETING) POWER PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-122 | ELECTRICAL BULKHEAD LEVEL 2 POWER PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-123 | ELECTRICAL BULKHEAD LEVEL 3 POWER PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-200 | ELECTRICAL CELLAR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| E-201 | ELECTRICAL GROUND FLOOR LIGHTING PLAN | 4 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-202 | ELECTRICAL 2ND FLOOR LIGHTING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-203 | ELECTRICAL 3RD FLOOR LIGHTING PLAN | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| E-204 | ELECTRICAL 4TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-205 | ELECTRICAL 5TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-206 | ELECTRICAL 6TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-207 | ELECTRICAL 7TH FLOOR LIGHTING PLAN | 2 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-213 | ELECTRICAL 8TH-16TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-217 | ELECTRICAL 17TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-218 | ELECTRICAL 18TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-219 | ELECTRICAL 19TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-220 | ELECTRICAL 20TH FLOOR LIGHTING PLAN | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-221 | ELECTRICAL BULKHEAD LEVEL 1 LIGHTING PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-222 | ELECTRICAL BULKHEAD LEVEL 2 LIGHTING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-223 | ELECTRICAL BULKHEAD LEVEL 3 LIGHTING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-300 | ELECTRICAL POWER RISER DIAGRAM | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-301 | ELECTRICAL RESIDENTIAL APARTMENT LIGHTING CONTROL ONE-LINE DIAGRAMS | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| E-301A | ELECTRICAL RESIDENTIAL | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-302 | ELECTRICAL GALLERY LIGHTING CONTROL ONE-LINE DIAGRAM | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-400 | ELECTRICAL SCHEDULES SHEET No. 1 | 3 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-401 | ELECTRICAL SCHEDULES SHEET No. 2 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-402 | ELECTRICAL SCHEDULES SHEET No. 3 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-403 | ELECTRICAL SCHEDULES SHEET No. 4 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| E-404 | ELECTRICAL SCHEDULES SHEET No. 5 | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| E-405 | ELECTRICAL SCHEDULES SHEET No. 6 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-406 | ELECTRICAL SCHEDULES SHEET No. 7 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-407 | ELECTRICAL SCHEDULES SHEET No. 8 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-408 | ELECTRICAL SCHEDULES SHEET No. 9 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-409 | ELECTRICAL SCHEDULES SHEET No. 10 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-410 | ELECTRICAL SCHEDULES SHEET No. 11 | 1 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-411 | ELECTRICAL SCHEDULES SHEET No. 12 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-412 | ELECTRICAL SCHEDULES SHEET No. 13 | 1 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-413 | ELECTRICAL SCHEDULES SHEET No. 14 | 1 | 07/15/2020 | | Bulletin 4.4 (07/15/20) |
| E-420 | ELECTRICAL GALLERY SCHEDULES SHEET No. 1 | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-421 | ELECTRICAL GALLERY SCHEDULES SHEET No. 2 | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-500 | ELECTRICAL DETAILS SHEET No. 1 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| E-501 | ELECTRICAL DETAILS SHEET No. 2 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-600 | RESIDENTIAL ELECTRICAL CLOSET PART PLANS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| E-601 | ELECTRICAL CELLAR GROUNDING PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| E-602 | ELECTRICAL RESIDENTIAL SECTIONS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| E-603 | ELECTRICAL GALLERY LIGHTING SECTIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Fire Alarm** | | | | | |
| FA-001 | RESIDENTIAL FIRE ALARM DRAWING AND SYMBOL LIST | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-002 | RESIDENTIAL FIRE ALARM SEQUENCE OF OPERATIONS AND DETAILS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-100 | RESIDENTIAL FIRE ALARM CELLAR CONSTRUCTION (LL LEVEL MARKETING) PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-101 | RESIDENTIAL FIRE ALARM GROUND FLOOR CONSTRUCTION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-102 | RESIDENTIAL FIRE ALARM 2ND FLOOR PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-103 | RESIDENTIAL FIRE ALARM 3RD FLOOR PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-104 | RESIDENTIAL FIRE ALARM 4TH FLOOR PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-105 | RESIDENTIAL FIRE ALARM 5TH FLOOR PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-106 | RESIDENTIAL FIRE ALARM 6TH FLOOR PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-107 | RESIDENTIAL FIRE ALARM 7TH FLOOR PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-113 | RESIDENTIAL FIRE ALARM 8-16TH FLOOR CONSTRUCTION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-117 | RESIDENTIAL FIRE ALARM 17TH FLOOR CONSTRUCTION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-118 | RESIDENTIAL FIRE ALARM 18TH FLOOR CONSTRUCTION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-119 | RESIDENTIAL FIRE ALARM 19TH FLOOR CONSTRUCTION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-120 | RESIDENTIAL FIRE ALARM 20TH FLOOR CONSTRUCTION | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-121 | RESIDENTIAL FIRE ALARM BULKHEAD LEVEL 1 CONSTRUCTION R LEVEL MARKETING PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-122 | RESIDENTIAL FIRE ALARM BULKHEAD LEVEL 2 PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FA-123 | RESIDENTIAL FIRE ALARM BULKHEAD LEVEL 3 PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-200 | RESIDENTIAL FIRE ALARM RISER DIAGRAM | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-300 | GALLERY FIRE ALARM SYMBOL LIST, SEQUENCE OF OPERATIONS AND GENERAL NOTES | 2 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| FA-301 | GALLERY FIRE ALARM DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FA-400 | GALLERY FIRE ALARM CELLAR CONSTRUCTION (LOWER LEVEL MARKETING) PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-401 | GALLERY FIRE ALARM GROUND FLOOR CONSTRUCTION (L LEVEL MARKETING) PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-402 | GALLERY FIRE ALARM 2ND FLOOR PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-403 | GALLERY FIRE ALARM 3RD FLOOR PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-404 | GALLERY FIRE ALARM 4TH FLOOR PLAN | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| FA-500 | GALLERY FIRE ALARM RISER DIAGRAM | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-600 | FIRE ALARM AUXILIARY RADIO COMMUNICATIONS SYSTEM (ARCS) DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FA-700 | FIRE ALARM ARCS CELLAR CONSTRUCTION | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FA-701 | FIRE ALARM ARCS GROUND FLOOR CONSTRUCTION (L LEVEL MARKETING) PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FA-702 | FIRE ALARM ARCS 2ND FLOOR PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FA-703 | FIRE ALARM ARCS 3RD FLOOR PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FA-704 | FIRE ALARM ARCS 4TH FLOOR PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| FA-705 | FIRE ALARM ARCS 5TH FLOOR PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |



Suffolk Construction Company, Inc.

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| FA-708 | FIRE ALARM ARCS 8TH FLOOR PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FA-711 | FIRE ALARM ARCS 11TH FLOOR PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FA-714 | FIRE ALARM ARCS 14TH FLOOR CONSTRUCTION (15TH FLOOR MARKETING) PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FA-717 | FIRE ALARM ARCS 17TH FLOOR CONSTRUCTION (18TH FLOOR MARKETING) PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FA-720 | FIRE ALARM ARCS 20TH FLOOR CONSTRUCTION | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FA-723 | FIRE ALARM ARCS BULKHEAD LEVEL 3 PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FA-800 | FIRE ALARM ARCS RISER DIAGRAM | 1 | 11/15/2019 | | Bulletin 4 (11/15/15) |
| FA-900 | FIRE ALARM DETAILS SHEET | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **AUDIO VISUAL** | | | | | |
| AV-001 | AUDIOVISUAL COVER SHEET | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-100 | AUDIOVISUAL CELLAR FLOOR FACILITIES PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-101 | AUDIOVISUAL GROUND FLOOR FACILITIES PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-102 | AUDIOVISUAL SECOND FLOOR FACILITIES PLAN | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-103 | AUDIOVISUAL THIRD FLOOR FACILITIES PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-200 | AUDIOVISUAL CELLAR FLOOR FACILITIES REFLECTED CEILING PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| AV-201 | AUDIOVISUAL GROUND FLOOR FACILITIES REFLECTED CEILING PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| AV-202 | AUDIOVISUAL SECONDFLOOR FACILITIES REFLECTED CEILING PLAN | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-203 | AUDIOVISUAL THIRD FLOOR FACILITIES REFLECTED CEILING PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-301 | AUDIOVISUAL SYSTEM FLOW DIAGRAMS | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-302 | AUDIOVISUAL SYSTEM FLOW DIAGRAMS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| AV-401 | AUDIOVISUAL LOW VOLTAGE CONDUIT SCHEDULE | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-402 | AUDIOVISUAL DISPLAY SCHEDULE | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-403 | AUDIOVISUAL SCHEMATIC INSTALLATION DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-404 | AUDIOVISUAL SCHEMATIC INSTALLATION DETAILS | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-500 | AUDIOVISUAL CELLAR FLOOR LOW VOLTAGE CONDUIT PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-501 | AUDIOVISUAL GROUND FLOOR LOW VOLTAGE CONDUIT PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-502 | AUDIOVISUAL SECOND FLOOR LOW VOLTAGE CONDUIT PLAN | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-503 | AUDIOVISUAL THIRD FLOOR LOW VOLTAGE CONDUIT PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| AV-600 | AUDIOVISUAL CELLAR FLOOR LOW VOLTAGE CONDUIT REFLECTED CEILING PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| AV-601 | AUDIOVISUAL GROUND FLOOR LOW VOLTAGE CONDUIT REFLECTED CEILING PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| AV-602 | AUDIOVISUAL SECOND FLOOR LOW VOLTAGE CONDUIT REFLECTED CEILING PLAN | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| AV-603 | AUDIOVISUAL THIRD FLOOR LOW VOLTAGE CONDUIT REFLECTED CEILING PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **SECURITY** | | | | | |
| SE-001 | SECURITY GENERAL INFO, SYMBOLS & DRAWING LIST | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-100 | SECURITY CELLAR FLOOR PLAN-CONSTRUCTION FLOOR, LL I FLOOR PLAN-MARKETING FLOOR | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-101 | SECURITY GROUND FLOOR PLAN-CONSTRUCTION FLOOR, L I, FLOOF PLAN-MARKETING FLOOR | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-102 | SECURITY FLOOR 2 PLAN | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| SE-103 | SECURITY FLOOR 3 PLAN | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| SE-104 | SECURITY FLOOR 4 PLAN | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| SE-105 | SECURITY FLOOR 5 PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| SE-106 | SECURITY FLOOR 6 PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| SE-107 | I SECURITY 7TH-16TH FLOOR A PLAN-CONSTRUCTION FLOOR, 7TH-17TH FLOOR PLAN-MARKETING FLOOR | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-117 | s SECURITY 17TH FLOOR / PLAN-CONSTRUCTION FLOOR, 18TH FLOOR PLAN-MARKETING FLOOR | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-118 | SECURITY 18TH FLOOR PLAN-CONSTRUCTION FLOOR, PHC FLOOR PLAN-MARKETING | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-119 | SECURITY 19TH FLOOR PLAN-CONSTRUCTION FLOOR, PHB FLOOR PLAN-MARKETING | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-120 | SECURITY 20TH FLOOR PLAN-CONSTRUCTION FLOOR, PHA FLOOR PLAN-MARKETING | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-121 | SECURITY BULKHEAD LEVEL 1 PLAN-CONSTRUCTION FLOOR, ROOF-MARKETING FLOOR | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-122 | SECURITY BULKHEAD L2 PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-123 | SECURITY BULKHEAD L3 PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-201 | SECURITY EQUIPMENT ELEVATIONS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-301 | SECURITY WIRING RISER DIAGRAM | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| SE-302 | INTERCOM WIRING RISER | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SE-401 | SECURITY DETAILS (SHEET 1) | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| SE-402 | SECURITY DETAILS SHEET 2 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Telecommunications** | | | | | |
| TC-001 | TELECOM COVER SHEET 1 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| TC-002 | TELECOM COVER SHEET 2 | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| TC-100 | TELECOM CELLAR PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-101 | TELECOM GROUND FLOOR PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-102 | TELECOM SECOND FLOOR PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-103 | TELECOM THIRD FLOOR PLAN | 3 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-104 | TELECOM FOURTH FLOOR PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-105 | TELECOM FIFTH FLOOR PLAN | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-106 | TELECOM SIXTH FLOOR PLAN | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-107 | TELECOM SEVENTH FLOOR PLAN | 0 | 08/17/2018 | | Bulletin 1 (08/17/18) |
| TC-108 | TELECOM EIGHTH FLOOR PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-109 | TELECOM 9TH-12TH FLOOR PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-113 | TELECOM 13TH-16TH FLOOR PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-117 | TELECOM 17TH FLOOR PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-118 | TELECOM 18TH FLOOR PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-119 | TELECOM 19TH FLOOR PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-120 | TELECOM 20TH FLOOR PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-121 | TELECOM ROOF PLAN | 1 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-201 | TELECOM SER/DAS ROOM LAYOUTS | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| TC-202 | TELECOM IDF CLOSET LAYOUTS | 1 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| TC-301 | TELECOM CONDUIT AND CABLING RISER DIAGRAM | 2 | 11/15/2019 | | Bulletin 4 (11/15/19) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| TC-401 | TELECOM DETAILS SHEET 1 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| TC-402 | TELECOM DETAILS SHEET 2 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| TC-403 | TELECOM DETAILS SHEET 3 | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| TC-501 | TELECOM CABLE TRAY AND LADDER RACK SPECIFICATIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Facade Maintenance** | | | | | |
| FM-101 | EQUIPMENT LAYOUT WORKING POSITION | 1 | | | FM SK 021172020 (02/17/20) |
| FM-102 | EQUIPMENT MAINTENANCE EQUIPMENT LAYOUT STORED POSITION | 1 | | | FM SK 021172020 (02/17/20) |
| FM-103 | FACADE MAINTENANCE ROOF & TERRACE ACCESS | 1 | | | FM SK 021172020 (02/17/20) |
| FM-201 | FACADE MAINTENANCE BMU SECTIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FM-202 | FACADE MAINTENANCE DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FM-301 | FACADE MAINTENANCE ISA LOCATIONS NORTH & WEST ELEVATIONS | 1 | | | FM SK 021172020 (02/17/20) |
| FM-302 | FACADE MAINTENANCE ISA LOCATIONS SOUTH & EAST ELEVATIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FM-303 | FACADE MAINTENANCE ISA LOCATIONS SOUTH PARTIAL ELEVATIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Foundation** | | | | | |
| FO-101 | CELLAR FRAMING PLAN | 2 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| FO-102 | NORTH - SOUTH SECTION THROUGH BUILDING | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FO-103 | EAST - WEST SECTION THROUGH BUILDING | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FO-104 | TYPICAL FOUNDATION SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FO-105 | FOUNDATION SECTIONS AND DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| FO-106 | FOUNDATION SECTIONS AND DETAILS | 0 | 02/01/2019 | | Bulletin 3 (02/01/19) |
| FO-107 | FOUNDATION SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| FO-110 | FOUNDATION SECTIONS AND DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Landscape** | | | | | |
| L-1.01 | IMAGES AND LANDSCAPE SCHEDULE | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-2.01 | SURFACES I | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-2.02 | SURFACES II | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-3.01 | TREES AND SHRUBS LEVEL 1, 2, 7,18 AND 21 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-3.02 | TREES AND SHRUBS LEVEL 5 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-3.03 | PLANT SELECTION CHARACTERISTICS | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-4.01 | TEMPORARY IRRIGATION SYSTEM LEVEL 1,2,7,18 AND 21 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-4.02 | TEMPORARY IRRIGATION SYSTEM LEVEL 5 | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-5.01 | STREET STONE SCUPTURE RESIDENTIAL LOBBY DETAIL | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-5.02 | PLANTER TYPICAL DETAILS GREEN ROOF DETAILS SCULPTURAL STONE BENCH DETAIL | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-5.03 | TERRACE DIVIDER | 1 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-5.04 | TYPICAL PLANTER DETAILS TYPICAL TREE ANCHORAGE | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| L-5.05 | TERRACE DIVIDER LEVEL 5 | 0 | 11/15/2019 | | Bulletin 4 (11/15/19) |
| **BUILDERS PAVEMENT** | | | | | |
| BPP-001 | COVER SHEET | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |

Printed on Fri May 26, 2023 at 10:33 am EDT

Job #: 220008 540 West 21st Street Casco
540 West 21st
New York, New York 10011



Suffolk Construction Company, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| BPP-002 | PLAN & PROFILE | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| BPP-003 | PLAN & PROFILE | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| BPP-004 | NYCDOT DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| BPP-005 | NYSDOT DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Vertical Transportation** | | | | | |
| VT-100 | VERTICAL TRANSPORTATION PE1, PE2 AND SE3 | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| VT-101 | VERTICAL TRANSPORTATION PE4, PE5 AND FR1 | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| **WATERPROOFING** | | | | | |
| WP-101 | WATERPROOFING GENERAL PLAN | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| WP-201 | WATERPROOFING TYPICAL SECTIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| WP-202 | WATERPROOFING TYPICAL SECTIONS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| WP-301 | WATERPROOFING DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| WP-302 | WATERPROOFING DETAILS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| **Life Safety** | | | | | |
| LS-100 | LIFE SAFETY - CELLAR FLOOR | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-101 | LIFE SAFETY - 1ST FLOOR | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-102 | LIFE SAFETY -2ND FLOOR | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-103 | LIFE SAFETY - 3RD FLOOR | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-104 | LIFE SAFETY - 4TH FLOOR | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-105 | LIFE SAFETY - 5TH & 6TH FLOORS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-106 | LIFE SAFETY - 7TH-12TH FLOORS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-108 | LIFE SAFETY - 13TH-17TH FLOORS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-109 | LIFE SAFETY - 18TH & 19TH FLOORS | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-110 | LIFE SAFETY - 20TH FLOOR & BULKHEAD LEVEL 1 | 0 | 07/20/2018 | | CD Issue 3 (07/20/18) |
| LS-111 | LIFE SAFETY - BULKHEAD LEVEL 2 & BULKHEAD LEVEL 3 | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| **SOE** | | | | | |
| SOE-001 | GENERAL NOTES | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-100 | MONITORING PLAN | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-101 | SECANT/SECANT PILE LOCATION | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-102 | SUPPORT OF EXCAVATION | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-201 | SECTIONS A,B,C | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-202 | SECTIONS D,E,F | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-203 | SECTIONS G,H, I | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-204 | CON-ED VAULT PLANS AND SECTIONS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-301 | DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |
| SOE-302 | DETAILS | 0 | 10/19/2018 | | Bulletin 2 (10/19/18) |

**SCHEDULE 5**

**HLTC RESTRICTIVE DECLARATIONS**

1. Restrictive Declaration Highline Transfer of Development Rights made by Is-Ila Realty Corp. dated as of September 4, 2015 and recorded against Manhattan Block 692, Lots 27, 53, and 57 at CRFN2015000360817

2. Restrictive Declaration made by 505-507 West 27 Street Limited Partnership dated as of April 24, 2017 and recorded against Manhattan Block 699, Lots 27 and 42 at CRFN2017000158243

3. Restrictive Declaration made by 509-511 West 27 Street Limited Partnership dated as of September 14, 2017 and recorded against Manhattan Block 699, Lot 25 and 26 at CRFN2017000348884

# EXHIBIT B

| 540 West 21st Street Liquidation Analysis | | | Notes |
|---|---|---|---|
| | Estimated Recovery under Chapter 7 Liquidation | Estimated Recovery under Chapter 11 Plan | |
| Sales Price | $ 90,000,000.00 | $ 95,800,000.00 | |
| Cash on Hand | $ 10,000.00 | $ 10,000.00 | |
| **Total Available for Distribution** | **$ 90,010,000.00** | **$ 95,810,000.00** | |
| | | | |
| Less: Administrative Claims | | | |
| Chapter 7 Trustee Fee | $ 2,700,000.00 | N/A | |
| Chapter 7 Trustee Professionals | $ 50,000.00 | N/A | |
| Brokerage Fee | $ 900,000.00 | $ 850,000.00 | 1 |
| Windown Costs | $ 10,000.00 | $ 10,000.00 | |
| Total Administrative Claims | $ 3,660,000.00 | $ 860,000.00 | |
| **Net Proceeds Available after Administrative Claims** | **$ 86,350,000.00** | **$ 94,950,000.00** | |
| | | | |
| Less: Priority Claims | | | |
| Property Tax | $ 754,066.42 | $ 754,066.42 | |
| | | | |
| Less: Secured Claims | | | |
| Mechanics' Liens | $ 392,000.00 | $ 304,713.93 | 1 |
| Secured/DIP Lender | $ 85,500,000.00 | $ 70,989,000.00 | 1 |
| Total Priority and Secured Claims | $ 86,646,066.42 | $ 72,047,780.35 | |
| **Net Proceeds Available to Pay Unsecured Creditors** | **$ (296,066.42)** | **$ 22,902,219.65** | |
| | | | |
| Less: Unsecured Claims | | | |
| General Unsecured Claims | $0.00 | $ 2,602,219.65 | 1,2 |
| Claim of DZ 21st Street | $0.00 | $ 14,000,000.00 | 1,3 |
| Reserve Fund (for Allowed Disputed Investor Claims) | | $ 6,300,000.00 | 4 |

Notes:

1. The Debtor negotiated reductions in claims directly with claimholders pre-petition. These agreed reductions would not apply to creditor claims under a chapter 7 liquidation.
2. General Unsecured Creditors would receive no distribution under a chapter 7 liquidation while they are paid a percentage of their Allowed Claims under the chapter 11 plan.
3. The Claim of DZ 21st Street would also receive no distribution under a chapter 7 liquidation while it is expected to receive 49% of its Allowed Claim under the chapter 11 Plan.
4. The Reserve Fund amount is set pursuant to section 6.4 of the Second Amended Plan and Disclosure Statement

# **EXHIBIT C**

## FOURTH AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF
## 540 WEST 21ST STREET HOLDINGS LLC

This FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of 540 West 21st Street Holdings LLC (the "**Company**"), is made and entered into and is effective as of September 15, 2017 (the "**Effective Date**"), by and among West 21st Member LLC, a Delaware limited liability company ("**Casco Member**"), DZ 21st Street LLC, a New York limited liability company ("**Zwirner Member**") and, for the limited purposes set forth herein, David Zwirner, an individual ("**Zwirner Principal**").

