# EXHIBIT A

**(Proof of Claim No. 16)**

Debtor     540 West 21st Street Holdings LLC

United States Bankruptcy Court for the District of     District of Delaware

Case number     23-11053

## Official Form 410

# Proof of Claim          04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | Yarden Tadmor |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| | | |
|---|---|---|
| 2. | **Has this claim been acquired from someone else?** | ☐ No |
| | | ☑ Yes. From whom?    Eran Tadmor |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|

See Additional/Expanded Creditor Address(es) page:

Yarden Tadmor
Lauren Friend McKelvey
Reitler Kailas & Rosenbla...
885 Third Ave, 20th Floor
New York, NY 10022
**P:** 212-209-3037
**E:** lmckelvey@reitlerlaw.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — — —

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No |
| | | ☐ Yes. Claim number on court claims registry (if known)     Filed on _____ MM/DD/YYYY |

| | | |
|---|---|---|
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | | ☐ Yes. Who made the earlier filing? |

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

7. **How much is a claim?**

874,765.16

Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Aiding and Abetting Breach of Fiduciary Duty; Unjust Enrichment (see attached Supporting Documentation)

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property

**Nature of property**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A Claim may be partly priority and partly nonpriority. For example, law limits the amount entitled to priority.

| | | Amount entitled to priority |
|---|---|---|
| ☑ | No | |
| ☐ | Yes. Check one: | |
| ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | _____ |
| ☐ | Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | _____ |
| ☐ | Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | _____ |
| ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | _____ |
| ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | _____ |
| ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | _____ |

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    10/27/2023 at 01:31 pm PT
                           MM / DD / YYYY HH : MM

/s/Lauren Friend McKelvey
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | | | |
|---|---|---|---|
| | Lauren | Friend | McKelvey |
| | First Name | Middle Name | Last Name |

| Title | Counsel to Claimant |
|---|---|

| Company | Reitler Kailas & Rosenblatt LLP |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer |

| Address | Reitler Kailas & Rosenblatt LLP | 11921 Freedom Drive, Suite 550 |
|---|---|---|
| | Number | Street |
| | Reston | VA | 20190 |
| | City | State | ZIP Code |

| Contact phone | |
|---|---|

| Email | lmckelvey@reitlerlaw.com |
|---|---|



**Additional/Expanded Creditor Address(es):**

**Primary Address (Expanded)**
Yarden Tadmor
Lauren Friend McKelvey
Reitler Kailas & Rosenblatt LLP
885 Third Ave, 20th Floor
New York, NY 10022
Phone: 212-209-3037
lmckelvey@reitlerlaw.com

Stretto Corporate Restructuring
855.812.6112 inquiries@stretto.com
cases.stretto.com
Proof Of Claim
Page 4

**Supporting Documentation**

**Key Definitions**

1. The "**Debtor**" refers to 540 West 21st Street Holdings LLC, the owner of the Property.

2. The "**Claimants**" refers to, collectively, Yarden Tadmor, individually ("**Tadmor**") and Yarden Tadmor, as the trustee for the heirs of Eran Tadmor ("**Trustee**").

3. The "**Project**" refers to the development of a mix-use building on the Property.

4. The "**Property**" refers the real property located at located at 540 West 21st Street, New York, New York 10011.

**The Claims**

5. Between approximately May 28, 2015 and September 08, 2016,  Eran Tadmor, the late brother of Tadmor advanced funding to the Project ("**Eran Tadmor Claim**") by way of agreements with Great Feats Ltd., a BVI Business Company ("**Great Feats**"), attached hereto as Exhibits 1 and 2.

6. Part of Eran Tadmor Claim was assigned to Tadmor ("**Tadmor Claim**") and part of the Eran Tadmor Claim was held by Eran at the time of his passing and is now held by the Trustee ("**Trustee Claim**").

7. Collectively, the Yarden Claim and the Trustee Claim are referred to as the "**Claims**."

8. The Trustee Claim consists of $245,021.15 in principal and $629,743.91 in interest as of August 2, 2023. The Yarden Claim is reflected in the books and records of Great Feats as both equity and a shareholder loan.  Upon request to Great Feats of the amounts reflected in their books and records, the amounts were higher than the amounts Claimants believes is owed. Upon information and belief, Yarden holds $2,500 in equity in Great Feats and $245,021.15 as the principal balance of a shareholder loan in Great Feats.

9. The Trustee Claim consists of $245,021.15 in principal and $629,743.91 in interest as of August 2, 2023. The Trustee Claim is reflected in the books and records of Great Feats as both equity and a shareholder loan. Upon request to Great Feats of the amounts reflected in their books and records, the amounts were higher than the amounts Claimants believes is owed. Upon information and belief, the Trustee Claim holds $2,500 in equity in Great Feats and $245,021.15 as the principal balance of a shareholder loan in Great Feats.

10. The interest calculation, applicable to each of the Claims is as follows:

| As of June | Principal + Interest | Interest % | Interest Amount |
|---|---|---|---|
| 2015 | $ 245,021.25 | | |
| 2016 | $ 281,774.44 | 15% | $ 36,753.19 |
| 2017 | $ 324,040.60 | 15% | $ 42,266.17 |
| 2018 | $ 382,367.91 | 18% | $ 58,327.31 |
| 2019 | $ 451,194.14 | 18% | $ 68,826.22 |
| 2020 | $ 532,409.08 | 18% | $ 81,214.94 |
| 2021 | $ 628,242.71 | 18% | $ 95,833.63 |
| 2022 | $ 741,326.40 | 18% | $ 113,083.69 |
| 2023 | $ 874,765.16 | 18% | $ 133,438.75 |
| | Total Interest $ | | 629,743.91 |

**The Project Funding**

11. According to Debtor's Investment Brief dated December 2019, the total Project cost was estimated at approximately $197 million. *See* Adv. Pro. No. 23-50490, Doc 4, Ex. 3 at 65-66.

12. According to the Debtor's Plan, the Debtor obtained approximately $282 million in financing for the Project: $228 million in unsecured financing obtained by Debtor and its affiliates and $54 million (in principal) in secured financing held by Ray New York LLC ("**Ray New York**"). *See* Case 23-11053, Doc 167 at 17-19.

13. Accordingly, Debtor raised approximately $85 million in financing in excess of the expected Project costs.

14. When questioned about the transfer of the monies loaned to non-Debtor entities, the Debtor's representative testified at the Meeting of Creditors that as a result of the transfers, the Debtor had a "pile of money that was in hand" and that those monies were used to make payments for the Project, like "suppliers" and "expenses". *See* Adv. Pro. No. 23-50490, Doc 4, Ex. 4 at 44.

15. As of the Petition Date, the Debtor had less than $50,000 in cash [*See* Case 23-11053, Doc 1 at 21] and Project is incomplete, with only the foundation built.

16. The Debtor has not accounted for the $282 million it raised from investors and lenders, like Claimants.

17. Of the $282 million raised, the Debtor has not adequately explained the disposition of the $197 million that was budgeted to be used for completion of the Project. Because the Project is not even close to complete, the Debtor, upon information and belief, did not spend all $197 million on completion of the Project. The Debtor has not adequately explained who received the proceeds of the portion of the $197 million that was not used for Project completion.

18. Nor has the Debtor adequately explained why it raised $85 million more than the expected Project costs or who ultimately received the proceeds of such $85 million in additional funding.

19. The Debtor misappropriated Project funds. On or about January 12, 2017 Debtor paid over 15,000 Euros to rent a ski chalet for four days in Switzerland, which was used by Uri Chaitchik for, upon information and belief, personal purposes.

20. It can be inferred from these facts, and the Claimants expect further facts in discovery to show, that the Debtor spent substantial portions of the $282 million raised on expenses that did not benefit or provide value to the Debtor or the Project and/or otherwise transferred substantial portions of the $282 raised to persons that did not result in benefit or value to the Debtor or the Project.

**The Breach of Fiduciary Duty of Great Feats**

21. Great Feats is single purpose entity whose sole purpose is to invest in the Project (Ex. 1 at p. 1) and whose primary asset is such investment. *See* Exhibit 3 attached hereto.

22. At all times relevant to this Claim, Great Feats' directors owed a fiduciary duty to the Claimants (or their predecessors).

23. The Great Feats Shareholders Agreement is governed by English law. Ex. 1 at p. 11, § 17. Under English law, directors of a company owe a fiduciary duty of good faith to their shareholders and, where a company is insolvent or bordering on insolvency, the directors' duty to act in good faith in its interests, is extended so as to include the interests of the company's creditors as a whole as well as those of its shareholders. *See BTI 2014 LLC v Sequana SA* [2022] UKSC 25*; Byers and Others v Chen Ningning* (British Virgin Islands) [2021] UKPC 4; *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250.

24. For such time that Great Feats bordered on insolvency or was insolvent, Great Feats directors also owed a fiduciary duty to the Claimants as creditors of Great Feats as a result of Claimants' shareholder loans to Great Feats.

25. Upon information and belief, Great Feats bordered on insolvency or was insolvent as early as 2019 through the Petition Date.

26. In February 2019, Tadmor met with Yaron Har-zvi. Mr. Har-zvi. Upon information and belief, Mr. Har-zvi was acting as a representative of Great Feats at such time. At the meeting, Mr. Har-zvi informed Tadmor that due to additional financing of the Project, Tadmor would not likely be repaid on his shareholder loan to Great Feats.

27. In February of 2021, Great Feats provided Tadmor with the Update attached as <u>Exhibit 4</u>. The Update stated that Debtor/the Project experienced "a significant value shortfall below the Bank and Gallery liabilities" and that the Debtor had less than $1 million in cash.

28. Great Feats directors knew or should have known through the exercise of reasonable diligence that the millions in financing raised by the Debtor and its affiliated entities was: (a) not entirely used for the benefit of the Project; and/or (b) being misappropriated by Debtor and its affiliates.

29. On numerous occasions, Tadmor requested that persons representing Great Feats, including Mr. Har-zvi and Doron Levi, investigate the operations of the Project.

30. Despite Great Feats knowledge of the Debtor's and Project's financial difficulties and unlikely return to investors, and despite Great Feats knowledge (or willful disregard) of Debtor's misappropriation of Project funding,  Great Feats cooperated with the Debtor on several occasions to request that the Claimants and other shareholders of Great Feats invest additional funds in the Project – via Debtor's affiliated companies – which affiliates companies were structured so as to have priority over Great Feats and its shareholders and creditors. *See* <u>Exhibits 4, 5 and 6 </u>attached hereto.

31. In the 2019 request made by Great Feats on behalf of the Debtor, the Debtor offered each "Investor Member" of 540 West 21st Street LLC and 540 West 21st Investment II LLC the opportunity to invest in invest in 540 W 21st Development LLC.  This offer was provided by Great

Feats to Claimants to invest as "Investor Members" of 540 West 21st Street LLC in 540 W 21st Development LLC. *See* Ex. 6.

32. Great Feats directors failed to exercise their fiduciary duties as a result of Great Feats insufficiently monitoring its primary asset, standing idly by and allowing its primary asset to be depleted improperly, and actively working with the Debtor to raise additional financing having priority over Great Feats' financing of the Project and thereby exacerbating Great Feats' insolvent position.

**The Control of Chaitchik and Telch**

33. The Debtor and its affiliates are controlled by Uri Chaitchik ("Chaitchik") and Noam Teltch ("Telch").

34. The Debtor's Operating Agreement identifies Chaitchik as an "Authorized Representative" and "Casco Principal," a "notice party" and states that he has "Management & Control" over Debtor. *See* Adv. Pro. No. 23-50490, Doc 4, Ex. 5 at §§ 1.1, 12.5 and Ex. D, Casco Organizational Chart.

35. The Debtor's Offering Plan filed with the New York Attorney General provides, "[t]he principals of [Debtor] who will be actively involved in this offering are Mr. Uri Chaitchik and Mr. Noam Teltch". *See* Adv. Pro. No. 23-50490, Doc 4, at Ex. 7 at p. 227 of the PDF. This is signed by Chaitchik under penalty of perjury. *Id*. at p. 553 of the PDF.

36. Upon its formation, Chaitchik and Telch were listed as the directors of NuCapital Management, Inc., the entity at the top of the organizational chart in Debtor's Plan. *See* Case 23-11053, Doc 167 at 16.

37. Telch is listed as the "Proxy" in the Shareholder Agreement for Amberfeld Limited, the predecessor to Great Feats. *See* Ex.1 at p. 22.

38. Telch signed as the authorized person for several Debtor affiliates, including 540 West 21st Development LLC, 540West 21st Street Investment Member LLC, and Casco Development Corp.,

39. Chaitchik was the signatory on Debtor's account when Debtor made the payment to the ski chalet mentioned above.

40. Based upon information received from other investors in (and/or lenders to) various Debtor affiliates in connection the Project, Chaitchik engaged in hundreds of conversations with investors in (and/or lenders to) various Debtor affiliates in connection the Project.

**The Debtor and its Affiliates' Abuse of the Corporate Form**

41. Upon information and belief, the Debtor, Chaitchik and Telch disregarded the corporate form of the Debtor and its affiliates.

42. On several occasions when the the Debtor required additional financing for the Project, the Debtor, Chaitchik and/or Telch formed a new entity to receive such financing. Such new entities were structured in a manner to provide the investors in (and/or lenders to) such new entities to with a preference over the investors in (and/or lenders to) Great Feats.

43. Despite these different entities receiving funds, all funds raised for the Project (including Claimants' funds) were comingled in a "pile of monies" available to Debtors.

44. Upon information and belief, Mr. Teltch was unable to provide sufficient management over the Project because he was engaged in another entrepreneurial venture.

**The Agreement with Ray New York**

45. According to the Debtor's Plan, Ray New York holds a secured claim of approximately $85 million, of which approximately $54 million was advanced by Ray New York or its successor as principal. *See* Case 23-11053, Doc 167 at 17.  Thus, the Debtor and Ray New York claim that Ray New York is entitled to almost $30 million in interest and fees.

46. The Debtor stated that Ray New York purchased its claim for $52 million on April 7, 2022 and advanced another $4 million. Thus, if paid its $85 million claim in full, Ray New York will earn almost $30 million over the principal amount it invested the Project in less than 2 years.

47. Ray New York is owned by Chaitchik's father-in-law. This ownership was first admitted by Debtor only response to Tadmor's questioning at the Meeting of Creditors.

48. Over the course of the Debtor's bankruptcy case, the Debtor has filed insufficient disclosures regarding the ownership of Ray New York, the calculation of Ray New York's claim and Chaitchik's control of the Debtor, and the Debtor has filed supplement disclosures in an attempt to correct such insufficient disclosures.

49. Claimant contends that the disclosures in the Debtor's bankruptcy case are still insufficient and lacking necessary details to fully evaluate the relationship between Ray New York, the Debtor and Chaitchik and the amount of Ray New York's claim (particularly the calculation of $30 million in interest and fees).

**The Lack of Notice to Claimants and Insufficient Notice to Great Feats**

50. The Debtor has provided insufficient notice to investors and lenders in the Project.

51. The Debtor has not provided notice of the bankruptcy case to Claimants. Claimants discovered the bankruptcy case through a news article.

52. The Debtor added Great Feats to the Schedules on October 6, 2023 and provided notice of the bankruptcy case to Great Feats care of Doron Levi, APM Law on or after October 6, 2023.

53. Mr. Levi, in turn, provided notice to Claimants on October 17, 2023. In his notice, Mr. Levi stated that the Claimants would receive no funds from the Project and requested a power of attorney to liquidate Great Feats.

54. Upon information and belief, Great Feats is not pursuing any claim in this bankruptcy case.

**Aiding and Abetting Breach of Fiduciary Duty**

55. The directors of Great Feats owed a fiduciary duty to Claimants as shareholders of Great Feats and as creditors of Great Feats when Great Feats bordered on insolvency or was insolvent.

56. Great Feats directors breached their fiduciary duty to Claimants as a result of Great Feats insufficiently monitoring its primary asset, standing idly by and allowing its primary asset to be depleted improperly by Debtor, and actively working with the Debtor to raise additional financing having priority over Great Feats' financing in the Project.

57. Debtor knew or should have known that Great Feats directors had a fiduciary duty to Claimants and that Great Feats directors were violating their fiduciary duties to Claimants.

58. Debtor knowingly participated in such breach by misappropriating Project funds and actively working with Great Feats to raise additional financing having priority over Great Feats' financing in the Project.

59. As a result of Debtor's aiding and abetting Great Feats' directors' breach of their fiduciary duties to Claimants, Claimants suffered the damages in the amount of their Claims.

**Unjust Enrichment**

60. Alternatively, Claimants have a direct claim against the Debtor for unjust enrichment.

61. Debtor has stated its position that Claimants have no claim against the Debtor in law. Although Claimants disagree with such position, if Debtor is successful in such position, then Claimants are entitled to the equitable remedy of unjust enrichment.

62. By granting a secured claim to Ray New York that provides Ray New York with $30 million in interest and fees in under a two-year period, the Debtor and Ray New York are enriched. Ray New York is enriched by earning such interest and fees. Debtor is enriched by its agreement with Ray New York that Ray New York will support Debtor's bankruptcy case with DIP financing and

pay certain creditors in full under the Plan. In exchange for Debtor's payment of bankruptcy claims under the Plan, Debtor is receiving releases of claims and other benefits.

63. Claimants are impoverished by such agreements with Ray New York. Upon information and belief, but for the agreements with Ray New York, additional funds would be available for other investors in (and/or lenders) to the Project like Claimants (for example, in the case of the subordination of some or all of Ray New York's claim).

64. There is no justification for Ray New York earning almost $30 million in interest and fees on the Project in under a two year period.

**Reservation of Rights**

65. Claimants requested an extension of time to file this Claim which was not granted.

66. Several of the critical facts contained in this Claim were only discovered by Claimants after the filing of the bankruptcy case. Claimants expect to discovery additional facts supporting their Claims in discovery in the bankruptcy case.

67. Claimants reserve the right to amend their Claims to add claims that arise out of the conduct, transaction, or occurrence set out—or attempted to be set out—in these Claims, including but not limited to direct and derivative claims for fraud, misappropriation, aiding and abetting, unjust enrichment, tortious interference, alter ego and piercing the corporate veil.

## Investment and Shareholders Agreement

## Relating to GREAT FEATS LIMITED

This Investment and Shareholders Agreement (the "Agreement") is made on *May 28*, 2015

### BETWEEN

(A) **Great Feats Limited**, a BVI business company registered under the laws of the British Virgin Islands, with its registered address at Trinity Chambers, POB 4301, Road Town, Tortola, British Virgin Islands (the **"Company"**)

(B) each of the parties that signs this Agreement as an Investor (each, individually an **"Investor"** and collectively the **"Investors"**)

### WHEREAS

A. The Company is a single purpose entity which has intends to invest its funds in the Project (as defined below) by acquiring a portion of the Ambarfeld Shares (as defined below);

B. As from the Closing Date (as defined below), Ambarfeld shall hold 40%[1] of 540 West 21st Street, LLC (the **"SPV"**), which indirectly owns the Property and the Project.

C. The Investors are interested in acquiring new shares in the Company and the Company is interested that the Investors shall acquire new shares in the Company;

D. In connection with the acquisition of shares by the Investors, the Company requires the injection of funds, and the Investor has agreed to provide the Company with such funding in the amount of the Investment Amount (as defined below);

### Now therefore the Parties agree as follows:

### 1. Interpretation

1.1. In this Agreement and in the Exhibits hereto unless the context otherwise requires, the following words and expressions shall bear the meanings set opposite them:

| | |
|---|---|
| **"$" or "Dollar"** | United States Dollar |
| **"Advisory Agreement"** | An agreement entered into on 29 January 2014 between Ambarfeld and *"Client"* and the Manager as *"Advisor"* |
| **"Ambarfeld Shares"** | 50,000 shares, par value $1.00 per share, being all of the authorized, issued and outstanding share capital of Ambarfeld |
| **"Ambarfeld"** | **Ambarfeld Limited**, a BVI business company registered under the laws of the British Virgin Islands, with its |

---

[1] Under the SPA Icy Face may exercise an option for Ambarfeld to sell 10% out of the 40% of the SPV which will expire on 16 June 2015. As of the date hereof it is envisaged that this option will not be exercised and therefore the full amount of 40% will continue to be held by Ambarfeld. However the final decision as to the exercise of the option will be made immediately prior to its expiry.

registered address at c/o Icaza, Gonzalez-Ruiz & Aleman (BVI) Limited, Vanterpool Plaza, P.O box 873, Road Town, Tortola, British Virgin Islands

| | |
|---|---|
| **"Articles"** | The Articles of Association of the Company, as shall be in force from time to time |
| **"Board"** | The Board of Directors of the Company, and if only one Director is appointed, that Director |
| **"Business Days"** | Any day (other than Saturday or Sunday) on which the banks in Israel and New York are open for business |
| **"Closing Date"** | 16 October 2016 |
| **"Designation Agreement"** | An agreement entered into on 19 May 2015, between the Company and Icy Face, enclosed hereto as **Exhibit 3.5** |
| **"Designee"** | Any individual or corporate entity who will be designated by Icy Face under Section 11.07 of the SPA as someone who will acquire a portion of the Ambarfeld Shares |
| **"Director"** | Member of the Board |
| **"Distribution Policy"** | As detailed in Section 12.2 |
| **"Escrow Account"** | A bank account to be held and operated by the Escrow Agent the details of which will be provided to each Investor and to the Company by written notice from the Escrow Agent from time to time |
| **"Escrow Agent"** | Adv. Doron Levy, of Amit, Pollak, Matalon & Co, Nitsba Tower,17 Itzhak Sade Street, 67775 Tel Aviv, Israel |
| **"Escrow Agreement"** | An Agreement to be entered into by the Company and each Investor with the Escrow Agent, in the form of **Exhibit 7.3.1** |
| **"Excess Cash"** | Any cash available to the Company as proceeds of loan repayment or any income, less payment of any costs and expenses associated with the operations of the Company (including, but not limited to, fees, expenses and amounts retained for capital expenditures), less any taxes due by the Company (or the estimated amount of such costs, expenses and taxes to be kept in the Bank Account), and subject to keeping an additional cushion of \$100,000 in the Escrow Account |
| **"Fundamental Issues"** | As detailed in Section 0 |
| **"Funding Dates"** | The date falling 7 Business Days after the date of the date on which the Escrow Agent delivered the details of the Escrow Account to each Investor and to the Company being the First Funding Date |
| | 20 December 2015 being the Second Funding Date |
| | 20 March 2016 being the Third Funding Date |
| | 20 June 2016 being the Fourth Funding Date |

20 September 2016 being the Final Funding Date

(each being a **"Funding Date"**)

| | |
|---|---|
| **"Icy Face"** | **Icy Face Limited**, a BVI business company registered under the laws of the British Virgin Islands, with its registered address at Trinity Chambers, POB 4301, Road Town, Tortola, British Virgin Islands |
| **"Icy Face Agreement"** | An agreement entered into on 17 March 2015 (as amended on 18 May 2015) by Icy Face and acknowledged by the Manager, enclosed hereto as **Exhibit 1.1** |
| **"Investment Amount"** | The amount specified in the Subscription Form, that the Investor commits to invest in the Company, which may be decreased, but not increased, by the Company's decision as provided for in this Agreement |
| **"Liquidation Event"** | The disposal by the SPV of the Project resulting in the final distributions to be made by the SPV to Ambarfeld, and the distribution by Ambarfeld of all proceeds thereof to its shareholders |
| **"LLC Agreement"** | An agreement entered into on 30 January 2014 (as may be or may have been amended, restated, supplemented and/or otherwise modified) which governs the operation of the SPV |
| **"Manager"** | Golden Drache Limited, a BVI business company registered under the laws of the British Virgin Islands, with its registered address at c/o Icaza, Gonzalez-Ruiz & Aleman (BVI) Limited, Vanterpool Plaza, P.O box 873, Road Town, Tortola, British Virgin Islands |
| **"Project"** | The development of a mixed-use building on the Property |
| **"Property"** | lots 53, 57 and 61 located at west 21st street (540, 548, 550-552W 21st St.), New York, NY 10011 |
| **"Seller"** | The Seller of the Ambarfeld Shares |
| **"Shareholders Loan"** | The aggregate of several loans to be granted to the Company by the Investors which will be a part of the Investment Amount of each Investor |
| **"Shares"** | Ordinary shares each having a nominal value of $ 1.00 in the registered share capital of the Company |
| **"SPA"** | A Share Purchase Agreement dated as of 17 April 2015, (as amended on 27 April 2015) between Icy Face and the Seller |
| **"SPV"** | 540 West 21st Street, LLC, a Delaware limited liability company, with its registered address at 15 Warren street Ste 25, Hackensack, NJ, 07601 |
| **"Subscription Form"** | The form completed by each Investor in accordance with **SCHEDULE A** |

1.2. The headings in this Agreement are inserted for convenience only and shall not affect the construction thereof.

1.3. References herein to recitals, sections and exhibits refer to recitals, sections and exhibits of this Agreement unless otherwise stated.