## RECITALS

WHEREAS, the Company was formed pursuant to the provisions of the Delaware Limited Liability Company Act, Delaware Code, Title 6 Section 18-101, et seq., as amended from time to time (the "**Act**") and pursuant to that certain Certificate of Formation dated as of November 22, 2013 and filed with the Secretary of State of the State of Delaware (the "**Secretary of State**") on November 22, 2013 (the "**Certificate of Formation**");

WHEREAS, the Company is currently governed by that certain Third Amended and Restated Limited Liability Company Operating Agreement dated as of December 22, 2015, by 540 W 21st Development LLC ("**Existing Member**"), as the sole member (the "**Existing Agreement**");

WHEREAS, on September 15, 2017, Existing Member and Casco Member entered into that certain Assignment and Assumption Agreement, pursuant to which Existing Member transferred one hundred percent (100%) of its membership interest in the Company (the "**Transferred Interest**") to Casco Member, and Casco Member assumed and agreed to be bound by all of the terms, covenants and conditions on the part of the Existing Member with respect to the Transferred Interest to be performed and observed under this Agreement from and after the date hereof;

WHEREAS, the Company owns real property designated on the tax map of the City of New York as Lots 53, 57, 61 and 63 in Manhattan Block 692, (the "**Land**");

WHEREAS, DZ 20th Street LLC ("**Zwirner Contributor**"), an Affiliate of Zwirner Member, owns the real property designated on the tax map of the City of New York as Lot 11 in Manhattan Block 692, together with the improvements thereon and the unutilized Floor Area Development Rights appurtenant thereto (the "**Lot 11 Development Rights**");

WHEREAS, pursuant to that certain contribution agreement (the "**Zwirner Contribution Agreement**") and that certain Zoning Lot Development and Easement Agreement (the "**ZLDA**"), each dated of even date herewith between Zwirner Contributor and the Company, Zwirner Contributor will, on the Effective Date, contribute the Zwirner Transferred Development Rights and the Zwirner Retained Development Rights to the Company;

WHEREAS, as of the Effective Date, in consideration of the contributions being made to the Company by Zwirner Member pursuant to the Zwirner Contribution Agreement, Zwirner Member is being admitted to the Company as a Member;

WHEREAS, the Members desire for the Company to use the Development Site and its appurtenant Floor Area Development Rights, together with the Lot 11 Development Rights, to develop, construct, and finance a mixed residential and commercial development (the "**Project**") at the Property in accordance with this Agreement and the Concept Plans (as defined below);

WHEREAS, from and after the Effective Date, Casco Member shall be the owner of the portion of the Project that is defined herein as the Casco Member Property and Zwirner Member shall be the owner of the portion of the Project that is defined herein as the Zwirner Member Property;

WHEREAS, the Development Site will be developed and subjected to a condominium declaration whereby the Casco Member Property will become one or more condominium units (collectively, the "**Casco Unit**") and the Zwirner Member Property will become one condominium unit (the "**Zwirner Unit**");

WHEREAS, Zwirner Member will be obligated to contribute capital to the Company to fund the construction of the Zwirner Unit as more fully set forth in this Agreement;

WHEREAS, after the substantial completion of its construction and receipt of Temporary Certificates of Occupancy, and subject to the other terms of this Agreement, title to the Zwirner Unit will be conveyed to Zwirner Member and title to the Casco Unit will be conveyed to Casco Member;

WHEREAS, the Members intend that the Company undertake all of the foregoing while achieving substantially the same treatment, prior to the Conversion Date, as though the Project were initially subjected to a condominium regime; and

WHEREAS, the Members desire to amend and restate the Existing Agreement in its entirety with this Agreement to set out the terms of their agreement with respect to the foregoing, among other things, as more fully set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and the promises contained herein (the receipt and sufficiency of which are hereby acknowledged), the parties hereto, intending to be legally bound, do hereby agree as follows:

## ARTICLE 1

## DEFINITIONS AND TERMS

1.1    **Definitions**.  Unless the context otherwise requires, the following terms shall have the following meanings for the purposes of this Agreement:

"**Act**" has the meaning ascribed thereto in the Recitals.

"**Additional Funds**" has the meaning ascribed thereto in Section 3.3.1(a).

"**Additional Funds Notice**" has the meaning ascribed thereto in Section 3.3.1(a).

"**Affiliate**" means, with respect to a specified Person, (a) a Person that, directly or indirectly through one or more intermediaries, Controls, is controlled by or is under common control with, the specified Person, (b) a Person that owns, directly or indirectly, more than fifty percent (50%) of the ownership interests in the specified Person or an Affiliate of the specified Person, or (c) a Person in which the specified Person or an Affiliate of the specified Person owns, directly or indirectly, more than fifty percent (50%) of the ownership interests.  Notwithstanding the foregoing, an Affiliate does not include a Person that is a partner, member or shareholder in a partnership, joint venture, limited liability company or corporation with the Company or any Member if such Person is not otherwise an Affiliate of the Company or such Member.

"**Agreement**" has the meaning ascribed thereto in the Preamble to this Agreement.

"**Authorized Representative**" means, with respect to Casco Member, Noam Teltch and Uri Chaitchik and with respect to Zwirner Member, David Zwirner, each in their capacities as authorized signatories of the respective Members, or such other individuals as either Member shall identify in a notice given to the other Member in accordance with this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to do business and are not required by law or executive order to close in New York, New York.

"**Business of the Company**" means the purpose of the Company as described in Section 2.6.

"**Buy-Out Factor**" has the meaning ascribed thereto in Section 11.4.

"**Capital Contribution**" means the total amount of any cash or the value of any non-cash property contributed to the Company by or on behalf of a Member in accordance with this Agreement.

"**Casco Costs**" has the meaning ascribed thereto in Section 3.4.2.

"**Casco Loan Guarantor**" has the meaning ascribed thereto in Section 2.9.1.

"**Casco Loan Guarantor Indemnitees**" has the meaning ascribed thereto in Section 2.9.2.

"**Casco Member**" has the meaning ascribed thereto in the Preamble.

"**Casco Member Loan**" has the meaning ascribed thereto in Section 2.8.3.3.

"**Casco Member Property**" means the portion of the Property to be developed as the Casco Unit, utilizing the Retained Casco Member Development Rights and the Zwirner Transferred Development Rights.

"**Casco Principals**" means Noam Teltch and Uri Chaitchik (the "**Initial Casco Principals**") and any replacements designated pursuant to Section 8.6.

"**Casco Transferred Rights**" means the portion of the Floor Area Development Rights appurtenant to the Property that will be utilized by the Zwirner Unit.

"**Casco Unit**" has the meaning ascribed thereto in the Recitals.

"**Certificate of Formation**" has the meaning ascribed thereto in the Recitals, as the same may be amended from time to time with the prior written consent of any of the Lenders if so required hereunder or under any Loan Documents.

"**Code**" means the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

"**Common Areas**" means the common areas of the Project that are not exclusively part of the Casco Member Property (or Casco Unit) or the Zwirner Member Property (or Zwirner Unit), including the Mechanical Space.

"**Company**" has the meaning ascribed thereto in the Recitals.

"**Company Property**" means any assets of the Company, whether tangible or intangible, or any portion thereof.

"**Completion Date**" means the date a TCO is issued for the Zwirner Unit.

"**Concept Plans**" means the concept plans attached hereto as Exhibit A-1 and, if Zwirner Member makes the election referenced in Section 2.8.6.2 in respect of the Enhanced Exterior, Exhibit A-2, as the same may be further modified in accordance with the terms of this Agreement.

"**Condominium Regime**" means submission of the Project to a condominium regime which shall establish separate ownership of the Casco Unit and the Zwirner Unit.

"**Construction Contract**" means a construction contract to be entered into by the Company, as owner, and a contractor, for construction of the Project.

"**Construction Loan**" means a construction loan, secured by a mortgage on the Property or a pledge of direct or indirect interests in the Company, made on terms consistent with this Agreement, and, as to any terms not addressed by this Agreement, then upon such terms as are reasonable and customary for a construction loan, as determined by the Managing Member.

"**Construction Loan Closing Date**" means the date on which the Company shall initially close the Construction Loan.

"**Control**" or "**control**" (and the correlative terms "**controlled by**", "**controlling**" and "**under common control with**") of a Person the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person.

"**Conversion Date**" has the meaning ascribed thereto in Section 10.1.

"**Damages**" means all actual losses, costs, expenses, damages, claims, liabilities, or fines (including, but not limited to, any judgment, award, settlement, reasonable attorneys' fees and disbursements and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim or the enforcement of a Person's obligation to indemnify or reimburse such Damages); provided that "Damages" shall not include any consequential or punitive damages other than consequential or punitive damages actually paid by any indemnitee to a third party.

"**Deadlock Decision**" has the meaning ascribed thereto in Section 7.6.

"**Deadlock Event**" has the meaning ascribed thereto in Section 7.6.

"**Development Management Parties**" has the meaning ascribed thereto in Section 7.7.

"**Development Site**" the Land, including all appurtenant Floor Area Development Rights.

"**Distributions**" means each distribution received by the applicable Member from the Company pursuant to Section 5.1 hereof.

"**Effective Date**" has the meaning ascribed thereto in Preamble of this Agreement.

"**Enhanced Exterior**" has the meaning ascribed thereto in Section 2.8.6.

"**Enhanced Exterior Costs**" has the meaning ascribed thereto in Section 2.8.6.1.

"**Existing Agreement**" has the meaning ascribed thereto in the Recitals.

"**Expenses**" means all sums expended in respect of the Project or the Company, including, without limitation, all sums expended to pay for the costs of owning, developing, constructing, financing, operating and maintaining the Project, the Company and the Subsidiaries.

"**Financing Parameters**" means the financing parameters set forth on Exhibit B, attached hereto.

"**Floor Area Development Rights**" has the meaning ascribed thereto in the ZLDA.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Immediate Family**" means, and is limited to, an individual Person's spouse, parents, grandparents, children, grandchildren, siblings, nieces and nephews (and their lineal descendants) and trusts for the benefit of any of them.  A trust, estate, family partnership, limited liability company or corporation, all of the beneficiaries, partners, members or shareholders of which consist of such Person or members of such Person's Immediate Family, shall be considered such Person's Immediate Family for the purposes of this Agreement.

14263543.1

"**Initial Casco Principals**" is defined in the definition of "Casco Principals".

"**Interest**" means (a) a Member's ownership interest in the Company, including its share of the profits and losses of the Company and its right to receive distributions of Company Property, and (b) if such Member is Zwirner Member, the Member's ownership interest in the Zwirner Member Property and if such Member is Casco Member, the Member's ownership interest in the Casco Member Property, in each case, together with any and all rights, powers and benefits accorded to a Member under this Agreement and the duties and obligations of such Member hereunder.

"**Land**" has the meaning ascribed thereto in the Recitals.

"**Lender**" means the holder of a Loan, from time to time.

"**Liquidation Event**" means any sale, transfer or other disposition or liquidation of all or any portion of the Project (including any foreclosure sale of all or any portion of the Project and any sale of all or any portion of the Project in connection with a bankruptcy of the Company or any of its Subsidiaries); provided, however, such event shall not cause a dissolution except as otherwise provided pursuant to Article 12, and provided, further, that the term "Liquidation Event" does not include any distribution in kind in connection with the Release Date.

"**Liquidation Proceeds**" means, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of the Company in connection with such Liquidation Event.

"**Loan Commitments**" means, as to any potential Loans, any executed term sheets, loan applications, commitments and other related agreements with prospective lenders for the making of such Loan.

"**Loan Documents**" means, collectively, all documents, agreements and instruments executed and delivered in connection with any Loan.

"**Loan Guaranty**" has the meaning ascribed thereto in Section 2.9.1.

"**Loan(s)**" means, collectively, any loan to the Company, the Casco Member or any of the Subsidiaries entered into in accordance with this Agreement.

"**Losses**" has the meaning ascribed thereto in Section 2.9.2.

"**Lot 11 Development Rights**" has the meaning ascribed thereto in the Recitals.

"**Managing Member**" has the meaning ascribed thereto in Section 7.1.

"**Mechanical Space**" means the above and below grade common space for shared mechanical support of the entire Project.

"**Member's Property**" means (i) the Casco Member Property in the case of Casco Member and (ii) the Zwirner Member Property in the case of Zwirner Member.

6

"**Members**" means, collectively, Casco Member and Zwirner Member as well as any other Persons who hold Interests in accordance with this Agreement, each in such Person's capacity as a member of the Company.  Reference to a "Member" shall be to any one of the Members.

"**Net Cash Flow**" means, for any given period, all receipts of the Company from the Project for such period, from whatever source derived (but specifically excluding any Net Financing Proceeds), which are available for distribution by the Company following (a) the payment of all Expenses of the Company for such period to the extent not funded from Reserves (including any principal and interest due during any such period with respect to any debt of the Company), and (b) the establishment or replenishment, as deemed reasonably necessary by the Managing Member, of Reserves.

"**Net Financing Proceeds**" means the amount by which any cash proceeds received by the Company from any Loan exceeds (a) the amount required to be paid by the Company in reduction or satisfaction of prior Loans or liens upon the Project, (b) any closing costs incurred or required to be paid by the Company in connection with such Loan (c) the amount of any such proceeds applied to fund any reserves as the Managing Member deems appropriate, and (d) the amount of any such proceeds applied, to the extent authorized by the Managing Member, to fund the Project.

"**Net Liquidation Proceeds**" means, with respect to any Liquidation Event, all Liquidation Proceeds, less (a) reasonable and customary costs and expenses incurred in connection with such Liquidation Event and (b) without duplication of the foregoing, payment of the costs and establishment of reserves as determined by the Managing Member.

"**Notices**" has the meaning ascribed thereto in Section 12.5.

"**Officer**" has the meaning ascribed thereto in Section 7.6.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, unincorporated organization, governmental or regulatory body or other entity.

"**Project**" has the meaning ascribed thereto in the Recitals.

"**Project Costs**" means the aggregate of all costs and expenses associated with the acquisition, development and financing of the Project, as determined by the Managing Member.

"**Property**" means the Development Site and all improvements and appurtenances and all fixtures and other personal property related thereto which may now or hereafter be located, erected or developed thereon or used in connection therewith.

"**Qualified Developer**" means a developer of commercial real estate with at least ten (10) years of experience developing projects in New York City similar to the Project.

"**Qualified Gallery Owner**" means a reputable owner and operator of one or more first-class commercial art galleries with (i) at least ten (10) years of experience operating art galleries of similar quality to the David Zwirner Gallery existing as of the Effective Date and (ii) a net worth of not less than fifty million ($50,000,000) dollars.

14263543.1

"**Redemption Option**" has the meaning ascribed thereto in Section 11.4.

"**Redemption Option Event**" has the meaning ascribed thereto in Section 11.4.

"**Release Date**" means a date determined by Managing Member in accordance with this Agreement for the undertaking of the acts contemplated by Section 10.2 hereof, which shall be (a) no later than ten (10) Business Days after applicable law permits the actions ascribed thereto in Sections 10.2 (such actions, collectively, the "**Releases**") to occur, and (b) no earlier than the fifth (5th) Business Day following the Completion Date.

"**Releases**" has the meaning ascribed thereto in the definition of "Release Date."

"**Reserves**" means funds set aside by the Company from Capital Contributions or Revenues as reserves in amounts reasonably necessary or prudent for payment of Expenses not likely to be covered out of any other account of the Company, as determined by the Managing Member.

"**Retained Casco Member Development Rights**" means the Floor Area Development Rights remaining after subtracting the Casco Transferred Rights from the total Floor Area Development Rights appurtenant to the Development Site as if it were an independent zoning lot.

"**Revenues**" means all actual cash receipts of the Company from the Project (including Liquidation Proceeds arising from a Liquidation Event), excluding Capital Contributions.

"**ROFO**" has the meaning ascribed thereto in Section 8.6.1.

"**ROFO Acceptance Notice**" has the meaning ascribed thereto in Section 8.6.3.

"**ROFO Closing Date**" has the meaning ascribed thereto in Section 8.6.5.

"**ROFO Deposit Period**" has the meaning ascribed thereto in Section 8.6.4.

"**ROFO Down Payment**" has the meaning ascribed thereto in Section 8.6.4.

"**ROFO Exercise Notice**" has the meaning ascribed thereto in Section 8.6.2.

"**ROFO Offer Period**" has the meaning ascribed thereto in Section 8.6.3.

"**ROFO Proposed Terms**" has the meaning ascribed thereto in Section 8.6.2.

"**ROFO Purchase Price**" has the meaning ascribed thereto in Section 8.6.2.

"**ROFO Sale Documents**" has the meaning ascribed thereto in Section 8.6.6.

"**Rules**" has the meaning ascribed thereto in Section 12.9.1.

"**Secretary of State**" has the meaning ascribed thereto in the Recitals.

"**Shortfall Loan**" has the meaning ascribed thereto in Section 3.3.3.

"**Subsidiary**" means a Person whose equity interests are owned, in whole or in part directly or indirectly, by the Company.

"**Tax Matters Member**" has the meaning ascribed thereto in Section 4.3.

"**Temporary Certificate of Occupancy**" or "**TCO**" means, as to either the Casco Unit or the Zwirner Unit, a temporary certificate of occupancy for such Casco Unit or Zwirner Unit, as applicable, issued by the Department of Buildings of the City of New York.

"**Transfer**" has the meaning ascribed thereto in Section 8.1.

"**Transfer Taxes**" has the meaning ascribed thereto in Section 4.4.1.

"**ZLDA**" has the meaning ascribed thereto in the Recitals.

"**Zwirner Base Cost**" means thirty million dollars ($30,000,000).

"**Zwirner Commercial Development Rights Value**" means the value of the Zwirner Retained Development Rights along with any interest in real property appurtenant to such Zwirner Retained Development Rights, which the parties hereby agree is equal to the (a) the zoning square footage of the Zwirner Retained Development Rights multiplied by (b) one hundred ninety-eight dollars and eighty-five cents per square foot ($198.85/sq ft).

"**Zwirner Contribution Agreement**" has the meaning ascribed thereto in the Recitals.

"**Zwirner Contributor**" has the meaning ascribed thereto in the Recitals.