1.4. The exhibits form part of this Agreement.

## 2. Transaction

2.1. The Investors shall invest the Investment Amount in the Company. The company may resolve to record all or any portion of the Investment Amount as a Shareholders Loan in the Company, pursuant to a shareholders loan agreement in the form enclosed as **Exhibit 2.1**.

2.2. The Company shall issue the Investors such number of Shares, for a price of $ 0.01 per Share, as shall represent such Investor's pro-rata portion of the total Investment Amount invested by all Investors under this Agreement. The Shares will be registered in the name of Salamander Nominees Limited or another licensed registered agent in the British Virgin Islands or the Escrow Agent, who will be holding the Shares on behalf of the Investors, and the Investors shall deliver to the Escrow Agent a duly completed *"Company Application Form"* and *"Nominee Agreement"*. The form of the Nominee Agreement is enclosed as **Exhibit 2.2**.

2.3. The Company shall utilize its funds in order to finance the acquisition of a portion of the Ambarfeld Shares and other expenses, all as provided for in Section 6.

2.4. Under the terms incorporated in the Designation Agreement, the Company shall be allotted such number of Ambarfeld Shares that will equal the Company's pro-rata portion of the Ambarfeld Purchase Price (as defined in the Icy Face Agreement). It is clarified that due to other designation agreements that Ice Face may enter into, potential financing of the Project, and other events that may occur in connection with the Project, the final number of Ambarfeld Shares that will be acquired by the Company, and the final amount that the Company will be required to pay for these Ambarfeld Shares will only be determined immediately prior to the Closing Date.

2.5. It is hereby clarified that the effective price per share that will be paid by the Company for the Ambarfeld Shares it shall acquire, will be equal to the effective price per Ambarfeld Share that will be paid by Icy Face and by other parties with whom Icy Face may enter into designation agreements. Therefore the effective amount that each Investor will (indirectly) invest in the Project will be similar to the effective price of other Investors that will acquire the Ambarfeld Shares.

## 3. The Company

The Company represents and warrants towards the Investors as follows:

3.1. The Company is a limited liability BVI business company incorporated and validly existing under the laws of the British Virgin Islands. A true copy of the Company's certificate of incorporation, Memorandum and Articles of Association are enclosed hereto as **Exhibit 3.1**.

3.2. As of the date hereof, the registered share capital of the Company is $50,000, divided into 50,000 Shares, and other than pursuant to this Agreement there is and will be no third party who has any right to receive or be issued any Shares or other securities by the Company.

3.3. The Company has not transacted nor has it been involved in any activity, except for the transactions contemplated herein.

3.4. The Company has not prepared or filed any financial statements, nor was it required to do so.

3.5. Under the terms and condition of the Designation Agreement, a copy of which is enclosed as **Exhibit 3.5,** the Company has the right to be designated as a third party under Section 11.07 of the SPA.

## 4. **Investors' Representations and Warranties**

Each of the investors represents and warrants towards the Company and the Manager as follows:

4.1. The Investor is acquiring the Shares for its own account for investment and not as a nominee and not with a view to the distribution thereof.

4.2. THE INVESTOR HEREBY DECLARES AND ACKNOWLEDGES THAT IT IS AWARE THAT THERE ARE SIGNIFICANT RISKS ASSOCIATED WITH INVESTMENT IN THE PROJECT, AND THAT THE INVESTMENT IN THE PROJECT MAY NOT BE SUITABLE FOR ALL INVESTORS. THE COMPANY AND THE MANAGER CANNOT GUARANTEE THE ACCURACY OF THE INFORMATION OR THE DATA PRESENTED TO THE INVESTOR SINCE IT WAS PARTLY CREATED AND BEEN RETRIEVED FROM OUTSIDE THIRD PARTIES OR FROM OTHER PUBLICATIONS AND THEREFORE THE COMPANY ASSUMES NO RESPONSIBILITY FOR ANY MISLEADING CONTENT OR INCORRECTLY LISTED INFORMATION OR DATA DUE TO SUCH NEGLIGENCE. ALL DRAWINGS CONCEPTS AND VIEWS ARE FOR ILLUSTRATION PURPOSE ONLY AND CAN BE INACCURATE OR MATERIALLY DIFFERENT FROM THE FINAL OUTCOME. DATA CAN ALSO QUICKLY BECOME OUT OF DATE AND THEREFORE ALL INFORMATION PRESENTED IS NOT GUARANTEED AND SHOULD BE INDEPENDENTLY VERIFIED BY THE INVESTOR AS TO THE CORRECTNESS OR THE ACCURACY OF SUCH INFORMATION.

THE INVESTOR FURTHER DECLARES AND ACKNOWLEDGES THAT REAL ESTATE DEVELOPMENT PROJECTS INVOLVE FINANCING ISSUES, PLANNING ISSUES, ENVIRONMENTAL ISSUES, OBJECTIONS AND INTERFERENCE BY THIRD PARTIES, INDEXATION, SUPPLY AND DEMAND THAT CAN CREATE MAJOR DELAYS, SET-BACKS AND ADDITIONAL EXPENSES THAT WILL HAVE SIGNIFICANT IMPACT ON THE ECONOMIC VALUE OF THE PROJECT. THEREFORE THERE CAN BE NO ASSURANCE THAT THE PROJECT WILL ACHIEVE ITS INVESTMENT OBJECTIVES AND EACH PROSPECTIVE INVESTOR SHOULD INDEPENDENTLY EVALUATE THE RISKS ASSOCIATED WITH INVESTMENT IN THE PROJECT.

4.3. The Investor had the opportunity to review the following documents and represents that it is fully aware of the terms and conditions thereof, and, to the extent applicable, agrees to such terms and conditions as they may affect the Manger, the Company and its holding of the Ambarfeld Shares:

4.3.1. the Advisory Agreement;

4.3.2. the SPA;

4.3.3. the LLC Agreement.

4.4. The Investor had the opportunity to ask questions and to receive answers regarding the Project, and the terms and conditions of the issuance of the Shares.

4.5. The Investor understands and acknowledges that the Company has not commenced any business activities and is dependent on the success of the Project.

4.6. The Investor has the ability to bear the economic risks of the potential loss of its entire investment.

4.7. The Investor understands that no public market now exists for any of the Shares, nor shall any such market is planned to exist in the future.

## 5. Funding

5.1. No later than on the First Funding Date, each Investor shall make a bank transfer of 25% (twenty five percent) of the Investment Amount, as specified in its respective Subscription Form, into the Escrow Account.

5.2. On each subsequent Funding Date, each Investor shall make a bank transfer of such part of its respective portion of the Investment Amount, as shall be required by notice that such Investor will receive from the Escrow Agent. Unless instructed otherwise in a duly written notice from the Escrow Agent delivered by the Escrow Agent to each Investor at least 7 Business Days in advance of the applicable Funding Date, each Investor shall make a bank transfer of the following portion of the Investment Amount at the corresponding Funding Date:

5.2.1. 20% (twenty percent) on the Second Funding Date

5.2.2. 20% (twenty percent) on the Third Funding Date

5.2.3. 20% (twenty percent) on the Fourth Funding Date

5.2.4. The remainder of such Investor's respective portion of the Investment Amount on the Fifth Funding Date.

5.3. Each Investor shall be a beneficiary of such number of Shares representing a percentage of the total number of Shares, which will be equal to the pro-rata portion of the actually invested funds by such Investor in the Company out of the total amount of the actually invested funds by all Investors in the Company. Any beneficial interest in a fraction of a Share shall be rounded down to the nearest whole number.

5.4. The provisions of this Section 0 shall supersede any other provisions relating to funding in the SPA or in the Shareholders Agreement.

5.5. The Investor acknowledges that it is aware that under the provisions of the SPA and the Icy Face Agreement, if the Company, Icy Face or any other Designee, does not transfer its respective portion of the Ambarfeld Purchase Price, and consequently Icy Face does not transfer in full the amounts required to be paid to the Seller under the SPA at the time. In such case, Icy Face, and consequently the Company and the Investors may face severe consequences, including, without limitation, forfeiture of all Ambarfeld Shares and the loss of all fund previously invested in the Company.

### 5.6. Defaulting Investor

The Company shall have the right to enforce its rights against any Investor who has not deposited its respective potion of the Investment Amount (a **"Defaulting Investor"**) within 3 Business Days after each Funding Date. Without prejudice to the aforesaid, the Company may offer to the other Investors, or any third party (the **"Remedying Investor"**) the opportunity to replace such Defaulting Investor as an Investor in the Company, under the same terms and conditions as set-out in this Agreement.

IN SUCH CASE ALL OF THE RIGHTS SUCH DEFAULTING INVESTOR HAS UNDER THIS AGREEMENT AND/OR UNDER ITS RESPECTIVE SHAREHOLDERS LOAN AGREEMENT (INCLUDING, WITHOUT LIMITATION, THE RIGHT TO REPAYMENT OF THE DEFAULTING SHAREHOLDER'S SHAREHOLDERS LOAN), AND THE BENEFICIAL INTEREST IN THE SHARES OF THE COMPANY, SHALL BE FORFEITED, AND THE COMPANY MAY TRANSFER SUCH RIGHTS TO ANY SUCH REMEDYING INVESTOR. EACH INVESTOR HEREBY GIVES A POWER OF ATTORNEY TO THE MANAGER TO TRANSFER, OR TO INSTRUCT THE ESCROW AGENT TO TRANSFER, SUCH DEFAULTING INVESTOR'S SHARES AND ALL OTHER RIGHTS TO THE REMEDYING INVESTOR(S), AND THE DEFAULTING INVESTOR HEREBY WAIVES ALL RIGHTS AND RELEASES THE MANAGER AND OR THE ESCROW AGENT FROM ANY LIABILITY IN CONNECTION THEREWITH.

## 6. Use of Proceeds

6.1. The Company shall utilize the funds of the Investment Amount in order to satisfy its obligations under the Designation Agreement in order to acquire title in a portion of the Ambarfeld Shares. In addition, the Company is authorized to utilize a portion of the funds of the Investment Amount in order to finance the costs and expenses of its incorporation, its ongoing activities and operations, and expenses in connection with the transactions contemplated herein (including, but not limited to, payment of the Escrow Agent's fees and expenses).

6.2. If the Investment Amount will not suffice to meet the Company's requirements, the Board may resolve to raise funds from other investors or from a financial institution.

6.3. No shareholder shall be required to extend further financing to the Company, over and above the Investors' commitment to grant their respective Investment Amount, or to provide any guarantee or collateral for the Company's benefit in order for the Company to obtain any financing.

6.4. If required by the Manager, the Board will resolve from time to time to raise additional capital, by equity, loans, or otherwise, under such terms and conditions as the Board may resolve meet with the Company's best interests, and always subject to the provisions of Section 0.

## 7. Management

### 7.1. Management of the Company

7.1.1. The Company will be managed by Salamander Associates Limited, **("Salamander")** under the standard terms of a management services agreement (the **"MSA"**) with this firm, as may be amended from time to time in accordance with its terms.

7.1.2. The Escrow Agent may, and if a shareholders adopt a resolution under Section 10.1.1, the Escrow Agent will, act in order to replace Salamander by another registered agent in the British Virgin Islands that has been proposed by Salamander or by the Manager and approved by the Escrow Agent, provided that such replacement registered agent agrees to assume the roles and responsibility of Salamander.

### 7.2. Management of the Investment in the Ambarfeld Shares

7.2.1. Pursuant to the provisions of the Icy Face Agreement, the Manager, or any third party designated by the Manager, will be the sole representative of all the entities that will become holders of the Ambarfeld Shares. Accordingly, the Manager shall be authorized to make all decisions that the Manager deems to be beneficial for all such parties, including the Company, in connection with the Transaction.

7.2.2. The provisions of the Advisory Agreement shall apply, *mutatis mutandis*, to the management of the Company investment in Ambarfeld Shares.

7.2.3. The Manager shall be entitled to receive a Finder's Fee and an Incentive Fee (as defined in the Icy Face Agreement).

THE INVESTORS ACKNOWLEDGE AND CONFIRM THAT THE MANAGER WILL EXERCISE ITS FULL DISCRETION WHEN MAKING DECISIONS RELATING TO AMBARFELD, AND SHALL NOT HAVE A DUTY OF CARE TOWARDS THE INVESTORS. ANY CLAIM OF ANY INVESTOR TOWARDS THE MANAGER IS HEREBY WAIVED AND THE MANAGER IS HEREBY RELEASED OF ANY LIABILITY TOWARDS THE INVESTORS, BY LAW OR EQUITY.

THE AFORESAID SHALL NOT DEROGATE FROM ANY OF MANAGER'S DUTIES UNDER THE ADVISORY AGREEMENT AND THE ICY FACE AGREEMENT.

### 7.3. Role of the Escrow Agent

7.3.1. The Escrow Agent shall open and operate the Escrow Account in accordance with the instructions of the Manager, and the Company and each Investor shall execute a copy of the Escrow Agreement in the form enclosed hereto as **Exhibit 7.3.1.**

7.3.2. The Escrow Agent shall send and receive any and all communications to the Company and the Investors on behalf of the Manager (without any liability with respect to the content or timeliness of delivery of such communications), and shall be the sole point of contact for any Investor with respect to the Transaction.

7.3.3. The Escrow Agent may be replaced only in accordance with the terms set forth in the Escrow Agreement.

THE INVESTORS ACKNOWLEDGE AND CONFIRM THAT THE ESCROW AGENT SHALL NOT HAVE A DUTY OF CARE TOWARDS THE INVESTORS. ANY CLAIM OF ANY INVESTOR TOWARDS THE ESCROW AGENT IS HEREBY WAIVED AND THE ESCROW AGENT IS HEREBY RELEASED OF ANY LIABILITY TOWARDS THE INVESTORS, BY LAW OR EQUITY.

## 8. The Board

8.1. The Company will have a Board consisting of at least 1 and no more than 4 Directors.

8.2. A majority of the Investors may replace the Directors from time to time.

8.3. Except for resolutions regarding Fundamental Issues, all Board resolutions shall be adopted by simple majority.

8.4. The Board shall meet when needed.

8.5. The Board may adopt a written resolution without a meeting, provided that all Directors sign such resolution.

8.6. Unless resolved otherwise by the Shareholders as a Fundamental Issue, the Directors shall not be entitled to receive any remuneration from the Company for their serving as Directors, provided that any remuneration agreed under the MSA is hereby deemed to be approved.

## 9. Shareholders Meetings

9.1. The Company will hold ordinary Shareholders meetings as shall be required by the laws of the British Virgin Islands.

9.2. The Shareholders may adopt a written resolution without a meeting, provided that all Shareholders entitled to vote in such meeting sign such resolution.

9.3. Except for resolutions regarding Fundamental Issues, all Shareholder resolutions shall be adopted by simple majority.

## 10. Fundamental Issues

10.1. The issues listed below are Fundamental Issues. Resolutions regarding Fundamental Issues listed below shall require an affirmative vote of 75% of the holders of the Shares:

10.1.1. replacement the Escrow Agent or of the management services company;

10.1.2. any change in the Articles which would affect the rights of the Shareholders;

10.1.3. the redemption of any Shares, debentures, warrants or options or the purchase by the Company of its own Shares, except in connection with a Liquidation;

10.1.4. any material change in the nature of operation of the Company's business;

10.1.5. the sale of all or a substantial portion of the Company's assets except in connection with a Liquidation or a restructuring of the corporate structure of the Company and the holding of the Ambarfeld Shares that will not have an adverse economic effect on the Investors;

10.1.6. the taking of any measures, including the making of any application to any court of law or the calling of any meeting of shareholders or creditors, to consider a proposal, for any liquidation, arrangement with, or an assignment for the benefit of its creditors, the dissolution or administration of the Company or the appointment of a receiver, administrator, Escrow Agent or other similar officer in respect of the assets of the Company;

10.2. Changes to the Distribution Policy shall require a unanimous resolution of all Shareholders.

## 11. The Articles

In case of any discrepancy between the provisions of this Agreement and the Articles, the provisions of this Agreement shall prevail in the following cases:

11.1. In the relationship between the Company and one or more Investors; and

11.2. In the relationship between two or more Investors.

## 12. Reporting and Information Rights

The Company will deliver to the Shareholders:

12.1. All reports that the Company will receive, if at all, regarding the Project, within 30 days after the Company receives such reports.

12.2. Annual financial statements, within 120 days after the end of each calendar year, including balance sheet and profit & loss account, changes in the equity statements, and any other information which may be required by law in the British Virgin Islands and any relevant tax authority. The reports will be prepared in accordance with IFRS.

## 13. Distribution Policy

As soon as the Company shall have Excess Cash, and in any case at when a Liquidation Event occurs, the Company will distribute any Excess Cash, within 30 Business Days after the end of each calendar quarter, as follows:

13.1. First, to the Shareholders pro-rata their portion of the Shareholders Loan until the aggregate amount distributed under this section shall equal the total amount of the accrued and unpaid interest on the Shareholders Loan;

13.2. Thereafter, to the Shareholders pro-rata their portion of the Shareholders Loan until the aggregate amount distributed under this section shall equal the principal amount of the Shareholders Loan;

13.3. Thereafter to all Shareholders as dividends pro-rata their shareholding.

## 14. Pre-emptive Rights

14.1. In case the Board resolves that the Company shall issue new Shares, it shall first offer them to the existing Shareholders, pro-rata their shareholdings at the time of the issuance, and shall specify the requested price per Share and terms of payment (the "Issue Terms").

14.2. In case one or more Shareholders declines to purchase such new Shares at the price and under the terms offered by the Company, the other Shareholders shall have the right to purchase such Shares, pro-rata their shareholdings at the time of the issuance.

14.3. Any new Shares not purchased by the Shareholders may be issued by the Company to third parties under terms not less favorable to the Company than the Issue Terms. Such third party shall be required, as a condition to the issuance of shares thereto, to enter into this Agreement as an Investor.

14.4. The provisions of Sections 14.1 - 14.3 shall apply, *mutatis mutandis*, to a resolution of the Board to raise funds by new shareholders loans solely or in combination with the issuance of new Shares.

## 15. Limitation on the Transferability of Shares

No Shareholder will be entitled to dispose of its Shares until the lapse of 3 years as from the Closing Date. Thereafter, the following provisions shall apply:

15.1. **Right of First Refusal** - all Shareholders will have a pro rata right of first refusal to purchase any Shares offered for sale by any other Shareholder to any person or entity, and shall be entitled to purchase the pro rata portion of any other Shareholder that does not exercise such right of first refusal, as follows:

   15.1.1. Should a shareholder (hereinafter the **"Transferring Shareholder"**) wish to sell or transfer any shares in the Company, it shall give notice in writing to the Company (with a copy to the Escrow Agent), of such proposed sale or transfer, and such notice shall specify the identity of the proposed transferee, and full details regarding the shares proposed for sale (hereinafter, the **"Transfer Shares"**) and the price, terms and conditions of the proposed sale or transfer (hereinafter, the "Sale Notice"). The Company will promptly deliver the Sale Notice to all other Shareholders.

   15.1.2. Within 30 days following receipt of a Sale Notice (hereinafter – the **"Notice Period"**), each of the other shareholders shall have the right to notify the Transferring Shareholders, of their decision to purchase, directly or through a related party, all or part the Transfer Shares at the price, terms and conditions set out in the Sale Notice.

   15.1.3. Should the other shareholders positively respond, in accordance with subsection 15.1.2, the Transfer Shares shall be sold and conveyed to the other shareholders at the price, terms and conditions set out in the Sale Notice. If the other shareholders decide to purchase in aggregate a number of Shares exceeding the number of the Transfer Shares (the **"Aggregate Number"**), each such shareholder shall purchase a portion of the Transfer Shares pro-rata the number of Transfer Shares that it wanted to purchase out of the Aggregate Number.

   15.1.4. In the event that the Aggregate Number does not equal at least the number of the Transfer Shares within the Notice Period, the Transferring Shareholder shall be entitled to sell or transfer the Transfer Shares to the proposed transferee at the price, terms and conditions, all as set out in the Sale Notice within a period of 60 days from the conclusion of the Notice Period. After said 60-day period shall have elapsed, the Transferring Shareholder shall not be entitled to sell any shares in the Manager without once again satisfying the provisions of this Section 15.1.

   15.1.5. The closing of the sale by the Transferring Shareholder and the other shareholders that wish to participate in such sale, shall be agreed between the Transferring Shareholder and the other shareholders that wish to participate in such sale and the parties shall cooperate in good faith in the provision of all documents necessary for the closing of the said sale.

15.2. The limitations set-out in subsection 15.1 above shall not apply regarding transfers to legal entities controlled by a Shareholder, to immediate family members of a Shareholder or pursuant to a legally binding and valid Probate Order or Succession Order.

## 16. Confidentiality

All Investors shall keep in strict confidence all information relating to the Company, the Investors, the Manager, the Escrow Agent, the Project, the Company's business and this Agreement **("Confidential Information")**, and are obligated to treat the Confidential Information confidentially as business or trade secrets and, without the prior written consent of the Company, not to divulge any Confidential Information to any third party. The aforesaid limitation shall not apply in case of information that at the time of disclosure is in the public domain or subsequently enters the public domain (other than as a result of a direct or indirect disclosure by a the Shareholder in violation hereof), nor in case that an Investor is required by law to release information to a competent authority, and then only to the minimum extent to which it is required.

## 17. **Governing Law, Dispute Resolution**

This Agreement shall be governed and construed in accordance with the laws of England and Wales, without giving effect to its conflicts of laws provisions. All disputes which may arise from this contract or in connection with shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to The London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presented to the Court will be English.

## 18. **Miscellaneous**

18.1. This Agreement may be executed in any number of counterparts, each of which will be an original as regards any party whose signature appears thereon and all of which together will constitute one and the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, will bear the signatures of all parties reflected hereon as signatories. The Manager is intended to become a third-party beneficiary of this Agreement.

18.2. This Agreement, along with any exhibits, schedules, and amendments hereto, encompasses the entire agreement of the Parties, and supersedes all previous understandings and agreements between the parties, whether oral or written. The Parties hereby acknowledge and represent, that they have not relied on any representation, assertion, guarantee, warranty or other assurance, except those set out explicitly in this Agreement, prior to the execution of this Agreement.

18.3. Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written document signed by all parties to this Agreement. The waiver by a party of any breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding breach or default.

18.4. Unless otherwise explicitly provided for in this Agreement, where a reconcilable conflict exists between one or more provisions of this Agreement and provisions of other documents mentioned or referred to in this Agreement, they shall have the following order of precedence between them as follows: first the LLC Agreement, second the Advisory Services Agreement, third the SPA, fourth the Designation Agreement and fifth– this Agreement, and in such case the provision of this Agreement shall be interpreted in a way that will give effect to the most senior document in the above list. In case of any discrepancy between the provisions of this Agreement and the Shareholders Loan Agreement the provisions of this Agreement shall take precedence.

18.5. The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions.

18.6. Each party will bear its respective expenses and fees of its own accountants, attorneys, and other professionals incurred with respect to this Agreement and the transactions contemplated herein, provided that the Company shall pay any costs and expenses from

the proceeds of the Investment Amount.