"**Zwirner Cost Over-run Event**" has the meaning ascribed thereto in Section 3.3.1(a).

"**Zwirner Cost Over-runs**" has the meaning ascribed thereto in Section 3.4.1.

"**Zwirner Costs**" has the meaning ascribed thereto in Section 3.4.1.

"**Zwirner Fit-Out Plans and Specs**" has the meaning ascribed thereto in Section 2.8.5.1.

"**Zwirner Fit-Out Schedule**" has the meaning ascribed thereto in Section 2.8.5.2.

"**Zwirner Fit-Out Work**" has the meaning ascribed thereto in Section 2.8.5.

"**Zwirner Member**" has the meaning ascribed thereto in the Preamble.

"**Zwirner Member Property**" means the portion of the Property developed and to be developed as the Zwirner Unit, utilizing the Zwirner Retained Development Rights and the Casco Transferred Rights.

"**Zwirner Member Shortfall**" has the meaning ascribed thereto in Section 3.3.1(c).

"**Zwirner Payment Milestones**" means the events identified under the column entitled "Zwirner Payment Milestones" on the schedule of payments set forth on <u>Exhibit C</u>.

9

"**Zwirner Principal**" has the meaning set forth in the Recitals.

"**Zwirner Residential Development Rights Value**" means a dollar amount equal to the (a) the zoning square footage of the Zwirner Transferred Development Rights multiplied by (b) four hundred ninety dollars per square foot ($490/sq ft).

"**Zwirner Retained Development Rights**" means the portion of the Lot 11 Development Rights that will be used for commercial use only in the Zwirner Unit, determined as of the Effective Date to be approximately ten thousand seven hundred seventy-nine (10,779) square feet.

"**Zwirner Total Development Rights Value**" means (a) 1.33333 *multiplied by* (b) the sum of the Zwirner Commercial Development Rights Value and the Zwirner Residential Development Rights Value.

"**Zwirner Transferred Development Rights**" means the portion of the Lot 11 Development Rights that is not the Zwirner Retained Development Rights.

"**Zwirner Unit**" has the meaning ascribed thereto in the Recitals.

## ARTICLE 2

## THE COMPANY AND ITS BUSINESS; PHASES OF DEVELOPMENT

2.1     **Formation of Company**. The Company was formed pursuant to the provisions of the Act by the execution and delivery of the Certificate of Formation to the Secretary of State in accordance with and pursuant to the Act. The rights and liabilities of the Members, the management of the affairs of the Company and the conduct of its business shall be as provided in the Act, except as herein otherwise expressly provided.

2.2     **Name**. The name of the Company is "540 West 21st Street Holdings LLC". The Members shall operate the Business of the Company under such name or use such other or additional name(s) as determined by the Managing Member from time to time.

2.3     **Principal Office**. The Company shall maintain its principal place of business at c/o Casco Real Estate Development, 548 West 21st Street, New York, New York 10011 or at such other place as is approved by the Managing Member from time to time.

2.4     **Registered Office and Registered Agent**. The registered office and registered agent for service of process of the Company shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, or such other place as is approved by the Managing Member from time to time. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State pursuant to the Act.

2.5     **Period of Duration**. The period of duration of the Company commenced on the date of the filing of the Certificate of Formation with the Secretary of State, and shall continue until the Company is terminated or dissolved in accordance with this Agreement. The existence

10

of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

2.6 **Business and Purpose of the Company**.  The business purpose of the Company ("**Business of the Company**") is limited solely to the following:

2.6.1    developing the Project, including (a) developing the Casco Member Property and transferring the Casco Unit to Casco Member, and (b) developing the Zwirner Member Property and transferring the Zwirner Unit to Zwirner Member;

2.6.2    obtaining Loans, executing and delivering Loan Documents and performing the obligations of the borrower, mortgagor, assignor, pledgor, debtor or otherwise, as the case maybe, thereunder;

2.6.3    designing, developing, constructing, financing and completing the Project in accordance with this Agreement, the Concept Plans and any requirements of the Loan Documents; and

2.6.4    transacting any and all lawful business for which a limited liability company may be organized under the Act that is incident, necessary or appropriate to accomplish the foregoing, including, without limitation, contracting for necessary or desirable services of professionals and others and doing any of the actions described above.

2.7 **Representations by Members**.

2.7.1 **Representations and Warranties of Casco Member**.  To induce Zwirner Member to execute, deliver and perform this Agreement, Casco Member hereby represents and warrants to Zwirner Member, and its successors and assigns, as follows:

(a)    Casco Member is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the full right, power and authority to enter into this Agreement, and to perform all of its obligations hereunder;

(b)    This Agreement has been duly and validly executed and delivered by and on behalf of Casco Member and constitutes a valid, binding and enforceable obligation of Casco Member enforceable in accordance with its terms, except to the extent such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general application affecting the rights of creditors in general;

(c)    As of the Effective Date, the ownership structure of Casco Member is shown on Exhibit D and Casco Member is Controlled by the Casco Principals;

(d)    Casco Member is in compliance with Executive Order 13224 (September 23, 2001), the rules and regulations of the Office of Foreign Assets Control, Department of Treasury, and any enabling legislation or other Executive Orders in respect thereof; and

11

14263543.1

2.7.2  **Representations and Warranties of Zwirner Member**.  To induce Casco Member to execute, deliver and perform this Agreement, Zwirner Member hereby represents and warrants to Casco Member, and its permitted successors and permitted assigns, as follows:

(a)    Zwirner Member is a limited liability company, validly existing and in good standing under the laws of the State of Delaware, with full right, power and authority to enter into this Agreement and to perform its obligations hereunder;

(b)    This Agreement has been duly and validly executed and delivered by and on behalf of Zwirner Member and constitutes a valid, binding and enforceable obligation of Zwirner Member enforceable in accordance with its terms, except to the extent such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general application, affecting the rights of creditors in general;

(c)    As of the Effective Date, the ownership structure of Zwirner Member is shown on <u>Exhibit E</u> and Zwirner Member is Controlled by David Zwirner;

(d)    Zwirner Member is in compliance with Executive Order 13224 (September 23, 2001), the rules and regulations of the Office of Foreign Assets Control, Department of Treasury, and any enabling legislation or other Executive Orders in respect thereof; and

2.7.3  **Indemnification**.

(a)    Casco Member shall indemnify the Company, Zwirner Member and their respective Affiliates, and each of their respective shareholders, members, partners, directors, officers, managers, successors and assigns from and against all Damages arising out of, relating to or as a result of or in connection with, the breach by Casco Member of any of its representations and warranties set forth herein.

(b)    Zwirner Member shall indemnify the Company, Casco, Casco's Affiliates and each of their respective shareholders, members, partners, directors, officers, managers, successors and assigns from and against all Damages arising out of, relating to, or as a result of or in connection with, the breach by Zwirner Member of any of its representations and warranties set forth herein.

2.7.4  **Survival.** All warranties, representations, covenants, obligations and agreements contained in this Agreement shall survive any and all performances hereunder.  All warranties and representations shall be effective regardless of any investigations made or which could have been made by the party benefiting from such warranties and representations.

2.8    **Development**.  The development of the Project shall be managed by the Managing Member, subject to the rights of Zwirner Member expressly set forth in this Agreement. The Project shall proceed as follows:

2.8.1 **Reserved**.

2.8.2 **Development Activities Generally**. Subject to the provisions of this Agreement, the Managing Member shall take such actions as it deems necessary or desirable to advance the Project, including causing the Company to: (i) negotiate and enter into a Construction Contract (and agreements related thereto), (ii) arrange for Loan Commitments to finance the Project and consummate the closing of one or more Loans in accordance with the terms of this Agreement that, in the determination of the Managing Member, are necessary in order to finance the Project, (iii) negotiate one or more architect agreements (and agreements related thereto) and other consultant agreements for the Project or portions thereof; (iv) hire a general contractor and other customary consultants including architects, expeditor, structural engineer, and MEPS engineer; (v) further develop the Concept Plans to reflect building coordination (including development of structural and mechanical systems for the building and, in Casco Member's sole discretion, further design development of the Casco Unit); and (vi) obtain all required permits for the Project.

2.8.3 **Debt Financing**.

2.8.3.1 Debt Financing. The Members intend that a portion of the cost of construction of the Project shall be financed by Loans from mortgage and perhaps mezzanine loans from third party lenders. Managing Member shall have the sole and exclusive authority (and shall use commercially reasonable efforts) to cause the Company and the Subsidiaries to obtain any such Loans that the Managing Member determines are necessary or desirable for the financing of the Project. Unless non-compliance is approved by the unanimous prior written consent of the Members, any senior Loan or construction Loan that is secured by a mortgage on the Property shall comply with the Financing Parameters. If the Company or the Subsidiaries are unable to obtain such Loans to fund the Project on or before the date that is twenty-four (24) months from the Effective Date (it being understood that the Managing Member, the Company and the Subsidiaries shall have no obligation to obtain financing that deviates from the terms of the Financing Parameters in any respect), then the Casco Member shall have the right, by written notice to the Company and Zwirner Member, to exercise its Redemption Option with a Buy-Out Factor of 100%.

2.8.3.2 Security for Loans. Because conversion to a condominium form of ownership may not be feasible until construction of the Project has substantially progressed, the Company will hold fee title to the Project, all Loans will encumber the entire Property and all development and construction agreements will, to the extent applicable, be entered into by the Company. At such time as it shall be feasible to do so, and as required under this Agreement, the Company will submit the Zwirner Member Property and the Casco Member Property to a condominium regime.

2.8.3.3 Casco Loan. The Zwirner Member acknowledges and agrees that the Casco Member may seek financing secured by a pledge of the Casco Member's interest in the Company (a "**Casco Member Loan**") which, for the avoidance of doubt, shall be a "Loan" for the purposes of this Agreement. The Zwirner Member further acknowledges and agrees that upon a default under the documents evidencing and securing any Casco Member Loan, the lender thereunder shall have the right to foreclose on the Casco Member's interest in the Company, accept

an assignment in lieu of foreclosure or otherwise exercise on its collateral and succeed to Casco Member's interest in the Company.

      2.8.4   **Construction of Core and Shell**. The Managing Member shall cause the construction of the Project to be completed in accordance with the terms of the Construction Contract and the Concept Plans. Throughout construction of the Project, Zwirner Member will cooperate in good faith to responsibly avoid delays.

      2.8.5   **Construction of Zwirner Fit-Out Work**. Subject to the terms of Sections 2.8.7, 2.8.8 and 2.8.9, Zwirner Member shall perform, at its sole cost and expense, any work within the Zwirner Unit to the extent not described in the Concept Plans (the "**Zwirner Fit-Out Work**"). Until such time as the Casco Unit has received a TCO, the Zwirner Fit-Out Work shall be performed in accordance with the following terms:

      2.8.5.1   Zwirner Member shall deliver to Casco Member design plans and specifications (the "**Zwirner Fit-Out Plans and Specs**") for the construction of all portions of the Zwirner Fit-Out Work in accordance with the design schedule attached as Exhibit F;

      2.8.5.2   Zwirner Member shall diligently perform and ensure the completion of the Zwirner Fit-Out Work in accordance with the Zwirner Fit-Out Plans and Specs and a construction time table to be provided by Casco Member (the "**Zwirner Fit-Out Schedule**") to reflect milestones necessary for the Zwirner Fit-Out Work so as not to adversely affect or delay the ability of the Casco Member to obtain a TCO for the Casco Unit.  The preliminary Zwirner Fit-Out Schedule is attached hereto as Exhibit G. Casco Member shall deliver or cause to be delivered to Zwirner Member an update to the Zwirner Fit-Out Schedule upon the commencement of the following construction milestones: demolition, excavation, construction of the foundation and construction of the super structure for the Project. The Zwirner Fit-Out Work shall be performed in accordance with the Zwirner Fit-Out Schedule, as updated; and

      2.8.5.3   The general contractor that the Managing Member is using for the Project shall oversee and be the general contractor for the Zwirner Fit-Out Work.

      2.8.6   Enhanced Exterior.

      2.8.6.1   Casco Member will obtain from the general contractor and forward to Zwirner Member an estimate (based on 100% schematic designs dated June 2, 2017) of the additional cost to have the exterior of the Zwirner Unit constructed to include the design enhancements to the Project shown on Exhibit A-2 (the "**Enhanced Exterior**"), which shall be subject to the terms of Exhibit A-3. Zwirner Member acknowledges that such cost estimates are subject to change. As used herein, "**Enhanced Exterior Costs**" shall refer to the actual costs of having the exterior of the Zwirner Unit constructed to include the Enhanced Exterior, irrespective of the estimate provided by Casco Member pursuant to the immediately preceding sentence.

      2.8.6.2   Zwirner Member shall have the right, at Zwirner Member's sole cost and expense, to elect to have the exterior of the Zwirner Unit constructed to include some or all of the components of the Enhanced Exterior by delivering to Casco Member, not later than twenty (20) days after the date of the notice described in Section 2.8.6.1 a written notice, making such election, which shall be irrevocable. The failure by Zwirner Member to deliver such notice

within the time periods set forth in this Section 2.8.6.2, time being of the essence, shall be deemed an election by Zwirner Member not to have the Zwirner Unit constructed to include any component of the Enhanced Exterior, and to waive Zwirner Member's rights in connection therewith.

2.8.7    Meeting Schedule.    Managing Member and Zwirner Member (or their respective construction managers and owner's representatives) shall meet on a monthly basis (or more frequently, if requested by Casco Member) to coordinate and discuss the status and progress of the development of the Project, including the Zwirner Fit-Out Work.  Commencing six months prior to the scheduled substantial completion of the Zwirner Fit-Out Work in accordance with the Zwirner Fit-Out Schedule, the parties shall meet weekly, unless Managing Member and Zwirner Member agree otherwise.  Zwirner Member shall have a right to participate in significant meetings relating to the construction of the Zwirner Unit occurring outside the regular monthly meetings. Zwirner Member shall submit or cause its construction manager or owner's representative to submit to Casco Member a report on the progress and status of the Zwirner Fit-Out Work not less frequently than once every month.

2.8.8    Delay Events.  If a Member becomes aware of or anticipates at any time that the Zwirner Fit-Out Work will fail to meet a given milestone in the Zwirner Fit-Out Schedule, such Member shall promptly notify the other Member and the Members shall exercise best efforts to agree on the manner of resolution of such delay.  In seeking resolution of any delay, Zwirner Member shall consider and implement temporary or permanent modifications to the Zwirner Fit-Out Plans and Specs (and cause the construction of the Zwirner Fit-Out Work to conform to such modifications) that would be reasonably necessary for the progress and completion of the Zwirner Fit-Out Work in accordance with the Zwirner Fit-Out Schedule.

2.8.9    Step-In Rights.   If at any time the construction manager for the Project identifies that a delay in the Zwirner Fit-Out Work is anticipated to result in a delay of twenty (20) days or more in the Zwirner Fit-Out Schedule, Managing Member and Zwirner Member shall engage in good faith discussions for a period of up to ten (10) days (provided that such ten (10) day period shall be reduced to five (5) days following the date that is ninety (90) days before the scheduled substantial completion of the Zwirner Fit-Out Work in accordance with the Zwirner Fit-Out Schedule).  If Zwirner Member and Managing Member are unable to agree on a resolution within ten (10) days (or five (5) days, as applicable) from the date that the delay is identified, Zwirner Member shall, at Zwirner Member's sole cost and expense, cause the construction of the Zwirner Fit-Out Work to be performed in accordance with directions from Casco Member. Such direction from Casco Member (which Zwirner Member must implement or cause to be implemented) may include any directions that are necessary to facilitate the substantial completion of the Zwirner Fit-Out Work in accordance with the Zwirner Fit-Out Schedule, including the implementation of temporary or permanent modifications to materials or other aspects of the Zwirner Fit-Out Work that do not prohibit the ultimate compliance with the Zwirner Fit-Out Plans and Specs.

2.9    **Guaranties and Indemnities**.

2.9.1    **Guaranties**.  If, in connection with any Loan, a Lender requires any guaranty of payment, carry guaranty, non-recourse "bad boy" carve-out guaranty, construction completion guaranty, environmental indemnity, guaranty of compliance with applicable laws or any other kind

of guaranty (each, a "**Loan Guaranty**") and the Lender does not accept such Loan Guaranty from the Company or a Subsidiary, Casco Member may provide or cause another Person (such guarantor, the "**Casco Loan Guarantor**") acceptable to such Lender to provide such Loan Guaranty.

2.9.2    **Company Indemnity**. The Company and its Subsidiaries shall indemnify and hold harmless each Casco Loan Guarantor and its respective members, partners, shareholders, principals, officers, directors, employees, agents, representatives and Affiliates (collectively, the "**Casco Loan Guarantor Indemnitees**") from and against any and all claims, demands, losses, damages, liabilities, lawsuits and other proceeding, judgments, awards, costs and expenses (including reasonable attorneys' fees, disbursements and court costs) ("**Losses**") to the extent the same arise directly or indirectly from any Loan Guaranty; provided, that (i) the foregoing indemnity shall not apply to the extent the same arise out of or result from the fraud, willful misconduct, gross negligence, violation of law or willful breach of the express terms of this Agreement or the Loan Guaranty by such Casco Loan Guarantor Indemnitee or any of their respective members, partners, shareholders, principals, officers, directors, employees, agents, representatives; and (ii) the Casco Loan Guarantor Indemnitees shall only be reimbursed out of the assets of the Company.

2.10    **Zwirner Put Right**.

If the Construction Loan Closing Date has not occurred by the two (2) year anniversary of the Effective Date, Zwirner Member shall have the right, by delivering written notice to Casco Member, to require Casco Member to exercise the Redemption Option with a Buy-Out Factor of 100%.

## ARTICLE 3

## MEMBERS AND FUNDING

3.1    **Names and Addresses of Members**.  The addresses of the Members are:

3.1.1    **Casco Member**.  West 21st Street Member LLC, a Delaware limited liability company having an address at c/o Casco Development Corp., 548 West 21st Street, New York, NY 10011.

3.1.2    **Zwirner Member**.  DZ 21st Street LLC, a New York limited liability company having an address at 525 W 19th Street, New York, New York 10011.

3.1.3    **Beneficial Ownership**.  From and after the Effective Date, (i) Casco Member will be the sole beneficial owner of the Casco Member Property and the Casco Unit, (ii) Zwirner Member will be the sole beneficial owner of the Zwirner Member Property and the Zwirner Unit, (iii) Casco Member shall receive and be entitled to all of the benefits, and shall bear and be subject to all of the obligations, attributable to the Casco Member Property and the Casco Unit, and (iv) Zwirner Member shall receive and be entitled to all of the benefits, and shall bear and be subject to all of the obligations, attributable to the Zwirner Member Property and the Zwirner Unit.  Except as otherwise set forth herein, from and after the Effective Date, (i) Casco Member shall not have a beneficial ownership interest in the Zwirner Member Property or the Zwirner Unit and (ii) Zwirner Member shall not have a beneficial interest in the Casco Member Property or the Casco Unit.

14263543.1

3.2     **Zwirner Closing Date Capital Contribution**.

On the Effective Date, Zwirner Member shall contribute to the Company, as a capital contribution, cash in an amount equal to four million five hundred thousand dollars ($4,500,000). Such funds, and any Additional Funds contributed by Zwirner Member (including funds in connection with the Enhanced Exterior Costs, if applicable), shall be (i) deposited in a segregated account of the Company, and (ii) used only in connection with the Zwirner Unit.

3.3     **Additional Contributions**.

3.3.1     **Additional Capital Contributions**.