18.7. Any notice or other communication required or permitted to be given under this Agreement will be in writing, will be delivered personally or by registered mail (air mail for international delivery), or courier delivery, or by facsimile or electronic mail with a confirmation copy by registered mail (air mail for international delivery), and will be deemed given upon actual delivery or, if mailed by registered or certified mail, 7 days after deposit in the mails, addressed according to the details provided in the heading of this Agreement, or to such other address as a party may have furnished to the other parties by written notice given in accordance with this Section 18.7.

18.8. This Agreement has been negotiated by the respective parties hereto and the language hereof will not be construed for or against either party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first herein above written.

*[SIGNATURE PAGE TO FOLLOW]*



SIGNATURE PAGE

Great Feats Limited

By: _SALAMANDER MANAGEMENT (LIMITED)_

Name:

By: _eran tadmor_

(Investor)

**SCHEDULE A – SUBSCRIPTION FORM** (Corporate Investor)

To:
Great Feats Limited (the **"Company"**)
Trinity Chambers
POB 4301
Road Town, Tortola,
**British Virgin Islands**

Dear Sirs,

In connection with our contemplated investment in the Company, we would like to subscribe for investment in the Company as follows:

**Amount:** _____

**Name of Investor:** _____

**Country in which incorporated:** _____

**Registered Office Address:**

_____

_____

**Company Number:** _____

**Facsimile number:** _____

**Email address:** _____

**Bank Details** (for distributions to be made by the Company)

Name of bank: _____

Branch Details: _____

Address: _____

_____

Account Number: _____

Account Name: _____

Routing Instructions: _____

IBAN: _____

**Details of Ultimate Beneficial Owner:**

**Residential Address:**

_____

_____

_____

_____

**Passport Number**: _____          **Issuing Country**: _____

We hereby declare and certify that the above details are correct and understand that I may be requested to provide certain documentation as shall be required by the Company's Directors in order to satisfy the relevant know your client sand anti money laundering provisions.

Name (print):     _____

Date:             _____

Signature:        _____

Signed by:        _____

Title:            _____

## SCHEDULE A – SUBSCRIPTION FORM (Individual Investor)

To:
Great Feats Limited (the "Company")
Trinity Chambers
POB 4301
Road Town, Tortola,
British Virgin Islands

Dear Sirs,

In connection with our contemplated investment in the Company, we would like to subscribe for investment in the Company as follows:

Amount: _____ $ 1,000,000 _____

Name of Investor: ERAN TADMOR

Residential Address:

Facsimile number:

Email address:

Bank Details (for distributions to be made by the Company):

Name of bank:

Branch Details:

Address:

Account Number:

Account Name:

Routing Instruction

IBAN:

I hereby declare and certify that the above details are correct and understand that I may be requested to provide certain documentation as shall be required by the Company's Directors in order to satisfy the relevant know your client and anti money laundering provisions.

Name (print):     ERAN TADMOR

Date:     28|5|15

Signature:

**LIST OF EXHIBITS**

| 1.1 | Icy Face Agreement |
|-----|-------------------|
| 2.1 | Form of Shareholder Loan Agreement |
| 2.2 | Form of Nominee Agreement |
| 3.1 | Great Feats Corporate Docs |
| 3.5 | Designation Agreement |
| 7.3.1 | Form of Escrow Agreement |

**EXHIBIT 1.1     Icy Face Agreement**

# EXHIBIT 1.1

## SHAREHOLDERS' AGREEMENT

THIS SHAREHOLDERS' AGREEMENT (the "**Agreement**"), effective as of March **17**, 2015 ("**Effective Date**"), is made and entered into by and among the individuals and entities listed in **Annex A** each of which had entered into this Agreement hereto (each an "**Initial Investor**" and together, the "**Initial Investors**") and such other parties that, subject to the written consent of the Representative (as defined below), will sign a joinder to this Agreement (the "**Joinder Agreement**") (each, an "**Additional Investor**"). The Initial Investor, together with any Additional Investors shall be referred to as the "**Investors**", or the "**Parties**".

### RECITALS

**WHEREAS,** the Investors, jointly and severally, would like to purchase 50,000 shares USD1.00 par value of Amberfeld Limited. (the "**Shares**"), an International Business Company incorporated in the territory of the British Virgin Islands, registration number 1800843 ("**Amberfeld**" or the "**Company**"), constituting 100% of the issued and outstanding share capital of Amberfeld for an aggregate purchase price equal to the Amberfeld Purchase Price, as defined below (the "**Investment**"); and

**WHEREAS,** at the time of the Investment, Amberfeld is the owner of 40% of the ownership rights (the "**Rights**") in 540W 21st LLC (the "**LLC**") and the owner of several promissory Notes in the amount of USD 21,897,000, par value, provided to the LLC, in accordance with that certain LLC Agreement, dated January 30, 2014, entered into by and among Casco Development Corp., a Delaware corporation (the "**Managing Member**"), Amberfeld and several other investors listed therein, (the "**LLC Agreement**");

**WHEREAS,** the Investors wish to cooperate in good faith to perform the Investment, and in furtherance thereof, to appoint the Proxy (as defined below) as their agent and exclusive representative to negotiate and agree upon the terms of the Investment( other than the aggregate purchase price as defined in this agreement) ,with the current shareholder of Amberfeld (the "**Seller**"), and sign on their behalf and in their stead, on an applicable share purchase agreement reflecting such terms (the "**SPA**");

**WHEREAS,** the Investors desire, in addition to the provisions and terms as may be set forth in the Company's memorandum, bylaws, articles of association, or such other corporate constitutive documents then in effect (the "**Articles**"), to regulate certain rights and obligations in connection with the Company which shall apply to all Investors immediately upon the closing of the transactions to be contemplated under the SPA (the "**SPA Closing**"), and following the expiration of the Proxy Agreement (as defined below), to appoint the Manager (as defined below), as their agent and exclusive representative for all matters related to the Investment and the Company;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto agree as follows:

### 1. PREAMBLE, ANNEXES AND TITLE HEADINGS

1.1. The preamble to this Agreement and its Appendices constitute an integral part thereof.

1.2. The Section headings are for convenience only and shall not be used in the interpretation of the Agreement.

### 2. DEFINITIONS



2.1. **"Advisory Agreement"** shall mean that certain advisory services agreement signed between the Company and the Manager.

2.2. **"Amberfeld Purchase Price"** shall mean USD 30,769,700 (Thirty Million Seven hundred and Sixty Nine Thousands and Seven Hundreds United States Dollars), as adjusted in accordance with the provisions of Section 3.5 herein.

2.3. **"Funding Call Notice"** a call for additional funds to be sent to each of the Investors by the Manager as a written notice, according to which each such Investor shall be required to wire additional funds to the Designated Account, in order to fulfill a corresponding obligation of the Company towards the Seller, the LLC or for any other reason.

2.4. **"Calculation Dates"** means each of 30 June and 31 December, with the first Calculation Date being 30 June 2015.

2.5. **"Designated Account"** shall mean a bank account held by the Escrow Agent for the benefit of the Investors, and as soon as practicable, the bank account of the Company.

2.6. **"Escrow Agent"** shall mean such agent appointed by the Representative, who shall act in accordance with the provisions of an escrow agreement specifically relating to the transaction contemplated herein, to be entered into by and between the Representative (on behalf of the Investors) and the elected Escrow Agent (the **"Escrow Agreement"**).

2.7. **"Idelton"** shall mean Idelton Finance Limited, one of the Members of the LLC, who currently holds 20% of the ownership rights in the LLC.

2.8. **"IRR"** shall mean, as of the relevant Calculation Date, the internal rate of return to the Investors from the Amberfeld Purchase Price calculated using Microsoft Excel Function XIRR.

2.9. **"Incentive Fee"** means payments to the Manager , reduced by payments made or owed to the Manager by the Company or on its behalf in accordance with the Advisory Agreement, and by the relative tax payments made by the LLC on the amounts received by the company calculated as follows:

   2.9.1. Once Total Returns equal to or exceed the Amberfeld Purchaser Price plus 8% IRR, the Manager will be entitled to payment in an amount equal to 2.67% IRR of the Total Investment Amount per year of investment.

   2.9.2. Once the Total Returns exceed 10.67% IRR, any additional Returns will be divided between the Manager and the Investors, such that the Manager will receive 25% of such returns and the Investors shall receive 75% of such returns, until the Total Return will be equal to 25% IRR.

   2.9.3. Once Total Returns exceed 25% IRR, any additional returns will be divided between the Manager and the Investors, such that the Manager will receive 50% of such additional returns and the Investors shall receive 50% from of such returns.

2.10. **"Member"** shall mean a member of the LLC, as defined in the LLC Agreement.

2.11. **"Ordinary Shares"** shall mean Ordinary Shares of the Company, nominal value USD1.00 each.

2.12. **"Permitted Transferee"** shall mean, with respect to any shareholder: (i) such shareholder's immediate family members (spouse, parent, child, siblings); (ii) a person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such shareholder; (iii) a transferee by operation of law; provided, in each of (i) through (iii) above, that the Permitted Transferee has executed a written undertaking to comply with and to be bound by this Agreement, the Articles of Association of the Company and all agreements binding upon the transferor regarding the transferred shares.

2.13. **"Proxy"** shall mean Mr. Noam Teltch, a Panamanian resident.

2.14. **"Put Option"** shall mean an option to be granted to Amberfeld by Idelton, concurrently with the execution of the SPA, according to which, Amberfeld shall have the right, but not the obligation, to sell to Idelton, and, upon the exercise thereof, Idelton shall be obliged to buy from Amberfeld, up to 10% of the ownership rights in the LLC, at an exercise price up to 25% of the Amberfeld Purchase Price, as may be adjusted in accordance with the provisions of Section 3.5 of this Agreement, to be exercised no later than June 10 ,2015 , with accumulated interest of 5% per annum, compounded from the Effective Date and until the payment day.

2.15. **"Representative"** shall mean the Proxy and upon the termination of the Proxy Agreement (as defined below), the Manager, or, if the Manager does not counter sign this Investment Agreement as provided for in Section 10.9 below, then "Representative" shall mean with respect to each Investor, such other person or corporate entity nominated by such Investor by giving written notice to the Proxy.

2.16. **"Manager"** shall mean Golden Drache Ltd., a BVI Business Company incorporated in the territory of the British Virgin Islands, registration number 1800834, or another party if and when nominated by an Investor under Section 10.10 below.

2.17. **"Shareholder"** shall mean any holder of any class or series of shares of the Company.

2.18. **"Total Investment Amount"** shall mean the total amount paid by all Investors under the provisions of this agreement.

2.19. **"Total Returns"** shall mean all amounts received by Amberfeld in return for its investment in the LLC ,including, *inter alia*, interest payments on loans, dividends and any other payment, plus any tax payments made with respect to any of these payments by the LLC and/or Amberfeld.

## 3. **THE INVESTMENT**

3.1. **Performance of the Investment**. Subject to and in accordance with the terms and conditions of this Agreement, following the signing of this agreement by each of the Investors and by the Proxy, each of the Investors, agree to carry out the Investment and to make his part (as detailed in Annex C) of the payment of the Amberfeld Purchase Price, as may be adjusted from time to time in accordance with Section 3.5below, and any interest accrued thereupon, as well as the finder's fee described in Section 3.4.2 below.

3.2. **Appointment of a Proxy**. The Investors hereby irrevocably appoints the Proxy, as their mutual representative to negotiate with the Seller the terms of the Investment and the SPA and sign on the SPA on their behalf and in their stead, all in accordance with and subject

4

to the terms and conditions of the proxy agreement attached hereto as **Annex B** and executed concurrently with this Agreement (the "**Proxy Agreement**"). The appointment of the Proxy under the Proxy Agreement shall become effective on the date of the Agreement and shall expire, upon the execution and delivery of the SPA.

3.3. **The Designated Account**. The Designated Account shall be managed by the Representative (as may be delegated to the Escrow Agent in accordance with the Escrow Agreement). The Designated Account shall be used for all transactions of the company including the collection of the Amberfeld Purchase Price plus accrued interest thereon, or any part thereof, from the Investors. The Designated account shall be used by the Representative only for payments of the Amberfeld Purchase Price to the Seller or any other obligations of the company under this agreement. As soon as practicable, the Designated Account shall be used as the bank account of the Company for all intents and purposes

3.4. **Payment Schedule**. Each of the Investors shall pay his part of The Amberfeld Purchase Price and the Finder's Fee described in section 3.4.2 below ,to the Designated Account, , subject to the provisions of section 3.5 below and in accordance with the following payment schedule (the "**Payment Schedule**"):

   3.4.1. No later than one business day after the Proxy has delivered to the Investors the details of the Designated Account, together with a duly signed copy of the Escrow Agreement, and in any case not before March 23, 2015, each Investor shall transfer to the Designated Account, the amount set forth under such Investor's **Annex C**, in the Column "*First Payment*", which shall equal, in the aggregate, to USD4,000,000 (Four Million United States Dollars);

   3.4.2. No later than three (3) months following the Effective Date, each Investor shall transfer to the Designated Account the amount set forth in such Investor's **Annex C**, in the Column "*Second Payment*", which shall equal, in the aggregate to USD4,000,000 (Four Million United States Dollars) plus interest accrued thereon. This amount includes a one-time payment in an aggregate amount of USD 912,000, which constitutes a finder's fee, and will be paid out to the Manager;

   3.4.3. No later than nine (9) months following the Effective Date, each Investor shall transfer to the Designated Account the amount set forth under such Investor's **Annex C**, in the Column "*Third Payment*", which shall equal, in the aggregate to USD3,000,000 (Three Million United States Dollars) plus interest accrued thereon ;

   3.4.4. No later than twelve (12) months following the Effective Date, each Investor shall transfer to the Designated Account the amount set forth under such Investor's **Annex C**, in the Column "*Fourth Payment*", which shall equal, in the aggregate to USD3,000,000 (Three Million United States Dollars) plus interest accrued thereon ;

   3.4.5. No later than fifteen (15) months following the Effective Date, each Investor shall transfer to the Designated Account the amount set forth under such Investor's **Annex C**, in the Column "*Fifth Payment*", which shall equal, in the aggregate to USD3,000,000 (Three Million United States Dollars) plus interest accrued thereon;



5

3.4.6. No later than eighteen (18) months following the Effective Date, each Investor shall transfer to the Designated Account the amount set forth under such Investor's **Annex C**, in the Colum *"Sixth Payment"*, which shall equal the outstanding portion of the Amberfeld Purchase Price at such time plus accrued interest thereon (the "**Final Payment**").

Any part of outstanding amount of the Amberfeld Purchase Price not paid at the closing of the transactions to be set forth in the SPA, (the "**Outstanding Amberfeld Purchase Price**") shall carry an interest of 5% accumulative on an annual basis, compounded from the Effective Date until the actual payment of such portion of the Outstanding Amberfeld Purchase Price (the "**Agreed Interest**").

3.5. **Adjustments to the Amberfeld Purchase Price**. The Amberfeld Purchase Price may be calculated and adjusted in accordance with the following terms and provisions:

   3.5.1. Any and all amounts contributed by the Seller through Amberfeld following the Effective Date, as may be required under the LLC Agreement, shall be added to the Final Payment and shall also accumulate the Agreed Interest compounded from the actual contribution date of each such amount and until actual payment of the Final Payment.

   3.5.2. Any distribution to be made from the LLC to its Members, due to refinance, investment or presales preformed by the LLC, will be transferred by the Manager to the Seller, and will be considered as payments on the account of the Outstanding Amberfeld Purchase Price and shall reduce the portion of Outstanding Amberfeld Purchase Price due by each Investor, on a pro rata basis. The Manager shall determine the necessary adjustments to **Annex C**.

   3.5.3. **Failure to Pay**. It is agreed and understood by the Investors, that a failure by any Investor (the "**Defaulting Investor**") to make timely payment in accordance with Section 3.4 above which is not cured within 7 days (the "**Cure Period**") shall consider as a breach of this Agreement. A Defaulting Investor shall be deemed to have waived and forfeited any and all rights or claims with respect to prior payments made by such Defaulting Investor in relation to the Investment, or any Ordinary Shares otherwise attributable to such Defaulting Investor. For the avoidance of doubt it is hereby clarified that such waiver and forfeiture, if any, will be the sole remedy against such Defaulting Investor and in such case the Defaulting Investor shall have no other liabilities whatsoever towards the Seller, the Company, the Representative, the Proxy or any other third party, in connection with this Agreement or any other document relating to the transactions contemplated herein. Upon such breach by one or more Defaulting Investor(s), the following events shall occur: The Representative shall provide all the Investors, other than the Defaulting Investor(s), a written notice (the "**Buy Out Notice**"), according to which, each of the Investors shall has an option to pay, within 14 days from the lapse of the Cure Period, the amount not paid by the Defaulting Investors when due (the "**Unpaid Amount**") or a portion thereof, provided that the Investors who are interested in exercising such option (each such investor, a "**Paying Investor**"), pay, in the aggregate, not less than the entire Unpaid Amount. If more than one Paying Investor exists, than the payment of the Unpaid Amount shall be divided among the Paying Investors, *pro rata* among all such Paying Investors, based on their relative commitment to invest according to each such Paying Investor's Annex C (the "**Buy Out Option**").



6

3.5.4. Upon the exercise of the Buy Out Option and payment of the Unpaid Amount in full, the Paying Investor(s) shall be considered as if they were entitled with the rights of the Defaulting Investor(s), *pro rata*, among themselves and all amounts paid previously by the Defaulting Investor(s) until such time (the "**Previously Paid Amounts**"), shall be deemed as if they were paid by the Paying Investors(s), *pro rata*, among all such Paying Investors.

3.5.5. Following the exercise of the Buy Out Option, the Manager shall determine, the allocation of the payment obligations of the Outstanding Amberfeld Purchase Price, and shall provide a new **Annex C** for each of the Investor in accordance therewith.

3.5.6. For avoidance of doubt, it is clarified that the SPA will provide for a forfeiture of all Shares as well as an amount of up to the entire Amberfeld Purchase Price previously paid to the Seller at that time, in the event that not all of the Purchase Price is transferred to the Seller in a timely manner.

3.6. **Allocation of Shares**. Upon full payment of the Amberfeld Purchase Price, the Representative shall instruct the Escrow Agent to release the Shares from the escrow, and transfer to each of the Investors (the "**Transfer**") such amount of Ordinary Shares which constitutes the holding percentage ascribed to such Investor in accordance with his relative share in the investment (the "**Holding Percentage**"). For avoidance of doubt, the appointment of the Representative shall remain in force after the Transfer.

3.7. **Admission of Additional Investors**. The Representative or any person or entity designated by him, shall have the full right, power and authority to admit any Additional Investor(s) at the sole discretion of the Representative by signing such Additional Investor(s) on a Joinder Agreement in order to meet the Company's obligations to the seller .In case the valuation of the company for the purpose of this transaction will be less than the Total Investment of all Investors in the company until the time of Additional Investor(s) Investment , the Representative shall provide all the Investors, a Buy Out Option in the terms and conditions as set in section 3.5.3 above, in the relevant changes. The Representative shall determine the necessary adjustments to the **Annex C** provided to each Investor in accordance with the admission of such Additional Investor(s).

4. **REPRESENTATIONS AND WARRANTIES OF THE INVESTORS**

Each of the Investors hereby represents and warrants to the other Investors and to the Representative as follows:

4.1. **Acknowledgments**

4.1.1. The Investor acknowledges and confirms that it agrees to all the terms and provisions of the LLC Agreement and provide his consent for the Company to act upon the LLC Agreement in all matters as if it has been a Shareholder at the signature of the LLC Agreement originally.

4.1.2. The Investor acknowledges that the LLC currently plan to, subject to favorable market conditions, sell its properties within 3-4 years from the Effective Date (the "**Proposed Terms**") and, consequently, to fully distribute all proceeds to the Members and be liquidated (the "**Liquidation Event**"). However, the Investor acknowledges that due, for example, to unfavorable market conditions, the Proposed Terms may materially change, and the Liquidation Event may be

significantly delayed.

4.1.3. The Investor acknowledges and agrees to the terms of the Put Option as detailed above.

4.1.4. The Investor acknowledges and agrees that the Proxy, and upon the expiration of the Proxy Agreement, the Manager, shall be the sole manager of the Company. The Manager or any person or entity designated by him, shall have the full right, power and authority to conduct the business and affairs of the Company, and to do all things necessary including the admission of any Additional Investor(s) and/or any purchase, sale, financing or mortgaging of any asset of the Company. Each Investor agrees that the decisions of the Representative shall bind the Company and shall be treated as if they were decisions approved by all of the Investors.

4.1.5. The Investor acknowledges and agrees that in any case of conflict or inconsistency between this agreement and the LLC Agreement or any other related agreement including but not limited to the Advisory Agreement and the Promissory Notes (as attached to the LLC Agreement), the LLC Agreement and/or the other related agreements shall prevail.

4.1.6. By signing this agreement each Investor is obligated to invest up to the amount and according to the date payments set forth in such Investor's **Annex C**.

## 4.2. **Enforceability**

4.2.1. This Agreement, when executed and delivered by such Investor, constitutes the valid, binding and enforceable obligations of the Investor. The execution, delivery and performance of this Agreement by the Investor will not conflict with or result in a violation of, any of the terms, conditions and provisions of their governing instruments.

4.2.2. Organization and Authority. The Investor is a legal entity duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it was incorporated. The Investor has full corporate power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted.

4.2.3. Authorization; Approvals. All corporate action on the part of the Investor its shareholders and directors necessary for the authorization, execution, delivery, and performance of all of the Investor's obligations under this Agreement has been taken prior to the date hereof. This Agreement when executed and delivered by or on behalf of the Investor, shall be duly and validly authorized, executed and delivered by the Investor and shall constitute the valid and legally binding obligations of the Investor, legally enforceable against it in accordance with their respective terms.

4.2.4. No Breach. Neither the execution and delivery of this Agreement nor compliance by the Investor with the terms and provisions hereof, will conflict with, or result in a breach or violation of, any of the terms, conditions and provisions of: (i) its governing documents in effect at the Effective Date, or (ii) any judgment, order, injunction, decree, or ruling of any court or governmental authority, domestic or foreign.

## 5. **MANAGEMENT FOLLOWING THE SIGNING OF THE SPA**

5.1. From the Effective Date and until the expiration of the Proxy Agreement in accordance with its terms, the management authority set forth in Section 3.2 shall vest irrevocably and exclusively with the Proxy. Upon the signing of the SPA and thereafter, the management authority set forth in this Section 5 shall vest irrevocably and exclusively with the Manager.

5.2. The Representative, acting alone and without the consent of any Investor, shall have the full right, power, authority and discretion to conduct the business and affairs of the Company, and to do all things necessary (including without limitation, the admission of any Additional Investors and/or any purchase, sale, financing or mortgaging of any asset of the Company or any subsidiary) in order to meet the obligations and commitments of the Company and any subsidiary.

5.3. The decisions of the Manager or and the proxy shall bind the Company and any subsidiary and shall be treated as if they were decisions approved by all Investors. Each contract, agreement, deed, mortgage, security agreement, promissory note or other instrument or document executed by the Manager with respect to any business or property of the Company or any subsidiary shall be conclusive evidence in favor of any and every person or entity relying thereon or claiming thereunder that (a) at the time of the execution and delivery thereof this Agreement was in full force and effect, (b) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Company, and (c) the Manager was duly authorized and empowered to execute and deliver, and to cause the Company to perform any and every such instrument or document for and on behalf of the Company.

5.4. No Investor is an agent of the Company solely by the virtue of being an Investor, and no Investor has authority to sign, act for or bind the Company solely by virtue of being an Investor, all such powers being vested solely and exclusively in the Manager.

5.5. Any Investor that executes any document or instrument or otherwise take any action to bind the Company in violation of the foregoing shall be solely responsible for, and shall indemnify the Company and each other Investor against, any losses that the Company, or such other Investor, as the case may be, may at any time become subject to or liable for by reason of the actions specified above.