(a)     From and after the Construction Loan Closing Date, the Members shall fund Additional Funds in accordance with this Agreement. The Managing Member shall have the right, upon either the occurrence of any event resulting in a Zwirner Cost Over-run (a "**Zwirner Cost Over-run Event**"), the occurrence of a Zwirner Payment Milestone or at any time to pay for the Enhanced Exterior Costs, to request additional capital contributions ("**Additional Funds**") from Zwirner Member by delivering a written notice to Zwirner Member (an "**Additional Funds Notice**"), which shall:

(i)     identify the date (the "**Funding Due Date**") on which such Additional Funds are due (which date shall not be earlier than ten (10) Business Days after the date of the Additional Funds Notice),

(ii)     identify the amount of Additional Funds requested of Zwirner Member, which shall be equal to (A) in the case of the occurrence of a Zwirner Payment Milestone, the amount of funds identified next to such Zwirner Payment Milestone, and (B) in the case of a Zwirner Cost Over-run Event, the amount of Zwirner Cost Over-runs attributable to such Zwirner Cost Over-run Event; and

(iii)     in the case of the occurrence of a Zwirner Payment Milestone, include (A) a copy of a certification from the Project architect or construction manager that the construction of the Project has been completed through such Zwirner Payment Milestone, and (B) confirmation that the relevant construction milestone described in the construction timetable of the Construction Loan has been satisfied (or would be satisfied upon receipt of the Additional Funds from Zwirner Member then being requested).

(b)     Zwirner Member, upon receipt of a duly issued Additional Funds Notice from the Managing Member, shall be required to contribute to the Company the amount of the Additional Funds requested and the other terms of this Agreement.

(c)     If Zwirner Member fails to provide the full amount of the Additional Funds on or before the Funding Due Date (such funds being herein referred to as a "**Zwirner Member Shortfall**"), then Casco Member may contribute an amount equal to the Zwirner Member Shortfall to the Company, which shall be treated, as a Shortfall Loan.

(d)    Casco Member shall have the right to contribute Additional Funds to the Company as and when Casco Member deems necessary to fund the cost of completing the Project.

(e)    If required by Casco Member, Zwirner Member shall provide to Casco Member, upon ten (10) Business Days' prior written notice, reasonable evidence of Zwirner Member's capacity to fund the Zwirner Base Cost in accordance with the payment schedule set forth herein as Exhibit C, and the Enhanced Exterior Costs, if Zwirner Member has delivered the notice pursuant to Section 2.8.6.2 in respect of the Enhanced Exterior.

3.3.2    **Limitation of Liability**.  Anything contained in this Article 3 to the contrary notwithstanding, if any Member is required pursuant to Section 3.3.1 to provide Additional Funds to the Company and shall fail to do so, such Member's sole liability, and the other Member's sole remedy, shall be expressly as set forth in this Article 3.  Except as expressly provided hereunder, no Member and no member, principal, partner, shareholder, director, officer or employee of any Member shall have any personal liability to provide such Additional Funds.

3.3.3    **Shortfall Loans**.  To the extent that Casco Member elects to provide a loan to Zwirner Member, in accordance with Section 3.3.1(c), each such loan shall (i) be due and payable within thirty (30) days following the date such loan is extended and (ii) shall bear interest at a rate of twenty percent (20%) per annum, calculated on the basis of a 365-day year (each such loan, a "**Shortfall Loan**").  Notwithstanding anything to the contrary contained herein, Casco Member shall not be obligated to extend any Shortfall Loan.  The unpaid principal and interest on any Shortfall Loans outstanding shall be setoff against any amounts otherwise distributable to Zwirner Member and paid to Casco Member until all such Shortfall Loans, together with any unpaid interest, have been paid off (including upon any Liquidation Event).

3.4    **Project Costs**.  The allocation of Project Costs to each Member shall be as follows:

3.4.1    **Zwirner Costs**. Zwirner Member shall be responsible for the following costs (the "**Zwirner Costs**"):

3.4.1.1    the Zwirner Base Cost,

3.4.1.2    if Zwirner Member has made the election pursuant to Section 2.8.6.2 in respect of the Enhanced Exterior, the actual Enhanced Exterior Costs (irrespective of the estimate provided by Casco Member pursuant to Section 2.8.6.1), subject to the terms of Exhibit A-3,

3.4.1.3    any Project Costs arising out of or incurred as a result of, in connection with or related to change orders (it being understood that no change order shall be permitted which would cause a delay in the Zwirner Fit-Out Schedule) to the work described in the Concept Plans that are requested by, or other actions taken by, Zwirner Member including a breach by Zwirner Member of this Agreement or of the Loan Agreements ("**Zwirner Cost Over-runs**"),

3.4.1.4    any costs of the Zwirner Fit-Out Work, whether performed by Zwirner Member or by Casco Member pursuant to the terms of Section 2.8.9, and

3.4.1.5   the cost of any other work performed by Casco Member pursuant to the terms of Section 2.8.9.

3.4.2   **Casco Costs**. Casco Member shall be responsible for all Project Costs which are not Zwirner Costs ("**Casco Costs**").

3.5   **Rights with Respect to Capital**.

3.5.1   **Company Capital**.  Except as specifically provided herein, (a) no Member shall have the right to withdraw, reduce, or receive any return of, its Capital Contribution and (b) no Capital Contribution may be returned in the form of property other than cash, except as otherwise expressly contemplated by this Agreement.

3.5.2   **No Interest on Capital Contributions**.  Except as expressly provided in this Agreement, no Capital Contribution of any Member shall bear interest or otherwise entitle the contributing Member to any compensation for use of its Capital Contribution.

# ARTICLE 4

# TAX MATTERS

4.1   **Tax Treatment**.  Notwithstanding any provision of this Agreement to the contrary, the Members intend that, for federal, state and local tax purposes, from inception (i) Casco Member shall be treated as owning one hundred percent (100%) of the Casco Member Property and the Casco Unit, and (ii) Zwirner Member shall be treated as owning one hundred percent (100%) of the Zwirner Member Property and the Zwirner Unit.   Unless otherwise required by a "determination" (as defined in Section 1313(a) of the Code), neither Member shall, and each Member shall cause its Affiliates not to, take any position for tax purposes inconsistent with such intent.

4.2   **Allocations**.  Casco Member shall be allocated one hundred percent (100%) of every item of income, gain, loss, deduction and credit that is attributable to the Casco Member Property; and Zwirner Member shall be allocated one hundred percent (100%) of every item of income, gain, loss, deduction and credit that is attributable to the Zwirner Member Property.  No Member shall be allocated any of the income, gain, loss, deduction or credit that is attributable to the other Member's Property.  If the Company accrues or incurs any item that is not specifically attributable to a Member's Property, such item shall be allocated between the Members in the manner reasonably determined by the Managing Member, taking into account the relationship of such item to each Member's Property.

4.3   **Tax Elections and Decisions**.  If there is any federal, state or local tax election, or any other decision pertaining to a tax matter, that affects solely a particular Member's Property, such Member shall have the sole authority to make, or cause the Company to make, such election or decision.  Any federal, state or local tax election, or other decision pertaining to a tax matter (including the filing of any tax return or challenging any property tax assessment with respect to the Property), that affects both Members' Properties shall be made jointly by the Members.  The Managing Member shall jointly prepare and file any income and other tax returns for the Company to the extent required by law, subject to the provisions of this Section 4.3.  The Members intend

14263543.1

that the Company shall not be treated as a partnership (or other non-disregarded entity) for income tax purposes.  If, contrary to this intention, any tax authority treats the Company as a partnership for income tax purposes, then Casco Member shall be designated as the "**Tax Matters Member**" under Code Section 6231(a)(7) and as the Partnership Representative under Code Section 6223, provided that such designation does not override the requirement that all decisions as to tax matters shall be a joint decision of the Members.

4.4     **Transfer Tax**.

4.4.1    The Members do not expect any New York State or New York City real estate or real property transfer taxes ("**Transfer Taxes**") to be payable in connection with the conveyance of the Casco Unit to Casco Member or the conveyance of the Zwirner Unit to Zwirner Member and, absent a change in the relevant Transfer Tax law between the date hereof and the date of such conveyance, the Company and each of the Members shall report each such conveyance consistent with such expectation.  If, contrary to the expectation of the Members or because of a change in the relevant Transfer Tax law after the date of this Agreement, any Transfer Taxes are payable in connection with either of such conveyances, then (i) Casco Member shall pay or cause to be paid, and shall indemnify and hold harmless the Company and Zwirner Member from and against, any Transfer Tax (including interest and penalties with respect thereto) imposed on or with respect to the conveyance of the Casco Unit to Casco Member; and (ii) Zwirner Member shall pay or cause to be paid, and shall indemnify and hold harmless the Company and Casco Member from and against, any Transfer Tax (including interest and penalties with respect thereto) imposed on or with respect to the conveyance of the Zwirner Unit to Zwirner Member.  With respect to any Transfer Taxes described in the preceding sentence payable, or asserted by any tax authority to be payable, (i) the Member responsible for such Transfer Taxes pursuant to the preceding sentence shall control, in its sole discretion, all matters pertaining to such Transfer Taxes and the transfer tax returns filed with New York City and New York State with respect to such Transfer Taxes, including any inquiries or audits by any Governmental Authority with respect thereto, and (ii) the Members shall, and shall cause their respective affiliates to, cooperate with each other with respect to such Transfer Taxes.

4.4.2    The Members will cooperate with each other in order to minimize Transfer Taxes in connection with (a) the Company's acquisition of the Development Site, Zwirner Transferred Development Rights, and Zwirner Retained Development Rights, and (b) the Releases; provided, however, that (i) Zwirner Member shall pay or cause to be paid, and shall indemnify and hold harmless the Company and Casco Member from and against, any Transfer Tax (including interest and penalties with respect thereto) imposed in connection with the transfers to the Company or its Subsidiaries pursuant to the Zwirner Contribution Agreement; and (ii) Casco Member shall pay or cause to be paid, and shall indemnify and hold harmless the Company and Zwirner Member from and against, any Transfer Tax (including interest and penalties with respect thereto) imposed in connection with the Casco Transferred Rights.

**ARTICLE 5**

**DISTRIBUTIONS**

5.1    **Distributions to Members**.  The Members do not anticipate that the Company will generate any Net Cash Flow or Net Financing Proceeds prior to the Release Date, and thus the Members do not anticipate that the Company will make any cash distributions to the Members ("**Distributions**").  However, if either the Casco Member Property (or the Casco Unit) or the Zwirner Member Property (or the Zwirner Unit) generates any Net Cash Flow or Net Financing Proceeds prior to the Release Date, then the Member that owns such Member's Property (or Unit) that generated such Net Cash Flow or Net Financing Proceeds shall be entitled to receive and keep 100% of such Net Cash Flow or Net Financing Proceeds.

5.2    **Distributions upon the Release Date**.  Distributions upon the Release Date shall be made in accordance with Section 10.2.

5.3    **Distributions upon a Liquidation Event**.  Upon the occurrence of a Liquidation Event, the proceeds of such Liquidation Event shall be distributed first to repay or provide for all liabilities, including any Loans, of the Company or its Subsidiaries, with the remainder, if any, distributed to the Casco Member and Zwirner Member in the respective amounts equitably allocated, in the reasonable determination of the Managing Member, to the Casco Member Property and Casco Unit, on the one hand, and the Zwirner Member Property and Zwirner Unit, on the other hand (taking into account relevant factors including the relative completion of the Zwirner Unit and Casco Unit and the amount of capital and other property contributed by each Member and its Affiliates towards the Company and the Project); provided, however, the unpaid principal and interest on any Shortfall Loans outstanding shall be setoff against any amounts otherwise distributable to Zwirner Member and paid to Casco Member until all such Shortfall Loans, together with any unpaid interest, have been paid off.

**ARTICLE 6**

**MEMBERS**

6.1    **Authority of Members**.  The Members shall have the power to exercise only those rights and powers granted to the Members pursuant to the express terms of this Agreement.

6.2    **Interests**.  The Members hereby agree that the Company shall have one class of Interests.  Holders of Interests held by Casco Member in the Company on the Effective Date (and their permitted successors and assigns following the Effective Date) shall own and hold all of the right, title and interest in and to the beneficial interests in the Casco Member Property and the Casco Unit, and all the other rights of the Casco Member set forth hereunder. Holders of Interests held by Zwirner Member in the Company on the Effective Date (and their permitted successors and assigns following the Effective Date) shall own and hold all of the right, title and interest in and to the beneficial interests in the Zwirner Member Property and the Zwirner Unit, and all the other rights of the Zwirner Member set forth hereunder.

## ARTICLE 7

## MANAGEMENT

7.1     **Management Duties, Authority and Powers; Cooperation**. Except as otherwise expressly provided in this Agreement, Casco Member (the "**Managing Member**") shall have the sole and exclusive authority to do all things, take all actions, and make all decisions that it deems necessary, desirable or appropriate to complete the Project in accordance with the Concept Plans and the terms of this Agreement.

7.2     **Certain Required Management Actions**. Notwithstanding any provision in this Agreement to the contrary, if (i) an emergency exists (with an emergency being defined as the imminent threat of injury or material damage to person or property) and (ii) the Zwirner Member cannot reasonably be given notice or consulted under the circumstances, then Managing Member may take such actions as it, in good faith, believes are reasonably necessary to address the immediate threat created by such emergency; provided, however, Managing Member must give notice to Zwirner Member promptly after any such action is taken.

7.3     **Compensation of Members**.  No compensation or other benefits shall be paid to the Managing Member in its capacity as Managing Member.  Nothing in the foregoing shall limit the rights (if any) of the Managing Member or any successor to receive distributions it is otherwise entitled to receive pursuant to the terms herein.

7.4     **Management of Subsidiaries**.  At all times, the Company shall cause, including by amending the organizational documents of its Subsidiaries, the management of each of its Subsidiaries to be vested solely in the Company, either directly or indirectly, such that the management of each Subsidiary is ultimately subject to the management provisions of this Agreement.

7.5     **Delegation**.  (i) The Managing Member may, but shall not be required to, delegate certain functions to one or more officers of the Company (each, an "**Officer**"), including a President, a Secretary, a Treasurer, one or more Vice Presidents, one or more Assistant Secretaries and one or more Assistant Treasurers, (ii) the Managing Member may appoint such Officers and agents as they shall, acting reasonably and in good faith, deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Managing Member, (iii) the Officers of the Company shall hold office until their successors are chosen and qualified, (iv) any Officer may be removed at any time, with or without cause, by the Managing Member and (v) the Officers appointed by the Managing Member may perform such acts designated by the Managing Member to the extent of the powers and authority of the Managing Member set forth in this Agreement or otherwise vested in them by action of the Managing Member not inconsistent with this Agreement. The Managing Member may delegate any of its duties under this Agreement to one or more Affiliates of the Managing Member, provided that any such delegation or engagement of a Subsidiary or third party shall not limit or reduce the obligations of the Managing Member under this Agreement. The foregoing delegation by Managing Member of any duty shall be to real estate professionals who are experienced with the development of "Class A" mixed use projects located in the City of New York.

14263543.1

7.6    **Deadlock**.

7.6.1    If, by reason of a change of law or the occurrence of an event that is not within the control of either Member or their Affiliates (including a natural disaster or other act of God), it becomes, in the Managing Member's reasonable determination, impracticable or infeasible to construct the Project substantially in accordance with the amount of the Project Costs anticipated as of the Effective Date, or the Concept Plans, the Managing Member shall have the right to propose a change to the Concept Plans for approval by Zwirner Member (such proposal, a "**Deadlock Decision**"). If the Managing member proposes a Deadlock Decision, the senior executives of each Member shall act in good faith to agree on a Deadlock Decision. If such senior executives are unable to reach a resolution to the Deadlock Decision that is mutually acceptable to both Members, in their sole discretion, within thirty (30) days after the date of the notice of the Deadlock Decision, a "**Deadlock Event**" shall be deemed to have occurred.

7.6.2    Upon the occurrence of a Deadlock Event, Managing Member, shall have the option, in its sole and absolute discretion, to exercise the Redemption Option in accordance with the terms of Section 11.4.

7.7    **Cooperation**. Each Member (i) shall cooperate with the other Member, and with Managing Member, the Company, the Subsidiaries, the construction or development managers, any Lenders and the Affiliates and delegates of the foregoing (collectively, the "**Development Management Parties**"), in all respects in connection with the pre-development, development, design and construction of the Project, (ii) shall promptly and in a timely manner provide information in its possession or control that the Development Management Parties require for the Project (including providing information that any of the Development Management Parties reasonably requests in connection with any Loan Commitments, such as organizational structure charts, copies of operating agreements and other organizational documents, and other reasonable and customary information as to such Member and its direct and indirect owners), (iii) shall answer all inquiries the Development Management Parties may have with respect to such information, and (iv) shall approve or disapprove any items presented to such Member for its review and approval. Each Member shall, and shall cause its Affiliates and each of their respective employees, contractors, consultants, and agents to, at all times, abide by all safety rules and procedures required or promulgated by the Development Management Parties.

# ARTICLE 8

# RESTRICTIONS ON TRANSFER OR CONVERSION OF COMPANY INTERESTS

8.1    **Transfer or Assignment of Member's Interest**.  Subject to the terms of this Article 8, the Interest of each Member is personal property, and may be transferred or assigned only as provided in this Agreement and, so long as any Loan remains outstanding, in accordance with the applicable Loan Documents. Except as otherwise provided in this Article 8, no sale, transfer, hypothecation, pledge, encumbrance or assignment of a Member's Interest, or any part thereof or any right to receive distributions thereof, direct or indirect, at any level or tier of ownership in the Company, whether voluntary, involuntary, by operation or law or otherwise (a "**Transfer**"), will be valid without the consent of all the Members, in each of their sole and absolute discretion. For the avoidance of doubt, the term "Transfer" includes any direct or indirect

sale, assignment, transfer, conveyance, encumbrance, pledge or hypothecation by a direct or indirect beneficial owner of a Member of all or any portion of such owner's direct or indirect interest in the Member.

8.2     **Permitted Transfers**.  Subject to the repayment of all then outstanding Shortfall Loans pursuant to Section 8.4.2, the following Transfers (each a "**Permitted Transfer**") in relation to all or any portion of the Interest of each Member referenced below shall be permitted without the approval of the other Member:

8.2.1    In the case of Casco Member:

8.2.1.1     a Transfer of all or any part of the direct or indirect limited liability company interest in Casco Member, provided that following such Transfer, the Casco Principals shall continue to directly or indirectly Control Casco Member;

8.2.1.2     a Transfer of all or any part of the direct or indirect limited liability company interest in Casco Member to a Qualified Developer; or

8.2.1.3     a Transfer of all of the Casco Member's interest in the Company in connection with a Loan, pursuant to Section 2.8.3.3 hereof.

8.2.2    In the case of Zwirner Member:

8.2.2.1     A Transfer of all or any part of the direct or indirect limited liability company interest in Zwirner Member of an amount which, combined with all prior Transfers, is not more than forty-nine percent (49%) of the direct or indirect limited liability company interest in Zwirner Member, provided that following such Transfer, the Zwirner Principal shall continue to (A) directly or indirectly Control Zwirner Member, and (B) with members of his Immediate Family, continue to own at least fifty-one percent (51%) of the economic interests in Zwirner Member; or

8.2.2.2     Subject to the ROFO set forth in Section 8.6, a Transfer of all, and not less than all, of the direct or indirect limited liability company interest in Zwirner Member to a Qualified Gallery Owner provided that such transferee shall provide, or cause a creditworthy affiliate reasonably acceptable to Casco Member, to guaranty (as successor in interest) the obligations of Zwirner Member under Sections 3.3, 3.4 and 8.6.

8.2.3    For the avoidance of doubt, nothing in this Section 8.2 shall be deemed to permit a direct Transfer of any portion of the Interest of either Zwirner Member or Casco Member in the Company, and (b) upon the redemption of the Zwirner Member pursuant to Section 10.2, except to the extent any obligation expressly survives the termination or redemption of Zwirner Member from the Company, Zwirner Member shall have no further liability or obligation under this Agreement (including the provisions relating to Transfers and restrictions thereon).

8.3     **Admission of New Members**.  Notwithstanding anything to the contrary set forth in this Article 8, no Transfer shall be permitted or effective for any purpose unless all required consents, including any required consents under the Loan Documents shall have been obtained in writing.  In addition, no such transfer of a direct interest in the Company shall be binding on the

Company unless (a) the transferee shall execute and acknowledge an instrument, in form and substance reasonably satisfactory to the remaining Members, whereby it agrees to assume and be bound by all of the covenants, terms and conditions of this Agreement, as the same may have been amended by Managing Member, from and after the effective date of such transfer, provided that such amendments do not materially adversely affect Zwirner Member's rights hereunder, (b) a duplicate original of such instrument duly executed and acknowledged by the parties thereto is delivered to the Company, (c) the transferee shall pay all reasonable expenses in connection with its admission as a Member (including, without limitation, all transfer taxes payable in connection therewith), and (d) all then outstanding Shortfall Loans shall be repaid in accordance with Section 8.4.2. Except as otherwise provided in this Article 8, no Person shall be admitted into the Company as a new Member.