5.6. In addition, to the extent that the Manager or affiliate thereof execute any guarantee or undertakes any similar obligation to pay any lender and makes a payment under such guarantee or other undertaking in behalf of the Company and/or on behalf of the Investor, each Investor hereby agrees to indemnify the Manager, the proxy or such affiliate for such Investor's share, in accordance with the holding percentage of such Investor multiplied by the amount ascribed to such execution of guarantee, undertaking or any similar obligation , but in any case no Investor will be required to Invest more than his obligation as detailed in Annex C.. The foregoing shall survive the termination of this Agreement.

5.7. The Company shall protect, defend, indemnify and hold harmless the Manager or and the Proxy or any of their representatives from and against any and all losses, costs, amounts paid or payable, threats, damages, injuries, liabilities, settlements, judgments, awards, fines, penalties, and fees (including attorneys' fees) and expenses of any kind or nature ("**Damages**") that the Manager and or Proxy incurs by reason of or in connection with his acting as the Manager or Proxy of the Company, except for Damages caused by willful misconduct or fraud of the Manager or Proxy. During the continuance of the Company, the Manager and Proxy shall be permitted to participate in or carry on any other business or trade without any payment or obligation to the Company.



5.8. The Manager may designate one or more individuals as officers or other agents of the Company, who may but need not have titles, and shall exercise and perform such powers and duties as shall be assigned and delegated to them from time to time by the Manager.

5.9. In case the Manager determined that additional funds above the Amberfeld Purchase Price are needed in order to finance the Company to pay the Company's fees, costs or expenses payable by the Company pursuant to this Agreement, to meet the Company's obligations, or from any other reason, the Manager may, in its sole discretion, elect to send a written notice to all Investors (a "**Funding Call Notice**").

5.10. A Funding Call Notice shall state the aggregate amount of additional funds that are required to be funded by the Investors, the amount of the funding required from each Investor, computed on a pro rate basis in accordance with their percentage interest in the Company as of the date hereof, the purpose for which such additional funds are required and the date by which such additional funding is required to be made.

5.11. In case the Funding Call Notice, together with amounts already invested by the Investor, exceed the total Investment amount of an Investor, as detailed in Annex C (the "Excess Amount"), the Investor may choose not to invest the Excess Amount ( a" Non Participating Investor". In such case the Manager shall provide all the Investors, other than the Non Participating Investor(s), a written notice, according to which, each of the Investors shall has an option to pay, within 7 days, the amount not paid by the Non Participating Investors . The Dilution of the Non Participating Investors will be done based on a company value equal to Total Investment in the company until the time of the Funding Call Notice. In case the Funding Call Notice, together with amounts already invested by the Investor, does not exceed the total Investment amount of an Investor, as detailed in Annex C, section 3.5.3 shall prevail with the relevant changes.

5.12. The Manager shall provide instructions to the Escrow Agent in respect of the funds held by the Escrow Agent in the Designated Account.

5.13. In consideration for the Manager's services and all other undertakings detailed herein, and in the Advisory Agreement, following the SPA Closing, the Company, shall pay the Manager the Incentive Fee.

5.14. The Incentive Fee shall be the Manager's compensation in full for satisfactorily providing the service defined in this Agreement. Without derogating from the generality of the aforesaid, the Incentive Fee shall not substitute any fee, compensation or consideration ascribed to the Company for any services provided to the Company or to the LLC which are not part of this Agreement, including but not limited to advisory services provided to the Company by the Manager in accordance with the Advisory Agreement and any payments for services provided to the Company and/or to the LLC by the Managing Member. For avoidance of doubt, it is hereby clarified that the payments which are made in accordance with the Advisory Agreement shall be reduced from the Incentive Fee.

## 6. **RIGHT OF FIRST REFUSAL**

6.1. As of the Effective Date, if any Investor, and following the SPA Closing, any holder of Ordinary Shares of the Company ("**Holder**"), desires to sell or transfer all or any part of the rights for such shares to any party, which is not a Permitted Transferee of such Holder (the "**Third Party**"), such Holder (the "**Selling Shareholder**") shall first offer the rights for such shares (the "**Offered Shares**"), at the price and on the terms of the proposed

transfer , to all other holders of Ordinary Shares of the company ("**Entitled Holders**"), by written notice to the Manager. The notice shall include the identity of the Third Party and the proposed price and terms of sale of the Offered Shares (the "**Offer**") Any Entitled Holder may accept such offer in respect of all or any of the Offered Shares by giving the Selling Shareholder (with a copy to the Company) notice to that effect within seven (7) days after being served with the Offer. Failure to timely accept the offer as to any of the Offered Shares shall be deemed as a decision not to purchase any of the Offered Shares and to waive any rights with respect thereto.

6.2. If the acceptances, in the aggregate, are in respect of all of, or more than, the Offered Shares, then the accepting Entitled Holders shall be entitled to acquire the Offered Shares, on the terms aforementioned, in proportion to their respective holdings of shares, provided that no Entitled Holder shall be entitled or shall be forced to acquire under the provisions of this Section 6 more than the number of Offered Shares initially accepted by such Entitled Holder, and upon the allocation to the Entitled Holder of the full number of shares so accepted, such Entitled Holder shall be disregarded in any subsequent computations and allocations hereunder. Any shares remaining after the computation of such respective entitlements shall be re-allocated among the accepting Entitled Holders (other than those to be disregarded as aforesaid), in the same manner, until one hundred percent (100%) of the Offered Shares have been allocated as aforesaid.

6.3. If the acceptances by the Entitled Holders, in the aggregate, are in respect of less than the total number of Offered Shares, then the Selling Shareholder shall have ninety (90) days thereafter to sell the Offered Shares at the price and upon terms and conditions no more favorable to the Third Party than specified in the Offer. In the event that such Selling Shareholder has not sold the Offered Shares within said ninety (90) days period, such Selling Shareholder shall not thereafter sell any of the Ordinary Shares of the Company without first offering such shares to the Entitled Holders in the manner provided above.

## 7. **CHANGES IN SHARE CAPITAL**

7.1. If, from time to time during the term of this Agreement there is a dividend of any security, share split or other change in the character or amount of any of the outstanding securities of the Company then, in such event, the Agreement shall be amended to apply to any and all such new, substituted or additional securities for all purposes of this Agreement with the same force and effect as the securities presently subject to this Agreement and with respect to which such securities were distributed.

## 8. **CONFIDENTIALITY UNDERTAKING**

8.1. Each of the Parties to this Agreement undertakes to keep as strictly confidential, and not to disclose, make available, grant access or make any use of, the terms and existence of this Agreement and any of the details provided to them in relation to this Agreement, or in consummation of the transactions contemplated hereby, including but not limited to details provided with respect to the LLC, The LLC Agreement, and any details relating thereto, the Proxy, the Escrow Agent ,the Manager and the Investors.

8.2. This Section 8 shall survive termination of this Agreement for any reason and shall remain in effect with regard to the terminated Investor indefinitely.

## 9. **TERM AND TERMINATION**

9.1. This Agreement shall become effective as of the Effective Date and shall remain in effect until it expires or terminates upon the earlier of:

    9.1.1. Upon the lapse of 3 months as of the Effective Date, in case the SPA is not signed, for any reason, within 3 months following the Effective Date.

9.2. Furthermore, this Agreement shall terminate with respect to an Investor, but not with respect to all other Investors:

    9.2.1. If such Investor is a Defaulting Investor.

    9.2.2. If following the SPA Closing, such Investor ceases to be a shareholder of the Company

## 10. MISCELLANEOUS

10.1. **Amendments**. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived with the written consent of all the Investors. Any amendment or waiver affected in accordance with this paragraph shall be binding upon all Parties hereto and their respective successors and assigns.

10.2. **Entire Agreement**. This Agreement constitutes the full and entire understanding and agreement between the parties regarding the matters set forth herein and supersedes and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter. Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon the successors, assigns, heirs, executors and administrators of the parties hereto. It is clarified that the rights and obligations of the Investors as shareholders in the Company shall be governed by the Articles, however, in the event of any discrepancy between the provisions of this Agreement and those of the Articles, as between the Investors, the provisions of this Agreement shall prevail (with the exclusion of a contradiction resulting from a later amendment to the Articles, in which case the provision of such later amendment shall prevail).

10.3. **Notices, Etc**. All notices and other communications required or permitted hereunder shall be in writing, and shall be either (i) mailed by first-class mail, postage prepaid, (ii) delivered by facsimile number or e-mail address or (iii) otherwise delivered by hand or by messenger, to the addresses of each Investor as set forth on the signature page hereof, or at such other address or facsimile number or e-mail address as each of them shall have furnished to the other parties hereto in writing. Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having have given when delivered, if delivered by hand or by messenger, or by facsimile or e-mail, or, if sent by mail, on the confirmation of receipt or seventy-two (72) hours after the same has been deposited in a regularly maintained receptacle for the depositing of mail, addressed and mailed as aforesaid.

10.4. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. Facsimile signatures of a party shall be binding as evidence of such party's agreement hereto and acceptance hereof.

10.5. **Governing Law; Forum for Dispute Resolution**. This Agreement shall be governed and

construed in accordance with the laws of the United Kingdom, without giving effect to its conflicts of laws' provisions. All disputes which may arise from this contract or in connection with shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to The London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presented to the Court will be English.

10.6. **No Assignment**. This Agreement and the rights and obligations hereunder are not assignable by either Party without prior written consent of the other Parties; provided, however, that each Investor shall be permitted to assign his rights and obligations under this Agreement, together with the transfer of his part of the Shares (in a manner provided in this Agreement), subject to the assignee of the rights signing a joinder to this Agreement in which such assignee assume the applicable rights and obligations of the selling Investor.

10.7. **Severability**. In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and the severed provision will be interpreted to reflect the intent of the Parties hereto to the greatest extent as possible.

10.8. **Condition Precedent.** This Investment Agreement shall only become binding upon the Investors after it has been counter signed by Mr. Noam Teltch at his capacity as Proxy herebelow.

10.9. **Manager's Signature; Nomination of a Different Manager.** No later than 14 days after the SPA has been signed, the Proxy will deliver to the Investors a duly signed copy thereof bearing the signature of Golden Drache Ltd. as provided herebelow. If no such counter-signed copy has been delivered to the Investors within the prescribed time (a **"Non Delivery Event"**), each Investor shall be entitled to give notice to the Proxy that Golden Drache Ltd. shall not become the Representative. In such case the Proxy shall inform the Company, the Escrow Agent and any other third party as may be requested by an Investor, that the Investors may now nominate another person or corporate entity to serve as Manager and/or Representative, which shall counter sign this Investment Agreement. In such case each Investor shall have the right to nominate another person or corporate entity to serve as Representative with respect to such Investor. For the avoidance of doubt, even if not appointed as the Manager and/or Representative, Golden Drache Ltd. will continue to be entitled to receive the Incentive Fee and the finder's fee as detailed in Section 3.4.2 above, and any alternative Manager and/or Representative shall not be entitled to receive any of the Incentive Fee or the finder's fee.

*[Signature Page to Follow]*



13

*IN WITNESS WHEREOF, th*e undersigned have executed this Investment Agreement as of the date set forth above.

LEONARD O'BRIEN

*[Signature Page to Investment Agreement dated March __, 2015]*

14

*IN WITNESS WHEREOF,* Golden Drache Ltd and Mr. Noam Teltch at their capacity as Manager and Proxy respectively acknowledge, approve and undertake to act in accordance with their respective roles under the provisions of this Investment Agreement as of the date set forth above.

LEONARD O'BRIEN

*[Dated March __, 2015]*

## FIRST AMMENDMENT AGREEMENT

## Dated as of 18 May 2015

## TO THE SHAREHOLDERS AGREEMENT DATED AS OF MARCH 17, 2015

## (THE "SHAREHOLDERS AGREEMENT")

Between the individuals and entities which had entered into the Shareholders Agreement, and have signed this Amendment Agreement, each of them a **"Party"** and collectively the **"Parties"**

### 1.   RECITALS

1.1   The Parties have executed on 17 March 2015 a certain Shareholders Agreement (the **"Shareholders Agreement"**) pursuant to which the Parties shall acquire up to 100% of the shares of the Company (the **"Shares"**), for a total purchase price of up to $30,769,700 (thirty million seven hundred sixty nine thousand and seven hundred United States Dollars), plus interest accrued thereon, all as detailed in the Shareholders Agreement.

1.2   The Parties would like to amend the provisions of the Shareholders Agreement as provided for in this First Amendment Agreement.

### 2.   DEFINITIONS

Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Shareholders Agreement.

### 3.   CHANGES TO SECTIONS 2.8, 2.9 AND 3.4.2 OF THE SHAREHOLDERS AGREEMENT

3.1   The definition of *"IRR"* in Section 2.8 will be replaced in its entirety by the following wording:

*"2.8 "IRR" shall mean, as of the relevant Calculation Date, the internal rate of return to the Investors from the Amberfeld Purchase Price calculated on a US Dollar basis using Microsoft Excel Function XIRR."*

3.2   The definition of *"Incentive Fee"* in Section 2.9 will be replaced in its entirety by the following wording:

*"2.9 "Incentive Fee" means payments to the Manager, reduced by payments made or owed to the Manager by the Company or on its behalf in accordance with the Advisory Agreement, calculated as follows:*

*2.9.1   Once Total Returns equal to or exceed the Total Investment Amount, as invested by Amberfeld, plus 8% annual interest rate, the Manager will be entitled to payment in an amount equal to 2% annual interest rate of the Total Investment Amount per year of investment.*



2.9.2 *Once the Total Returns exceed 10.00% IRR, any additional Returns will be divided between the Manager and the Investors, such that the Manager will receive 20% of such returns and the Investors shall receive 80% of such returns, until the Total Return will be equal to 25% IRR.*

2.9.3 *Once Total Returns exceed 25% IRR, any additional returns will be divided between the Manager and the Investors, such that the Manager will receive 50% of such additional returns and the Investors shall receive 50% from of such returns."*

3.3 The wording of Section 3.4 2 will be replaced in its entirety by the following wording:

3.4.2 *No later than three (3) months following the Effective Date, each Investor shall transfer to the Designated Account the amount set forth in such Investor's Annex C, in the Column "Second Payment", which shall equal, in the aggregate to USD4,250,000 (Four Million Two Hundred and Fifty Thousand United States Dollars) plus interest accrued thereon. This amount includes a one-time payment in an aggregate amount of USD1,140,000 (One Million One Hundred and Forty Thousand United States Dollars), which constitutes a finder's fee which will be paid out to the Manager, and transaction expenses of USD110,000 (One Hundred and Ten Thousand United States Dollars The Finder's Fee will be reduced to USD855,000 (Eight Hundred Fifty Five Thousand United States Dollars) if the Company exercises the Put Option;"*

3.4 A new Section 10.10 will be added to the Shareholder Agreement as follows:

*"10.10 Restructuring. Investors acknowledge that it is the Manager's intention to change the holding structure in the LLC and certain promissory notes given to the LLC, to a more favorable holding structure. However the Investors acknowledge that such restructure is subject to the approval of all members of the LLC and that such approval may not be obtained."*

## 4. NO OTHER AMENDMENTS

Except as explicitly provided for in this Amendment Agreement, all other provisions of the Shareholders Agreement shall remain in full force and effect.

## 5. ENTERING INTO FORCE

This Amendment Agreement shall enter into force at the time it has been signed by the Parties and acknowledged by the Manager.

*[Signature page follows]*



**EXHIBIT 2.1**     **Form of Shareholder Loan Agreement**

**EXHIBIT 2.1**

## SHAREHOLDER LOAN AGREEMENT

THIS AGREEMENT is dated _____ and made between:

(1) _____ as lender (the "**Lender**") and

(2) Great Feats Limited as borrower (the "**Borrower**").

WHEREAS    the Borrower wishes for the Lender to grant a loan to the Borrower (as defined below the **"Loan"**); and

WHEREAS    the parties now agree to enter into this Loan Agreement relating to the Loan.

**Now therefore the parties agree as follows:**

## 1    Definitions

All capitalized terms not defined herein shall have the meaning ascribed to them in the Investment Agreement.

**"NIS"** shall mean New Israeli Shekel

## 2    The Loan

Subject to the terms of this Agreement, the Lender makes available to the Borrower a loan (the "**Loan**") in an amount of NIS_____ (_____ New Israeli Shekel) (the **"Principal"**). The Loan shall have similar terms to other loans which will be granted under equal conditions by other lenders (the Loan and other loans, hereinafter: the **"Loans"**).

All bank and transfer costs shall be to the account of the Lender. If the Loan is transferred in any currency other than NIS, then on the drawdown date, the amount of the Loan shall be converted into NIS, calculated according to the Representative Rate known on the drawdown date.

## 3    Purpose

The Borrower shall apply the proceeds of the Loan only for partially financing the purchase of shares in Ambarfeld Limited (the **"Shares"**). The Borrower shall not use the proceeds of the Loan for any other purpose.

## 4    Drawdown

Disbursement of the Loan will be made no later than _____ (the **"Effective Date"**). The Principal shall be transferred to the Trust Account of the details of which shall

be by the Trustee to the Lender shortly after the signing of this Loan Agreement.

**5    Interest**

Interest shall be charged on the outstanding Loan amount at a basic rate of 15% per annum, compounded annually, and calculated on the basis of the actual days elapsed in a year of 360 days. Interest shall start to accrue as from the Effective Date.

In the event that a senior financing facility is secured for the Project, the Interest shall be raised to 18% per annum as from the date such senior facility is drawn down.

**6    Payment of Interest**

Any accrued Interest shall be payable when the Loan is repaid in accordance with Clauses 7 and 8.

**7    Repayment**

The Loan term shall end on 30 June 2019 (the **"Repayment Date"**). The Borrower may extend the Repayment Date by 12 months by giving the Lender a 30 days' prior written notice.

**8    Prepayments**

Prepayments are allowed with 5 Business Days prior notice to the Lender. Any Prepayment shall be made to all Loans pari-passu the respectable portion of each of the Loans. Any such prepayment shall include the interest on the Loan accrued but not paid until such prepayment date.

**9    Subordinate Loan**

The Loans shall further be subordinated to any credit facilities that the Company may obtain from one or more financial institutions (a **"Financing"**), so that any full or partial repayment of the Loans shall only be made subject to the terms of the Financing.

**10    Assignment and Transfer**

The parties are not entitled to assign or transfer all or any of their rights, benefits and obligations under this Agreement without the prior written consent of the other party. However the Lender may assign its rights in connection with a transfer of Shares allowed under the Investment Agreement.

**11    Governing Law**

This Agreement shall be governed and construed in accordance with the laws of England and Wales, without giving effect to its conflicts of laws provisions. All disputes which may

arise from this contract or in connection with shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to The London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presented to the Court will be English.

## 12    Severability

Should any provision of this agreement be or become wholly or partially invalid then the remaining provisions, shall remain valid. Invalid provisions shall be replaced in accordance with the original economic intention of the parties and the purpose of this agreement.

Date: _____

_____
Lender

_____
Borrower

**EXHIBIT 2.2     Form of Nominee Agreement**

EXHIBIT 2.2

# AGREEMENT

## OF

## NOMINEE SECURITY HOLDING

*made and entered into between*

**SALAMANDER NOMINEES LIMITED**

*and*

**ERAN TADMOR**

## 1.  RECORDAL

1.1 The undersigned, Eran Tadmor (hereinafter referred to as "the Client"), do hereby authorize SALAMANDER NOMINEES LIMITED (hereinafter referred to as "the Nominee"), to hold, as nominees on the Client's behalf, such funds, money deposits, script, share certificates, securities, documents of security and/or value, precious metals and coins as the Client may from time to time lodge with the Nominee, the Client remaining the beneficial owner thereof.

1.2 The Client acknowledges having read and understood these terms and conditions relating to such nominee holding by the Nominee.

## 2.  INTERPRETATION

Unless the context clearly otherwise indicates, the following words shall be attributed the meanings stated hereunder:

2.1 "the Nominee" - SALAMANDER NOMINEES LIMITED, a company with limited liability and incorporated according to the company laws of the British Virgin Islands and having as its registered address:

PO Box 4301
Road Town
Tortola
British Virgin Islands

2.2 "the Client" - The party whose name is stipulated in clause 1.1 supra of this agreement and whose address is:

60 Nordau, Tel- Aviv, Israel

2.3 "Securities" - Funds, money deposits, script, warrants, depositary receipts, stocks, commercial paper, share certificates, securities, documents of security, debt, title and/or value, precious metals and coins.

## 3.  ACKNOWLEDGEMENT OF RECEIPT

Upon receipt of the Securities from the Client, the Nominee shall issue to the Client a certificate, in the form annexed hereto marked "Annexure A", reflecting the nature of the Securities held by the Nominee as nominee for and on behalf of the Client.  This form is to be read, mutatis mutandis, with this agreement.

## 4.  DECLARATION

The Client affirms being the lawful holder of right of the Securities.

## 5.  CONDITIONS

The Nominee holds the Securities as nominee for the Client, the Client being the beneficial owner thereof, on the following terms and conditions:

5.1 The Nominee is absolved from any liability or duty to place on investment, take up any

rights, exercise any conversions or subscription of rights, take up or collect coupons, redeemable subscriptions or deal or negotiate with takeovers, offers or capital reorganizations, exercise voting rights or any other duties or responsibilities pertaining to the Securities, save unless specifically requested to do so in writing by the Client and likewise agreed by the Nominee in writing that such task shall be performed.

5.2 The Client shall, unless otherwise agreed with the Nominee in writing, take all the steps necessary to protect any rights they may have in connection with the Securities lodged with the Nominee as nominees. If no written instructions have been received by the Nominee from the Client in respect of such actions, the Nominee shall have the right to act in accordance with its own discretion and will be held blameless for any act or omission resulting in a loss, albeit direct, consequential or otherwise.

5.3 In the event that the Nominee agrees or resolves to exercise their discretion to perform customary administrative duties such as, inter alia, re-investment, the collection of coupons and redeemable securities, the obtaining of new coupons, the exchange of provisional certificates, et al, such acts shall be performed without the Nominee assuming any liability or responsibility therefore and the Nominee may likewise rely on publications and lists available to it likewise without assuming any liability therefore.

5.4 The Nominee may, at its discretion, lodge the Securities for safe keeping and ancillary services with any institution of its choice, the Client's right of recourse thereafter for any loss suffered by them as a result of any act or omission of the said institution lying solely against such institution.

## 6.   NOMINEE AND SAFE CUSTODY FEES

6.1 The Nominee shall charge to the Client its usual charges, as published from time to time, charged for providing nominee, safe custody and ancillary services together with such additional fees and charges emanating from any organization and institution that the Nominee may from time to time lodge the Securities with for safekeeping.

6.2 The Nominee reserves the right to modify its fees, as aforementioned, at any time and the Client shall be advised thereof, inter alia, by circular letter.

## 7.   RIGHT OF LIEN AND OFFSET

The Nominee has a right of lien over all the Securities held for and on behalf of the Client, whether in the Nominee's own custody or placed elsewhere and a right of offset in respect of claims which the Nominee may have against the Client from any funds held by the Nominee as nominees for and on behalf of the Client.

## 8.   TERMINATION

This agreement shall endure until cancelled by:

8.1 The Client giving the Nominee 60 days written notice of their intention to cancel this agreement and recover all the Securities of which the Client is the beneficial holder and which are being held by the Nominee;

8.2 The Nominee giving notice (for any period of time) to the Client of its intention to cancel this agreement and whereupon any amounts owing to the Nominee shall be immediately payable.

## 9. AGREEMENT IN COUNTERPART

This Agreement may be executed by the Client and the Nominee in any number of counterparts and by the several parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

## 10. DOMICILIUM AND NOTICES

10.1 Any notice given by any party to the other party of this agreement shall be deemed to be received by the addressee:-

   (i)    on the date on which the notice was delivered to the addressee's domicilium citandi et executandi if delivered by hand; or

   (ii)    on the fifth day after posting thereof if sent by pre-paid registered mail to the addressee at their domicilium citandi et executandi.

10.2 The parties hereto elect as their domicilium citandi et executandi for all purposes in terms of this agreement the addresses reflected for each party respectively in clause 2 of this agreement, and which domicilia may only be changed by giving notice as hereinbefore provided.