8.4    **Shortfall Loans**.

8.4.1    In the event of any transfer of an Interest, if the transferor shall have made any Shortfall Loans, the transferor shall transfer to the transferee of such Interest all or a proportional share of its interest therein, as applicable.

8.4.2    Notwithstanding anything to the contrary contained herein, no Member shall be permitted to make any Transfer while such a Member is a borrower under a Shortfall Loan unless such Shortfall Loan is repaid in its entirety (together with any accrued and unpaid interest) contemporaneously with such Transfer.

8.5    **Void Transfers**.  Any Transfer made in violation of this Article 8 shall be of no force or effect and shall not bind or be recognized by the Company, and the transferring Member shall continue to be treated as a Member for all purposes, and remain obligated under each and every provision, of this Agreement.

8.6    **ROFO**.

8.6.1    The Transfer of all of the direct or indirect limited liability company interest in Zwirner Member pursuant to Section 8.2.2.2 shall be subject to Casco Member's right of first offer as set forth in this Section 8.6 (the "**ROFO**").

8.6.2    Prior to making or permitting any Transfer to be made pursuant to Section 8.2.2.2, Zwirner Member shall trigger the ROFO by delivering written notice to Casco Member (the "**ROFO Exercise Notice**"). The ROFO Exercise Notice shall contain the material terms (the "**ROFO Proposed Terms**") including the purchase price for which all, and not less than all, of the direct or indirect interest in Zwirner Member would be sold (the "**ROFO Purchase Price**"), and an offer by Zwirner Member to sell all, and not less than all, of Zwirner Member's Interest in the Company to Casco Member for the ROFO Purchase Price and otherwise on the ROFO Proposed Terms.

8.6.3    At any time within the twenty (20) day period (the "**ROFO Offer Period**") commencing on the date Casco Member receives the ROFO Exercise Notice, Casco Member may deliver to Zwirner Member a notice (the "**ROFO Acceptance Notice**") whereby Casco Member agrees to purchase all, and not less than all, of the Zwirner Member's Interest for the ROFO Purchase Price and otherwise on the ROFO Proposed Terms.

14263543.1

8.6.4    If Casco Member timely delivers a ROFO Acceptance Notice, then within ten (10) days after such delivery (the "**ROFO Deposit Period**"), Casco Member shall deposit in an escrow with a reputable title insurance company (selected by Casco Member and authorized to do business in the State of New York), or another mutually agreeable escrow agent, a non-refundable down payment in immediately available funds in an aggregate amount (the "**ROFO Down Payment**") equal to ten percent (10%) of the ROFO Purchase Price.

8.6.5    If Casco Member timely delivers the ROFO Down Payment, Zwirner Member, as the seller, and Casco Member, as purchaser, shall proceed to close the sale of Zwirner Member's Interest at the ROFO Purchase Price on a mutually acceptable closing date (the "**ROFO Closing Date**"), but in any event not later than one hundred twenty (120) days after the expiration of the ROFO Deposit Period, at a location designated by Casco Member.

8.6.6    On the ROFO Closing Date, (i) Zwirner Member and Casco Member shall complete the closing of the sale of Zwirner Member's Interest by executing and delivering such documents as may be reasonably requested by Casco Member to evidence the transfer (the "**ROFO Sale Documents**"), (ii) Casco Member shall direct the title company holding the ROFO Down Payment to deliver the same in immediately available funds to Zwirner Member and (iii) Casco Member shall pay to Zwirner Member the ROFO Purchase Price (less a credit for the ROFO Down Payment and as adjusted for customary prorations), in immediately available funds.

8.6.7    If Casco Member delivers a ROFO Acceptance Notice but (a) Casco Member fails to timely deliver the ROFO Down Payment or the closing fails to occur solely by reason of a default of Casco Member, (i) Zwirner Member shall be entitled to retain the ROFO Down Payment as liquidated damages and (ii) Zwirner Principal shall thereafter be free, at any time, to cause a sale of the direct or indirect interest in Zwirner Member to a Qualified Gallery Owner pursuant to the terms of Section 8.2.2.2 at such price as Zwirner Principal determines as if Casco Member had not delivered a ROFO Acceptance Notice or (b) if the closing hereunder fails to occur by reason of default of Zwirner Member, then Casco Member shall have the right to obtain specific performance for such sale of Zwirner Member's Interest to Casco Member for the ROFO Purchase Price.

8.6.8    If Casco Member elects not to purchase the Zwirner Member Interest or fails to timely deliver the ROFO Acceptance Notice, Zwirner Principal may sell the direct or indirect interest in Zwirner Member to a Qualified Gallery Owner pursuant to the terms of Section 8.2.2.2 for a purchase price equal to or greater than ninety-eight (98%) percent of the ROFO Purchase Price and on such additional terms which, taken together, are substantially the same to Zwirner Principal as, or better than, those set forth in the ROFO Proposed Terms.

8.6.9    The closing of a sale permitted under Section 8.6.8 must occur no later than six (6) months after the ROFO Exercise Notice or, if such closing fails to occur within such time period or if the terms of such sale are materially changed, including if the purchase price is less than ninety-eight (98%) percent of the ROFO Purchase Price, then Zwirner Principal must again follow (and cause Zwirner Member to follow) the procedures of the ROFO prior to causing any disposition described under Section 8.2.2.2.

14263543.1

## ARTICLE 9

## BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS

9.1    **Books and Records**.  At the Company's expense, the Managing Member shall cause to be kept proper and complete records and books of account in which shall be entered fully and accurately all transactions and other matters relating to the Company's business as are usually entered into such records and books of account kept for businesses of a like character.   The Company's records and books shall be kept on an accrual basis in accordance with tax accounting. Notwithstanding anything contained herein to the contrary, the Managing Member shall maintain such books of account and other records as may be required under any applicable Loan Documents.

9.2    **Reports; Monthly Walkthrough**.    The Managing Member shall provide the Members with quarterly operating reports.   Such reports shall be delivered to all Members within thirty (30) days after quarter end. In addition, the Managing Member shall provide a monthly certification from the architect certifying as to the percentage completion of the Project as of the last day of the preceding month, together with a certification from Managing Member that all funds contributed by Zwirner Member have been used only in connection with the Project. Casco Member shall provide or cause its owner's representative to provide to Zwirner Member or its owner's representative a monthly walkthrough of the Project, at a mutually acceptable time.

9.3    **Company Accounts**.  Subject to the terms of any Loan, all funds of the Company shall be deposited by the Managing Member into a federally insured segregated operating account for each such entity.

## ARTICLE 10

## CONDOMINIUM CONVERSION; RELEASE OF GALLERY UNIT

10.1    **Condominium Regime**.  As soon as reasonably practicable based on the progress of construction of the Project, and subject to compliance with the Loan Documents, the Company shall subject the fee interest in the Development Site and the other Property to a condominium regime in accordance with the requirements of applicable law, including, but not limited to the Condominium Act and Article 23-A of the New York General Business Law and the rules and regulations promulgated thereunder, by executing a condominium declaration in a form to be reasonably determined by the Casco Member, and causing it to be recorded in the appropriate recording office.  The Members shall exercise good faith and commercially reasonable efforts to agree as promptly as commercially reasonable on the terms of the condominium declaration (which shall provide, among other things, that (a) the Zwirner Unit may not be used for any purpose other than as a first-class art gallery, which may include incidental office use and incidental food and beverage sales, each not to exceed five percent (5%) of the floor space of the Zwirner Unit, (b) the Zwirner Unit will not be open past eight o'clock in the evening (8pm) more than twenty (20) times per year, and (c) Zwirner Member shall exercise good faith efforts to use a lighting system in the Zwirner Unit that minimizes the impact upon the Casco Unit of light from the Zwirner Unit) and an allocation of common costs and expenses, including those relating to the common areas, and to grant reciprocal access easements in relation to building systems including mechanical spaces. Other than as provided in the condominium declaration, Casco Member shall not impose any

27

restrictions on the use of the Zwirner Unit, and the condominium declaration shall contain a provision that prohibits any amendments that impose further material restrictions on the use of the Zwirner Unit without the written consent of the Zwirner Member (or its successor). The date of such creation of the Condominium Regime is herein referred to as the "**Conversion Date**".

10.2    **Release Date**.  Notwithstanding any provision of this Agreement to the contrary, but subject to the terms of any Loan, on the Release Date:

10.2.1  upon the contribution by Zwirner Member of any Additional Funds required as of such date in accordance with the terms of this Agreement, the Managing Member shall cause the Company to convey the fee interest of the Zwirner Unit (and any related interest in the Common Areas) to Zwirner Member, at which time Zwirner Member shall (i) be deemed to have automatically withdrawn as a Member of the Company and Zwirner Member's Interest shall be deemed automatically redeemed, and (ii) execute and deliver a redemption acknowledgment in form and substance reasonably satisfactory to Casco Member (provided, however, that Zwirner Member's failure to deliver same shall not affect the automatic withdrawal and redemption set forth in this Section 10.2.1); and

10.2.2  Managing Member may either (a) (i) cause the Company to convey the fee interest of the Casco Unit (and any related interest in the Common Areas) to Casco Member, at which time Casco Member shall (A) be deemed to have automatically resigned from the Company as a Member of the Company, (B) execute and deliver a redemption acknowledgment in form and substance reasonably satisfactory to the Members (provided, however, that Casco Member's failure to deliver same shall not affect the automatic redemption set forth in this Section 10.2), and (C) otherwise deliver all documents and other deliveries and take all such other actions required under this Section 10.2; and (ii) cause the Company to be dissolved as provided in Article 11, or (b) continue to hold its interest in the Casco Unit through the Company, without the participation of Zwirner Member.

## ARTICLE 11

## TERMINATION AND DISSOLUTION; REDEMPTION OPTION

11.1    **Dissolution**.

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining Member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act, (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act, which decree may not be sought by a Member without the prior written consent of the other Members including in the event of any deadlock with respect to any decision required to be made by the Members, or (iii) the written approval of the Members to dissolve the Company. Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company, to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within ninety (90) days after the occurrence of the event that

terminated the continued membership of such Member in the Company, agree in writing (x) to continue the Company and (y) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member of the Company.

(b)    Except as hereinabove provided, no act, thing, occurrence, event or circumstance shall cause or result in the dissolution of the Company.

(c)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed in the manner provided in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

11.2    **Distributions Upon Dissolution**.  Upon the liquidation and dissolution of the Company, the assets of the Company will be distributed to the Members as follows:

11.2.1  Prior to Release Date. If the dissolution occurs before the Release Date for any reason, the Casco Member shall exercise its Redemption Option with a Buy-Out Factor of 100%.

11.2.2  On or Following the Release Date. If the dissolution occurs by reason of the election by Casco Member pursuant to Section 10.2.2(a) following the conveyance of the Zwirner Unit to Zwirner Member, (a) the Casco Unit (and any related interest in the Common Areas) and all assets of the Company or any Subsidiary (including the Casco Unit, cash reserves or other liquid assets) will be distributed exclusively to Casco Member, subject to any liabilities, including the Loans, allocable to the Casco Unit and said related assets.

11.2.3  If the Company's assets are sold in connection with a Liquidation Event, the Net Liquidation Proceeds shall be distributed as provided in Section 5.3.

11.3    **Continuation of the Company**.  Notwithstanding anything to the contrary contained herein, the death, retirement, resignation, expulsion, bankruptcy, dissolution or removal of a Member shall not in and of itself cause the dissolution of the Company, and the Members are expressly authorized to continue the business of the Company in such event, without any further action on the part of the Members.

11.4    **Redemption Option**.  Upon the occurrence of any of the following: (a) the failure by Zwirner Member to provide the full amount of any Additional Funds requested by the Managing Member and required to be funded by Zwirner pursuant to this Agreement on or before the Funding Due Date which remains uncured for ten (10) Business Days following written notice from Managing Member, (b) the failure to obtain financing pursuant to Section 2.8.3, (c) a Deadlock Event, (d) the exercise by Zwirner Member of its rights to cause Casco Member to exercise the Redemption Option pursuant to Section 2.10, or (f) a dissolution for any reason after the commencement of construction of the Project (each, a "**Redemption Option Event**"), Casco Member shall have the option to cause the Company to redeem the Zwirner Member's Interests in the Company at a price equal to the Buy-Out Factor multiplied by: the sum of: (i) the total aggregate amount of Capital Contributions made by Zwirner Member through the date of the

Redemption Option Event plus (ii) the Zwirner Total Development Rights Value.  The Casco Member rights described in the immediately preceding sentence are referred to herein as the "**Redemption Option**".  In the case of the foregoing clause (a), before exercising the Redemption Option, the Casco Member must first give fifteen (15) Business Days' notice to the Zwirner Member of the Casco Member's intent to exercise the Redemption Option, and then may proceed with exercising the Redemption Option only if Zwirner Member fails to cure such funding default within such fifteen (15) Business Day period, subject to the Zwirner Member's right to dispute under Section 12.9 any request for Additional Funds from the Zwirner Member on the grounds that such request is contrary to this Agreement.  Upon the exercise of the Redemption Option, Zwirner Member shall (i) be deemed to have automatically resigned from the Company as a Member of the Company, and (ii) execute and deliver a redemption acknowledgment in form and substance reasonably satisfactory to Casco Member (provided, however, that Zwirner Member's failure to deliver same shall not affect the automatic redemption set forth in this Section 11.4). "**Buy-Out Factor**" means (x) in the case of the exercise of the Redemption option pursuant to Section 11.4(a), eighty-five percent (85%), and (y) in all other cases, 100%.

## ARTICLE 12

## MISCELLANEOUS PROVISIONS

12.1    **Waiver of Fiduciary Duties**.

12.1.1 This Agreement is not intended to, and does not, create or impose any fiduciary duty on any of the Members, the Managing Member or on their respective Affiliates. Further, the Members and the Managing Member hereby waive any and all fiduciary duties that, absent such waiver, may exist at or be implied by law or in equity, and in doing so, recognize, acknowledge and agree that their duties and obligations to one another and to the Company are only (i) as expressly set forth in this Agreement, (ii) to act in good faith and fair dealing, and (iii) those required under the Act including, and limited to, the liability of a Member or the Managing Member for (A) intentional misconduct or a knowing violation of law and (B) any transaction for which the Member or the Managing Member received a personal benefit in violation or breach of any provision of this Agreement.

12.1.2  To the extent that, at law or in equity, any Member or the Managing Member has duties (including fiduciary duties) and liabilities relating thereto to the Company or to another Member, the Members and the Managing Member acting under this Agreement will not be liable to the Company or to any such other Member for their good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities relating thereto of any Member or the Managing Member otherwise existing at law or in equity, are agreed by the Members and the Managing Member to replace to that extent such other duties and liabilities of the Members or the Managing Member relating thereto.

12.1.3  Each Managing Member shall be entitled to rely in good faith on the advice of legal counsel to the Company, accountants, other experts and financial or professional advisors.

14263543.1

12.1.4  To the fullest extent permitted by law, neither Member shall be required to consider the interests of, or have any duty stated or implied by law or equity (including any fiduciary duty) to any other Member by virtue of owning any interest in the Company.

12.2  **Counterparts**.  This Agreement may be (i) executed in several counterparts, and all counterparts so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart and (ii) delivered by telecopy or in portable document format (PDF) by electronic mail, which shall be deemed an original for all purposes.

12.3  **Successors and Assigns**.  Subject to the provisions of this Agreement relating to Transfer, this Agreement shall be binding upon and, as to permitted or accepted successors, transferees and assigns, inure to the benefit of the Members and the Company and their respective heirs, legatees, legal representatives, successors, transferees and assigns, in all cases whether by the laws of descent and distribution, merger, reverse merger, consolidation, sale of assets, other sale, operation of law or otherwise.

12.4  **Severability**.  In the event any Section, or any sentence within any Section, is declared by a court of competent jurisdiction to be illegal, void or unenforceable, such sentence or Section shall be deemed severed from the remainder of this Agreement and the balance of this Agreement shall remain in full force and effect and the Members shall amend or substitute such invalid, illegal or unenforceable provision with legal, enforceable and valid provisions which would produce as nearly as possible the rights and obligations previously intended by the Members without renegotiation of any material terms and conditions stipulated herein.

12.5  **Notification or Notices**.  In order to be effective, all notifications or notices, consents, approvals and disapprovals required or permitted by this Agreement to be given ("**Notices**") must be in writing and shall be effective only if given as follows: (a) by hand delivery; (b) by deposit in the United States mail as first class certified mail, return receipt requested, postage paid; (c) by overnight nationwide commercial courier service; or (d) by email transmission; provided that, in the case of delivery pursuant to clause (d) a confirmation copy is delivered by duplicate notice in accordance with any of clauses (a) through (c) immediately above, in each case, to the party intended to receive the same at the following address(es):

to Casco Member:　　　　　　West 21st Street Member LLC
　　　　　　　　　　　　　　c/o Casco Development Corp.
　　　　　　　　　　　　　　548 W 21st Street
　　　　　　　　　　　　　　New York, New York 10011
　　　　　　　　　　　　　　Attention: Uri Chaitchik and Noam Teltch
　　　　　　　　　　　　　　Email:  uri@casco-re.com and noam@casco-re.com

with copies to (which shall not constitute notice):

　　　　　　　　　　　　　　Fried, Frank, Harris, Shriver & Jacobson, LLP
　　　　　　　　　　　　　　One New York Plaza
　　　　　　　　　　　　　　New York, New York 10004
　　　　　　　　　　　　　　Attention: Jonathan L. Mechanic, Esq. and

Zachary Bernstein, Esq.
Emails: jonathan.mechanic@friedfrank.com,
zachary.bernstein@friedfrank.com

to Zwirner Member:                    DZ 21st Street LLC
                                       c/o David Zwirner Gallery
                                       525 W 19th Street
                                       New York, New York 10011
                                       Attention: David Zwirner
                                       Email:  david@davidzwirner.com

with copies to (which shall not constitute notice):

                                       Morrison Cohen LLP
                                       909 Third Avenue
                                       New York, NY 10022
                                       Attention: Theodore L. Marks
                                       Email: tmarks@morrisoncohen.com

Any party may change the address to which any such Notice is to be delivered by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this Section 12.5.  Notices shall be deemed to have been given on the date they are actually received; provided, however, that the inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery.  Failure or delay in delivering copies of any Notice within any corporation or firm to the persons designated to receive copies shall in no way adversely affect the effectiveness of such Notice.

12.6    **Construction**.  The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the Members.

12.7    **Section Headings**.  The captions of the Certificate of Formation or Sections in this Agreement are for convenience only and in no way define, limit, extend or describe the scope or intent of any of the provisions hereof, shall not be deemed part of this Agreement and shall not be used in construing or interpreting this Agreement.

12.8    **Governing Law; Venue**.  This Agreement shall be construed according to the internal laws, and not the laws pertaining to choice or conflict of laws, of the State of Delaware. All actions or proceedings arising in connection with this Agreement to enforce any arbitration award or judgment shall be tried and litigated in state or federal court located in New York City. Each of the parties to this Agreement submits to the jurisdiction of the courts of that state and agrees that process may be served upon it by registered or certified mail addressed as provided in Section 12.5 or by any other means permitted by applicable law.  Service made as set forth above shall, to the fullest extent permitted by law, have the same legal force and effect as if served upon such party within the State of New York.

12.9    **Dispute Resolution**.

12.9.1  The Members shall use reasonable efforts and endeavor in good faith to resolve any disputes in connection with this Agreement. Subject to Section 12.9.2, if either Member believes an impasse has been reached in connection with this Agreement, the Members hereby agree that such dispute shall be exclusively submitted to final and binding arbitration in New York, New York, administered in accordance with JAMS Streamlined Arbitration Rules and Procedures in effect at that time (the "Rules").  The Members shall cooperate with JAMS (if required) and with each other in scheduling the arbitration proceedings so that a final non-appealable award is rendered within forty-five (45) calendar days after submission to arbitration, and any notice requirements under Paragraph 14(b) of the JAMS Streamlined Arbitration Rules and Procedures or otherwise may be shortened by the arbitrator in its discretion. The arbitrator shall be (a) a disinterested and impartial person and (b) selected in accordance with Paragraph "12(c)" et seq. of the Rules.  The arbitrator shall be bound by the provisions of this Agreement (including Section 12.9.2) and shall not have the power to add to, subtract from, or otherwise modify such provisions.  Any decision rendered by the arbitrator in accordance with Section 12.9.2 shall be final, conclusive and binding upon the LLC and the Members and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The reasonable cost and expense of such arbitration shall be borne equally by the Members.