## 11. ENTIRE AGREEMENT AND WAIVER

This Agreement represents the entire agreement between the parties and supersedes all previous and oral agreements between the parties pertaining to the subject matter herein contained and no variation shall be of any force or effect unless reduced to writing and agreed and signed by all the parties hereto. Any waiver or indulgence by any party to insist on strict compliance with any provision of this agreement shall in no way constitute a waiver of such provision.

Signed and sealed this ___ day of June 2015      Signed this    day of     2015

Director
Salamander Nominees Limited
Annexure A

                       Full Name
                       CAAN TAOMOR

### DECLARATION OF NOMINEE

### SECURITY HOLDING

made to

## Eran Tadmor

("the Client")

We, SALAMANDER NOMINEES LIMITED, do hereby

## ACKNOWLEDGE AND DECLARE

that we hold the Securities reflected in Annexure B which are to be redeemed by us or re-registered in our name or in the names of our nominees and held by us upon Trust for you or your nominee and we hereby undertake to sell, transfer or otherwise negotiate or deal with the said Securities in such manner as you may from time to time direct. We further undertake and agree to account to you or your nominated nominee for all income and capital receivables and accruals, including, without limiting the scope thereof, interest, dividends, bonus or additional shares, issued to us as a result of our holding the said Securities on your behalf, save for any salary, director's fees, nominee or custodian fees which are due to and retainable by us. We further agree and undertake to exercise any voting rights, privileges or obligations that attach to the said Securities in such manner as you or your nominated nominee may from time to time direct, such being in accordance with the Agreement to which this declaration is annexed thereto, the terms and conditions being applicable mutatis mutandis.

In witness whereof this Declaration is
signed, sealed and delivered by
SALAMANDER NOMINEES LIMITED

this 3rd day of June 2015

Director: Salamander Nominees Limited BVI

Annexure B

Shares held in Great Feats Limited
__ SHARE OF USD 1.00 EACH
SHARE certificate no.__

**EXHIBIT 3.1    Great Feats Corporate Docs**

# EXHIBIT 3.1



6A11D4B5E9

## TERRITORY OF THE BRITISH VIRGIN ISLANDS
## BVI BUSINESS COMPANIES ACT, 2004

### CERTIFICATE OF INCORPORATION
### (SECTION 7)

The REGISTRAR of CORPORATE AFFAIRS, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

**Great Feats Ltd.**

BVI COMPANY NUMBER: **1860285**

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 27th day of January, 2015.

*for* **REGISTRAR OF CORPORATE AFFAIRS**
27th day of January, 2015



TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE BVI BUSINESS COMPANIES ACT, 2004

(the "Act")

MEMORANDUM OF ASSOCIATION

OF

Great Feats Ltd.

1 NAME

The name of the Company is Great Feats Ltd.

2 COMPANY LIMITED BY SHARES

The Company is a company limited by shares. The liability of each member is limited to the amount from time to time unpaid on that member's shares.

3 REGISTERED OFFICE

The first registered office of the Company will be situated at the office of the registered agent, which is at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands or such other place as the directors or members may from time to time decide, being the office of the registered agent.

4 REGISTERED AGENT

The first registered agent of the Company will be SHRM Trustees (BVI) Limited of Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands or such other registered agent as the directors or members may decide from time to time.

5 GENERAL OBJECTS AND POWERS

Subject to Regulation 6 below the objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the BVI Business Companies Act, 2004 or as the same may be revised from time to time, or any other law of the British Virgin Islands.

6 LIMITATIONS ON THE COMPANY'S BUSINESS

For the purposes of section 9(4) of the Act the Company has no power to:

(a) carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990;

(b) carry on business as an insurance or as a reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorising it to carry on that business;

(c) carry on the business of company management unless it is licensed under the Companies Management Act, 1990;

(d) carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands; or

(e) carry on the business as a mutual fund, mutual fund manager or mutual fund administrator unless it is licensed under the Mutual Funds Act, 1996.

7 AUTHORISED SHARES

(a) The Company is authorised to issue a maximum of 50,000 shares of one class with a par value of USD1.00 each.

(b) The shares in the Company shall be issued in the currency of the United States of America.

(c) Each share in the Company confers on the holder:

(i) the right to one vote at a meeting of the members of the Company or on any resolution of the members of the Company;

(ii) the right to an equal share in any dividend paid by the Company in accordance with the Act; and

(iii) the right to an equal share in the distribution of the surplus assets of the Company.

8 REGISTERED SHARES ONLY

Shares in the Company may only be issued as registered shares and the Company is not authorised to issue bearer shares. Registered shares may not be exchanged for bearer shares or converted to bearer shares.

9 AMENDMENTS

Subject to the provisions of the Act, the Company shall by resolution of the directors or members have the power to amend or modify any of the conditions contained in this Memorandum of Association.

We, SHRM Trustees (BVI) Limited of Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands in our capacity as registered agent for the Company hereby apply to the Registrar for the incorporation of the Company this 27th day of January, 2015.

Incorporator



Aliza Tyshor / Roman Kuczaj
Authorised Signatories
SHRM Trustees (BVI) Limited





3

# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE BVI BUSINESS COMPANIES ACT, 2004

### ARTICLES OF ASSOCIATION

OF

Great Feats Ltd.

### INTERPRETATION

1   References in these Articles of Association ("the Articles") to the Act shall mean the BVI Business Companies Act, 2004. The regulations in these Articles shall constitute the Articles of the Company. In these Articles words and expressions defined in the Act shall have the same meaning and, unless otherwise required by the context, the singular shall include the plural and vice versa, the masculine shall include the feminine and the neuter and references to persons shall include corporations and all legal entities capable of having a legal existence.

### SHARES

2   Every person whose name is entered as a member in the share register, being the holder of registered shares, shall without payment, be entitled to a certificate signed by a director or under the common seal of the Company with or without the signature of any director or officer of the Company specifying the share or shares held and the par value thereof, provided that in respect of shares held jointly by several persons, the Company shall not be bound to issue more than one certificate and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all.

3   If a certificate is worn out or lost it may be renewed on production of the worn out certificate, or on satisfactory proof of its loss together with such indemnity as the directors may reasonably require. Any member receiving a share certificate shall indemnify and hold the Company and its officers harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use or representation made by any person by virtue of the possession of such a certificate.

### SHARES AND VARIATION OF RIGHTS

4   Subject to the provisions of these Articles, the unissued shares of the Company (whether forming part of the original or any increased authorised shares) shall be at the disposal of the directors who may offer, allot, grant options over or otherwise dispose of them to

such persons at such times and for such consideration, being not less than the par value of the shares being disposed of, and upon such terms and conditions as the directors may determine.

5   Without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares, any share in the Company may be issued with such preferred, deferred or other special rights or such restrictions, whether in regard to dividend, voting or otherwise as the directors may from time to time determine.

6   Subject to the provisions of the Act in this regard, shares may be issued on the terms that they are redeemable, or at the option of the Company be liable to be redeemed, on such terms and in such manner as the directors before or at the time of the issue of such shares may determine.

7   The directors may redeem any share issued by the Company at a premium.

8   If at any time the Company is authorised to issue more than one class the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class and the holders of not less than three-fourths of the issued shares of any other class of shares which may be affected by such variation.

9   The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

10  Except as required by the Act, no person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any share or any interest in any fractional part of a share or (except as provided by these Articles or by the Act) any other rights in respect of any share except any absolute right to its entirety thereof by the registered holder.

### TRANSFER OF SHARES

11  Shares in the Company shall be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee. The instrument of transfer shall also be signed by the transferee if registration as a holder of the shares imposes a liability to the Company on the transferee. The instrument of transfer of a registered share shall be sent to the Company for registration.

12  Subject to the Memorandum of Association, these Articles and to Section 54(5) of the Act, the Company shall, on receipt of an instrument of transfer, enter the name of the

transferee of the share in the register of members unless the directors resolve to refuse or delay the registration of the transfer for reasons that shall be specified in the resolution.

## TRANSMISSION OF SHARES

13  Subject to Sections 52(2) and 53 of the Act, the executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognised by the Company as having any title to his share, save that and only in the event of death, incompetence or bankruptcy of which the Company no longer has any directors or members, then upon the production of any documentation which is reasonable evidence of the applicant being entitled to:

(a)  a grant of probate of the deceased's will, or grant of letters of administration of the deceased's estate, or confirmation of the appointment of the appointment as executor or administrator (as the case may be), of a deceased member's estate; or

(b)  the appointment of a guardian of an incompetent member; or

(c)  the appointment of a trustee of a bankrupt member; or

(d)  upon production of any ... the evidence of the applicant's beneficial ownership of ...

to the Company's register ... British Virgin Islands together with (if so requested by the register ...) ... of the share certificate(s) of the ... member ... indemnity in favour of the registered agent and appropriate legal advice in respect of any document issued by a foreign court, then the administrator, executor ... whose name has not been entered in the share register of the Company, may by written resolution of the applicant, endorsed with written approval by the registered agent, be appointed a director of the Company or entered in the share register as the legal and/or beneficial owner of the shares.

14  The production to the Company of any document which is reasonable evidence of:

(a)  a grant of probate of the will, or grant of letters of administration of the estate, or confirmation of the appointment as executor, of a deceased member; or

(b)  the appointment of a guardian of an incompetent member; or

(c)  the trustee of a bankrupt member; or

(d)  the applicant's legal and/or beneficial ownership of the shares,

shall be accepted by the Company even if the deceased, incompetent member or bankrupt member is domiciled outside the British Virgin Islands if the document is issued by a foreign court which had competent jurisdiction in the matter. For the purposes of establishing whether or not a foreign court had competent jurisdiction in such a matter the directors may obtain appropriate legal advice. The directors may also require an indemnity to be given by the executor, administrator, guardian or trustee in bankruptcy.

15  Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

16  Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person ... him be registered as the transferee of such share or shares and ... treated as if it were a transfer.

17  What amounts to incompetence on the part of a member is a matter to be determined by the court having regard to the relevant law and the circumstances of the case.

## ACQUISITION OF OWN SHARES

18  Subject to the provisions of the Act, the directors may, on behalf of the Company purchase, redeem or otherwise acquire any of the Company's own shares for such consideration as they consider fit, and either cancel or hold such shares as treasury shares. The directors may ... of any shares held as treasury shares on such terms and conditions as they may from time to determine. Shares may be purchased or otherwise acquired in exchange for newly issued shares in the Company.

## MEETINGS OF MEMBERS

19  The directors may convene meetings of the members of the Company at such times and in such manner and places as the directors consider necessary or desirable, and they shall convene such a meeting upon the written request of members entitled to exercise at least thirty (30) percent of the voting rights in respect of the matter for which the meeting is requested.

20  Seven (7) days notice at the least specifying the place, the day and the hour of the meeting and general nature of the business to be conducted shall be given in the manner hereinafter mentioned to such persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting.

21  Notwithstanding Article 20, a meeting of members held in contravention of the requirement to give notice is valid if members holding a ninety (90) percent majority of:

(a)  the total voting rights on all the matters to be considered at the meeting; or

(b)  the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with an absolute majority of the remaining votes.

have waived notice of the meeting and, for this purpose, the presence of a member at the meeting shall be deemed to constitute waiver on his part.

22  The inadvertent failure of the directors to give notice of a meeting to a member or the fact that a member has not received the notice, shall not invalidate the meeting.

## PROCEEDINGS AT MEETINGS OF MEMBERS

23  No business shall be transacted at any meeting unless a quorum of members is present at the time when the meeting proceeds to business. A quorum shall consist of the holder or holders present in person or by proxy entitled to exercise at least fifty (50) percent of the voting rights of the shares of each class or series of shares entitled to vote as a class or series thereon and the same proportion of the remaining shares entitled to vote thereon.

24  If, within half an hour of the time appointed for the meeting, a quorum is not present, the meeting shall be dissolved.

25  At every meeting the members present shall have chosen one of their number to be the chairman (the "Chairman"). Where the members are unlikely to choose a Chairman for any reason, then the person representing the greatest number of voting shares present at the meeting shall preside as Chairman failing which the eldest individual member present at the meeting or failing any member attending the meeting, the proxy present at the meeting representing the oldest member of the Company, shall take the chair.

26  The Chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

27  At any meeting a resolution put to the vote of the meeting shall be decided on a show of hands by a simple majority unless a poll is (before or on the declaration of the result of the show of hands) demanded:

(a)  by the Chairman; or

(b)  by any member present in person or by proxy and holding not less than one tenth of the total voting shares issued by the Company and having the right to vote at the meeting.

28  Unless a poll be so demanded, a declaration by the Chairman that a resolution has, on a show of hands been carried, and an entry to that effect in the book containing the minutes of the proceedings of the Company, shall be sufficient evidence of the fact, without proof of the number or proportion of the votes recorded in favour of or against such resolution.

29  If a poll is duly demanded it shall be taken in such manner as the Chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded. The demand for a poll may be withdrawn.

30  In the case of an equality of votes, whether on a show of hands, or on a poll, the Chairman of the meeting at which the show of hands takes place, or at which the poll is demanded, shall be entitled to a second or casting vote.

## VOTES OF MEMBERS

31  At any meeting of members whether on a show of hands or on a poll every holder of a voting share present in person shall have one vote for every voting share of which he is the holder.

32  Subject to the Memorandum of Association or these Articles, an action that may be taken by members of the Company at a meeting of members may also be taken by a resolution of members consented to in writing or by telegraph, cable or other written electronic communication, without the need for any notice.

33  If a committee is appointed by such Chairman who shall be of sound mind, that member may vote by such committee.

34  If two or more persons are jointly entitled to a registered share or shares and if more than one of such persons shall vote, whether by proxy at any meeting of members or in accordance with the terms of Article 31, the vote of that person whose name appears first among such voting joint holders in the share register shall alone be counted.

35  Votes may be given either personally or by proxy.

36  The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument purposes to vote.

37  Subject to Article 38 below, an instrument appointing a proxy shall be in such form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

38  The instrument appointing a proxy shall be in writing under the hand of the appointer unless the appointer is a corporation or other form of legal entity other than one or more individuals holding as joint owner in which case the instrument appointing a proxy shall be in writing under the hand of an individual duly authorised by such corporation or legal

entity to execute the same. The Chairman of any meeting at which a vote is cast by proxy so authorised may call for a notarially certified copy of such authority which shall be produced within seven days of being so requested failing which the vote or votes cast by such proxy shall be disregarded.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

39  Any corporation or other form of corporate legal entity which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the members or any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual member of the Company.

## DIRECTORS

40  Subject to any subsequent amendment of this Article the number of directors, the number of the directors shall be not less than one (1) or more than two (2).

41  The first director or directors shall be appointed to be registered agent of the Company. Thereafter, the directors shall be appointed by the members or the directors for such terms as the members or directors may determine and may be removed by the members or the directors by way of resolution.

42  Notwithstanding the provisions of Article 41 of this Act, each director holds office until his successor takes office. On the resignation or removal of the members as per Article 41, a resolution passed by the majority of the remaining directors.

43  A vacancy in the board of directors may be filled by a resolution of members or a resolution passed by the majority of the remaining directors.

44  A director shall not require a share qualification, but nevertheless shall be entitled to attend and speak at any meeting of the members and at any separate meeting of the holders of any class of shares in the Company.

45  A director, by writing under his hand deposited at the registered office of the Company, may from time to time appoint another director or another person to be his alternate. Every such alternate shall be entitled to be given notice of meetings of the directors and to attend and vote as a director at any such meeting at which the director appointing him is not personally present and generally at such meeting to have and exercise all the powers, rights, duties and authorities of the director appointing him. Every such alternate shall be deemed to be an officer of the Company and shall not be deemed to be an agent of the director appointing him. If undue delay or difficulty would be occasioned by giving notice to a director of a resolution of which his approval is sought in accordance with Article 70 his alternate (if any) shall be entitled to signify approval of the same on

behalf of that director. The remuneration of an alternate shall be payable out of the remuneration payable to the director appointing him, and shall consist of such portion of the last mentioned remuneration as shall be agreed between such alternate and the director appointing him. A director by writing under his hand deposited at the registered office of the Company may at any time revoke the appointment of an alternate appointed by him. If a director shall die or cease to hold the office of director the appointment of his alternate shall thereupon cease and terminate.

46  The directors may, by resolution, fix the emolument of directors in respect of services rendered or to be rendered in any capacity to the Company. The directors may also be paid such travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the directors, or any committee of the directors or meetings of the members, or in connection with the business of the Company as shall be approved by resolution of the directors.

47  Any director who, by request, goes or resides abroad for any purposes of the Company, or who performs services which are beyond the Board go beyond the ordinary duties of a director, may be paid such extra remuneration (whether by way of salary, commission, participation in profits or otherwise) as shall be approved by resolution of the directors.

48  The Company may pay a director or, if the director shall so require, a connected person (including a director's or a partnership of which the director is a member) by way of salary, commission, participation in profits or otherwise in respect of such office or services as shall be approved by resolution of the directors.

49  The office of director shall be vacated if the director:

(a)  is removed from office by resolution of members; or

(b)  is removed from office by resolution of the directors of the Company; or

(c)  becomes disqualified to act as a director under Section 111 of the Act.

50  (a)  A director may hold any other office or position of profit under the Company (except that of auditor) in conjunction with his office of director, and may act in a professional capacity to the Company on such terms as to remuneration and otherwise as the directors shall arrange.

(b)  A director may be or become a director or officer of, or otherwise be interested in any company promoted by the Company, or in which the Company may be interested, as a member or otherwise and no such director shall be accountable for any benefits received by him as director or officer or from his interest in such other company. The directors may also exercise the voting powers conferred by the shares in any other company held or owned by the

Company in such manner in all respects as they think fit, including the exercise thereof in favour of any resolutions appointing them, or of their number, directors or officers of such other company, or voting or providing for the payment of remuneration to the directors or officers of such other company. A director may vote in favour of the exercise of such voting rights in the manner aforesaid notwithstanding that he may be, or be about to become, a director or officer of such other company, and as such in any other manner is, or may be, interested in the exercise of such voting rights in the manner aforesaid.

(c) No director shall be disqualified by his office from contracting with the Company either as a vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any director shall be in any way interested be voided, nor shall any director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement, by reason of such director holding that office or by reason of the fiduciary relationship hereby established, provided the procedure in Article 50 (d) below is followed.

(d) A director of the Company shall, immediately after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose such interest to the board of directors.

(e) A director of the Company is not required to comply with Article 50(a) above if:

(i) the transaction or proposed transaction is between the director and the Company; and

(ii) the transaction or proposed transaction is or is to be entered into in the ordinary course of the company's business and on usual terms and conditions.

(f) For the purposes of Article 50(a) above, a disclosure to the board to the effect that a director is a member, director, officer or trustee of another named company or other person and is to be regarded as interested in any transaction which may, after the date of the entry or disclosure, be entered into with that company or person, is a sufficient disclosure of interest in relation to that transaction.

(g) Subject to Section 125(1) of the Act, the failure by a director to comply with Article 50(d) does not affect the validity of a transaction entered into by the director or the Company.

## OFFICERS

51  The directors of the Company may, by resolution of directors, appoint officers of the Company at such times as shall be considered necessary or expedient, and such officers may consist of a President, one or more Vice Presidents, a Secretary, and a Treasurer

and/or such other officers as may from time to time be deemed desirable. The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modifications in such duties as may be prescribed by the directors thereafter, but in the absence of any specific allocation of duties it shall be the responsibility of the President to manage the day to day affairs of the Company; the Vice Presidents to act in order of seniority in the absence of the President, but otherwise to perform such duties as may be delegated to them by the President, the Secretary to maintain the registers, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

52  Any person may hold more than one office and no officer need be a director or member of the Company. The officers shall remain in office until removed from office by the directors, whether or not a successor is appointed.

53  Any officer who is a body corporate may appoint any person its duly authorised representative for the purpose of transacting any of the business of the officers.

## POWERS OF DIRECTORS

54  The business of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company, and may exercise all such powers of the Company necessary for managing and for directing and superintending the business and affairs of the Company as are not by the Act or by these Articles required to be exercised by the members subject to any delegation of such powers as may be authorised by these Articles and permitted by the Act and to such requirements as may be prescribed by resolution of the members, but no requirement made by resolution of the members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

55  The board of directors may entrust to and confer upon any director or officer any of the powers exercisable by it upon such terms and conditions and with such restrictions as it thinks fit, and either collaterally with, or to the exclusion of, its own powers, and may from time to time revoke, withdraw, alter or vary all or any of such powers. Subject to the provisions of Section 110 of the Act, the directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit. Any committees so formed shall in the exercise of powers so delegated conform to any regulations that may be imposed on it by the directors or the provisions of the Act.

56  The directors may from time to time by power of attorney appoint any company, firm or person or body of persons to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Articles) and for such period and subject to such conditions as the directors think fit.

57. Any director who is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the directors and of transacting any of the business of the directors.

58. All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be, in such manner as the directors shall from time to time by resolution determine.

59. The directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

60. The continuing directors may act notwithstanding any vacancy in their body, save that if the number of directors shall have been fixed at two or more persons and by reason of vacancies having occurred in [...] purposes there shall be only one continuing director, he shall be authorised [...] the purpose of appointing another director.

## PROCEEDINGS OF DIRECTORS

61. The meetings of the board of directors [...] any committee thereof shall be held at such place or places as the directors shall [...]

62. The directors may elect a chairman [...] the Board of Directors') of their meeting and determine the period [...] which [...] to hold office. If no such Chairman of the Board of Directors is elected, or if at any meeting the Chairman of the Board of Directors is not present at the [...] fixed for holding the meeting, the directors present may choose one of their members to be the Chairman of the Board of Directors for the meeting. If the directors are unable to choose a Chairman of the Board of Directors, for any reason, then the oldest director present at the meeting shall preside as the Chairman of the Board of Directors.

63. The directors may meet together for the dispatch of business, adjourn and otherwise regulate their meetings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality in votes the Chairman shall have a second or casting vote. A director may at any time summon a meeting of the directors. If the Company shall have only one director, the provisions hereinafter contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of the directors. Such note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

64. A director shall be given not less than three (3) days notice of a meeting of the directors.

65. Notwithstanding Article 64, a meeting of directors held in contravention of Article 64 is valid if a majority of the directors, entitled to vote at the meeting, have waived the notice of the meeting; and, for this purpose, the presence of a director at the meeting shall be deemed to constitute waiver on his part.

66. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice shall not invalidate the meeting.

67. A meeting of the directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one-third of the total number of directors with a minimum of two (2), or in the case of only one director a minimum of one (1).

68. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting shall be dissolved.

69. Any one or more members of the Board of Directors or any committee thereof may participate in a meeting of the Board of Directors or committee by means of a conference telephone or similar communications equipment [...] all persons participating in the meeting to hear each other [...] the same time. Participation by such means shall constitute presence in person at a meeting.

70. A resolution approved by a majority of the directors [...] being entitled to receive notice of a meeting of the directors or any committee of the directors and taking the form of one or more documents [...] by telex [...] or other written or electronic communication shall be as [...] as a resolution [...] has been passed at a meeting of the directors or of such committee duly convened and held without the need for any notice.

## INDEMNITY

71. Subject to the provisions of the Act, the Company may indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a) is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

(b) is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise,

## SEAL

72  The directors shall provide for the safe custody of the common seal of the Company. The common seal when affixed to any instrument except as provided in Article 2, shall be witnessed by a director or officer of the Company or any other person so authorised from time to time by the directors. The directors may provide for a facsimile of the common seal and approve the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the common seal has been affixed to such instrument and the same had been signed as hereinbefore described.

## DISTRIBUTIONS

73  Subject to the provisions of the Act, the directors of a Company may, by resolution, authorise a distribution by the Company at a time, and of an amount, and to any members they think fit if they are satisfied, on reasonable grounds, that the Company will, immediately after the distribution, satisfy the solvency test as stipulated in Section 56 of the Act.