12.9.2  Notwithstanding anything in this Agreement to the contrary, Zwirner Member hereby agrees that it shall not take, and Zwirner Member shall prevent its affiliates and assignees from taking, any of the following actions, even if Casco Member breaches one or more of its obligations under this Agreement: any action or arbitration, including seeking injunction or other equitable relief, to oppose, prevent, impair, delay or otherwise obstruct (a) receipt of a TCO, (b) the commencement of, any aspect of and the completion of the construction of the Project, or (c) the issuance of any building or other permit with respect to the Project. Zwirner Member hereby acknowledges and agrees that Casco Member shall suffer damages in the event of any breach by Zwirner Member of any of its covenants under this Section 12.9.2 and hereby agrees to pay or cause to be paid, and to indemnify and hold harmless Casco Member from and against any and all claims, losses, damages and expenses (including reasonable attorneys' fees and expenses) and other liabilities and obligations actually incurred or suffered as a result of such breach. Nothing in this Section 12.9.2 shall preclude Zwirner Member from bringing an action for money damages based on Casco Member's breach of one or more of Casco Member's obligations under this Agreement. Casco Member hereby agrees that so long as Zwirner Member has complied with its obligations to provide Additional Funds and otherwise to contribute to the Company and pay all Zwirner Costs hereunder, Casco Member shall continue to develop the Project in accordance with this Agreement during the pendency of any arbitration, whether initiated by Casco Member or Zwirner Member.

12.10    **Certain Terminology**.  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine and neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  Whenever the words "including," "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner as though the words "without limitation," immediately followed the same.  Except as otherwise indicated, all Article, Section and Exhibit references in this Agreement shall be deemed to refer to the Sections and Articles in, and the Exhibits to, this Agreement.  All Exhibits and Schedules attached and referred to in this Agreement are hereby incorporated herein

as fully set forth in (and shall be deemed to be a part of) this Agreement.  All references herein to the sale, assignment, conveyance, transfer or other disposition of any portion of the Project shall mean the sale, assignment, conveyance, transfer or other disposition of the fee interest in the Project if held in fee or the leasehold interest if the Project is subject to a ground lease in each case, together with any development rights relating to the Project.

12.11   **Further Actions**.  Each of the Members agrees to execute, acknowledge and deliver such additional documents, and take such other actions, as may reasonably be required from time to time to carry out each of the provisions, and the intent, of this Agreement, and every agreement or document relating hereto, or entered into in connection herewith.

12.12   **Waiver of Right to Jury**.  WITH RESPECT TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED AGREEMENT, EACH MEMBER HEREBY IRREVOCABLY WAIVES ALL RIGHTS IT MAY HAVE TO DEMAND A JURY TRIAL.  THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE MEMBERS AND EACH MEMBER ACKNOWLEDGES THAT NONE OF THE OTHER MEMBERS NOR ANY PERSON ACTING ON BEHALF OF THE OTHER PARTIES HAS MADE ANY REPRESENTATION OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  EACH MEMBER FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.  EACH OF THE MEMBERS FURTHER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND SIGNIFICATIONS OF THIS WAIVER PROVISION.

12.13   **Third Party Beneficiaries**.  There are no third party beneficiaries of this Agreement.  Except as expressly provided in this Agreement, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective successors and assigns, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision of this Agreement give any third person any right of subrogation or action over or against any party to this Agreement.  Without limitation on the foregoing, to the fullest extent permitted by the Act, no third party shall have any right to enforce any contribution obligation on a Member.

12.14   **Partition**.  Without limiting the provisions of Article 10 regarding the Conversion Date, (i) the Members agree that the Company Property that the Company may own or have an interest in is not suitable for partition, and (ii) each of the Members hereby irrevocably waives any and all rights that it may have to maintain any action for partition of any Company Property in which the Company may at any time have an interest.

12.15   **Entire Agreement**.  This Agreement and the Certificate of Formation (together with the other agreements described herein), constitute the entire agreement of the Members with respect to the subject matter hereof, and supersedes all prior written and oral agreements, understandings and negotiations with respect to the subject matter hereof.

14263543.1

12.16  **Waiver**.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

12.17  **Attorneys' Fees**.  In the event of any litigation, arbitration or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation, arbitration or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorneys' fees, and all other out-of-pocket costs and expenses incurred in connection with settling or resolving such dispute.  The attorneys' fees, which the prevailing party is entitled to recover, shall include fees for prosecuting or defending any appeal and shall be awarded for any supplemental proceedings until the final judgment is satisfied in full.  In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit or arbitration procedure on this Agreement shall be entitled to its reasonable attorneys' fees incurred in any post judgment proceedings to collect or enforce the judgment.  This attorneys' fees provision is separate and several and shall survive the merger of this Agreement into any judgment.

12.18  **Authorized Representatives**.  Wherever in this Agreement the consent or approval of a Member is required with respect to all matters pertaining to the Company, the written statement of any one Authorized Representative of such Member shall be sufficient to bind such member with respect to all matters pertaining to the Company.  Wherever used in this Agreement, the terms "approved by" or "approval of" or "consented to" or "consent of" or "satisfactory to", or words of similar import, with respect to a Member that is not a natural Person, means a decision or action which has been consented to in writing by the Authorized Representative of such Member, and with respect to a Member who is an individual, means a decision or action which has been consented to in writing by such individual.

12.19  **Confidentiality**.  The Members hereby agree to, and shall cause their Affiliates and each of their respective advisors, agents, capital sources (inclusive of debt and equity), contractors and consultants, to, maintain the confidentiality, except as required by law, of all information relating to the business, operation or finances of a Member or the Company which are proprietary to, or considered proprietary by, such Member or the Company.  The Members will inform each other of any legal effort by others to obtain any such confidential information.

12.20  **Reserved**.

12.21  **Cumulative Remedies**.  Subject to the limitations expressly herein set forth, no remedy conferred upon the Company or any Member in this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.  Notwithstanding the foregoing or any other provision of this Agreement, each party hereby waives any right to receive consequential damages (including damages for lost profits) or punitive damages.

12.22  **No Suretyship Defenses**.  Each Member hereby waives any guarantor or suretyship defense that may otherwise apply with respect to this Agreement or any provision hereof.

12.23  **Brokers**.  Each of the Members represents and warrants to the other that neither it nor its Affiliates have employed the services of, or dealt with, any broker, investment banker, agent or finder in connection with this Agreement or the Company.  Each party agrees to indemnify and hold the other party harmless from all claims, actual or threatened, by any broker, investment banker, agent or finder arising by reason of the indemnifying party's breach of the representation and warranty set forth herein. This provision shall run to the benefit of the Members only and not to any third party.

12.24  **Effectiveness**.  In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each party hereto.

12.25  **Amendments**.  Except as expressly set forth herein, no amendment or waiver of this Agreement (or provision hereof) shall be enforceable against any Member unless it is in writing and duly executed and delivered by such Member; provided, however, that (a) the Members shall not unreasonably withhold, delay, or condition consent to any amendment required by any Loan to which the Company is a party, or which is required by a prospective lender under any prospective Loan that satisfies the terms of the Financing Parameters, and (b) the Members shall reasonably cooperate to amend this Agreement to the extent necessary or desirable in connection with obtaining a Loan secured directly or indirectly by the Property or the interest of a Member in the Company.

12.26  **Public Announcements**.  No Member nor any of its Affiliates shall, without the prior written approval of the Managing Member, issue any press releases or similar public announcements with respect to the Company, the Project or the transactions contemplated by this Agreement except to the extent required by applicable law.

12.27  **Defaults**.  Except where expressly provided otherwise herein, if either Member shall breach any of its obligations under this Agreement, and such breach is not cured by the breaching Member and continues for (1) for five (5) Business Days after notice from the non-breaching Member in the case of any default which can be cured by the payment of a sum of money, or (2) for thirty (30) days after notice from the non-breaching Member in the case of any other default, the non-breaching Member may exercise all of its remedies at law or in equity against the breaching Member.

12.28  **No Personal Liability**. The Members will not be bound by, or be personally liable for, the expenses, liabilities or obligations of the Company except as otherwise provided in the Act or this Agreement.

12.29  **Further Assurances**. Each party agrees to execute and deliver such further instruments as may be necessary or desirable to effect this Agreement and the covenants and obligations of the parties hereto.

12.30  **Certification of Company Interests**.

(a)  Each limited liability company interest in the Company shall constitute and shall remain a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and New York and (ii)

the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.  Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del C. § 8-101, et. seq.) (the "UCC"), such provision of Article 8 of the UCC shall be controlling.  Notwithstanding anything to the contrary contained herein, so long as any Obligations are outstanding, no Member shall, without the prior written consent of the lender under any Loan then outstanding, issue and shall not permit the issuance of any additional limited liability company interests of the Company other than its initial issuance of limited liability company interests issued on or prior to the date of this Agreement.

(b)     Certificates.

(i)          Upon the issuance of limited liability company interests in the Company to any Person in accordance with the provisions of this Agreement, without any further act, vote or approval of any Member, Officer or any Person, the Company shall issue one or more certificates in the name of such Person substantially in the form of Schedule B hereto (a "Certificate"), which evidences the ownership of the limited liability company interests in the Company of such Person.  Each such Certificate shall be denominated in terms of the percentage of the limited liability company interests in the Company evidenced by such Certificate and shall be signed by an Officer on behalf of the Company.  On the date hereof, upon the execution and delivery of this Agreement, the Company shall, without any further act, vote or approval of any Member or any other Person, issue one or more Certificates in the name of Member, each of which Certificates shall evidence the ownership of such Member's limited liability company interest.

(ii)         Each Certificate shall bear, in effect, the following legend: "Each limited liability company interest in the Company shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the States of Delaware and New York and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1994 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code)."  This provision shall not be amended, and no such purported amendment to this provision shall be effective until all outstanding certificates have been surrendered for cancellation.

[Remainder of Page Intentionally Blank; Signature Page Follows Immediately]

IN WITNESS WHEREOF, this Agreement is executed by the Members, effective as of the date first set forth above.

**CASCO MEMBER:**

**West 21st Street Member LLC,**
a Delaware limited liability company

By: _____
     Name: Noam Teltch
     Title: Authorized Signatory

*[signatures continue on following page]*

**ZWIRNER MEMBER:**

**DZ 21st Street LLC,**
a New York limited liability company

By: _____

    Name: David Zwirner

    Title: Member


**ZWIRNER PRINCIPAL:**

Solely for the purposes of complying with, and
guarantying the compliance by Zwirner Member
with, Sections 3.3, 3.4 and 8.6:

_____

David Zwirner

**Exhibit A-1**

**Base Concept Plans**

**10        PROJECT DESCRIPTION**

**1010      Project Summary**
Description:  540 West 21st Street (a.k.a. 540w21) is a mixed-use (residential and commercial art gallery) building located on a parcel bordered by 11th Avenue to the west, an existing building (Lot 52) to the east, 21st Street to the north and an existing building (Lot 7501) to the south. The building, as currently proposed, stands approximately 20 stories above grade at a building height of 250'. The building contains approximately 212,000 total gross square feet (GSF) of floor area, above and below grade.

The development's ground floor consists of i) David Zwirner Art Gallery, ii) Residential Lobby iii) Future Commercial/Retail tenant use.

In addition to the space allocated on the East side of the ground floor, The David Zwirner Art Gallery also comprises the entire floor of levels 2 & 3 (with the exception of residential egress stairs, passenger elevators and building support risers/infrastructure which continue express through these levels to support the residential floors above); and a portion of the cellar level and level 4 comprising mechanical rooms and requirements..

The project is envisioned to achieve a LEED Gold Certification.

The building is being designed in accordance with the 2014 New York City Building Code as well as all other applicable codes.

**DAVID ZWIRNER GALLERY AREA SUMMARY**
The following areas provided are as per the Renzo Piano Building Workshop Concept Design model dated 6/1/2017:

Gross Floor Area:    43,067 SF
Zoning Floor Area:   38,157 SF

**GENERAL NOTE**

The drawings and specifications presented are in Design Development phase and are subject to change due to coordination and value engineering requirements.

**B10        SUPERSTRUCTURE**

**B1010      Floor and Roof Construction**
Description:  With the exception of the main gallery space, the floor system may be primarily comprised of reinforced concrete flat slab construction or a fireproofed steel framing system supported by columns and shear walls.  In order to achieve an approximately 60' column-free span within the main 3rd floor gallery space, the gallery floor system may be comprised of composite metal deck supported on fireproofed steel framing or some other appropriate structural system.
All concrete surfaces will be left rough after formwork is removed and will be unfinished.

**B1020      Stairs**
Description:  Cast-in-place concrete stairs will be provided for all required egress stairs.

**B20        EXTERIOR VERTICAL ENCLOSURES**

**B2010      Exterior Walls**
Description: Cladding system, including openings such as windows, doors, louvers, and detail profiles will be in accordance with the design intent of Renzo Piano Building Workshop.
Concrete Masonry (CMU) or metal stud and gypsum board partition walls will be provided at lot-line walls at existing adjacent buildings.

**B30        EXTERIOR HORIZONTAL ENCLOSURES**

**B3010      Roofing**
Description:  Fluid-applied roofing system such as American hydrotech or equal with a paver system that will be in accordance with the design intent of Renzo Piano Building Workshop.

**C10        INTERIOR CONSTRUCTION**

**C1010      Interior Partitions**
Description:  Interior partitions to be provided at required egress stair enclosures and interior demising locations to separate building tenants/occupants and will be in accordance with the design intent of Renzo Piano Building Workshop.  Partitions may be gypsum board assemblies with engineered metal stud framing or, if required, concrete masonry units (CMU) and shall provide code-required fire-rated separations and acoustic attenuation.

**C1030      Interior Doors**
Description:  Interior doors will be provided at required egress stair enclosures and will be in accordance with the design intent of Renzo Piano Building Workshop.

**C1070      Suspended Ceiling Construction**
Description:  Not provided as a part of this scope of work.  Underside of floor construction above to remain exposed.  See Section B10.

**C20        INTERIOR FINISHES**

**C2010      Wall Finishes**
Description: Not provided as a part of this scope of work.

**C2030      Flooring**
Description:  Not provided as a part of this scope of work.  Concrete floor construction to remain exposed as per Section B10. Allowance for finished floor build-up (topping slab + finish) provided over structural slab datum. Dimension of build-up will be in accordance with the design intent of Renzo Piano Building Workshop.

**C2050      Ceiling Finishes**
Description:  Not provided as a part of this scope of work.  Underside of floor construction above to remain exposed.  See Section B10.

**D20        PLUMBING**
1. A capped 4" sanitary, 2 ½" cold water capped valve and 3" vent pipe will be provided for the Gallery space. The 2 ½" capped cold water will be located in the 3rd floor Gallery mechanical room. The capped sanitary and vent lines will be located below the ground floor within the Gallery space.

2.  A flow meter with BMS connection will be provided for domestic water tap to allow for metering of water usage for the purposes of billing the gallery for all domestic water usage.

3. Tenant will be responsible for provision of domestic hot water heaters for tenant hot water requirements.

4. Gallery will be billed directly from DEP for water consumption.

5. Gallery will be billed from Con Edison for gas consumption.

6. Gallery will be required to provide scrubbers and all cooking and gas exhausts in and through their own space for all cooking requirements.

**D30        HEATING, VENTILATION AND AIR CONDITIONING (HVAC)**
1.  A valved 5" condenser water supply and return with a BTU meter tied into the BMS will be provided for the Gallery space. Tenant will be billed by landlord for metered condenser water usage. The location of the capped supply and return condenser water will be located in the 3rd floor Gallery mechanical room. Condenser water will have a 12 degree temperature difference (85 deg. F - 97 deg. F).

2.  A valved 4" heating hot water with a BTU meter tied into the BMS (sized for space heating) will be provided. Tenant will be billed by landlord for metered hot water usage. The delta T for heating will be at least 40 degrees. The location of the capped supply and return hot water will be in the 3rd floor Gallery mechanical room.

3.  Provide a pathway to give fresh air and toilet exhaust to gallery.  Location of louvers and pathway to louvers shall be as per coordinated Renzo Piano Building Workshop design in coordination with facade. A maximum of 25 sq.ft. net free area intake and 25 sq.ft. net free area exhaust/spill louver will be provided for tenant use.

**D40        FIRE PROTECTION**
An individual sprinkler rig with a 3" Sprinkler control valve will be provided on each floor (within the stairwell)  for the Gallery space.

**D50        ELECTRICAL, Communications & Security**
1.  A dedicated service switch (1600A) will be provided at the 2nd floor switchgear room.  Space will be provided for the Gallery's Con-Ed Meter and (5) 4" conduits stubbed into the gallery MEP space. Tenant will be responsible for feeders from the service switch to the gallery electrical room and for all tenant electrical distribution.

2.  (2) 2" empty conduits will be provided from the Main Distribution Frame (MDF) to demising Gallery space (for IT and Security).

3. (2) 2" empty conduits will be provided for remote annunciator connection between fire command stations between the Gallery and base building FCC's. Final configuration will be dependent on many factors, such as common MEP spaces, FDNY rulings, lobby addresses, etc.

4. Gallery will be billed directly from Con Edison for power consumption.

**DRAFT**

**Gallery Scope Delineation - Description**

AAI Architects, P.C.

540 West 21st Street

DATE:  06/19/2017

ASK-120



**Cellar Level** ①

1" = 20'-0"

1. ALL WALLS, DOORS, WINDOWS, COLUMNS, FLOOR OPENINGS, ETC. ARE SHOWN AS PLACE-HOLDERS ONLY. FINAL QUANTITY, LOCATIONS AND SIZES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP AND FINAL CONSTRUCTION DOCUMENTS.

2. ADDITIONAL MEP/FP BUILDING INFRASTRUCTURE SYSTEMS NOT SHOWN, INCLUDING BUT NOT LIMITED TO RISERS, CHASES, SHAFTS AND HORIZONTAL RUNS SHALL BE PROVIDED IN AN EFFICIENT MANNER AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

3. FLOOD PROTECTION SYSTEM, INCLUDING EMERGENCY EVACUATION STAIRWAYS, TO BE PROVIDED AS PER FINALIZED AND DOB-APPROVED DESIGN AND SHALL BE COORDINATED WITH THE EXTERIOR BUILDING WALL AT LEVEL 1, INCLUDING A SETBACK FROM THE PROPERTY LINE, IF REQUIRED.

4. ALL REQUESTED FLOOR OPENINGS MUST BE SIZED, LOCATED AND COORDINATED SO AS TO UTILIZE A CONVENTIONAL FLAT PLATE CONCRETE FRAMING SYSTEM WITHOUT THE NEED FOR SUPPLEMENTAL STRUCTURAL SUPPORT.

5. ALL MECHANICAL ROOMS/SPACES ARE SHOWN FOR REFERENCE ONLY. GENERAL SIZE OF ROOMS MUST BE MAINTAINED IN ORDER TO BALANCE THE ZONING FLOOR AREA. FINAL LOCATION/SIZE TO BE AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

**KEYED NOTES**

① FLOOR OPENING FOR ELEVATORS. CASCO DEVELOPMENT CORPORATION WILL PROVIDE ELEVATOR SHAFT WALL CONSTUCTION.

② FLOOR OPENING FOR MONUMENTAL (NON-EGRESS) STAIRWAY

③ EXTERIOR BUILDING WALL DESIGN, INCLUDING THE CLADDING SYSTEM, OPENINGS, WINDOWS, DOORS, LOUVERS AND DETAIL PROFILES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

④ EGRESS STAIR SERVING GALLERY. FINAL LOCATION TO BE IN ACCORDANCE WITH RPBW DESIGN INTENT.