74  Subject to the rights of the holders of shares entitled to any priority to which the par value of the shares in issue, excluding those shares which are held by the Company as Treasury Shares at the date of declaration of that distribution.

75  The directors may, before recommending any distribution, set aside out of the profits of the Company such sums as they think proper as a reserve or reserves which shall, at their discretion, either be employed in the business of the company or be invested in such investments as the directors may from time to time think fit.

76  If several persons are registered as joint holders of any share, any of them may give effectual receipt for any distribution or other monies payable on or in respect of the share.

77  Notice of any distribution that may have been declared shall be given to each member in manner hereinafter mentioned and all distributions unclaimed for three years after having been declared may be forfeited by the directors for the benefit of the Company.

78  No distribution shall bear interest against the Company.

## COMPANY RECORDS

79  The Company shall keep records that:
(a) are sufficient to show and explain the Company's transactions; and
(b) will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

80  The Company shall keep:
(a) minutes of all meetings of:
   (i) directors,
   (ii) members,
   (iii) committees of directors, and
   (iv) committees of members;
(b) copies of all resolutions consented to by:
   (i) directors,
   (ii) members,
   (iii) committees of members, and
   (iv) committees of members;
(c) an imprint of the common seal and the registered seal of the Company.

81  The Company shall keep the following records at the office of its registered agent or at such other place or places, within or without the British Virgin Islands, as the directors may determine:
(a) minutes of meetings and resolutions of members and of classes of members maintained in accordance with Article 80; and
(b) minutes of meetings and resolutions of directors and committees of directors maintained in accordance with Article 80.

82  The Company shall keep the following documents at the office of its registered agent:
(a) the Memorandum of Association and Articles of the Company;
(b) the register of members maintained in accordance with Article 85 or a copy of the register of members;
(c) the register of directors maintained in accordance with Article 84 or a copy of the register of directors;
(d) copies of all notices and other documents filed by the Company in the previous ten years; and

(c) a copy of the register of charges kept by the Company pursuant to Section 162(1) of the Act.

83 (a) Where the Company keeps a copy of the register of members or the register of directors at the office of its registered agent, it shall

(i) within 15 days of any change in the register, notify the registered agent, in writing, of the change; and

(ii) provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

(b) Where the place at which the original register of members or the original register of directors is changed, the Company shall provide the registered agent with the physical address of the new location of the records within 14 days of the change of location.

84 The Company shall keep a register of directors containing the names and addresses of the persons who are directors of the Company, the date on which each person whose name is entered was appointed as a director of the Company, the date on which each person named as a director ceased to be a director of the Company, and such other information as may be prescribed.

85 The Company shall maintain a register of members showing the full names and addresses of the persons holding registered shares in the Company, the number of shares of each class and series of shares held by such person, the date on which the name of each member was entered in the register of members and where applicable, the date such person ceased to hold any registered shares in the Company.

86 The records, documents and registers required by Articles 79 to 85 inclusive shall be open to the inspection of the directors at all times.

87 The directors shall from time to time determine whether and to what extent and at what times and places and under what conditions the records, documents and registers of the Company or any of them shall be open to the inspection of members not being directors, and no member (not being a director) shall have any right of inspecting any records, documents or registers of the Company except as conferred by the Act or authorised by resolution of the directors.

AUDIT

88 The directors may by resolution call for the accounts of the Company to be examined by an auditor or auditors to be appointed by them at such remuneration as may from time to time be agreed.

89 The auditor may be a member of the company but no director or officer shall be eligible during his continuance in office.

90 Every auditor of the Company shall have a right of access at all times to the books of accounts of the Company, and shall be entitled to require from the officers of the Company such information and explanations as he thinks necessary for the performance of his duties.

91 The report of the auditor shall be annexed to the accounts upon which he reports, and the auditor shall be entitled to receive notice of, and to attend, any meeting at which the Company's audited Profit and Loss Account and Balance Sheet is to be presented.

NOTICES

92 Any notice, information or written statement required to be given to members shall be served by mail (air-mail service of available) addressed to each member at the address shown in the share register.

93 All notices directed to any registered shares to which persons are jointly entitled, to whichever of such persons is named first in the share register, and given, shall be sufficient notice to all the holders of such shares.

94 Any notice, if served, shall be deemed to have been served within ten days of posting, and in proving the notice shall be sufficient to prove that the letter containing the notice was properly addressed and mailed with the postage prepaid.

PENSION AND SUPERANNUATION FUND

95 The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is, or has been at any time, interested, and to the wives, widows, families and dependents of any such persons, and make payments for or towards the insurance of such persons as aforesaid and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. A director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension, allowance or emolument.

## 17

### WINDING UP

96    The Company may be voluntarily liquidated under Part XII of the Act if it has no liabilities and it is able to pay its debts as they become due. If the Company shall be wound up, the liquidator may, in accordance with a resolution of members, divide amongst the members in specie or in kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for such purpose set such value as he deems fair upon any such property to be divided as aforesaid and may determine how such division shall be carried out as between the members or different classes of members. The liquidator may vest the whole or any part of such assets in trustees upon such trust for the benefit of the contributors as the liquidator shall think fit, but so that no member shall be compelled to accept any shares or other securities whereon there is any liability.

### AMENDMENT TO ARTICLES

97    The Company may alter or modify the conditions contained in these Articles as originally drafted or as amended from time to time by a resolution of the directors or the members.



## 18

We, SHRM Trustees (BVI) Limited of Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands in our capacity as registered agent for the Company hereby apply to the Registrar for the incorporation of the Company this 27th day of January, 2015.

Incorporator

Aliza Tyshri / Ronan Kuczaj
Authorised Signatories
SHRM Trustees (BVI) Limited

**EXHIBIT 3.5    Designation Agreement**

# DESIGNATION AGREEMENT

Dated as of $\frac{iL}{19}$ May, 2015

Between

A.  **Great Feats Limited**, a BVI business company registered under the laws of the British Virgin Islands, with its registered address at ~~Palm Grove House~~, POB 438, Road Town, Tortola, British Virgin Islands ("**Great Feats**"). *TRINITY CHAMBERS* 4301



B.  **Icy Face Limited**, a BVI business company registered under the laws of the British Virgin Islands, with its registered address at Trinity Chambers, POB 4301, Road Town, Tortola, British Virgin Islands ("**Icy Face**").

each of them "Party" and collectively the "Parties"

## 1.  RECITALS

1.1  On 17 March 2015 Icy Face entered a certain Shareholders Agreement (as amended on 18 May 2015) (the "**Shareholders Agreement**") pursuant to which Icy Face and other parties shall cooperate and co-invest in order to acquire 100% of the shares (the "**Shares**") of Ambarfeld Limited (the "**Company**"), all as detailed in the Shareholders Agreement.

A copy of the Shareholders Agreement is attached hereto as **EXHIBIT 1.1**

1.2  On 17 April 2015 Icy Face entered into a certain Share Purchase Agreement (as amended on 27 April 2015) (the "**SPA**") pursuant to which Icy Face shall acquire 100% of the shares of the Company (the "**Shares**"), for a total purchase price of $30,769,700 (thirty million seven hundred sixty nine thousand and seven hundred United States Dollars), plus interest accrued thereon, all as detailed in the SPA. The purchase price may be increased or decreased, as provided for in the SPA and according to its terms. Great Feats has reviewed the SPA, and agrees to its terms and conditions. A copy of the SPA is available for review at the office of the Escrow Agent.

1.3  Pursuant to Section 11.07 of the SPA Icy Face is entitled to designate one or more persons to take title to all or any portion of the Shares.

1.4  The Parties would like for Icy Face to designate Great Feats as a purchaser of Shares which would reflect the right to own beneficial interest in the SPV, by delivering a Designation Notice to that effect to the Seller in accordance with Section 11.07 of the SPA. The Designation Notice will be delivered on or about the Closing Date (as defined in the SPA).

## 2.  DEFINITION

Capitalized terms used herein and not otherwise defined shall be have the meaning ascribed to them in the Shareholders Agreement.

2.1 **"Designation Notice"** means a notice to be given by Icy Face to the Seller under Section 11.07 of the SPA in the form of **ANNEX A**

2.2 **"Designee"** means a party designated by Icy Face under the provisions of Section 11.07 of the SPA

2.3 **"Escrow Account"** means A bank account to be held and operated by the **Escrow Agent** the details of which will be provided by the **Escrow Agent** to the Company shortly after the signing of this Designation Agreement

2.4 **"Escrow Agent"** " means Adv. Doron Levy, of Amit, Pollak, Matalon & Co., Nitsba Tower,17 Itzhak Sade Street, 67775 Tel Aviv, Israel

2.5 **"Seller"** shall mean the "Seller" as defined in the SPA

2.6 **"SPA Escrow Agent"** shall mean the Escrow Agent as defined in the SPA

2.7 **"SPV"** means **540 West 21st Street, LLC**, a Delaware limited liability company, with its registered address at 15 Warren street Ste 25, Hackensack, NJ, 07601

### 3. DESIGNATION OF GREAT FEATS

3.1 Great Feats is hereby granted by Icy Face the right to acquire up such number of Shares which will reflect the right to own beneficial rights in the SPV, and designates Great Feats as a Designee.

3.2 The total amount payable for the Shares which will eventually be acquired by Great Feats (or its assignees) will be calculated according to the final amount which needs to be paid under the Shareholders Agreement and the SPA, so that Great Feats will eventually pay an equal amount per Share as that payable by Icy Face and any other Designees.

3.3 The total amount to be paid by Great Feats will be decided by the Manager, taking into account the investment commitment which Great Feats will offer to make, and other investment commitments which may be made by other Designees and by Icy Face. Icy Face shall not be required to allocate any minimum amount for investment by Great Feats.

### 4. GREAT FEATS'S OBLIGATIONS

4.1 Great Feats acknowledges the provisions of the Shareholders Agreement and the SPA. By entering into this Designation Agreement Great Feats hereby accedes to the Shareholders Agreement, becoming an *"Investor"* under the Shareholders Agreement, and assuming all the rights and obligations of an Investor.

4.2 Great Feats will invest its pro-rata portion of the Ambarfeld Purchase Price by making payments to the Seller or to the SPA Escrow Agent, at the times and under the conditions that such payments are required to be made under the provisions of the SPA.

3

4.3 Whereas the funds Great Feats will allocate in order to make the payments will be deposited in the Escrow Account which will be managed by the **Escrow Agent**, Great Feats will enter into a Escrow Agreement with the **Escrow Agent**, in the form enclosed as **Exhibit 4.3,** pursuant to which the **Escrow Agent**, *inter alia*, will be authorized to make payments from the Escrow Account to the Seller.

5. **COSTS**

Each party shall bear its own costs and expenses in connection with the preparation, negotiation, execution and performance of this Designation Agreement.

6. **NO OTHER AMENDMENTS**

6.1 All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said Rules.

6.2 Any amendment of, supplement to or termination of, this Agreement, including any modification of this clause, shall be valid only if made in writing.

6.3 The annexes to this agreement form an integral part of this agreement.

*[Signature page follows]*

4

[Signature page]

*[Signature page]*

**For Great Feats Limited**

(Place, date) GENEVA, SWITZERLAND     13/5/2015

**LEONARD O'BRIEN**

Name: *Salamander Management Limited*

**For Icy Face Limited**

(Place, date) GENEVA, SWITZERLAND     19/5/2015

LEONARD O'BRIEN

Name: *Salamander Management Limited*

**ANNEX "A" – DESIGNATION NOTICE**

**DESIGNATION NOTICE**

**In connection with the Share Purchase Agreement
dated as of 17 April 2015 (as amended on 27 April 2015)**

Lansing Finance Corp.                                                    by email: rosaa@icazalaw.com
c/o Sage Capital
Icaza, González-Ruiz & Alemán
P.O. Box 0823-02435
**Panama, Republic of Panama**

Attention: Rosa Arnold

Dear Ms. Arnold,

As provided for in Section 11.07 of that certain Share Purchase Agreement dated as of 17 April 2015 (as amended on 27 April 2015) entered into between Lansing Finance Corp. as *Seller*, Icy Face Limited as *Buyer* and Ambarfeld Limited as *Company*, with respect to the intended acquisition by the Buyer of the shares of Ambarfeld from the Seller (the **"SPA"**), we hereby give you notice as follows:

1.    Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the SPA.

2.    Name and full contact details of Designee:

_____

_____

_____

3.    Percentage of Shares to which title will be taken: _____

Enclosed please find the Designee's declaration and undertaking under **ARTICLE V** of the SPA enclosed as **Exhibit A**.

Please acknowledge receipt of this Designation Notice.

Sincerely yours,                                          Acknowledged by:

For **Icy Face Limited**                                  For **Lansing Finance Corp.**

_____            _____
(Place, date)                                             (Place, date)

_____            _____
Name:                                                     Name:

**EXHIBIT "A"**

The undersigned, _____, of _____, in connection with our designation as **Designee** under Section 11.07 of that certain Share Purchase Agreement, dated as of 17 April 2015 (as amended on 27 April 2015) entered into between Lansing Finance Corp. as **Seller**, Icy Face Limited as **Buyer** and Ambarfeld Limited as **Company**, with respect to the intended acquisition by the Buyer of the shares of Ambarfeld from the Seller (the **"SPA"**), confirms and undertakes as follows:

1. Capitalized terms used herein and not otherwise defined shall be have the meaning ascribed to them in the SPA.

2. We have been inform of the terms and conditions and we had a chance (together with our advisers) to review the fully signed version of the SPA.

3. We agree to be bound by the terms and conditions of the SPA, as if we have been a "*Buyer*" (as defined in the SPA). Specifically, we make the following representations and warranties to the Seller, the Buyer and the Company with respect to the SPA as if we executed the SPA as a Buyer (as defined in the SPA):

   3.1. **Organization and Authority of Designee**; Enforceability. Designee is a _____ duly organized, validly existing and in good standing under the laws of _____. Designee has full power and authority to enter into the SPA and the documents delivered hereunder, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Designee of the SPA and the documents delivered hereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Designee. The SPA and the documents delivered hereunder have been duly executed and delivered by Designee, and (assuming due authorization, execution and delivery by Seller) the SPA and the documents delivered hereunder constitute legal, valid and binding obligations of Designee enforceable against Designee in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

   3.2. **No Conflicts; Consents**. The execution, delivery and performance by Designee of the SPA and the documents delivered hereunder, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with the Organizational Documents of Designee; or (b) violate or conflict with any Law applicable to Designee. No consent, approval, waiver or authorization is required to be obtained by Designee from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Designee of the SPA and the documents delivered hereunder and the consummation of the transactions contemplated hereby and thereby.

   3.3. **Investment Purpose**. Designee is an "accredited investor" as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended, and is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Designee acknowledges that the Shares are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Shares may not be transferred or sold except in accordance with the terms of the Company's Organizational Documents and pursuant to the registration provisions of the Securities Act of

1933, as amended, or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

3.4. **Legal Proceedings**. There is no Action pending or, to Designee's knowledge, threatened against or by Designee or any Affiliate of Designee that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by the SPA or the documents delivered hereunder.

3.5. **JV Agreement**. Designee acknowledges and agrees that it has been provided a true and correct copy of the JV Agreement and that upon consummation of the transactions contemplated by the SPA, Designee shall be subject to and bound by the terms thereof (as to the Company) as of the Closing. The execution, delivery and performance by Designee of the SPA and the documents delivered hereunder, and the consummation by Designee (or its Affiliates) of the transactions contemplated hereby and thereby, do not, and will not, cause a breach of Section 7(d) of the JV Agreement.

3.6. **Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the SPA or the documents delivered hereunder based upon arrangements made by or on behalf of Designee.

3.7. **OFAC; FCPA**. None of Designee, any one Person owning a ten percent(10%) or greater direct or indirect interest in, or controlling, controlled by or under common control with, Designee, or any group of Persons owning a fifty percent (50%) or greater direct or indirect interest in, or controlling, controlled by or under common control with, Designee, (a) is currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury (or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation), (b) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of U.S. law, regulation, or executive order of the President of the United States, (c) is incorporated in any country subject to U.S. country-based economic sanctions in violation of any applicable law, rule or regulation, (d) illegally conducts business in any country subject to U.S. country-based economic sanctions, or (e) is in violation of any requirements of law relating to money laundering, anti-terrorism, bribery, corrupt practices, trade embargos and economic sanctions (including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act of 2010).

Sincerely yours.

For _____

(Place, date)

Name:

**EXHIBIT 7.3.1    Form of Escrow Agreement**

**EXHIBIT 7.3.1**

## ESCROW AGREEMENT

Reference is made to the certain Investment and Shareholders Agreement (the "**ISA**") relating to Great Feats Limited made on [●] 2015, by and between Great Feats Limited, a BVI business company registered under the laws of the British Virgin Islands, with its registered address at Trinity Chambers, P.O.B. 4301, Road Town, Tortola, British Virgin Islands (the "**Company**") and each of the parties that signs the ISA as an investor (each, individually an "**Investor**" and collectively the "**Investors**")

Pursuant to Section 7.3.1 of the ISA, this Escrow Agreement is made and entered into effect as of this ___ day of May, 2015 (the "**Effective Date**"), by and among (i) the Company (ii) each Investor; and (iii) Adv. Doron Levy, the address of whom for purposes hereof is c/o Amit, Pollak, Matalon & Co., Law Offices, 17 Yitzhak Sadeh Street, Nitsba Tower, 19th Floor, Tel-Aviv, 6777517, Israel (the "**Escrow Agent**"). Each of the Investors, the Company and the Escrow Agent shall refer to us a "**Party**" and collectively, the "**Parties**".

## WITNESSETH

**WHEREAS** under the provisions of the ISA, the Escrow Agent has been appointed by the Company and the Investors (the "**Beneficiaries**") to serve as an escrow agent in connection to the transaction contemplated under the provisions of the ISA in which the Escrow Assets (as defined herein) are to be held in escrow and released therefrom, all subject to the terms and conditions set forth herein; and

**WHEREAS**, the Beneficiaries have agreed that the authority to make all decisions in connection with the Transaction (as defined in the ISA), including, but not limited to, the Escrow Assets, shall vest with Golden Drache Limited, a BVI business company registered under the laws of the British Virgin Islands, with its registered address at [●] Tortola, British Virgin Islands (the "**Manager**"), as the Manager deems to be beneficial for all parties to the Transaction, including the Company;

**WHEREAS**, all terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in that certain ISA.

**NOW THEREFORE**, the Parties agree as follows:

1. Appointment of Escrow Agent and Deposit of the Escrow Assets

    1.1 The Escrow Agent is hereby appointed as the Escrow Agent hereunder, and is hereby irrevocably instructed by the Beneficiaries to act in accordance with the instruction to be given to the Escrow Agent by the Manager with respect to the Investment Amount (as defined in the ISA), as the same may be provided to the Escrow Agent by any of the Beneficiaries on one or more occasions in connection with the ISA (the "**Escrow Assets**"), all on the terms and subject to the conditions set forth herein. The Escrow Agent hereby accepts such appointment, all on the terms and subject to the conditions set forth herein.

    1.2 The parties hereby agree that the Escrow Assets shall be held by the Escrow Agent for and on behalf of the Beneficiaries, and subject to the instruction to be given by the Manager; the Manager is irrevocably authorized by the Beneficiaries to act on behalf of the Beneficiaries with respect to the Escrow Assets, as the Manager deems to be beneficial for all parties to the Transaction, including the Company.

2 Scope of Duty of the Escrow Agent

    2.1 The Escrow Assets shall be held by the Escrow Agent in escrow.

    2.2 For the Purpose of this Escrow Agreement, the Escrow Agent shall set up, hold and operate the Escrow Account, as defined in the ISA. The Escrow Agent shall hold the Escrow Assets in the Escrow Account to be managed by the Escrow Agent or by an affiliate or sub-contractor of the Escrow Agent, in accordance with the written instructions of the Manager.

    2.3 In the absence of written instructions from the Manager, the Escrow Assets available in the Escrow Account shall be held in an interest-bearing deposit which renews on a daily basis until withdrawn from such deposit.

    2.4 It shall be noted that, upon demand of the Manager, and subject to a prior consent of the Escrow Agent, the Escrow Agent may provide the Manager with other certain services in connection the Escrow Assets which are not deemed to be as a part of this Escrow Agreement ("**Additional Services**"). It is agreed that the Additional Services are excluded from the Annual Fee and shall be borne by the Beneficiaries in accordance with the standard rates of the Escrow Agent, as in effect at such time.

    2.5 The Escrow Agent shall send and receive any and all communications to the Company and the Investors, as applicable, on behalf of the Manager (without any liability with respect to the content or timeliness of delivery of such communications), and shall be the sole point of contact for any Investor with respect to the Transaction.

3 Beneficiaries Representations and Warranties

    3.1 Each Beneficiary represents and warrants that, as part of the opening process of the Escrow Account, the Bank may demand the Beneficiary to provide

several details regarding the Beneficiary and that Escrow Agent may provide these details, without a prior consent/notice of/to be sent to such Beneficiary. The Escrow Agent may, within its sole discretion, to replace the Escrow Account with an alternative bank account. In the event in which such replacement has been occurred, then the Escrow Agent shall provide the Beneficiary with a notice reading such replacement.

3.2 Each Beneficiary undertakes to ensure that the Escrow Account shall have a Minimum Balance of USD100,000, at all times, until the Termination of this Escrow Agreement (the "**Minimum Balance**"). It is agreed by each of the Beneficiaries that, subject to a prior notice to be sent by the Escrow Agent to the Beneficiary regarding the following, the Escrow Agent may be entitled to use any funds in the Escrow Account, including the Minimum Balance in order designed to ensure an implementation of payments derived from a demand of any governmental authority (the "**Governmental Payments**"). It is agreed that each Beneficiary shall comply with such undertaking to ensure a Minimum Balance in the Escrow Account even in an event in which the Escrow Agent has used the Minimum Balance in order to pay the Governmental Payments.

3.3 Each Beneficiary represents and warrants that he shall be fully responsible, at his own expense, to repay any expense or other obligation to repay any amount of money relating the Escrow Assets, including, without limitation, any payment derived from the holding of the Escrow Assets pursuant to this Escrow Agreement.

3.4 Each Beneficiary represents and warrants that, in prior to the date in which the first Escrow Asset should have been deposited in escrow under this Escrow Agreement, it shall provide the Escrow Agent with a notice specifying the up-to-date portion of the amount of the Escrow Assets, the type of the Escrow Assets and the depositing schedule for any portion of the Escrow Assets to be deposited in escrow by that Beneficiary under this Escrow Agreement.

3.5 The Beneficiary hereby represents and warrants to repay any and all applicable taxes, if there is any, in connection with the Escrow Assets.

4 Release of the Escrow Assets

4.1 The Escrow Agent shall release and transfer the Escrow Assets in accordance with the provisions of this Section 4.

4.2 Ten (10) Business days following a written notice to be sent to the Escrow Agent by the Manager specifying, *inter alia*, the portion of Escrow Assets ("**Transferred Assets**") to be transferred and the transferee of the Transferred Assets ("**Transfer Notice**"), the Escrow Agent shall transfer or take the action required by law to transfer the Transferred Assets in accordance with the provisions of the Transfer Notice, provided that the Escrow Agent may be entitled to deduct, within it sole discretion, any payments due to the trust beneficiary and/or bank fees related to such Escrow Assets form the Transferred Assets.

4.3 Without prejudice to generality of the aforesaid, any action in connection with the Transferred Assets or other disposition of shares, funds, and/or any other right held in escrow by the Escrow Agent pursuant to this Escrow Agreement shall be made by the Escrow Agent strictly in accordance with the requirements of any applicable law as understood by the Escrow Agent.

4.4 As far as the provisions of the Transfer Notice obligates the Escrow Agent to provide any report to be sent to the any governmental authorities, either directly or through bank or any other third party, regarding the transfer of the Transferred Assets, then the Escrow Agent shall report accordingly without any obligation to notify the beneficiary in advance or receive the beneficiary prior consent to such report.