⑤ STRUCTURAL CONCRETE CORE WALL PROVIDING BUILDING TENANT SEPARATION

⑥ CONCRETE MASONRY UNIT (CMU) OR METAL STUD AND GYPSUM BOARD PARTITION AT LOT-LINE WALL AT ADJACENT BUILDING WALL

⑦ BUILDING TENANT/OCCUPANT DEMISING WALL

⑧ ROOF COVERING

⑨ MINIMUM 12' WIDE X 33' DEEP COLUMN-FREE LOADING BERTH AS REQUIRED BY ZONING. LOADING BERTH SHALL HAVE AN ADDITIONAL (OUTSIDE OF REQUIRED LOADING BERTH) 396 SF CONNECTED AREA IN ORDER TO OBTAIN THE REQUIRED MAXIMUM ZONING FLOOR AREA DEDUCTION.

⑩ RESIDENTIAL EGRESS STAIRS AND PASSENGER ELEVATORS TO CONTINUE EXPRESS THROUGH LEVELS 2 & 3.

⑪ RESIDENTIAL EXPRESS ELECTRICAL RISER CLOSET

⑫ 450 SF FLOOR OPENING MUST BE LOCATED WITHIN GALLERY PROGRAM SPACE IN ORDER TO ACHIEVE REQUIRED THE REQUIRED ZONING DEDUCTION. THE FINAL LOCATION/CONFIGURATION WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

⑬ ENLARGED/ELONGATED BUILDING COLUMNS MAY BE REQUIRED, AS DESIGNED BY STRUCTURAL ENGINEER AND COORDINATED WITH RPBW DESIGN, TO OBTAIN COLUMN-FREE ZONE AT CELLAR POOL.

⑭ EXPRESS BUILDING INFRASTRUCTURE RISER/SHAFT SERVING THE PORTION OF BUILDING ABOVE THE GALLERY WILL BE REQUIRED. THOSE SHOWN HERE ARE FOR REFERENCE ONLY. FINAL QUANTITY, SIZE AND CONFIGURATION WILL BE DESIGNED BY MEP/FP ENGINEER AND COORDINATED WITH RPBW DESIGN INTENT.

⑮ AREA REQUIRED FOR:
5" VALVED CAPPED CONDENSER S&R WATER
4" VALVED CAPPED HOT S&R WATER FOR SPACE HEATING AND DOMESTIC HOT WATER
2 1/2" COLD WATER CAPPED VALVE

⑯ AREA REQUIRED FOR:
4" CAPPED SANITARY (BELOW SLAB)
3" CAPPED VENT PIPE

⑰ LOCATION OF COLUMNS IF THEY DO NOT TRANSFER. NEARBY COLUMNS SHOWN IN BLACK MAY BE DELETED OR RELOCATED.

**DRAFT**

**Cellar Level - Gallery Scope Delineation**

AAI Architects, P.C.

**540 West 21st Street**

**LEGEND**

NON-GALLERY PORTION OF BUILDING

DATE: 06/19/2017

**ASK-121**



**GENERAL NOTES**

1. ALL WALLS, DOORS, WINDOWS, COLUMNS, FLOOR OPENINGS, ETC. ARE SHOWN AS PLACE-HOLDERS ONLY. FINAL QUANTITY, LOCATIONS AND SIZES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP AND FINAL CONSTRUCTION DOCUMENTS.

2. ADDITIONAL MEP/FP BUILDING INFRASTRUCTURE SYSTEMS NOT SHOWN, INCLUDING BUT NOT LIMITED TO RISERS, CHASES, SHAFTS AND HORIZONTAL RUNS SHALL BE PROVIDED IN AN EFFICIENT MANNER AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

3. FLOOD PROTECTION SYSTEM, INCLUDING EMERGENCY EVACUATION STAIRWAYS, TO BE PROVIDED AS PER FINALIZED AND DOB-APPROVED DESIGN AND SHALL BE COORDINATED WITH THE EXTERIOR BUILDING WALL AT LEVEL 1, INCLUDING A SETBACK FROM THE PROPERTY LINE, IF REQUIRED.

4. ALL REQUESTED FLOOR OPENINGS MUST BE SIZED, LOCATED AND COORDINATED SO AS TO UTILIZE A CONVENTIONAL FLAT PLATE CONCRETE FRAMING SYSTEM WITHOUT THE NEED FOR SUPPLEMENTAL STRUCTURAL SUPPORT.

5. ALL MECHANICAL ROOMS/SPACES ARE SHOWN FOR REFERENCE ONLY. GENERAL SIZE OF ROOMS MUST BE MAINTAINED IN ORDER TO BALANCE THE ZONING FLOOR AREA. FINAL LOCATION/SIZE TO BE AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

**KEYED NOTES**

1. FLOOR OPENING FOR ELEVATORS. CASCO DEVELOPMENT CORPORATION WILL PROVIDE ELEVATOR SHAFT WALL CONSTUCTION.

2. FLOOR OPENING FOR MONUMENTAL (NON-EGRESS) STAIRWAY

3. EXTERIOR BUILDING WALL DESIGN, INCLUDING THE CLADDING SYSTEM, OPENINGS, WINDOWS, DOORS, LOUVERS AND DETAIL PROFILES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

4. EGRESS STAIR SERVING GALLERY. FINAL LOCATION TO BE IN ACCORDANCE WITH RPBW DESIGN INTENT.

5. STRUCTURAL CONCRETE CORE WALL PROVIDING BUILDING TENANT SEPARATION

6. CONCRETE MASONRY UNIT (CMU) OR METAL STUD AND GYPSUM BOARD PARTITION AT LOT-LINE WALL AT ADJACENT BUILDING WALL

7. BUILDING TENANT/OCCUPANT DEMISING WALL

8. ROOF COVERING

9. MINIMUM 12' WIDE X 33' DEEP COLUMN-FREE LOADING BERTH AS REQUIRED BY ZONING. LOADING BERTH SHALL HAVE AN ADDITIONAL (OUTSIDE OF REQUIRED LOADING BERTH) 396 SF CONNECTED AREA IN ORDER TO OBTAIN THE REQUIRED MAXIMUM ZONING FLOOR AREA DEDUCTION.

10. RESIDENTIAL EGRESS STAIRS AND PASSENGER ELEVATORS TO CONTINUE EXPRESS THROUGH LEVELS 2 & 3.

11. RESIDENTIAL EXPRESS ELECTRICAL RISER CLOSET

12. 450 SF FLOOR OPENING MUST BE LOCATED WITHIN GALLERY PROGRAM SPACE IN ORDER TO ACHIEVE REQUIRED THE REQUIRED ZONING DEDUCTION. THE FINAL LOCATION/CONFIGURATION WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

13. ENLARGED/ELONGATED BUILDING COLUMNS MAY BE REQUIRED, AS DESIGNED BY STRUCTURAL ENGINEER AND COORDINATED WITH RPBW DESIGN, TO OBTAIN COLUMN-FREE ZONE AT CELLAR POOL.

14. EXPRESS BUILDING INFRASTRUCTURE RISER/SHAFT SERVING THE PORTION OF BUILDING ABOVE THE GALLERY WILL BE REQUIRED. THOSE SHOWN HERE ARE FOR REFERENCE ONLY. FINAL QUANTITY, SIZE AND CONFIGURATION WILL BE DESIGNED BY MEP/FP ENGINEER AND COORDINATED WITH RPBW DESIGN INTENT.

15. AREA REQUIRED FOR:
5" VALVED CAPPED CONDENSER S&R WATER
4" VALVED CAPPED HOT S&R WATER FOR SPACE HEATING AND DOMESTIC HOT WATER
2 1/2" COLD WATER CAPPED VALVE

16. AREA REQUIRED FOR:
4" CAPPED SANITARY (BELOW SLAB)
3" CAPPED VENT PIPE

17. LOCATION OF COLUMNS IF THEY DO NOT TRANSFER. NEARBY COLUMNS SHOWN IN BLACK MAY BE DELETED OR RELOCATED.

West 21st Street

RETAIL

RESIDENTIAL LOBBY

DAVID ZWIRNER ART GALLERY

11th Avenue

**Level 1** ( 1 )

1" = 20'-0"

**DRAFT**

Level 1 - Gallery Scope Delineation

AAI Architects, P.C.

540 West 21st Street

**LEGEND**

NON-GALLERY PORTION OF BUILDING

DATE: 06/19/2017

ASK-122

**GENERAL NOTES**

1. ALL WALLS, DOORS, WINDOWS, COLUMNS, FLOOR OPENINGS, ETC. ARE SHOWN AS PLACE-HOLDERS ONLY. FINAL QUANTITY, LOCATIONS AND SIZES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP AND FINAL CONSTRUCTION DOCUMENTS.

2. ADDITIONAL MEP/FP BUILDING INFRASTRUCTURE SYSTEMS NOT SHOWN, INCLUDING BUT NOT LIMITED TO RISERS, CHASES, SHAFTS AND HORIZONTAL RUNS SHALL BE PROVIDED IN AN EFFICIENT MANNER AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

3. FLOOD PROTECTION SYSTEM, INCLUDING EMERGENCY EVACUATION STAIRWAYS, TO BE PROVIDED AS PER FINALIZED AND DOB-APPROVED DESIGN AND SHALL BE COORDINATED WITH THE EXTERIOR BUILDING WALL AT LEVEL 1, INCLUDING A SETBACK FROM THE PROPERTY LINE, IF REQUIRED.

4. ALL REQUESTED FLOOR OPENINGS MUST BE SIZED, LOCATED AND COORDINATED SO AS TO UTILIZE A CONVENTIONAL FLAT PLATE CONCRETE FRAMING SYSTEM WITHOUT THE NEED FOR SUPPLEMENTAL STRUCTURAL SUPPORT.

5. ALL MECHANICAL ROOMS/SPACES ARE SHOWN FOR REFERENCE ONLY. GENERAL SIZE OF ROOMS MUST BE MAINTAINED IN ORDER TO BALANCE THE ZONING FLOOR AREA. FINAL LOCATION/SIZE TO BE AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

**KEYED NOTES**

1. FLOOR OPENING FOR ELEVATORS. CASCO DEVELOPMENT CORPORATION WILL PROVIDE ELEVATOR SHAFT WALL CONSTUCTION.

2. FLOOR OPENING FOR MONUMENTAL (NON-EGRESS) STAIRWAY

3. EXTERIOR BUILDING WALL DESIGN, INCLUDING THE CLADDING SYSTEM, OPENINGS, WINDOWS, DOORS, LOUVERS AND DETAIL PROFILES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

4. EGRESS STAIR SERVING GALLERY, FINAL LOCATION TO BE IN ACCORDANCE WITH RPBW DESIGN INTENT.

5. STRUCTURAL CONCRETE CORE WALL PROVIDING BUILDING TENANT SEPARATION

6. CONCRETE MASONRY UNIT (CMU) OR METAL STUD AND GYPSUM BOARD PARTITION AT LOT-LINE WALL AT ADJACENT BUILDING WALL

7. BUILDING TENANT/OCCUPANT DEMISING WALL

8. ROOF COVERING

9. MINIMUM 12' WIDE X 33' DEEP COLUMN-FREE LOADING BERTH AS REQUIRED BY ZONING. LOADING BERTH SHALL HAVE AN ADDITIONAL (OUTSIDE OF REQUIRED LOADING BERTH) 396 SF CONNECTED AREA IN ORDER TO OBTAIN THE REQUIRED MAXIMUM ZONING FLOOR AREA DEDUCTION.

10. RESIDENTIAL EGRESS STAIRS AND PASSENGER ELEVATORS TO CONTINUE EXPRESS THROUGH LEVELS 2 & 3.

11. RESIDENTIAL EXPRESS ELECTRICAL RISER CLOSET

12. 450 SF FLOOR OPENING MUST BE LOCATED WITHIN GALLERY PROGRAM SPACE IN ORDER TO ACHIEVE REQUIRED THE REQUIRED ZONING DEDUCTION. THE FINAL LOCATION/CONFIGURATION WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

13. ENLARGED/ELONGATED BUILDING COLUMNS MAY BE REQUIRED, AS DESIGNED BY STRUCTURAL ENGINEER AND COORDINATED WITH RPBW DESIGN, TO OBTAIN COLUMN-FREE ZONE AT CELLAR POOL.

14. EXPRESS BUILDING INFRASTRUCTURE RISER/SHAFT SERVING THE PORTION OF BUILDING ABOVE THE GALLERY WILL BE REQUIRED. THOSE SHOWN HERE ARE FOR REFERENCE ONLY. FINAL QUANTITY, SIZE AND CONFIGURATION WILL BE DESIGNED BY MEP/FP ENGINEER AND COORDINATED WITH RPBW DESIGN INTENT.

15. AREA REQUIRED FOR:
    5" VALVED CAPPED CONDENSER S&R WATER
    4" VALVED CAPPED HOT S&R WATER FOR SPACE HEATING AND DOMESTIC HOT WATER
    2 1/2" COLD WATER CAPPED VALVE

16. AREA REQUIRED FOR:
    4" CAPPED SANITARY (BELOW SLAB)
    3" CAPPED VENT PIPE

17. LOCATION OF COLUMNS IF THEY DO NOT TRANSFER. NEARBY COLUMNS SHOWN IN BLACK MAY BE DELETED OR RELOCATED.

---

DAVID ZWIRNER
ART GALLERY

BUILDING FIRE PUMP ROOM

UP / DN

FCC   FS1

BUILDING GENERATOR ROOM

RESIDENTIAL ELECTRICAL SWITCHBOARD ROOM

GALLERY SWITCHGEAR

DN / UP

GALLERY HVAC
GALLERY ELECTRICAL
RESIDENTIAL DOMESTIC BOOSTER PUMP

**Level 2** (1)
1" = 20'-0"

**DRAFT**

Level 2 - Gallery Scope Delineation

AAI Architects, P.C.

540 West 21st Street

**LEGEND**
NON-GALLERY PORTION OF BUILDING

DATE: 06/19/2017

ASK-123

**GENERAL NOTES**

1. ALL WALLS, DOORS, WINDOWS, COLUMNS, FLOOR OPENINGS, ETC. ARE SHOWN AS PLACE-HOLDERS ONLY.  FINAL QUANTITY, LOCATIONS AND SIZES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP AND FINAL CONSTRUCTION DOCUMENTS.

2. ADDITIONAL MEP/FP BUILDING INFRASTRUCTURE SYSTEMS NOT SHOWN, INCLUDING BUT NOT LIMITED TO RISERS, CHASES, SHAFTS AND HORIZONTAL RUNS SHALL BE PROVIDED IN AN EFFICIENT MANNER AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

3. FLOOD PROTECTION SYSTEM, INCLUDING EMERGENCY EVACUATION STAIRWAYS, TO BE PROVIDED AS PER FINALIZED AND DOB-APPROVED DESIGN AND SHALL BE COORDINATED WITH THE EXTERIOR BUILDING WALL AT LEVEL 1, INCLUDING A SETBACK FROM THE PROPERTY LINE, IF REQUIRED.

4. ALL REQUESTED FLOOR OPENINGS MUST BE SIZED, LOCATED AND COORDINATED SO AS TO UTILIZE A CONVENTIONAL FLAT PLATE CONCRETE FRAMING SYSTEM WITHOUT THE NEED FOR SUPPLEMENTAL STRUCTURAL SUPPORT.

5. ALL MECHANICAL ROOMS/SPACES ARE SHOWN FOR REFERENCE ONLY.  GENERAL SIZE OF ROOMS MUST BE MAINTAINED IN ORDER TO BALANCE THE ZONING FLOOR AREA. FINAL LOCATION/SIZE TO BE AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

**KEYED NOTES**

1. FLOOR OPENING FOR ELEVATORS. CASCO DEVELOPMENT CORPORATION WILL PROVIDE ELEVATOR SHAFT WALL CONSTUCTION.

2. FLOOR OPENING FOR MONUMENTAL (NON-EGRESS) STAIRWAY

3. EXTERIOR BUILDING WALL DESIGN, INCLUDING THE CLADDING SYSTEM, OPENINGS, WINDOWS, DOORS, LOUVERS AND DETAIL PROFILES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

4. EGRESS STAIR SERVING GALLERY. FINAL LOCATION TO BE IN ACCORDANCE WITH RPBW DESIGN INTENT.

5. STRUCTURAL CONCRETE CORE WALL PROVIDING BUILDING TENANT SEPARATION

6. CONCRETE MASONRY UNIT (CMU) OR METAL STUD AND GYPSUM BOARD PARTITION AT LOT-LINE WALL AT ADJACENT BUILDING WALL

7. BUILDING TENANT/OCCUPANT DEMISING WALL

8. ROOF COVERING

9. MINIMUM 12' WIDE X 33' DEEP COLUMN-FREE LOADING BERTH AS REQUIRED BY ZONING.  LOADING BERTH SHALL HAVE AN ADDITIONAL (OUTSIDE OF REQUIRED LOADING BERTH) 396 SF CONNECTED AREA IN ORDER TO OBTAIN THE REQUIRED MAXIMUM ZONING FLOOR AREA DEDUCTION.

10. RESIDENTIAL EGRESS STAIRS AND PASSENGER ELEVATORS TO CONTINUE EXPRESS THROUGH LEVELS 2 & 3.

11. RESIDENTIAL EXPRESS ELECTRICAL RISER CLOSET

12. 450 SF FLOOR OPENING MUST BE LOCATED WITHIN GALLERY PROGRAM SPACE IN ORDER TO ACHIEVE REQUIRED THE REQUIRED ZONING DEDUCTION.  THE FINAL LOCATION/CONFIGURATION WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

13. ENLARGED/ELONGATED BUILDING COLUMNS MAY BE REQUIRED, AS DESIGNED BY STRUCTURAL ENGINEER AND COORDINATED WITH RPBW DESIGN, TO OBTAIN COLUMN-FREE ZONE AT CELLAR POOL.

14. EXPRESS BUILDING INFRASTRUCTURE RISER/SHAFT SERVING THE PORTION OF BUILDING ABOVE THE GALLERY WILL BE REQUIRED. THOSE SHOWN HERE ARE FOR REFERENCE ONLY. FINAL QUANTITY, SIZE AND CONFIGURATION WILL BE DESIGNED BY MEP/FP ENGINEER AND COORDINATED WITH RPBW DESIGN INTENT.

15. AREA REQUIRED FOR:
5" VALVED CAPPED CONDENSER S&R WATER
4" VALVED CAPPED HOT S&R WATER FOR SPACE HEATING AND DOMESTIC HOT WATER
2 1/2" COLD WATER CAPPED VALVE

16. AREA REQUIRED FOR:
4" CAPPED SANITARY (BELOW SLAB)
3" CAPPED VENT PIPE

17. LOCATION OF COLUMNS IF THEY DO NOT TRANSFER. NEARBY COLUMNS SHOWN IN BLACK MAY BE DELETED OR RELOCATED.

DAVID ZWIRNER
ART GALLERY

GALLERY SECURITY ROOM

GALLERY IT

GALLERY ELECTRICAL

GALLERY DOMESTIC BOOSTER ROOM

RESIDENTIAL AMENITIES FAN ROOM

GALLERY FAN ROOM

GALLERY MECHANICAL

**Level 3** ( 1 )

1" = 20'-0"

**DRAFT**

Level 3 - Gallery Scope Delineation

AAI Architects, P.C.

540 West 21st Street

**LEGEND**

NON-GALLERY PORTION OF BUILDING

DATE:  06/19/2017

ASK-124



**RESIDENTIAL DWELLING UNITS**

OPEN TO BELOW

**DAVID ZWIRNER ART GALLERY**

OPEN TO BELOW

ELEVATOR OVERRUN

FS1

GALLERY DUCT RUN ZONE

ATS

GALLERY FAN ROOM

## Level 4 — 1

1" = 20'-0"

**DRAFT**

Level 4 - Gallery Scope Delineation

AAI Architects, P.C.

540 West 21st Street

DATE: 06/19/2017

ASK-125

## GENERAL NOTES

1. ALL WALLS, DOORS, WINDOWS, COLUMNS, FLOOR OPENINGS, ETC. ARE SHOWN AS PLACE-HOLDERS ONLY. FINAL QUANTITY, LOCATIONS AND SIZES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP AND FINAL CONSTRUCTION DOCUMENTS.