## 5 Fees & Expenses Reimbursement

5.1 The Escrow Agent shall be entitled to a payment of an annual amount of USD _____ (the "**Annual Fee**") plus VAT (if applicable) to be paid by the Beneficiaries at the beginning of each year in advance commencement at _____ and until a Termination of this Escrow Agreement.

5.2 The Beneficiaries and the Manager hereby grant the Escrow Agent with an irrevocable right to deduct the Annual Fee or any portion thereof which has not been paid in accordance with Provision 5.1, from any funds exists in the Designated Account, at the date in which the Escrow Agent have been entitled to receive such payment.

5.3 The Beneficiaries and the Manager hereby grant the Escrow Agent with an irrevocable right to deduct an amount equal to expenses incurred or expected to be incurred by the Escrow Agent in connection with this Agreement, from any funds exists in the Designated Account, shortly before or after the date in which the Escrow Agent have incurred such an expense.

5.4 Any actions to be taken by the Escrow Agent, which is not in the internal business of the Escrow Agent pursuant to this Escrow Agreement (including, *inter alia*, actions in regard of a violation of this Escrow Agreement or dispute related thereto; actions as part of a judicial proceedings; actions to be taken by the Escrow Agent pursuant to instructions of the Manager; actions in connection to Section 2.4 of the Above; actions derived from any change in the applicable law or any amendment to be made to this Escrow Agreement; action in accordance with Section 7) is excluded from the Annual Fee and shall be borne by the Beneficiaries in accordance with the standard rates of the Escrow Agent, as in effect at such time.

## 6 Responsibilities and Indemnification

6.1 The duties, responsibilities and obligations of the Escrow Agent are limited to those expressly set forth herein, and no duties, responsibilities or obligations shall be inferred or implied. The Escrow Agent shall be neither subject to, nor required to comply with or inquire into, any other agreement between the parties hereto, even though reference thereto may be made herein, or to

4

comply with any direction or instruction (other than those expressly contained herein or delivered in accordance with this Escrow Agreement) from any Beneficiary or an entity acting on its behalf.

6.2 The Escrow Agent may assume the genuineness of all signatures on documents represented and/or delivered to the Escrow Agent, the authenticity and completeness of all documents submitted to the Escrow Agent as originals, the conformity to original documents of documents submitted to the Escrow Agent as copies, the authenticity and completeness of the originals of such documents, the legal competence of all signatories, the due authorization of any person purporting to provide a notice, request, consent or instruction or to acknowledge receipt in connection with the provisions hereof, and that the same is properly made or given. The Escrow Agent may also assume, without conducting any independent or further verification or other examination, that each document appearing to be a document issued by the Beneficiary was actually issued by him, that the persons who signed such documents are in fact authorized to do so, and that the stated position of such persons in the document is in fact the true position of such persons in the applicable entity. The Escrow Agent shall be under no duty or responsibility either *(a)* to make any independent verification as to the genuineness or correctness of the statements, data or signatures in any written instructions, notices or other instruments provided to it hereunder; or *(b)* to inquire into or investigate the genuineness, accuracy or validity of any such document or the authority of any person executing the same.

6.3 If at any time the Escrow Agent is served with any judicial or administrative order, judgment, decree, arbitrator award, writ or other form of judicial or administrative process which in any way affects the Escrow Assets (including, but not limited to, orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer thereof), the Escrow Agent is authorized to comply therewith in any manner it or legal counsel of its own choosing deems appropriate.

6.4 The Escrow Agent shall not be liable or responsible for, and is hereby released by the parties with respect to, any and all demands and/or claims any Beneficiary or the Manager may otherwise have against the Escrow Agent, with respect to the Escrow Agent's act or omissions hereunder or related to this Escrow Agreement, including without limitation for any loss or damage arising by reason of any act or omission by it hereunder, in connection herewith, or in connection with any of the transactions contemplated hereby, all except with respect to fraud on the part of the Escrow Agent.

6.5 The Beneficiaries, agree to indemnify and hold the Escrow Agent (and any of its partners, shareholders, directors, officers, beneficiaries, affiliates, employees, consultants and/or agents) harmless from and against any and all liabilities, damages, losses, costs and expenses (including without limitation attorneys' fees) incurred or sustained by it in connection with or relating to, directly or indirectly, carrying out of any of its duties or obligations hereunder or its services as Escrow Agent, including without limitation, by reason of or in connection with any demand, action or claim made against the Escrow Agent (and/or any of its partners, shareholders, directors, officers, beneficiaries, affiliates, employees, consultants and/or agents) except where

same were incurred or sustained by the Escrow Agent as a result of fraud on the part of the Escrow Agent. The Escrow Agent's officers, directors, shareholders, employees, agents, beneficiaries, affiliates, partners and consultants and such third parties shall be deemed, for the purposes of this Section 6.5, third-party beneficiaries with the right to enforce the understandings contained in this Section 6.5.

7 Disputes

7.1 In the event of any dispute or conflicting claims between any of the parties hereto with respect to this Escrow Agreement and/or the Escrow Assets, or in the event that the Escrow Agent is in doubt as to what action is to be taken, the Escrow Agent may at its sole discretion refuse to comply with any claims, demands or instructions, or refuse to take any further action, so long as such dispute or conflict shall continue or that such doubt shall exist, and may also file an interpleader in a court of competent jurisdiction. In any such case the Escrow Agent shall not be or become liable in any way to any party for failure or refusal to comply with such conflicting claims, demands or instructions. The Escrow Agent shall be entitled to so refrain from acting until such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction or arbitrator or settled by agreement between the conflicting parties, as evidenced in writing to the Escrow Agent.

8 Term; Termination

8.1 The term of this Escrow Agreement shall commence on the date hereof and shall continue until terminated as set forth below or until the Escrow Assets are released and transferred to any such entities as designated by the Manager (according to Section 6.2 above), as applicable, according to the earlier.

8.2 Either the Manager or the Escrow Agent may terminate this Escrow Agreement, at any time, by giving written notice of such termination to the other Party specifying a date, upon which such termination shall take effect, to be not less than 30 days following the provision of such notices ("**Termination Notice**"). A Termination Notice on behalf of the Escrow Agent may be deemed as a notice of resignation of the Escrow Agent; Promptly after receipt of a Termination Notice, the Beneficiary will appoint a successor escrow agent, such successor escrow agent to receive and hold the Escrow Assets upon the resignation date specified in the resignation notice. If a successor escrow agent is not appointed within 30 days after a Termination Notice has been received by the Manager, the Escrow Agent shall have the right, at its sole discretion, to petition to any court of competent jurisdiction for the appointment of a successor escrow agent

8.3 The provisions of Section 3 and of Sections 5 through 9 (including) shall survive termination or expiration of this Escrow Agreement for any reason whatsoever.

9 Miscellaneous

9.1 Conflict of Interest. Each of the parties hereto acknowledges that Amit, Pollak,

Matalon & Co. ("**APM**") represents Goldan Darch Ltd., which, as set forth in the ISA, has been appointed the Manager, and that Adv. Doron Levy, a partner at APM has been appointed to be the Escrow Agent in connection with this Escrow Agreement. By executing this Escrow Agreement, the Beneficiary hereby waives any argument or claim regarding any actual or potential conflict of interest against Adv. Doron Levy and / or APM which may arise as a result of APM's representation of said persons and entity. All parties further acknowledge that the provisions of this Section 9.1 shall inure to the benefit of APM although it is not a party to this Agreement.

9.2 Governing Law. The provisions of this Escrow Agreement shall be exclusively governed by and interpreted in accordance with the laws of the State of Israel, without regard to its conflict of law principles. Each of the parties hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the competent courts of Tel-Aviv, Israel to the exclusion of any other court, for the purposes of any action or dispute arising out of or in connection with this Escrow Agreement.

9.3 Amendment. No change, modification, alteration or addition of or to any provision of this Escrow Agreement shall be binding unless in writing and executed by or on behalf of the Escrow Agent and the Manager.

9.4 Waiver; Remedies. No failure or delay on the part of any party hereof in exercising any right, power or privilege under this Escrow Agreement will operate as a waiver thereof, nor will any waiver on the part of any party hereof of any right, power or privilege under this Escrow Agreement operate as a waiver of any other right, power or privilege under this Escrow Agreement, nor will any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege under this Escrow Agreement. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies, which the parties may otherwise have at law or in equity.

9.5 Taxes. The Beneficiary shall be responsible for payment of all taxes, duties, compulsory payments, fees and stamp duties arising under applicable law including under the Stamp Tax on Documents Law, 1961 and similar expenses resulting from or relating to this Escrow Agreement and shall promptly pay and dispose all such taxes, duties, compulsory payments, fees and expenses upon the request of the Escrow Agent. Without limitation of the foregoing, in the event that any tax liability is imposed or assessed against the Escrow Agent with respect to the performance of this Escrow Agreement or otherwise with respect to its service as Escrow Agent hereunder, then if requested by the Escrow Agent, such liability shall be paid and disbursed by the Beneficiary, at such time as requested by the Escrow Agent.

9.6 Notices. All notices, and other communications required or permitted to be given under this Escrow Agreement, shall be sent by registered mail, delivered by hand or delivered by electronic means of communications, to the addresses set forth below, and shall be deemed to have been delivered to the other party: *(a)* if given to the Escrow Agent, when actually received by the Escrow Agent; *(b)* if given to the other parties hereto, at the earlier of the following three dates: (i) if sent by registered mail - five (5) business days from the date of mailing; (ii)

if delivered by hand - upon actual delivery or attempted delivery (in the event of a refusal to accept it) at the address of the addressee; (iii) if delivered by facsimile or other electronic means of communication – upon electronic confirmation of receipt of the notice. The addresses of the parties for purposes of this Escrow Agreement shall be the addresses as set forth below, or any other address which shall be provided by due notice:

i.    If to Escrow Agent:
Adv. Doron Levy
C/o. Amit, Pollak, Matalon & Co.
Nitsba Tower, 18th Floor
17 Yitzhak Sadeh Street
Tel Aviv, 6777517
Israel
Facsimile: +972-3-568-9017
E-Mail: doron@apm-law.com

ii.    If to the Manager: [*]

British Virgin Islands
Attention:
E-Mail: _____

iii.    If to any Beneficiary: according to the details provided in the heading of the ISA, or to such other address as a Beneficiary may have furnished to the other Parties by written notice given in accordance with this Section 9.6**Error! Reference source not found.**.

9.7    Entire Document. This Escrow Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements and understandings of the parties of any nature, whether oral or written, relating thereto.

9.8    Severability. If any provision of this Escrow Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions thereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

9.9    Benefit, Binding Effect; Third-party beneficiaries. All statements, representations, warranties, covenants and agreements in this Escrow Agreement shall be binding on the parties hereto and shall inure to the benefit of the respective successors of each party hereto. Unless otherwise explicitly provided herein, nothing in this Escrow Agreement shall be construed to create any rights or obligations except among the parties hereto, and no person or entity shall be regarded as a third-party beneficiary of this Escrow Agreement.

9.10 Preamble. The preamble to this Escrow Agreement constitutes an integral part hereof.

9.11 Headings. Headings are included for reference purposes only and are not to be used in the interpretation or construction of this Escrow Agreement.

9.12 Delays or Omissions. No failure, delay, forbearance or omission of either party in exercising any power, right or remedy accruing to any party shall in any way restrict or diminish such party's rights and powers under this Escrow Agreement, or operate as a waiver of any breach or nonperformance by either party of any terms or conditions hereof. All remedies, under this Escrow Agreement or by law or otherwise afforded to any of the parties, shall be cumulative and not alternative.

9.13 Counterparts. This Escrow Agreement may be executed in any number of counterparts, each of which shall be deemed an original and enforceable against the parties actually executing such counterpart, and all of which together shall constitute one and the same instrument. The original of any copy of this Escrow Agreement executed with an original signature and transmitted via facsimile or other electronic means shall be deemed good and valid execution and delivery of this Agreement.

**9.14** Assignment of rights. This Agreement or any right or interest hereunder may not be assigned in whole or in part by the Escrow Agent or any Party, without the prior consent of the Escrow Agent and each of the other Parties. For avoidance of doubt nothing herein shall derogate from Section 8.

**[SIGNATURE PAGES TO FOLLOW]**

**IN WITNESS WHEREOF**, the parties have executed this Escrow Agreement by their respective, duly authorized signatory as of the Effective Date.

**ADV. DORON LEVY**

Name: _____
Title: _____

**IN WITNESS WHEREOF**, the parties have executed this Escrow Agreement by their respective, duly authorized signatory as of the Effective Date.

**GREAT FEATS LIMITED**

Name: Salamander Management (@)
Title: Director

**IN WITNESS WHEREOF**, the parties have executed this Escrow Agreement by their respective, duly authorized signatory as of the Effective Date.

X _____

Name: _____ eran tadmor _____
Title: _____

EXHIBIT 2.1

## SHAREHOLDER LOAN AGREEMENT

THIS AGREEMENT is dated June 1, 2015 and made between:

(1)     Mr. Eran Tadmor as lender (the "**Lender**") and

(2)     Great Feats Limited as borrower (the "**Borrower**")

WHEREAS     the Borrower wishes for the Lender to grant a loan to the Borrower (as defined below the "**Loan**"), and

WHEREAS     the parties now agree to enter into this Loan Agreement relating to the Loan.

**Now therefore the parties agree as follows:**

1     **Definitions**

All capitalized terms not defined herein shall have the meaning ascribed to them in the Investment Agreement

"**NIS**" shall mean New Israeli Shekel

2     **The Loan**

Subject to the terms of this Agreement, the Lender makes available to the Borrower a loan (the "**Loan**") in an amount of NIS958,320 (Nine Hundred Fifty Eight Thousand Three Hundred and Twenty New Israeli Shekel) (the "**Principal**"). The Loan shall have similar terms to other loans which will be granted under equal conditions by other lenders (the Loan and other loans, hereinafter the "**Loans**").

All bank and transfer costs shall be to the account of the Lender. If the Loan is transferred in any currency other than NIS, then on the drawdown date, the amount of the Loan shall be converted into NIS, calculated according to the Representative Rate known on the drawdown date.

3     **Purpose**

The Borrower shall apply the proceeds of the Loan only for partially financing the purchase of shares in Ambarfeld Limited (the "**Shares**"). The Borrower shall not use the proceeds of the Loan for any other purpose

4     **Drawdown**

Disbursement of the Loan will be made no later than July 15, 2015 (the "**Effective Date**").

The Principal shall be transferred to the Trust Account of the details of which shall be by the Trustee to the Lender shortly after the signing of this Loan Agreement.

5    Interest

Interest shall be charged on the outstanding Loan amount at a basic rate of 15% per annum, compounded annually, and calculated on the basis of the actual days elapsed in a year of 360 days. Interest shall start to accrue as from the Effective Date.

In the event that a senior financing facility is secured for the Project, the interest shall be raised to 18% per annum as from the date such senior facility is drawn down.

6    Payment of Interest

Any accrued interest shall be payable when the Loan is repaid in accordance with Clauses 7 and 8.

7    Repayment

The Loan term shall end on 30 June 2019 (the **"Repayment Date"**). The Borrower may extend the Repayment Date by 12 months by giving the Lender a 30 days' prior written notice.

8    Prepayments

Prepayments are allowed with 5 Business Days prior notice to the Lender. Any Prepayment shall be made to all Loans pari-passu the respectable portion of each of the Loans. Any such prepayment shall include the interest on the Loan accrued but not paid until such prepayment date.

9    Subordinate Loan

The Loans shall further be subordinated to any credit facilities that the Company may obtain from one or more financial institutions (a **"Financing"**), so that any full or partial repayment of the Loans shall only be made subject to the terms of the Financing.

10    Assignment and Transfer

The parties are not entitled to assign or transfer all or any of their rights, benefits and obligations under this Agreement without the prior written consent of the other party. However the Lender may assign its rights in connection with a transfer of Shares allowed under the Investment Agreement.

11    Governing Law

This Agreement shall be governed and construed in accordance with the laws of England

and Wales, without giving effect to its conflicts of laws provisions. All disputes which may arise from this contract or in connection with shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to The London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presented to the Court will be English.

12    **Severability**

Should any provision of this agreement be or become wholly or partially invalid then the remaining provisions shall remain valid. Invalid provisions shall be replaced in accordance with the original economic intention of the parties and the purpose of this agreement

Date: 6/29/16

_____
Lender

_____
Borrower

# SHAREHOLDER LOAN AGREEMENT

THIS AGREEMENT is dated as of December 23, 2015 and made between:

(1) Mr. Eran Tadmor as lender (the "**Lender**"); and
(2) Great Feats Limited as borrower (the "**Borrower**").

WHEREAS the Borrower wishes for the Lender to grant a loan to the Borrower (as defined below the "**Loan**"); and

WHEREAS the parties now agree to enter into this Loan Agreement relating to the Loan.

**Now therefore the parties agree as follows:**

1. **Definitions**

   All capitalized terms not defined herein shall have the meaning ascribed to them in the Investment Agreement between the Lender to the Borrower.

   "**NIS**" shall mean New Israeli Shekel.

2. **The Loan**

   Subject to the terms of this Agreement, the Lender makes available to the Borrower a loan (the "**Loan**") in an amount of NIS742,280 (Seven Hundred Forty Two Thousand two Hundred and Eighty New Israeli Shekel) (the "**Principal**"). The Loan shall have similar terms to other loans which will be granted under equal conditions by other lenders (the Loan and other loans, hereinafter: the "**Loans**").

   All bank and transfer costs shall be to the account of the Lender. If the Loan is transferred in any currency other than NIS, then on the drawdown date, the amount of the Loan shall be converted into NIS, calculated according to the Representative Rate known on the drawdown date.

3. **Purpose**

   The Borrower shall apply the proceeds of the Loan only for partially financing the purchase of shares in Amberfeld Limited (the "**Shares**"). The Borrower shall not use the proceeds of the Loan for any other Purpose.

4. **Drawdown**

   Disbursement of the Loan will be made no later than 23rd December, 2015 (the "**Effective Date**")

   The Principal shall be transferred to the Trust Account of the details of which shall be by the Trustee to the Lender shortly after the signing of this Loan Agreement.



5. **Interest**

   Interest shall be charged on the outstanding Loan amount a basic rate of 15% per annum, compounded annually, and calculated on the basis of actual days elapsed in a year of 360 days. Interest shall start to accrue as from the Effective Date.

   In the event that a senior financing facility is secured for the Project, the Interest shall be raised to 18% per annum as from the date such senior facility is drawn down.

6. **Payment of Interest**

   Any accrued Interest shall be payable when the Loan is repaid in accordance with Clauses 7 and 8.

7. **Repayment**

   The Loan term shall end on June 30, 2019 (the "**Repayment Date**"). The Borrower may extended the Repayment Date by 12 months by giving the Lender a 30 days prior written notice.

8. **Prepayments**

   Prepayments are allowed with 5 business Days prior notice to the Lender. Any Prepayment shall be made to all Loans pari-passu the respectable portion of each Loans. Any such prepayment shall include the interest on the Loan accrued but not paid until such prepayment date.

9. **Subordinate Loan**

   The Loans shall further be subordinated to any credit facilities that the Company may obtain from one or more financial institutions (a "**financing**"), so that any full or partial repayment of the Loans shall only be made subject to the terms of the Financing.

10. **Assignment and Transfer**

    The parties are not entitled to assign or transfer all or any of their rights, benefits and obligations under this Agreement without the prior written consent of the other party. However the Lender may assign its rights in connection with a transfer of Shares allowed under the Investment Agreement.

11. **Governing Law**

    This Agreement shall be governed and construed in accordance with the laws of England and Wales, without giving effect to its conflicts of laws provisions. All disputes which may arise from this contract or in connection whit shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to

settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to the London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presents to the Court will be English

## 12. Severability

Should any provision of this Agreement be or become wholly or partially invalid then the remaining provisions shall remain valid. Invalid provisions shall be replaced in accordance with the original economic intention of the parties and the purpose of this Agreement.

Date: 4/25/15

_____

Lender

_____

Borrower

# SHAREHOLDER LOAN AGREEMENT

THIS AGREEMENT is dated as of March 4th, 2016 and made between:

(1) Mr. Eran Tadmor as lender (the "**Lender**"); and

(2) Great Feats Limited as borrower (the "**Borrower**").

WHEREAS the Borrower wishes for the Lender to grant a loan to the Borrower (as defined below the "**Loan**"); and

WHEREAS the parties now agree to enter into this Loan Agreement relating to the Loan.

Now therefore the parties agree as follows:

1. **Definitions**

   All capitalized terms not defined herein shall have the meaning ascribed to them in the Investment Agreement between the Lender to the Borrower.

   "**NIS**" shall mean New Israeli Shekel.

2. **The Loan**

   Subject to the terms of this Agreement, the Lender makes available to the Borrower a loan (the "**Loan**") in an amount of NIS778,600 (Seven Hundred Seventy Eight Thousand and Six Hundred New Israeli Shekel) (the "**Principal**"). The Loan shall have similar terms to other loans which will be granted under equal conditions by other lenders (the Loan and other loans, hereinafter: the "**Loans**").

   All bank and transfer costs shall be to the account of the Lender. If the Loan is transferred in any currency other than NIS, then on the drawdown date, the amount of the Loan shall be converted into NIS, calculated according to the Representative Rate known on the drawdown date.

3. **Purpose**

   The Borrower shall apply the proceeds of the Loan only for partially financing the purchase of shares in Amberfeld Limited (the "**Shares**"). The Borrower shall not use the proceeds of the Loan for any other Purpose.

4. **Drawdown**

   Disbursement of the Loan will be made no later than 4th March, 2016 (the "**Effective Date**")

   The Principal shall be transferred to the Trust Account of the details of which shall be by the Trustee to the Lender shortly after the signing of this Loan Agreement.



5. **Interest**

   Interest shall be charged on the outstanding Loan amount a basic rate of 15% per annum, compounded annually, and calculated on the basis of actual days elapsed in a year of 360 days. Interest shall start to accrue as from the Effective Date.

   In the event that a senior financing facility is secured for the Project, the Interest shall be raised to 18% per annum as from the date such senior facility is drawn down.

6. **Payment of Interest**

   Any accrued Interest shall be payable when the Loan is repaid in accordance with Clauses 7 and 8.

7. **Repayment**

   The Loan term shall end on June 30, 2019 (the "**Repayment Date**"). The Borrower may extended the Repayment Date by 12 months by giving the Lender a 30 days prior written notice.

8. **Prepayments**

   Prepayments are allowed with 5 business Days prior notice to the Lender. Any Prepayment shall be made to all Loans pari-passu the respectable portion of each Loans. Any such prepayment shall include the interest on the Loan accrued but not paid until such prepayment date.

9. **Subordinate Loan**

   The Loans shall further be subordinated to any credit facilities that the Company may obtain from one or more financial institutions (a "**financing**"), so that any full or partial repayment of the Loans shall only be made subject to the terms of the Financing.

10. **Assignment and Transfer**

    The parties are not entitled to assign or transfer all or any of their rights, benefits and obligations under this Agreement without the prior written consent of the other party. However the Lender may assign its rights in connection with a transfer of Shares allowed under the Investment Agreement.

11. **Governing Law**

    This Agreement shall be governed and construed in accordance with the laws of England and Wales, without giving effect to its conflicts of laws provisions. All disputes which may arise from this contract or in connection whit shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to



settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to the London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presents to the Court will be English

12. **Severability**

Should any provision of this Agreement be or become wholly or partially invalid then the remaining provisions shall remain valid. Invalid provisions shall be replaced in accordance with the original economic intention of the parties and the purpose of this Agreement.

Date: 4/6/16

Lender

Borrower

# SHAREHOLDER LOAN AGREEMENT

THIS AGREEMENT is dated as of June 23rd, 2016 and made between:

(1) Mr. Eran Tadmor as lender (the "**Lender**"); and

(2) Great Feats Limited as borrower (the "**Borrower**").

WHEREAS the Borrower wishes for the Lender to grant a loan to the Borrower (as defined below the "**Loan**"); and

WHEREAS the parties now agree to enter into this Loan Agreement relating to the Loan.