2. ADDITIONAL MEP/FP BUILDING INFRASTRUCTURE SYSTEMS NOT SHOWN, INCLUDING BUT NOT LIMITED TO RISERS, CHASES, SHAFTS AND HORIZONTAL RUNS SHALL BE PROVIDED IN AN EFFICIENT MANNER AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

3. FLOOD PROTECTION SYSTEM, INCLUDING EMERGENCY EVACUATION STAIRWAYS, TO BE PROVIDED AS PER FINALIZED AND DOB-APPROVED DESIGN AND SHALL BE COORDINATED WITH THE EXTERIOR BUILDING WALL AT LEVEL 1, INCLUDING A SETBACK FROM THE PROPERTY LINE, IF REQUIRED.

4. ALL REQUESTED FLOOR OPENINGS MUST BE SIZED, LOCATED AND COORDINATED SO AS TO UTILIZE A CONVENTIONAL FLAT PLATE CONCRETE FRAMING SYSTEM WITHOUT THE NEED FOR SUPPLEMENTAL STRUCTURAL SUPPORT.

5. ALL MECHANICAL ROOMS/SPACES ARE SHOWN FOR REFERENCE ONLY. GENERAL SIZE OF ROOMS MUST BE MAINTAINED IN ORDER TO BALANCE THE ZONING FLOOR AREA. FINAL LOCATION/SIZE TO BE AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

## KEYED NOTES

1. FLOOR OPENING FOR ELEVATORS. CASCO DEVELOPMENT CORPORATION WILL PROVIDE ELEVATOR SHAFT WALL CONSTUCTION.

2. FLOOR OPENING FOR MONUMENTAL (NON-EGRESS) STAIRWAY

3. EXTERIOR BUILDING WALL DESIGN, INCLUDING THE CLADDING SYSTEM, OPENINGS, WINDOWS, DOORS, LOUVERS AND DETAIL PROFILES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

4. EGRESS STAIR SERVING GALLERY. FINAL LOCATION TO BE IN ACCORDANCE WITH RPBW DESIGN INTENT.

5. STRUCTURAL CONCRETE CORE WALL PROVIDING BUILDING TENANT SEPARATION

6. CONCRETE MASONRY UNIT (CMU) OR METAL STUD AND GYPSUM BOARD PARTITION AT LOT-LINE WALL AT ADJACENT BUILDING WALL

7. BUILDING TENANT/OCCUPANT DEMISING WALL

8. ROOF COVERING

9. MINIMUM 12' WIDE X 33' DEEP COLUMN-FREE LOADING BERTH AS REQUIRED BY ZONING. LOADING BERTH SHALL HAVE AN ADDITIONAL (OUTSIDE OF REQUIRED LOADING BERTH) 396 SF CONNECTED AREA IN ORDER TO OBTAIN THE REQUIRED MAXIMUM ZONING FLOOR AREA DEDUCTION.

10. RESIDENTIAL EGRESS STAIRS AND PASSENGER ELEVATORS TO CONTINUE EXPRESS THROUGH LEVELS 2 & 3.

11. RESIDENTIAL EXPRESS ELECTRICAL RISER CLOSET

12. 450 SF FLOOR OPENING MUST BE LOCATED WITHIN GALLERY PROGRAM SPACE IN ORDER TO ACHIEVE REQUIRED THE REQUIRED ZONING DEDUCTION. THE FINAL LOCATION/CONFIGURATION WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

13. ENLARGED/ELONGATED BUILDING COLUMNS MAY BE REQUIRED, AS DESIGNED BY STRUCTURAL ENGINEER AND COORDINATED WITH RPBW DESIGN, TO OBTAIN COLUMN-FREE ZONE AT CELLAR POOL.

14. EXPRESS BUILDING INFRASTRUCTURE RISER/SHAFT SERVING THE PORTION OF BUILDING ABOVE THE GALLERY WILL BE REQUIRED. THOSE SHOWN HERE ARE FOR REFERENCE ONLY. FINAL QUANTITY, SIZE AND CONFIGURATION WILL BE DESIGNED BY MEP/FP ENGINEER AND COORDINATED WITH RPBW DESIGN INTENT.

15. AREA REQUIRED FOR:
    5" VALVED CAPPED CONDENSER S&R WATER
    4" VALVED CAPPED HOT S&R WATER FOR SPACE HEATING AND DOMESTIC HOT WATER
    2 1/2" COLD WATER CAPPED VALVE

16. AREA REQUIRED FOR:
    4" CAPPED SANITARY (BELOW SLAB)
    3" CAPPED VENT PIPE

17. LOCATION OF COLUMNS IF THEY DO NOT TRANSFER. NEARBY COLUMNS SHOWN IN BLACK MAY BE DELETED OR RELOCATED.

## LEGEND

NON-GALLERY PORTION OF BUILDING

RESIDENTIAL DWELLING UNITS

DAVID ZWIRNER
ART GALLERY
ROOF

FS1

**Level 5** (1)

1" = 20'-0"

**GENERAL NOTES**

1. ALL WALLS, DOORS, WINDOWS, COLUMNS, FLOOR OPENINGS, ETC. ARE SHOWN AS PLACE-HOLDERS ONLY. FINAL QUANTITY, LOCATIONS AND SIZES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP AND FINAL CONSTRUCTION DOCUMENTS.

2. ADDITIONAL MEP/FP BUILDING INFRASTRUCTURE SYSTEMS NOT SHOWN, INCLUDING BUT NOT LIMITED TO RISERS, CHASES, SHAFTS AND HORIZONTAL RUNS SHALL BE PROVIDED IN AN EFFICIENT MANNER AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

3. FLOOD PROTECTION SYSTEM, INCLUDING EMERGENCY EVACUATION STAIRWAYS, TO BE PROVIDED AS PER FINALIZED AND DOB-APPROVED DESIGN AND SHALL BE COORDINATED WITH THE EXTERIOR BUILDING WALL AT LEVEL 1, INCLUDING A SETBACK FROM THE PROPERTY LINE, IF REQUIRED.

4. ALL REQUESTED FLOOR OPENINGS MUST BE SIZED, LOCATED AND COORDINATED SO AS TO UTILIZE A CONVENTIONAL FLAT PLATE CONCRETE FRAMING SYSTEM WITHOUT THE NEED FOR SUPPLEMENTAL STRUCTURAL SUPPORT.

5. ALL MECHANICAL ROOMS/SPACES ARE SHOWN FOR REFERENCE ONLY. GENERAL SIZE OF ROOMS MUST BE MAINTAINED IN ORDER TO BALANCE THE ZONING FLOOR AREA. FINAL LOCATION/SIZE TO BE AS PER MEP/FP ENGINEER AND RPBW COORDINATED DESIGN INTENT.

**KEYED NOTES**

1. FLOOR OPENING FOR ELEVATORS. CASCO DEVELOPMENT CORPORATION WILL PROVIDE ELEVATOR SHAFT WALL CONSTUCTION.

2. FLOOR OPENING FOR MONUMENTAL (NON-EGRESS) STAIRWAY

3. EXTERIOR BUILDING WALL DESIGN, INCLUDING THE CLADDING SYSTEM, OPENINGS, WINDOWS, DOORS, LOUVERS AND DETAIL PROFILES WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

4. EGRESS STAIR SERVING GALLERY. FINAL LOCATION TO BE IN ACCORDANCE WITH RPBW DESIGN INTENT.

5. STRUCTURAL CONCRETE CORE WALL PROVIDING BUILDING TENANT SEPARATION

6. CONCRETE MASONRY UNIT (CMU) OR METAL STUD AND GYPSUM BOARD PARTITION AT LOT-LINE WALL AT ADJACENT BUILDING WALL

7. BUILDING TENANT/OCCUPANT DEMISING WALL

8. ROOF COVERING

9. MINIMUM 12' WIDE X 33' DEEP COLUMN-FREE LOADING BERTH AS REQUIRED BY ZONING. LOADING BERTH SHALL HAVE AN ADDITIONAL (OUTSIDE OF REQUIRED LOADING BERTH) 396 SF CONNECTED AREA IN ORDER TO OBTAIN THE REQUIRED MAXIMUM ZONING FLOOR AREA DEDUCTION.

10. RESIDENTIAL EGRESS STAIRS AND PASSENGER ELEVATORS TO CONTINUE EXPRESS THROUGH LEVELS 2 & 3.

11. RESIDENTIAL EXPRESS ELECTRICAL RISER CLOSET

12. 450 SF FLOOR OPENING MUST BE LOCATED WITHIN GALLERY PROGRAM SPACE IN ORDER TO ACHIEVE REQUIRED THE REQUIRED ZONING DEDUCTION. THE FINAL LOCATION/CONFIGURATION WILL BE IN ACCORDANCE WITH THE DESIGN INTENT OF RENZO PIANO BUILDING WORKSHOP.

13. ENLARGED/ELONGATED BUILDING COLUMNS MAY BE REQUIRED, AS DESIGNED BY STRUCTURAL ENGINEER AND COORDINATED WITH RPBW DESIGN, TO OBTAIN COLUMN-FREE ZONE AT CELLAR POOL.

14. EXPRESS BUILDING INFRASTRUCTURE RISER/SHAFT SERVING THE PORTION OF BUILDING ABOVE THE GALLERY WILL BE REQUIRED. THOSE SHOWN HERE ARE FOR REFERENCE ONLY. FINAL QUANTITY, SIZE AND CONFIGURATION WILL BE DESIGNED BY MEP/FP ENGINEER AND COORDINATED WITH RPBW DESIGN INTENT.

15. AREA REQUIRED FOR:
    5" VALVED CAPPED CONDENSER S&R WATER
    4" VALVED CAPPED HOT S&R WATER FOR SPACE HEATING AND DOMESTIC HOT WATER
    2 1/2" COLD WATER CAPPED VALVE

16. AREA REQUIRED FOR:
    4" CAPPED SANITARY (BELOW SLAB)
    3" CAPPED VENT PIPE

17. LOCATION OF COLUMNS IF THEY DO NOT TRANSFER. NEARBY COLUMNS SHOWN IN BLACK MAY BE DELETED OR RELOCATED.

**DRAFT**

Level 5 - Gallery Scope Delineation

AAI Architects, P.C.

540 West 21st Street

**LEGEND**

NON-GALLERY PORTION OF BUILDING

DATE: 06/19/2017

ASK-126



2  Building Axonometric View South-East



1  Building Axonometric View North-West



DEVELOPER:
**540 West 21st Street LLC**
c/o Caird Development Corp.
546 W 21st St.
New York, NY 10011
TEL: 917-386-2423

DESIGNER:
**RENZO PIANO BUILDING WORKSHOP**
34° Paolo Nobles 29
16158 Genova, Italy
TEL: +39 010 61 711   FAX: +39 010 61 711 350

ARCHITECT OF RECORD:
**AAI ARCHITECTS, P.C.**
14 Wall Street, 2nd Floor
New York, NY 10005
TEL: 212-964-4940   FAX: 212-964-4090

STRUCTURAL ENGINEER:
**DESIMONE ENGINEERS**
228 East 45TH ST., 3RD Floor
New York, NY 10016
TEL: 212-532-2211

MEP ENGINEERS:
**COSENTINI ASSOCIATES**
Two Pennsylvania Plaza - Third Floor
New York, NY 10121
TEL: 212-615-3600

GEOTECHNICAL, ENVIRONMENTAL, SURVEYOR, FLOOD:
**LANGAN**
21 Penn Plaza
New York, NY 10001
TEL: 212-479-5400   FAX: 212-479-5444

INTERIOR DESIGNER:
**RDAI**
13 Rue du Mail
Paris, France 75002
TEL: 33 (0) 1 42 60 34 82

| No. | DESCRIPTION: | DATE: |
|-----|-------------|-------|
| 1 | 50% SCHEMATIC DESIGN | April 21, 2017 |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |
|   |  |  |

## NOT FOR CONSTRUCTION

Discrepancies must be reported immediately to the Architect
before proceeding.  Only figured dimensions are to be used.
Contractors must check all dimensions of work. This drawing is
protected by copyright.

ALL DIMENSIONS ARE SHOWN IN IMPERIAL.

KEY PLAN

| TRUE NORTH | PROJECT NORTH |
|-----------|---------------|

CONSULTANT:

PROJECT:
**540 West 21st Street**
New York, NY

BLOCK: 692   LOTS: 53,57,61,63

DRAWING TITLE:

Overall Axonometric Views

| SEAL & SIGNATURE: | DATE: | April 21, 2017 |
|---|---|---|
|  | PROJECT No. | 1631-00 |
|  | DRAWN | TEAM | REV: |
|  | CHK: | CHECKER |  |
|  | SCALE: |  |
|  | DWG No. |  |

# AD-011.

DOB PAGE No:      of

DOB EMPLOYEE STAMP*      DOB B-SCAN

**<u>Exhibit A-3</u>**

**Certain Terms Pertaining to the Enhanced Exterior Costs**

1. Item identified as 5th Floor roof and further identified as Item 1 on Exhibit A-2.  Casco Member shall pay the first $375,000 in cost.  Zwirner Member shall pay all cost in excess of $375,000.

2. Item identified as Art Door  fronting 21st Street and further identified as Item 2 on Exhibit A-2. Zwirner Member shall pay all the cost  of  the Art Door which exceeds $95 psf.

3. Item identified as glass on the front of the 3-story staircase facing 21st Street and further identified as Item 3 on Exhibit A-2.  Zwirner  Member shall pay the cost which exceeds $150 psf on the first floor and  the cost which exceeds $95 psf  on the second floor and above.

4. Item identified as glass on the rear of the 3-story staircase on the south side of the building and further identified as Item 4 on Exhibit A-2. Zwirner Member shall pay the cost which exceeds  $150 psf  on the first floor and  the cost which exceeds $95 psf on the second floor and above.

5. Item identified as 2nd floor roof and further identified as Item 5 on Exhibit A-2.  Zwirner Member shall pay the cost which exceeds $104.50  per square foot.

6. Item identified as Column Free Gallery Area fronting on 21 Street and further identified as Item 6 on Exhibit A-3 and  further identified on pages 1 and 2 of Exhibit A-1.  Zwirner Member shall pay $250,000 if Zwirner Member chooses to have the 2nd and 3rd floor gallery slabs be constucted in steel rather than concrete.

**Exhibit B**

Financing Parameters

1.      Maximum interest rate of LIBOR plus 5%

2.      Minimum initial loan term and completion date no less than anticipate construction period plus six months, plus extension options, and subject to force majeure.

3.      Release shall be conditioned solely upon payment of release price no more than $30,000,000 and substantial completion of Zwirner Unit.

4.      Other than any payment for Release of Zwirner Unit, loan shall be repaid from sales of individual condominium units within the Casco Unit only.

5.      If loan is floating rate, interest rate hedging is expected to be put in place where commercially reasonable to do so.  Any required interest rate cap shall have initial term of no more than two years and strike rate of no more than two percent.

6.      All loans must be non-recourse to the Members.  If lender requires a guaranty and does not accept such guaranty being provided by the Company or a Subsidiary, such guaranty (including all environmental or related indemnities and carve-out guarantees (for bad boy acts and any other carve-outs)) will be provided in accordance with the terms of the Agreement.

7.      Other than breaches relating to failure to pay interest or other amounts under the loan, bankruptcy events and certain customary automatic events of default, all breaches will have a cure period between breach and formal event of default.

## Exhibit C

Payment Schedule

**$30,000,000    COST**

| Zwirner Payment Milestone | % | PAYMENT | PER MO |
|---|---|---|---|
| 1. Contract Signing | 15% | $4,500,000 | |
| 2. Excavation Start | 10% | $3,000,000 | |
| 3. Foundation Completion | 10% | $3,000,000 | |
| 4. Superstructure – 2nd floor complete | 10% | $3,000,000 | |
| 5. Superstructure of Gallery Complete without skylights | 20% | $6,000,000 | |
| 6. 13 months of equal payment starting month after Payment 5 due date above | 30% | $9,000,000 | $692,307.69 |
| 7. Issuance of TCO | 5% | $1,500,000 | |
| | 100% | $30,000,000 | |

Exhibit D

Casco Organizational Chart



**Exhibit E**

Zwirner Organizational Chart



**Exhibit F**

Design Schedule



| Activity ID | Activity Name | OD | Start | Finish |
|---|---|---|---|---|
| | **540 West 21st Street with Gallery Fitout** | 705 | 05-Jul-17 | 24-Apr-20 |
| | **Demo & Abatement** | 96 | 05-Jul-17 | 17-Nov-17 |
| A1400 | Abatement of Existing Structure | 30 | 05-Jul-17* | 15-Aug-17 |
| A1410 | Demolition of Existing Buildings | 65 | 17-Aug-17 | 17-Nov-17 |
| | **Construction** | 537 | 02-Jan-18 | 24-Feb-20 |
| A1040 | Site Mobilization / Temp Protection | 5 | 02-Jan-18* | 08-Jan-18 |
| | **Foundation** | 195 | 02-Jan-18 | 09-Oct-18 |
| A1020 | Excavation / Foundation / UG Utilities | 195 | 02-Jan-18* | 09-Oct-18 |
| A1030 | Slab on Grade | 30 | 27-Aug-18 | 09-Oct-18 |
| | **Superstructure** | 109 | 27-Sep-18 | 07-Mar-19 |
| | **Exterior Wall** | 105 | 04-Dec-18 | 03-May-19 |
| | **MEPS Infrastructure** | 200 | 08-Mar-19 | 20-Dec-19 |
| A1260 | MEPS Core Infrastructure Risers / Critical MEF | 200 | 08-Mar-19 | 20-Dec-19 |
| | **Vertical Transportation** | 110 | 19-Apr-19 | 24-Sep-19 |
| | **Interior Fitout** | 200 | 06-May-19 | 24-Feb-20 |
| | **Amenity Spaces** | 200 | 06-May-19 | 24-Feb-20 |
| A1270 | Lower Floors Amenity Fitout | 100 | 06-May-19 | 25-Sep-19 |
| A1430 | Gallery Fitout | 190 | 20-May-19 | 21-Feb-20 |
| A1280 | Lobby Fitout | 100 | 04-Jun-19 | 24-Oct-19 |
| A1480 | Start Gallery Move-In | 0 | | 24-Feb-20 |
| | **Project Completion** | 96 | 09-Dec-19 | 24-Apr-20 |
| A1470 | Apartment Move-Ins | 65 | 24-Jan-20 | 24-Apr-20 |
| A1100 | Final Turnover of Apartments | 0 | | 17-Apr-20 |
| | **TCO** | 91 | 09-Dec-19 | 17-Apr-20 |
| A1440 | TCO # 1 | 30 | 09-Dec-19 | 22-Jan-20 |
| A1450 | TCO # 2 | 20 | 14-Feb-20 | 13-Mar-20 |
| A1460 | TCO # 3 | 20 | 23-Mar-20 | 17-Apr-20 |




**540 W 21st Street (CASCO)**
Project Schedule
Hunter Roberts Construction Group

**<u>Exhibit G</u>**

Preliminary Zwirner Fit-Out Schedule

540 W 21st St: Design Schedule
6/8/17
Design Phase Durations based on proposed durations in Agreement
CONCEPT (7 mos)
SCHEMATIC DESIGN (4 mos)
DESIGN DEVELOPMENT (6 mos)
CONSTRUCTION DOCUMENTS (6 mos)
2017
2018
JUL '16 - JAN '17
FEB
MAR
APR
MAY
JUN
JUL
AUG
SEP
OCT
NOV
DEC
JAN
FEB
MAR
APR
MAY
SCHEMATIC DESIGN
SD Pricing
SD Pricing
SD Pricing Review
PROCUREMENT / CDs
Excavation / Foundation Work
Excavation/Foundation
Residential
Residential Bid Set
Residential for Construction Set
Residential Units Bid Package
Initial GMP Bid Set
GMP Bid-Award Set
Resi Unit For Construction Set
Gallery
Gallery Bid Packages
Gallery for Construction Set
Gallery Bid Package
Initial GMP Bid Set
GMP Bid-Award Set
Gallery For Construction Set
GMP
80% GMP by CM
80% GMP Bid/Award Period
DOB
DOB Submissions
DOB Plan Review & Approvals
DOB Submissions
Target Foundation/Zoning Approval
Plan Review & Approvals