Now therefore the parties agree as follows:

1. **Definitions**

   All capitalized terms not defined herein shall have the meaning ascribed to them in the Investment Agreement between the Lender to the Borrower.

   "**NIS**" shall mean New Israeli Shekel.

2. **The Loan**

   Subject to the terms of this Agreement, the Lender makes available to the Borrower a loan (the "**Loan**") in an amount of NIS764,600 (Seven Hundred, Sixty Four Thousand and Six Hundred New Israeli Shekel) (the "**Principal**"). The Loan shall have similar terms to other loans which will be granted under equal conditions by other lenders (the Loan and other loans, hereinafter: the "**Loans**").

   All bank and transfer costs shall be to the account of the Lender. If the Loan is transferred in any currency other than NIS, then on the drawdown date, the amount of the Loan shall be converted into NIS, calculated according to the Representative Rate known on the drawdown date.

3. **Purpose**

   The Borrower shall apply the proceeds of the Loan only for partially financing the purchase of shares in Amberfeld Limited (the "**Shares**"). The Borrower shall not use the proceeds of the Loan for any other Purpose.

4. **Drawdown**

   Disbursement of the Loan will be made no later than June 23rd, 2016 (the "**Effective Date**")

   The Principal shall be transferred to the Trust Account of the details of which shall be by the Trustee to the Lender shortly after the signing of this Loan Agreement.



5. **Interest**

Interest shall be charged on the outstanding Loan amount a basic rate of 15% per annum, compounded annually, and calculated on the basis of actual days elapsed in a year of 360 days. Interest shall start to accrue as from the Effective Date.

In the event that a senior financing facility is secured for the Project, the Interest shall be raised to 18% per annum as from the date such senior facility is drawn down.

6. **Payment of Interest**

Any accrued Interest shall be payable when the Loan is repaid in accordance with Clauses 7 and 8.

7. **Repayment**

The Loan term shall end on June 30, 2019 (the "**Repayment Date**"). The Borrower may extended the Repayment Date by 12 months by giving the Lender a 30 days prior written notice.

8. **Prepayments**

Prepayments are allowed with 5 business Days prior notice to the Lender. Any Prepayment shall be made to all Loans pari-passu the respectable portion of each Loans. Any such prepayment shall include the interest on the Loan accrued but not paid until such prepayment date.

9. **Subordinate Loan**

The Loans shall further be subordinated to any credit facilities that the Company may obtain from one or more financial institutions (a "**financing**"), so that any full or partial repayment of the Loans shall only be made subject to the terms of the Financing.

10. **Assignment and Transfer**

The parties are not entitled to assign or transfer all or any of their rights, benefits and obligations under this Agreement without the prior written consent of the other party. However the Lender may assign its rights in connection with a transfer of Shares allowed under the Investment Agreement.

11. **Governing Law**

This Agreement shall be governed and construed in accordance with the laws of England and Wales, without giving effect to its conflicts of laws provisions. All disputes which may arise from this contract or in connection whit shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to

settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to the London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presents to the Court will be English

## 12. Severability

Should any provision of this Agreement be or become wholly or partially invalid then the remaining provisions shall remain valid. Invalid provisions shall be replaced in accordance with the original economic intention of the parties and the purpose of this Agreement.

Date: 6/28/6

_____
Lender

_____
Borrower

# SHAREHOLDER LOAN AGREEMENT

THIS AGREEMENT is dated as of September 08, 2016 and made between:

(1) Mr. Eran Tadmor as lender (the **"Lender"**); and
(2) Great Feats Limited as borrower (the **"Borrower"**).

**WHEREAS** the Borrower wishes for the Lender to grant a loan to the Borrower (as defined below the **"Loan"**); and

**WHEREAS** the parties now agree to enter into this Loan Agreement relating to the Loan.

**Now therefore the parties agree as follows:**

1. **Definitions**

   All capitalized terms not defined herein shall have the meaning ascribed to them in the Investment Agreement between the Lender to the Borrower.

   **"NIS"** shall mean New Israeli Shekel.

2. **The Loan**

   Subject to the terms of this Agreement, the Lender makes available to the Borrower a loan (the **"Loan"**) in an amount of NIS562,350 (Five Hundred and Sixty Two Thousand, Three Hundred and Fifty New Israeli Shekels) (the **"Principal"**). The Loan shall have similar terms to other loans which will be granted under equal conditions by other lenders (the Loan and other loans, hereinafter: the **"Loans"**).

   All bank and transfer costs shall be to the account of the Lender. If the Loan is transferred in any currency other than NIS, then on the drawdown date, the amount of the Loan shall be converted into NIS, calculated according to the Representative Rate known on the drawdown date.

3. **Purpose**

   The Borrower shall apply the proceeds of the Loan only for partially financing the purchase of shares in Amberfeld Limited (the **"Shares"**). The Borrower shall not use the proceeds of the Loan for any other Purpose.

4. **Drawdown**

   Disbursement of the Loan will be made no later than September 08, 2016 (the **"Effective Date"**)

   The Principal shall be transferred to the Trust Account of the details of which shall be by the Trustee to the Lender shortly after the signing of this Loan Agreement.



### 5. Interest

Interest shall be charged on the outstanding Loan amount a basic rate of 15% per annum, compounded annually, and calculated on the basis of actual days elapsed in a year of 360 days. Interest shall start to accrue as from the Effective Date.

In the event that a senior financing facility is secured for the Project, the Interest shall be raised to 18% per annum as from the date such senior facility is drawn down.

### 6. Payment of Interest

Any accrued Interest shall be payable when the Loan is repaid in accordance with Clauses 7 and 8.

### 7. Repayment

The Loan term shall end on June 30, 2019 (the "**Repayment Date**"). The Borrower may extended the Repayment Date by 12 months by giving the Lender a 30 days prior written notice.

### 8. Prepayments

Prepayments are allowed with 5 business Days prior notice to the Lender. Any Prepayment shall be made to all Loans pari-passu the respectable portion of each Loans. Any such prepayment shall include the interest on the Loan accrued but not paid until such prepayment date.

### 9. Subordinate Loan

The Loans shall further be subordinated to any credit facilities that the Company may obtain from one or more financial institutions (a "**financing**"), so that any full or partial repayment of the Loans shall only be made subject to the terms of the Financing.

### 10. Assignment and Transfer

The parties are not entitled to assign or transfer all or any of their rights, benefits and obligations under this Agreement without the prior written consent of the other party. However the Lender may assign its rights in connection with a transfer of Shares allowed under the Investment Agreement.

### 11. Governing Law

This Agreement shall be governed and construed in accordance with the laws of England and Wales, without giving effect to its conflicts of laws provisions. All disputes which may arise from this contract or in connection whit shall be settled by negotiations. The Parties shall use their best efforts for a peaceful resolution of the dispute and differences without recourse to arbitrations. In case of failure to



settle dispute out of court, the parties mutually agree to have the right to escalate peacefully unresolved disagreements to the London Court of International Arbitration (LCIA) in London, in accordance with the Regulations of the said court, and without resorting to other legal options. Arbitration outcome shall be final and binding on both parties. The governing language of this contract presents to the Court will be English

## 12. Severability

Should any provision of this Agreement be or become wholly or partially invalid then the remaining provisions shall remain valid. Invalid provisions shall be replaced in accordance with the original economic intention of the parties and the purpose of this Agreement.

Date: _11/27/16_

_____
Lender

_____
Borrower

# Great Feats Ltd.

*BVI Company 1860285*

**FINANCIAL STATEMENTS**

*for the year ended 31st December 2020*

## GREAT FEATS LIMITED
## Balance Sheet

|  | Notes | USD | USD |
|---|---|---|---|
|  |  | 31.12.2020 | 31.12.2019 |
| **ASSETS** |  |  |  |
| **Fixed Assets** |  |  |  |
| **Investment in 540W 21St** | 1 | 32,397,716 | 32,397,716 |
| **Total Fixed Assets** |  | 32,397,716 | 32,397,716 |
| **Current Assets** |  |  |  |
| **Accounts Receivable** | 2 | 866,799 | 773,928 |
| **Current account** | 3 | 117,279 | 99,925 |
| **Cash at bank and in hand** |  | 130,508 | 161,183 |
| **Total Current Assets** |  | 1,114,586 | 1,035,036 |
| **TOTAL ASSETS** |  | 33,512,301 | 33,432,752 |
|  |  |  |  |
| **LIABILITIES AND SHAREHOLDERS FUNDS** |  |  |  |
|  |  |  |  |
| **Capital and Reserves** |  |  |  |
| **Loss Carried Forward** |  | -6,949,199 | -6,243,202 |
| **Share Capital Account** |  | 179,500 | 179,500 |
| **Profit for the Year** |  | -1,017,782 | -705,997 |
| **Shareholders funds (deficit)** |  | -7,787,481 | -6,769,699 |
|  |  |  |  |
| **Long Term Liabilities** |  |  |  |
| **Mezzanine Loan** |  | 10,241,766 | 9,144,434 |
| **Shareholder Loan** |  | 31,058,017 | 31,058,017 |
| **Total Long Term Liabilities** |  | 41,299,782 | 40,202,450 |
|  |  |  |  |
| **TOTAL LIABILITIES AND SHAREHOLDERS FUNDS** |  | 33,512,301 | 33,432,752 |

**GREAT FEATS LIMITED ACCOUNT**

**Profit and Loss account**

| | Notes | USD<br>Jan - Dec 2020 | USD<br>Jan - Dec 2019 |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| **Interest Income** | 2 | 104,862 | 93,048 |
| **Interest from 540W 21St LLC** | 1 | - | 2,675,041 |
| **Total Income** | | 104,862 | 2,768,089 |
| | | | |
| **Expense** | | | |
| **Administration Fee - SML** | | 21,452.19 | 23,922 |
| **Bank Service Charges** | | 3,860 | 3,608 |
| **Interest Expense on Shareholder loan** | | - | 2,466,795 |
| **Interest Expenses on Mezzanine loan** | | 1,097,332 | 979,761 |
| **Total Expense** | | 1,122,644 | 3,474,086 |
| | | | |
| **Net Ordinary Income** | | -1,017,782 | -705,997 |
| | | | |
| **Loss for the Year** | | -1,017,782 | -705,997 |

# Great Feats Ltd.

## Notes to the financial statements

# For the year ended 31st December 2020

**Note 1**

In December 2017 Ambarfeld was liquidated. As a result , the investment in west 21st Street 540 was distributed to Ambarfeld's shareholders i.e.. the company and Icy Face Ltd .

**Note 2**

Loan receivable from Icy Face Ltd. The loan bears 12% annual interest rate.

**Note 3**

This amount is made of expenses paid by Great Feats on behalf of Icy Face.

| **Note 4** | Your investment is split as followed: | |
|---|---|---:|
| | *Principal - Shareholder Loan of USD* | *245,021* |
| | *Equity of USD* | *2,500* |
| | *Principal - Mezzanine Loan of USD* | *-* |
| | *Total* | *247,521* |

**Note 5**

Interest Expense on Shareholder loan is the interest accrued on the shareholder's loan to the year 2019 at 18% until the 30.06.2019

*Your part of the interest accrued (since inception) as of 31.12.2020 is USD*    *164,544*

**Note 6**    Interest Expense on Mezzanine Loan is the interest accrued on the Mezzanine's loan up to 31.12.2020 at 12%

*Your part of the interest accrued (since inception) as of 31.12.2020 is USD*

# 540 West 21 Update

28.2.2021

# Update

- Over the past years, the Manhattan condominium market has deteriorated, exacerbated by external factors such as the new tax law, regulatory uncertainty, local mansion tax and of course Covid-19. All construction and other work was halted. In Q3 2020.

- The bank debt of $50m, senior secured over the land and air rights is now in arrears.

- As of the end of 3rd Quarter the project has delayed payments to consultants, lawyers and contractors due to lack of funds, Those liabilities, estimated at $2-6m, need to be discharged immediately on lender demand and are senior to Mezz, Pref and Gallery.

- Due to work being halted, the gallery could request a repayment from the project. Approximately $28.5m and interest.

- These liabilities could be considered as senior secured ahead of the Mezz and Pref debt.

- The Mezz and Pref debt is $38.5m and interest.

# Update - continued

- In December 2020, the Group commissioned an appraisal report from Cushman and Wakefield to help formulate decisions and next steps

- Land and Condo values have suffered in recent years and Cushman valued the project at $53 – 58m.

- The Company has less than $1m of cash available

- **The bottom line is that the 2020 appraisal implies a significant value shortfall below the Bank and Gallery liabilities which we need to urgently address.**

# Next Steps and Options

- We are working on formulating options to protect the Company

- The Company received several non-binding proposals from external investors, which were lower than the combined liabilities.

- The proposals would also require new capital to be invested by the current stakeholders in order to preserve any value

- We need to immediately agree a solution with the Bank and other liabilities.

- We believe a solution will require c. $27.5m of new capital and will be preparing a notice to current investors

- New capital will be senior to all prior investment above the property and Gallery level

- Please consider your willingness to participate in this new capital.

# DISCLAIMER

This presentation was prepared by 540 west 21 street Holdings LLC (the "Company") with respect to the project known as 540 W. 21st St., New York, NY (the "Project"). The information included is believed by the Company to be reliable and has been obtained from sources believed to be reliable. The Company makes no representation as to the accuracy or completeness of the information. Opinions, estimates and projections in this presentation (including certain forward-looking statements and economic and market information) constitute the current judgment of the Company and are subject to change without notice. Any projections, forecasts and estimates contained in this presentation are necessarily speculative in nature and are based upon certain assumptions. It can be expected that some or all of such assumptions will not materialize or will vary significantly from actual results. Accordingly, any projections are only estimates and actual results may differ vary substantially from the projections or estimates shown. The Company has no obligation to update, modify or amend this presentation or to otherwise notify a reader thereof in the event that any matter stated herein, or any opinion, projection, forecast, or estimate set forth herein, changes or subsequently becomes inaccurate.

The Project will be subject to risks incident to the ownership of real estate, including: changes in general economic or local conditions; changes in the market that reduce the attractiveness of the Project to potential buyers; operating expenses; changes in supply or demand of competing properties; changes in interest rates, zoning and other governmental regulations and availability of financing that may render the ultimate sale of the Project difficult or unattractive; increases in maintenance, insurance and other operating costs, including real estate taxes; inflation and changes in tax laws and rates. Therefore, there can be no assurance that the Company will achieve its investment objectives with respect to the Project and each prospective investor should independently evaluate the risks associated with an investment in the Project. There is the possibility of loss, and all investment involves risk including the loss of all invested capital. Securities of the Company relating to the Project are not registered with any regulatory authority, are offered pursuant to exemptions from such registration, and are subject to significant restrictions.

This presentation is strictly confidential and may not be reproduced or redistributed in whole or in part nor may its contents be disclosed to any other person without the express consent of the Company.



APM & CO
Established 1956

apm@apm-law.com
www.apm-law.com
Office. 972-3-5689091
Fax. 972-3-5689092
APM House, 18 Raoul Wallenberg
St, Building D, 6th Floor, Ramat
Hachayal,Tel Aviv 6971915, Israel

| | | | | |
|---|---|---|---|---|
| Aharon Pollak | Tal Sheratzki-Jaffa* | Yahel Porat | Inbar Friedman | Niran Dor |
| Moshe Matalon | Ravit Arbel | Raya Vilenski | Shiran Geva | Chen Lustig |
| Arie Neiger * | Michael Yavin | Eitan Leder | Tali Berkovski | Joseph Sabag |
| Doron Levy | Efraim Levy | Jonathan Tessone | Gal Omer | Harel Afargan |
| Eldad Koresh | Na'ama Babish | Avishai Sahar | Shira Danziger | Ariella Magid |
| Yonatan Altman | Ruth Amit-Fogel | Yair Avraham | Reut Avraham | Avital Shukrun |
| Daniel Marcus | Omri Hephner | Gil Ben Moshe | Yoav Sherman | Gilad Gosher |
| Ian Rostowsky | Danny Nadri | Roi Gross | Shiran Gross | Shlomi Ardan |
| Anat Sterenlib-Molkho | Efrat Halmi | Reut Tzumie | Tal Ben Moshe | Yinon Himi |
| Shlomo Landress* | Ravit Dinmez | Dana Mechanian | Inbar Roth-Tvizer | Tal Alon |
| Asaf Biger | Shalom Simon** | Ephraim Ofek Aharon | Oleg Omeli | Rotem Golan |
| Ofra Cohen | Dana Sagive | Roy Niron | Eliad Farjoon | |
| Maya Issacharov * | Itai Nachtomy | Liron Usherovich | Noam Waldoks | |
| Erez Haver | Ranit Kessous-Katz | Mor Gazit | Shir Cohen Israel | |
| Aya Reich Mina | Moran Mordechay | Tal Sasson | Shirie Lilienthal | |
| Racheli Guz-Lavi (CPA) | Amir Fish | Shani Ashkenasi | Avital Yosipov | |
| Ayelet Torem | Yifat Weiss | Yoav Lande | Eitan Mor | |
| Yoav Etzyon* | Limor Segman | Efrat Spizaizen | Hila Blumberg | Nahum Amit |
| Rachel Harari-Lifshits | Shalev Brants | Tal Raveh | Omri Limor | [1923-2007] |
| Amichay Finkelstein | Reut Gan | Hadas Granit | Maya Rechnitz | Etty Avni-Borowits |
| Benjamin Grossman | Assaf Oren | Elinor Polak | Dana Shwartz | [1945-2005] |
| Stephen Barak Rozen | Shir Kodner | Amy Sapan* | Shira Burshtein | * Also a member of |
| Omer Bekerman* | Shikma Aboud Brandeis | Omer Ben Matityahu | Tal Tsarfaty | the New-York Bar |
| | | | Lihi Gudes | ** Notary |

April 30, 2017

## Re: Important Notice

**Dear Investor:**

Reference is made to that certain letter sent to you by the undersigned, on behalf of Great Feats Limited, on April 9, 2017 (the "**Previous Letter**").

On behalf of Great Feats Limited (the "**Company**"), as one of the owners of Ambarfeld Limited ("**Ambarfeld**"), I hereby provide you with the following important notice for your immediate attention. The information disclosed below is provided to you in your capacity as an equity holder and/or a lender of the Company. You are hereby requested to treat the information below as strictly confidential and not to make any use of it without the Company's prior written consent.

1. **Capital Call**

    a. As mentioned in the Previous Letter, Ambarfeld has received a funding call notice (the "**Funding Call Notice**") from the Managing Member, according to which the Project is in need of an additional amount of USD40,000,000 (the "**Funding Amount**"), which shall be invested in a new limited liability company (the "**New JV**").



AMIT, POLLAK, MATALON

b.  The New JV is expected to invest the Funding Amount in a subsidiary of 540 West 21st Street LLC (the "**JV**") against an issuance of 30.45% (the "**Issuance**") in accordance with a pre-money valuation of USD91,362,900 for the Project (the "**Pre-Money Valuation**").

c.  In order to try an avoid a dilution of Ambarfeld in accordance with the Pre-Money Valuation, the representatives of Ambarfeld have located a potential buyer, to which they intend to sell (subject to a successful negotiation), approximately 5% of the holdings of Ambarfeld in the JV (the "**Expected Sale**") for a price of reflecting a valuation of USD102,000,000 for the Project (the "**Expected Consideration**").

d.  The Expected Consideration shall be used to finance Ambarfeld's portion in the Funding Amount.

e.  Any Investor who wish to object the Expected Sale may do so by contacting the board of directors of the Company through the undersigned.

f.  Any Investor who is interested in obtaining his current indirect holding percentage in the Project by participation in the Funding Amount, according to a Project valuation of USD102,000,000, may contact the undersigned immediately, in order to do so.

Sincerely yours,

Omer Ben Matityahu, Adv.
Amit, Pollak, Matalon & Co.

2

February 7, 2019

Re:     Additional Funds

Ladies and Gentlemen:

Reference is made to: (i) that certain Limited Liability Company Agreement of 540 West 21st Street LLC ("540 W. 21st LLC"), dated as of January 30, 2014, by and among the Managing Member and the Investor Members set forth therein (as the same may be amended, restated, supplemented and/or otherwise modified, the "540 W. 21st LLC Agreement"), and (ii) that certain Limited Liability Company Agreement of 540 West 21st Investment II LLC ("Investment II" and, together with 540 W. 21st LLC, the "Companies"), dated as of May 4, 2017, by and among the Managing Member and the Investor Members set forth therein (as the same may be amended, restated, supplemented and/or otherwise modified, the "Investment II LLC Agreement" and, together with the 540 W. 21st LLC Agreement, the "LLC Agreements").  Capitalized terms used but not defined herein shall have the meanings assigned to them in the LLC Agreements.

Further to the letter sent to the investment members of 540 W. 21st LLC on or about March 31, 2017, and the letter sent to all members November 25, 2018. Managing Member is currently in the process of obtaining a construction loan (the "Construction Loan") to 540 West 21st Street Holdings LLC ("Borrower") from Goldman Sachs Bank and Criterion Real Estate Capital (collectively, "Lender") to fund the Project.  As part of the Construction Loan,  an aggregate amount of $22,000,000 in additional funds would be required for development costs and expenses associated with the Project.  Such funds do not include any funds necessary as liquidity requirement for a construction loan guarantee, which the Managing member is negotiating now with third parties.

The additional investment will be structured as an unsecured loan by the Investor Members providing additional funds towards the Project (each such Investor Member, a "Funding Member") to 540 W 21st Development LLC ("Development"), a subsidiary of the Companies.  The loan will be evidenced by a promissory note in the form attached hereto as Exhibit A accruing interest at a rate of 15% per annum (the "Note").  Each Funding Member shall have the right, upon written notice to Managing Member (the "Purchase Right Notice") made within six (6) months after units at the Project are offered for sale pursuant to an offering plan filed with the New York State Department of Law, to apply the outstanding principal and interest on the Note into a condominium unit at the Project (a "Unit"), provided that within seven (7) days after such Purchase Right Notice has been received by the Managing Member, such electing Funding Member or its affiliate executes a purchase agreement, option agreement or other document required by such offering plan to purchase a condominium unit, and pays such contract deposit, option premium or such other payment as required by the offering plan.  The selection of the Unit shall be on a first come basis.  The purchase price for the Unit shall equal the offering plan price of such residential unit, with a discount of the greater of (x) fifteen percent (15%) or (y) the discount offered to any other Funding Member.

THE RIGHT TO ACQUIRE A CONDOMINIUM UNIT UPON THE FILING OF AN OFFERING PLAN FOR THE CONDOMINIUM TO BE ESTABLISHED AT THE PROJECT IS NOT AT THE PRESENT TIME AN OFFERING OF A COOPERATIVE INTEREST IN REALTY.  NO SUCH OFFER WILL BE MADE UNTIL A FILING OF AN OFFERING PLAN

WITH THE NEW YORK STATE DEPARTMENT OF LAW. INVESTOR MEMBER MAY CHOOSE NOT TO EXERCISE SAID RIGHT WITHOUT PENALTY OR ADDITIONAL EXPENSE.

All current Investment Members of the Companies will be given the opportunity to participate and invest additional funds at this time, on a pro rata basis in accordance with such Members' investment in the respective Companies. If a Member chooses not to participate, the Managing Member may, at its discretion, offer the other Members or new investors the right to cover such shortfall.

The Managing Member is currently negotiating with third parties the funding of such additional funds necessary to meet the obligations, costs and expenses of the project.

Please let the Managing Member know, **no later than Friday, February 15, 2018** (the "Funding Date") whether you plan to participate in this new investment. On or prior to the Funding Date, please wire funds for this new investment to the account set forth below. Upon confirmation and proof of wire, Development will provide an executed Note to such Funding Member. Failure to wire funds by the Funding Date will be deemed to be a decision by the investor to not participate in the new investment. The Managing Member reserves the right to close on (and make use of) any funds received on or before the Funding Date.

<u>Wire Instructions</u>:



If you have any questions or would like to discuss, please contact the Managing Member.

[Signature pages follow]

Very truly yours,

**CASCO DEVELOPMENT CORP.**


By: _____
      Name:   Noam Teltch
      Title:    Vice President